Whitney E. Street (CA Bar No. 223870)
**BLOCK & LEVITON LLP**
100 Pine Street, Suite 1250
San Francisco, CA 94111
Tel.: (415) 968-1852
Fax: (617) 507-6020
whitney@blockleviton.com

Jacob A. Walker (CA Bar No. 271217)
**BLOCK & LEVITON LLP**
260 Franklin St., Suite 1860
Boston, MA 02110
Tel.: (617) 398-5600
Fax: (617) 507-6020
jake@blockleviton.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TATIANA PAVLOVA-COLEMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SPLUNK INC., DOUGLAS MERRITT, and JASON CHILD,<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Tatiana Pavlova-Coleman, ("Plaintiff"), by and through her attorneys, alleges upon personal knowledge as to her own acts, and upon information and belief as to all other matters, based upon the investigation conducted by and through her attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), news reports, press releases issued by Defendants, and other publicly available documents, as follows:

## NATURE AND SUMMARY OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Splunk Inc. ("Splunk" or the "Company") common stock between October 21, 2020 and December 2, 2020, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2. According to its most recent Annual Report filed on Form 10-K with the U.S. Securities and Exchange Commission (the "SEC"), Splunk "provides innovative software solutions that ingest data from different sources including systems, devices and interactions, and turn that data into meaningful business insights across the organization." Splunk states that its "Data-to-Everything platform enables users to investigate, monitor, analyze and act on data regardless of format or source." Splunk common stock trades on the NASDAQ stock exchange under the ticker symbol "SPLK." The Company is headquartered in San Francisco, CA.

3. On October 21, 2020, just ten days before the close of Splunk's 2021 third fiscal quarter, Splunk held a call with several analysts at the Virtual Analyst & Investor Session at .conf.20. On this call, and as detailed more completely herein, Splunk assured investors that everything was on track for its third quarter 2021 financial results.

4. Throughout the Class Period and in violation of the Exchange Act, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts to investors. Specifically, Defendants misrepresented and/or failed to disclose to investors that: (1) Splunk was not closing deals with its largest customers in the third fiscal quarter of 2021; (2) Splunk was not hitting the financial targets it had previously announced; and (3) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

2

5.      After the markets closed on December 2, 2020, Splunk announced its financial results for its third fiscal quarter for 2021, ended October 31, 2020.[1] In this announcement, Splunk reported total revenues of $559 million, down 11% year-over-year and which missed estimates by nearly $60 million. Furthermore, Splunk announced quarterly non-GAAP earnings per share of -$0.07, missing estimates by 15 cents, as well as GAAP earnings per share of -$1.26, missing by 24 cents per share. Splunk also announced guidance for the fourth quarter of 2021 (ending January 31, 2021) of total revenues between $650 and $700 million, and non-GAAP operating margins of between negative 4% and positive 3%.

6.      The Company also held an earnings call with analysts on December 2, 2020. On that call, Defendant Merritt admitted that despite the Company having reiterated their 2021 third quarter guidance just ten days before the close of the quarter, that these results fell "certainly short of both our expectations and our communication of those expectations."

7.      This development stunned the market, leading analyst JPMorgan to write that it was "blindsided by the magnitude of too many large deals slipping in the final days of October." On this news, shares of Splunk common stock plummeted, closing at just $158.03 per share on December 3, 2020, down over 23% from the December 2, 2020 closing price of $205.91 per share.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

9.      The federal law claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

---

[1] https://www.sec.gov/Archives/edgar/data/1353283/000135328320000035/a10312020ex-991.htm.

3

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, § 27 of the Exchange Act, 15 U.S.C. § 78aa.

11. This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

12. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

13. In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## INTRADISTRICT ASSIGNMENT

14. Pursuant to Local Rule 3-2(c), this is a securities fraud class action to be assigned on a district-wide basis. Defendant Splunk Inc. is headquartered in San Francisco, CA, which is within the San Francisco/Oakland Division.

## PARTIES

15. Plaintiff Tatiana Pavlova-Coleman, as set forth in her Certification filed contemporaneously herewith, acquired shares of Splunk common stock at artificially inflated prices, and has been damaged.

16. Defendant Splunk Inc. is incorporated under the laws of the State of Delaware, with its principal place of business at 270 Brannan Street, San Francisco, CA 94017. Its common stock trades on the NASDAQ stock exchange under the symbol SPLK.

17. Defendant Douglas Merritt has been Splunk's President, Chief Executive Officer, and a member of the Company's Board of Directors since 2015.

18. Defendant Jason Child has been Splunk's Senior Vice President and Chief Financial Officer since May 2019.

19. Defendants Merritt and Child are named as Defendants for violations of all counts asserted herein, and are referred to as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and the investing public, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material, non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants are therefore liable for the misstatements and omissions plead herein.

**SUBSTANTIVE ALLEGATIONS**

20. According to its most recent Annual Report filed on Form 10-K with the SEC, Splunk "provides innovative software solutions that ingest data from different sources including systems, devices and interactions, and turn that data into meaningful business insights across the organization." Splunk states that its "Data-to-Everything platform enables users to investigate, monitor, analyze and act on data regardless of format or source."

21. Splunk was incorporated in California in October 2003, and reincorporated in Delaware in May 2006. The Company is headquartered in San Francisco, CA.

22. On August 26, 2020, Splunk issued a press release on Form 8-K with the SEC in which it announced its financial results for the second fiscal quarter of 2021.[2] In this press release, Splunk announced guidance for the fiscal third quarter of 2021 (ending October 31, 2020), that "[t]otal revenues are expected to be between $600 million and $630 million," and that "[n]on-GAAP operating margin is expected to be between 2% and 5%."

23. On September 24, 2020, Splunk announced that Susan St. Ledger, the Company's former President, Worldwide Field Operations (*i.e.*, the head of sales), left Splunk.[3]

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND/OR OMISSIONS**

24. The Class Period begins on October 21, 2020, when just ten days before the close of Splunk's 2021 third fiscal quarter, Splunk held a call with several analysts at the Virtual Analyst & Investor Session at .conf.20. On this call, Splunk assured investors that everything was on track for the close of the third quarter.

25. Defendant Merritt stated:

[B]y the end of this year, we'll have reached our fiscal '23 goal, nearly 2 years early. And our customers are increasingly committing to bigger deals, as you can see in the tally of customers with ARR over $1 million.

***

Given the importance of ARR and using that as a prime comparison, Splunk is growing faster, actually much faster than the household name cloud software players when they're at our stage. At the end of Q2 with our ARR, just short of $2 billion, Splunk grew at 50% year-over-year. And as I said earlier, that was our seventh quarter of at least 50% growth. That means this block is growing faster than ServiceNow at $2 billion, faster than Salesforce at $2 billion and faster than Workday at $2 billion.

26. On this October 21, 2020 call, Defendant Child stated:

Our transformation has made our financials complicated, and I'm excited to bring some clarity to you today and make the most recent progress on our financials

---

[2] https://www.sec.gov/Archives/edgar/data/1353283/000135328320000028/a7312020ex-991.htm
[3] https://www.sec.gov/Archives/edgar/data/1353283/000110465920108306/tm2031700d1_ex99-1.htm

6

clearer. And most importantly, to make clear why we are so excited about both our near-term and long-term future growth prospects and our ability to generate meaningful cash flow from operations.

27. Defendant Child added:

Moving on to ARR. I first want to take a moment to dig a little deeper into our ARR numbers published up until this point and shine a light on some of the components of ARR. We dug into the numbers to determine 2 things that I think might be helpful for you.

First, we quantified the tailwind to ARR attributable to our shift away from perpetual and renewable software. Perpetual contracts, which fell to only 1% of software bookings by the end of FY '20, only generated ARR from their maintenance streams, whereas term and cloud contract value is fully counted in ARR.

As we've been asked many times, how much of an impact the shift away from perpetual has had on our ARR numbers, we decided to quantify this for you today. No more mystery, it's all laid out here for you.

Second, we quantified the tailwind impact from the acquisition of SignalFx. This one shouldn't be a surprise. We told you in Q3 of last year that SignalFx had a 300 basis point tailwind to total ARR. However, any benefit received from SignalFx completely disappears beginning this quarter as we lapped the date of the acquisition.

And here's the critical takeaway. By the end of Q4, we estimate that the tailwind from the shift from perpetual falls to less than 1%. So looking forward, we are reiterating our 40% compounded annual growth rate target for ARR from FY '20 through '23. It should be clear now why we remained confident in these targets given growth tailwinds that I described earlier.

28. Defendant Child also discussed as the first of the "4 biggest drivers of growth" for the Company "the significant and growing customer renewal base." He continued: "[s]o yes, we're still sticking to the $1 billion cash flow target for '23. My hope is that the slide would kind of provide a little more context and hopefully help you understand why we feel good about that. . . . So yes, we're definitely sticking to that target."

29. Defendant Child further stated that: "[f]or our larger customers, we're adding particular value across the expanded data volumes and infrastructures. And as you can see, we've

7

been successful with growing those relationships and offering new areas of value over time." He continued:

> Let's now move on to the cloud and why our shift to being cloud-first reinforces our confidence in hitting our growth targets. First, we want to level set for you what our renewal base looks like over the next couple of years. As we shifted away from selling perpetual software licenses and ramped up our renewable mix to reach 99% of all software bookings by Q4 of last year, we've created an accelerated renewal base that you can see ramps up sharply over the next 3 years.
>
> Through the end of FY '20, our term and cloud contracts had an average duration of approximately 3 years. So as we anniversary the contract renewal date for this renewable software base, you can see how much contract value on an ARR basis is up for renewal in any given year. This is what fuels our confidence in our long-term growth. Every one of these contracts up for renewal is an opportunity for us to grow.

30. The statements in ¶¶ 25-29 were materially false and misleading and omitted to disclose material information. Specifically, Defendants misrepresented and/or failed to disclose to investors that: (1) Splunk was not closing deals with its largest customers in the third fiscal quarter of 2021; (2) Splunk was not hitting the financial targets it had previously announced; and (3) as a result of the foregoing, Defendants' public statements were materially false and misleading at all relevant times.

31. Defendants knew, or in reckless disregard for the truth should have known, that at the time the statements in ¶¶ 25-29 were made, they were false and/or misleading, and/or failed to disclose material information to investors.

**THE TRUTH EMERGES**

32. After the markets closed on December 2, 2020, Splunk announced its financial results for its third fiscal quarter for 2021, ended October 31, 2020. In this announcement, Splunk reported total revenues of $559 million, down 11% year-over-year and which missed estimates by nearly $60 million. Furthermore, Splunk announced quarterly non-GAAP earnings per share of -$0.07, missing estimates by 15 cents, as well as GAAP earnings per share of -$1.26, missing by 24 cents per share. Splunk also announced guidance for the fourth quarter of 2021

8

(ending January 31, 2021) of total revenues between $650 and $700 million, and non-GAAP operating margins of between negative 4% and positive 3%.

33. The Company also held an earnings call with analysts on December 2, 2020. On that call, Defendant Merritt stated that during the quarter, "we saw a much lower-than-normal close rate among our largest deals, which caused us to fall short of our bookings target. Overall, our third quarter did not meet our expectations." Defendant Child echoed this comment, stating that "closing rates for several large transactions slowed significantly in the final weeks of the quarter, resulting in total bookings coming in below plan . . . ."

34. With the first question, an analyst from Barclays Bank PLC asked:

> Can you just talk a little bit about the deal slippage at the end of the quarter? Like obviously you had your Head of Sales leave. How much of this is execution-related and disruption coming from the changes on the internal side versus the market? And what's [sic] kind of confidence gives you that some of this is coming back in Q4? Because it looks like not many other vendors in the space have really talked about that.

35. Defendant Merritt responded:

> [W]hen we saw at the end of Q2 just compounded in Q3, which is deals that the exec team at the customer and our own team thought were going through that in the final hours or days of routing for approval got stopped by an extraneous group, the CEO or Board of Directors or CFO. As a context, when we go back and look quarter-over-quarter, the top 10 deals that were – that we went into a quarter with, we tend to close 7, 8 or 9 of those top 10 deals. This quarter we wound up closing 3.

36. An analyst from Morgan Stanley asked:

> I know a lot of investors are going to go to sales execution. You had a change in leadership. Can you help us understand like sort of where the confidence that you have that this isn't an execution issue, this doesn't have to do with the change of leadership, that this was more of a market event than a Splunk event if you will?

37. Defendant Merritt responded:

> So what we had said when Susan announced her transition was she had strong -- 3 strong leaders. Christian Smith had been leading global sales for the past 2-plus years. Carrie, obviously, as our continuing CMO and John Sabino as our continuing Chief Customer Officer. So from the day in, day out management and

everything from pipeline build, overall process flow, customer engagement, it's the same team underneath Susan that's still driving those activities.

My -- just in looking at the progression of this quarter, there was -- the unusual component was the number of our largest deals that, by the way, are still in play. They got pushed into Q4. That just has never happened before. And so I just -- I've been looking -- scrutinizing this in every way possible with the finance team, the sales ops team, the sales field leaders, myself, that the concerns that we had in Q2, that there was is some really aberrant buying behavior happening as -- again, large transactions got scrutiny that in the past 7 years or really the past probably 30 years of enterprise software, but the past 37 years here, I've never seen yet that level of scrutiny is the one common thread across a quarter that still delivered 44% ARR growth and 80% cloud revenue growth. So it's still, on a contextual basis, is an impressive growth quarter, but certainly short of both our expectations and our communication of those expectations.

38.  The Barclays Bank PLC analyst also asked about "duration and that customers didn't commit to kind of more bigger engagement, longer-term engagement. I'm just looking at your duration, like kind of how do I marry that up? Because that doesn't show anything. That looks all pretty normal there. Like help me understand that, please." Defendant Child responded:

Yes. Well, so duration is down because last year, we had an unusually high duration because of an exceptionally strong public sector quarter and specifically, even with a number of beyond 3-year deals, and so we didn't see that dynamic this year. So yes, sequentially, duration looks relatively consistent year-on-year. It's definitely a bigger headwind. It was down 22% or something like that year-on-year. But yes -- so I think overall, I would expect duration probably continues to look like it has all year going forward.

39.  An analyst from Jefferies LLC then asked:

Doug [Merritt], back October 21, you guys spoke to all of us and had pretty strong conviction, reiterated all the numbers. And I guess that would leave us to assume that, obviously, the sell part pretty hard at the back half and that these deals were effectively probably late stage, meaning that this was not a competitive loss scenario, this was more of a timing scenario. So I just want to confirm post that Analyst Day on the 21st that that's really where you saw this fall apart? And secondarily, that you don't believe that this was lost to competitors?

40.  Defendant Merritt responded that only one deal was lost to competitors and said that he had "never seen an approved deal within an approved budget envelope sponsored that [was] sponsored by a C-level executive get stalled by an outside party." He continued that "[w]e obviously felt confident going into .conf in the Analyst Day on the team's ability to perform this

10

quarter and then had some very, very unusual and unexpected activity occur, at least from our vantage point."

41. Defendant Merritt added that he did think "one or two" of those deals closed in the beginning of Q4, but expressed uncertainty: "I should have looked at that coming in."

42. These developments stunned the market, leading analyst JPMorgan to write that it was "blindsided by the magnitude of too many large deals slipping in the final days of October on the heels of an upbeat analyst day 10 days prior to the quarter close, at which the company reaffirmed guidance and stated that it was excited about near-term and long-term growth prospects,"[4] and that it could not explain the slip. JPMorgan and numerous other analysts immediately downgraded their ratings for Splunk stock, and slashed their target prices.

43. On this news, shares of Splunk common stock plummeted, closing at just $158.03 per share on December 3, 2020, down over 23% from the December 2, 2020 closing price of $205.91 per share.

44. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Splunk's common stock, Plaintiff and other members of the Class have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

45. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Splunk common stock between October 21, 2020 and December 2, 2020, inclusive, seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-

---

[4] https://www.thestreet.com/investing/splunk-drops-after-q3-report-what-wall-street-is-saying.

5. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

46. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

47. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a. Whether the Exchange Act was violated by Defendants;

    b. Whether Defendants omitted and/or misrepresented material facts;

    c. Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

    d. Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

    e. Whether the price of the Company's stock was artificially inflated; and

    f. The extent of damage sustained by Class members and the appropriate measure of damages.

48. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

49. Plaintiff will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

50. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FRAUD ON THE MARKET

51. Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

   a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

   b. The omissions and misrepresentations were material;

   c. The Company's common stock traded in efficient markets;

   d. The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

   e. Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts.

52. At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

53. The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

54. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## SCIENTER ALLEGATIONS

55. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Splunk, their control over, and/or receipt and/or modification of Splunk's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Splunk, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION

56. After the markets closed on December 2, 2020, Splunk announced its financial results for its third fiscal quarter for 2021, ended October 31, 2020. In this announcement, Splunk reported that it missed its projections for the third fiscal quarter of 2021. The Company also held an earnings call with analysts on the evening of December 2, 2020. On that call, Defendants stated that Splunk failed to close numerous large deals.

57. These developments stunned the market, leading analyst JPMorgan to write that it was "blindsided by the magnitude of too many large deals slipping in the final days of October," and that it could not explain the slip. On this news, shares of Splunk common stock plummeted, closing at just $158.03 per share on December 3, 2020, down over 23% from the December 2, 2020 closing price of $205.91 per share.

# CAUSES OF ACTION

## COUNT ONE
### Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

58. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

59. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose the material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

60. Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

61. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT TWO
### Violations of § 20(a) of the Exchange Act
### (Against the Individual Defendants)

62. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

63. The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

15

positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents described above which contained statements alleged by Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

a) determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

b) awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post- judgment interest thereon.

c) awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

d) awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

1 | Dated: December 4, 2020

Respectfully submitted,

By: */s/ Jacob A. Walker*
Jacob A. Walker (CA Bar No. 271217)
**BLOCK & LEVITON LLP**
260 Franklin St., Suite 1860
Boston, MA 02110
Tel.: (617) 398-5600
Fax: (617) 507-6020
jake@blockleviton.com

Whitney E. Street (CA Bar No. 223870)
**BLOCK & LEVITON LLP**
100 Pine Street, Suite 1250
San Francisco, CA 94111
Tel.: (415) 968-1852
Fax: (617) 507-6020
whitney@blockleviton.com

*Counsel for Plaintiff*