1

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

2

Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com

3

Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com

4

2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067

5

Tel: (310) 819-3470

6

*Counsel for Lead Plaintiff and
Lead Counsel for the Class*

7

8

[Additional Counsel Appear on Signature Page]

9

### UNITED STATES DISTRICT COURT

10

### NORTHERN DISTRICT OF CALIFORNIA

11

### OAKLAND DIVISION

12

13

IN RE SPLUNK INC. SECURITIES
LITIGATION

Master File No. 4:20-cv-08600-JST

14

**CONSOLIDATED CLASS
ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL
SECURITIES LAWS**

15

16

17

DEMAND FOR JURY TRIAL
CLASS ACTION

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ....................................................................................1

II.    JURISDICTION AND VENUE ..............................................................5

III.   INTRADISTRICT ASSIGNMENT........................................................5

IV.    PARTIES ................................................................................................6

V.     SUMMARY OF THE FRAUD ...............................................................7

    A.     Background ..................................................................................7

    B.     Splunk Assures Investors of Its Continuous Investments in Its Critical Marketing Efforts.................................................................................13

    C.     Splunk Assures Investors that It Continues to Hire Sales Personnel....................16

    D.     Splunk's Assurances Enable the Company to Complete Another $1.265 Billion Offering and Its Executives to Secure Shareholder Support for Millions of  Dollars in Incentive Payments .........................................19

    E.     Untold to Investors at the Time, Splunk Suspended Marketing Investments and Froze Hiring Throughout the Class Period ........................21

        1.     Splunk Suspended Its Investments in Marketing........................22

        2.     Splunk Froze Hiring Throughout the Class Period....................25

        3.     Splunk Conducted Layoffs During the Class Period ................28

VI.    THE TRUTH EMERGES ......................................................................30

VII.   DEFENDANTS' FALSE AND MATERIALLY MISLEADING STATEMENTS AND OMISSIONS ..................................................................................34

    A.     Defendants' Class Period Annual and Quarterly SEC Filings .............................35

    B.     Splunk's May 21, 2020 First Quarter Earnings Call ............................................36

    C.     June 8, 2020 Silicon Valley Business Journal ......................................................38

    D.     September 14, 2020 Jefferies Virtual Software Conference...................................39

VIII.  ADDITIONAL SCIENTER ALLEGATIONS................................................40

IX.    LOSS CAUSATION..............................................................................44

X.     THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR............................48

XI.    THE PRESUMPTION OF RELIANCE ........................................................49

XII.   CLASS ACTION ALLEGATIONS ............................................................. 51

COUNT I ............................................................................................. 52

For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against
All Defendants) ....................................................................... 52

COUNT II ............................................................................................ 54

For Violations of Section 20(a) of the Exchange Act (Against Defendants Merritt and
Child) ...................................................................................... 54

XIV.   PRAYER FOR RELIEF ...................................................................... 55

XV.   JURY DEMAND ................................................................................ 56

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

Court-appointed Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Lead Plaintiff"), by and through its undersigned counsel, brings this action individually and on behalf of all persons who purchased the common stock of Splunk Inc. ("Splunk" or the "Company") between March 26, 2020 and December 2, 2020, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Lead Plaintiff's information and belief are based on, among other things, the independent investigation of its undersigned counsel. This investigation included, among other things, a review and analysis of: (i) Splunk's public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of investor conference calls; (iv) publicly available presentations by Splunk; (v) press releases and media reports; (vi) securities pricing data; (vii) interviews of former Splunk employees; and (viii) other material and data identified herein. Lead Counsel's investigation into the factual allegations is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control.

# I.   **INTRODUCTION**

1.      Splunk has operated at a net loss every year since its inception and, by the beginning of the Class Period, had negative operating cash flows. Splunk's CEO, Defendant Merritt, assured investors that the Company would soon turn the corner, reaching positive operational cash flow by 2022 and achieving over a billion dollars in positive operational cash flow by 2023. Splunk told investors that it would accomplish these milestones through continuous investments in marketing and the continuous hiring of additional sales personnel. Splunk identified these operational investments as the keys to unlock the revenue growth necessary to reach positive operational cash flow. Defendants also allayed investor concern with further assurances that they would not attempt to achieve these critical milestones through a shortcut: by suspending marketing investments and freezing hiring. Such expense reductions—while they would temporarily alleviate cash outflows and make Splunk appear to be heading toward being cash-flow positive sooner—risked negatively impacting Splunk's future sales and performance.

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

2.      To build investor confidence, in each of their quarterly and annual filings with the SEC, Defendants told investors that they were continuously investing in marketing. They stated that "we continue to … invest in marketing programs" and "we intend to continue to make directed and substantial investments to expand our … marketing." They stressed the importance of these non-stop investments, explaining in their filings with the SEC that "maintaining and enhancing the 'Splunk' brand identity" is "critical" to retain current customers and attract new ones and "[t]he successful promotion of our brand will depend largely upon our marketing efforts."

3.      Defendants also told investors in Splunk's SEC filings and elsewhere that they were continuously hiring additional sales professionals. In their SEC filings during the Class Period, they stated that "we continue to hire additional personnel" and "[w]e expect to continue to expand our sales and marketing organizations to market and sell our software." They buttressed these statements with additional representations during investor conference calls, assuring the market that—with the exception of a short, two-week hiatus in early March 2020—the Company was continuously hiring. And when specifically asked in June 2020 about whether they had laid off employees or cut back on operational expenses, Defendant Merritt responded that they had not. He told investors that, for layoffs or cutbacks to occur, "there would have to be some really unexpected shifts in the macro environment beyond what we've already modeled."

4.      These representations were important to investors. The market potential for Splunk's products was massive—$81 billion and growing. But Splunk had not yet meaningfully tapped into that market. The reason was simple. As Splunk's CEO confided to his Chief Marketing Officer, "'the world doesn't know about [Splunk].'" For that reason, the Company had begun investing in marketing prior to the Class Period, which was necessary to "'take the brand to the next level'" and to capitalize on the market potential for its software. Continuous marketing investments were needed during the Class Period to maintain and enhance the Splunk brand—to retain existing customers and attract new ones. Splunk's additional sales personnel were likewise necessary during the Class Period to execute sales and achieve the high growth promised to investors.

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

5.     Investors and securities analysts agreed with Defendants' assessment. They credited and were comforted by Defendants' repeated assurances that Splunk was, indeed, continuously investing in marketing and continuously hiring (and not laying off) sales personnel during the Class Period. As a result, the Company's stock price steadily climbed over 44% by June 2020.

6.     This positive market sentiment was imperative to Splunk. Defendant Merritt and the Company's CFO, Defendant Child, needed to complete a massive debt offering to reinfuse funding to meet outstanding debt obligations and pay for operations. The positive market sentiment was also critical to secure a favorable shareholder vote in support of their outsized compensation packages, worth over $30 million. Defendants succeeded on both fronts: they completed a massive bond offering on June 5, 2020, and Splunk's shareholders voted in support of their compensation packages on June 11, 2020.

7.     But unknown to investors at the time, Splunk was <u>not</u> continuing to invest in marketing during the Class Period. And it was <u>not</u> continuing to hire new sales personnel. By the beginning of the Class Period, Splunk did exactly what it said it would not: Splunk skimped on operating expenses to alleviate temporary cash-flow concerns. Specifically, the Company's top executives suspended all marketing investments; instituted a lengthy hiring freeze; and laid off critical employees, including the Company's entire "new logo" unit responsible for bringing in new business. Defendants kept these corporate actions—which restricted Splunk's sales pipeline in later financial periods—well hidden, until they were ultimately revealed to investors in early December 2020.

8.     Defendants Merritt and Child knew, of course, long before the December 2020 revelations that the Company had suspended its marketing investments, frozen hiring, and conducted layoffs—significant corporate actions within the purview of the Company's top officers. Splunk employees have recounted how Defendant Merritt personally announced the Company's suspension of marketing investments during an internal, all-hands meeting conducted via Zoom at the start of the Class Period. In making the announcement, Defendant Merritt told his colleagues that the suspension was intended to address short-term cash-flow concerns. Merritt's

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

suspension in marketing investments—which applied across the Company's entire organization—was unprecedented and, while it temporarily made it appear to investors during the Class Period as if Splunk were reaching its cash-flow positive milestones sooner, it harmed the Company's ability to attract new customers, retain existing ones, and generate revenues critical to fuel the Company's promised high growth in future quarters and years.

9.      Splunk employees have also confirmed that, by the start of the Class Period, Splunk instituted a Company-wide hiring freeze. The hiring freeze was significant in scope and duration: the Company froze all hiring of sales personnel throughout the entire Class Period. Defendant Merritt also announced this significant corporate action during his internal, all-hands meeting via Zoom in March 2020, the start of the Class Period.

10.     In addition to suspending marketing investments and freezing hiring, Splunk took further corporate actions to address short-term cash-flow concerns. Beginning in mid-2020, Splunk conducted a series of significant layoffs. Splunk laid off, among others, the Company's entire "new logo" unit, which—before the layoffs—served the critical role at Splunk of bringing in new customers. By laying off these critical employees, the Company further hampered its ability to attract new business.

11.     The Company's suspension of marketing, hiring freeze, and layoffs had a significant effect. These corporate actions hamstrung the Company's ability to generate revenues in later financial quarters. Without marketing investments, the Company could not promote the brand. Without additional sales personnel and a "new logo" unit, the Company could not achieve the necessary high growth. As a result, as Splunk's employees at the time have explained, "it was tough to find pipeline, people to buy."

12.     At the end of the Class Period, on December 3, 2020, Defendant Child stunned investors when he admitted that Splunk, indeed, "suspended investments in marketing" and "froze hiring." These cutbacks, he acknowledged, caused Splunk to have "a tighter pipeline going into [the third quarter]." As a result, Splunk suffered a hard miss in its third-quarter financial results. Quarterly revenues dropped 11% year-over-year, and net losses ballooned. Defendant Child himself would later concede that Splunk "went through what transformation experts like to call

the valley of death," with "negative revenue, negative margin, negative cash flow." Faced with the consequences of their undisclosed corporate actions, Defendants also withdrew their coveted guidance to investors that they would eclipse $1 billion in positive operating cash flow by 2023.

13. Investors suffered immensely as a result of Defendants' misrepresentations. When the truth was revealed, securities analysts that had covered the Company for years reported that they were "blindsided," including by Defendants' withdrawal of their guidance that they would achieve over a billion dollars in positive operational cash flow by 2023. They further concluded that Splunk had "inflicted a garish wound to its credibility," and that the Company "won't ever be viewed the same way." Splunk's stock price cratered 23% in a single trading day, erasing over $7.7 billion in shareholder value.

## II. JURISDICTION AND VENUE

14. This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under the Exchange Act.

15. This Court has jurisdiction over the Exchange Act claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

16. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) and (c). At all relevant times, Splunk had its principal executive offices located in this District and conducts substantial business here. In addition, many of the acts alleged herein, occurred in this District.

17. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## III. INTRADISTRICT ASSIGNMENT

18. Pursuant to Local Rule 3-2(c), this is a securities fraud class action to be assigned on a district-wide basis. Defendant Splunk Inc. is headquartered in San Francisco, California, which is within the San Francisco/Oakland Division.

IV.    **PARTIES**

19.    Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund is a multi-employer, defined benefit, governmental retirement plan providing retirement, disability and death benefits to approximately 20,000 active and retired employees of the sheriff's offices in all 64 Louisiana parishes. As set forth in the accompanying certification, Louisiana Sheriffs purchased shares of Splunk common stock during the Class Period and suffered damages as a result of Defendants' misrepresentations and omissions.

20.    Defendant Splunk Inc. is a software company that sells data management software. Splunk's stock trades on the NASDAQ exchange under the ticker symbol "SPLK." Splunk is incorporated under the laws of the State of Delaware, with its principal place of business in San Francisco, California.

21.    Defendant Douglas Merritt ("Merritt") has been Splunk's President, Chief Executive Officer, and a member of its Board of Directors since 2015. In its SEC filings, Splunk identified Defendant Merritt during the Class Period as the Company's "chief operating decision maker," who "reviews financial information presented on a consolidated basis for purposes of making operating decisions, assessing financial performance and allocating resources." Defendant Merritt signed and certified each of the Company's quarterly and annual SEC filings during the Class Period. He also regularly spoke to investors and securities analysts concerning Splunk, its marketing investments, and its hiring and firing decisions, professing to know what he was speaking about.

22.    Defendant Jason Child ("Child") has been Splunk's Chief Financial Officer since May 2019. Child signed and certified each of the Company's quarterly and annual SEC filings during the Class Period. He also regularly spoke to investors and securities analysts concerning Splunk's marketing investments, and its hiring and firing decisions, professing to know what he was speaking about.

23.    Defendants Merritt and Child are collectively referred to herein as the "Executive Defendants" and, together with Splunk, as the "Defendants." The Executive Defendants directly participated in the management of Splunk's operations, had direct and supervisory involvement in

1   Splunk's day-to-day operations, and had the ability to control and did control Splunk's statements

2   to investors and financial reporting. They were both involved in drafting, reviewing, publishing,

3   and making the false and misleading statements and omissions alleged herein.

4   **V.   SUMMARY OF THE FRAUD**

5      **A.   Background**

6   24.   Splunk sells data management software that can be used to search, monitor, and

7   analyze large quantities of electronic data. Its software indexes real-time data and allows users to

8   produce graphs, dashboards and visualizations of the indexed data. It additionally provides users

9   the capability to diagnose network problems and protect against cybersecurity threats. Splunk's

10  primary competitors are large cloud service providers and software vendors—including Okta,

11  Zscaler, and Crowdstrike—as well as smaller companies focused on data analytics.

12  25.   Splunk's history has been marred by unprofitability. It has incurred GAAP net

13  losses every year since becoming a public company in 2012, and its accumulated deficit continues

14  to grow. Between 2012 and 2014, Splunk's accumulated deficit from net losses grew from

15  $90,700,000 to $386,800,000—an increase of over 326%. Between 2014 and 2018, its deficit

16  ballooned again from $386,800,000 to $1,230,000,000—another increase of almost 218%. By the

17  start of the Class Period, on March 26, 2020, its deficit had increased further to a remarkable $1.56

18  billion.[1]

19  26.   Meanwhile, Splunk's business is cash intensive, with large fixed costs. As such, it

20  has been required to rely upon cash infusions from outside sources, including billions of dollars

21  obtained through a series of equity and debt offerings. In January 2014, it raised over $550 million

22  through an equity offering for working capital. In September 2018, it raised another $2.13 billion

23  through a debt offering, leaving Splunk with expensive interest payments, including over $96

24  million for fiscal year 2020 (i.e., the year ending January 31, 2020). By the start of the Class Period,

25

26

27

28  ───────────────
[1] Splunk operates on a fiscal year ending January 31. References to fiscal year 2021, for example, refer to the fiscal year ending January 31, 2021.

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

Splunk had a long-term debt-to-equity ratio of 130%, which was five-times larger than the industry average.[2]

27.     Compounding its already cash-intensive business, Splunk undertook significant changes prior to the Class Period to the way it collects payments from its customers. Before this change, Splunk licensed its software products under a "perpetual licensing" model, whereby customers made substantial payments upfront in exchange for software licenses. By 2019, Splunk had announced that it had primarily switched to a "term licensing" model. As a result, it now no longer "collect[ed] the vast majority of the cash [from customers] upfront"; instead, it now collected payments from customers on a periodic basis.[3]

28.     This shift in the Company's billing model impacted the Company's cash flows by early 2019. Defendant Child acknowledged to investors that the licensing model transition was "hard on cash," explaining that "if you take the average term deal for every $3 in revenue recognized in revenue, you [now, under the new licensing model,] get $1 in cash, since [Splunk was now] billing it annually." In other words, because Splunk's contracts were typically for three years, it was now only getting one-third of the cash upfront. Defendants explained that the effect was "a greater cash flow drag" and "negative operating cash flow" in 2019.[4]

29.     Analysts were very worried about the fact that the Company was reporting negative operating cash flow in 2019—and for good reason. Having negative cash flow means that the Company was spending more cash to sell its products than it was bringing in. For example, Bloomberg's analysts observed that, while the Company's revenues had risen over time, that rise had been "without an equivalent improvement in operating cash flow and non-GAAP earnings."[5] Analysts at the investment research firm Zacks Equity Research similarly expressed concern that "Splunk is a highly leveraged company," adding that "the transition from perpetual licenses to subscription or renewable-based model has severely hurt the company's cash flow generation

---

[2] Zacks Equity Research analyst report: *Splunk, Inc. (SPLK)* (Jan. 23, 2020).
[3] Splunk Inc.'s Q3 2020 Earnings Call (Nov. 21, 2019).
[4] Splunk Inc's Q2 2020 Earnings Call (Aug. 21, 2019).
[5] Mandeep Singh & Matthew Martino, *Stock Compensation Exceeds Cash Flow*, BLOOMBERG INTELLIGENCE (Dec. 13, 2019).

ability due to lower upfront payment."[6] UBS Research also voiced caution, telling investors on March 3, 2020 that "there remains lingering contention on [Splunk's] … absent cash flow support" and "restrained op[eration] profitability trajectory."[7] Morningstar analysts noted that the "bears" were "say[ing]" that "[s]ignificant operating expenses, namely share-based compensation and outsize selling and marketing expenses, will limit Splunk's ability to attain profitability."[8] And Goldman Sachs analysts likewise added that "sales and marketing expenses for Splunk relative to companies of [its] size today seems a little bit on the higher side."[9]

30.     Analysts repeatedly asked Defendants about their negative operating cash flows and asked for guidance on when the Company would finally become cash-flow positive. For example, during Splunk's August 21, 2019 earnings call for the second quarter of 2020, a Goldman Sachs analyst said, "I'm surprised that you don't have some kind of a range for cash flow of next year" and "I would implore that we give a little more talk to having some range." Another analyst from BMO Capital Markets seconded this request, stating "I think it would be helpful to get some guidance and comments around cash flow for next year." A Goldman Sachs analyst once more questioned the timing of the Company's turnaround to becoming cash-flow positive, asking "[c]ould it be worse case calendar 2021 or somewhere between calendar 2021, because we've gone through the shift and we've endured the cash flow drop?" Yet another analyst, this time from Raymond James, pressed further, saying, "I'm just going to try to take another shot at the cash flow outlook," asking whether Splunk would be, "for fiscal 2021, at least cash flow from op[eration]s positive?"

31.     Becoming cash-flow positive would mean that Splunk would generate more incoming cash on selling its products than it spent on outgoing operations to sell those products. Becoming cash-flow positive was important to investors because it meant that the Company was

---

[6] Zacks Equity Research analyst report: *Company Report, Splunk, Inc.* (Dec. 31, 2019).
[7] UBS Research analyst report: *Market Dislocation = Attractive Opportunity for Secular Winner* (Mar. 3, 2020).
[8] Morningstar Equity analyst report: *Light Fiscal 2021 Guidance Overshadows Strong Growth Story for Splunk; Raising FVE to $182* (Mar. 24, 2020).
[9] Bank of America Merrill Lynch Global Technology Conference (June 4, 2020).

no longer spending more money on its day-to-day operations than it was making. It would also mean that Splunk would no longer need to rely on debt and equity offerings to fund its operations.

32.    To address investors' concerns, Defendants told the market that Splunk would become cash-flow positive from operations by fiscal year 2022 (i.e., the year ending January 31, 2022). The Company further told investors that Splunk would approach $1 billion in positive operating cash flow in fiscal year 2023 (i.e., the year ending January 31, 2023).[10] These assurance comforted investors that Splunk would turn the corner towards creating sustainable profit, instead of driving perpetual losses.

33.    Analysts cheered the Company's guidance to become cash-flow positive from operations. As Wells Fargo analysts explained in their analyst report, "[w]e expect 'flipping cash flow positive' to serve as a meaningful driver for Splunk's stock."[11] Credit Suisse's analysts increased their price target for Splunk's stock as a result, reporting that they took "comfort in [Splunk's] longer-term guidance of ... ~$1bn [billion] in OCF [Operating Cash Flow] by FY23."[12] Credit Suisse analysts also noted that they "see room for continued multiple expansion as … the Street gains more confidence in [Splunk's] ability to hit its FY23 FCF [Free Cash Flow] target of approximately $1bn."[13] Analysts further reiterated this sentiment during Splunk's earnings calls, with a Credit Suisse analyst telling Defendants during a December 2019 investor call that Splunk's "operating cash flow guidance" was "another welcome and surprising feature coming out of the quarter."[14] Jefferies analyst, Brent Thill, likewise told Defendants during a June 15, 2020 investor conference that "investors find the true north of $1 billion [in positive cash flow] an important metric to keep an eye on."

---

[10] *See* Splunk, Inc. Q3 2020 Earnings Call transcript (Nov. 21, 2019).
[11] Wells Fargo analyst report: *SPLK: Pushbacks On Our Positive Thesis Ahead Of .conf20* (Oct. 13, 2020).
[12] Credit Suisse analyst report: *F4Q20 – Rapid Transition to Cloud; In ARR We Trust* (Mar. 5, 2020).
[13] Credit Suisse analyst report: *Splunk, Inc.* (Jan. 13, 2020).
[14] *See* Credit Suisse Technology, Media & Telecom Conference transcript (Dec. 3, 2019).

1    34.    To further assuage investor concerns, at the start of the Class Period, in March 2020,

2    the Company announced that the Board's Compensation Committee changed the incentive

3    compensation structure for its executives. For the year ending January 31, 2021, the Board's

4    Compensation Committee now identified operating cash flow metrics as one of the main metrics

5    to evaluate executive incentive compensation.[15]

6    35.    Critically, Splunk assured investors that the Company would resolve its cash-flow

7    challenges and become cash-flow positive through revenue growth—not by a suspension of

8    marketing investments or a freeze in hiring. To that end, Defendants repeatedly emphasized to

9    investors that the market potential for its software was tremendous and that Splunk had only

10   scratched the surface. Defendant Merritt told investors in March 2018 that the total addressable

11   market ("TAM") for Splunk's products exceeded $55 billion, and that the Company was still early

12   in the process of capitalizing on that demand.[16] The Company reiterated to investors that there was

13   "TAM that's right in front of [the Company]," and that "the number of accounts that are not yet

14   Splunk customers is much larger than those that are in the stable."[17] Splunk again stated in early

15   2019 that the Company's penetration of the total addressable market was still "very early" and that

16   "the TAM ha[d] effectively doubled" in recent years.[18] Defendant Merritt echoed this same

17   message, stressing to investors and analysts that Splunk was "early in a large and growing market."

18   36.    By December 2019, Defendant Child told investors that the total addressable

19   market for Splunk's software had increased to "between $60 billion and $70 billion," and further

20   assured investors that Splunk was still "going after" that market.[19] By 2020, Defendant Child

21   upped this estimate, stating that the total addressable market for Splunk's software was now $81

22   billion and, by 2023, would grow to $114 billion.[20] Defendant Child reminded investors at every

23   chance that Splunk had "relatively little penetration" of the total addressable market to-date, with

24

25   ───────────────

26   [15] *See* Splunk Inc.'s Definitive Proxy on Schedule 14A (Apr. 28, 2020).

     [16] Splunk Investor and Analyst Meeting transcript (Mar. 27, 2018).

27   [17] Wells Fargo Securities Technology Summit (Dec. 4, 2018).

     [18] Splunk, Inc. Q1 2020 Earnings Call transcript (May 23, 2019).

28   [19] Credit Suisse Technology, Media & Telecom Conference (Dec. 3, 2019).

     [20] Splunk Inc Virtual Analyst & Investor Session at .conf20 (Oct. 21, 2020).

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

"far more [market] for [Splunk] to capture," and the Company was "uniquely equipped to pursue this TAM." Defendant Child further told investors that he is a "growth CFO" who, with Defendant Merritt, would achieve the "strong cash flow" growth promised to investors.[21]

37.     Defendants continued to stress to investors that reaching its momentous "cash-flow positive" state would be the result of revenue growth—i.e., successfully tapping into the $81 billion market—and not by skimping on operational expenses ("OpEx") through a suspension of marketing investments or a freeze in hiring. For example, on November 21, 2019, Defendant Child stressed to investors that "we're not cutting back on OpEx to try to show cash earlier." Defendant Child reiterated during a December 3, 2019 investor call that the Company was continuing "to spend OpEx to support the high growth of the company." Defendant Child reiterated again on June 15, 2020 that "ARR [annual recurring revenue] growth" is "the most critical aspect to try to generate that $1 billion of operating cash flow." He emphasized during a September 14, 2020 investor conference that getting to the $1 billion cash flow was "relatively simple" and that by the "middle of FY [20]22," Splunk would start to see "cash inflow" turn a corner, with the increase in annual recurring revenue making Splunk "turn positive middle of next year [i.e., middle of 2021]."

38.     Analysts embraced the Company's important promise to become cash-flow positive through execution (i.e., increased sales and revenue)—and not by suspending marketing investments or freezing hiring. For example, Argus Research analysts explained in a January 21, 2020 report that, "[g]iven Splunk's presence in a fast-growing market, we believe that much of its success will depend on execution - especially management's ability to ramp up software sales and capture market share without squeezing margins or running up losses."[22] Analysts at Oppenheimer likewise echoed that "the company should be able to expand margins through operating leverage."[23] William O'Neil & Co. agreed, reporting that "Splunk believes operating cash flow (OCF) will directly depend on ARR [Annual Recurring Revenue] going forward."[24] *Seeking Alpha*

---

[21] Bank of America Merrill Lynch Global Technology Conference (June 5, 2019).
[22] Argus Research Company analyst report: *Splunk, Inc.* (Jan. 21, 2020).
[23] Oppenheimer Co. Equity Research, Quarterly Update: *Raising Price Target as Accelerating ARR Points To Strong Underlying Demand* (Mar. 5, 2020).
[24] William O'Neil & Co analyst report: *Buy Recommendation* (May 26, 2020).

noted that Splunk's promise to become cash-flow positive through execution offered a "carrot for investors to latch onto," reiterating Defendants' assurances that Splunk was "patiently defer[ring] maximizing cash flows and ... continu[ing] to ramp up expenses to continue its land and expand strategy."[25]

### B.     Splunk Assures Investors of Its Continuous Investments in Its Critical Marketing Efforts

39.     Splunk emphasized to investors that it would achieve its promised high growth in 2020 and beyond and capture the immense market for its software by continuing to invest aggressively in marketing. Defendants repeatedly told investors that Splunk's marketing investments would jumpstart the Company's high growth and enable it to achieve $1 billion in positive cash flow by 2023. Marketing was essential to build brand awareness for Splunk and fuel meaningful market penetration, and Defendants were continuously investing in marketing—or so investors were led to believe.

40.     High-growth software companies, particularly in untapped markets, can only succeed if they continuously invest in marketing. Industry experts have long recognized that "[m]arketing is the growth lever that powers your [software] startup into the next phase of rapid expansion; the 'go faster' button that fuels your growth from stealth mode startup to expansion-stage success story."[26] Denise Lee Yohn, a well-renowned brand leadership expert, explained it well in a recent *Forbes* article: "The world is awash in innovative products, services, technologies, solutions, business models, etc. today. These new offerings must be brought to market and commercialized in order to generate revenue and profit. Innovation alone cannot sustain a company; it must be paired with marketing."[27]

---

[25] Michael Wiggins De Oliveira, *Splunk: Avoid This Stock*, SEEKING ALPHA (Nov. 28, 2019).
[26] Ryan Law & Emily Smith, *The Ultimate Guide to SAAS Marketing Strategies & Tactics*, COBLOOM (Mar. 23, 2020), https://www.cobloom.com/blog/saas-marketing-strategies#.
[27] Denise Lee Yohn, *Marketing Matters Now More Than Ever*, FORBES (Jan. 8, 2019), https://www.forbes.com/sites/deniselyohn/2019/01/08/marketing-matters-now-more-than-ever/?sh=6749edb2117a.

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

41.     Defendant Merritt recognized that Splunk's marketing investments were necessary to fuel the high growth that he told investors to expect. In 2018, when Defendant Merritt hired Carrie Palin ("Palin"), Splunk's Chief Marketing Officer, he specifically told Palin that "'the world doesn't know about [Splunk] yet" and, as of that point, "'we haven't invested there.'"[28] Palin agreed that "most of the world doesn't know about" Splunk and "doesn't know what Splunk does."[29] She further quipped that if you googled "Splunk," the responses include, "WTF [is] Splunk?" and "who the hell is this Company?" Indeed, Palin admitted that Splunk's internal survey data in 2019 showed that Splunk's brand recognition was in the single-digits, which she stated was "low for a company [of its] size."

42.     Defendant Merritt also publicly acknowledged that Splunk needed to increase— and assured investors it was increasing—its marketing investments to achieve revenue growth. He explained that the value proposition for Splunk software was "not entirely understood by [customers]" and, as result, he would "have to lean in hard on marketing."[30] He repeated this reliance on marketing investments to build the Splunk brand, telling a Futurum Research analyst during an interview that "even in Silicon Valley … there were tech people I'd talk to that wouldn't know who Splunk is." He added that Splunk's investments in marketing were driving market awareness, getting potential customers past the stage of "what's Splunk?" through "a ton of repeat messaging on [Splunk's] part for people to digest and really internalize [what Splunk does]."[31] Splunk publicly assured that it was "'tak[ing] the brand to the next level'" through continued and substantial marketing investments, stating that, by early 2019, marketing had "become so much more relevant to [Splunk's] revenue."[32]

---

[28] *See* theCube interview, *Carrie Palin, Splunk | Splunk .conf19*, YOUTUBE (Oct. 22, 2019), https://www.youtube.com/watch?v=byYQYnypDsc.
[29] Lochhead on Marketing Podcast*: Episode 027, How to Create A New Category & Brand w/ Carrie Palin CMO of $20B Splunk* (Jan. 26, 2019) https://lochhead.com/how-to-create-a-new-category-carrie-palin-splunk/.
[30] Splunk, Inc. Q3 2020 Earnings Call transcript (Nov. 21, 2019).
[31] Futurum Tech Podcast – Interview Series, *Data To Everything Makes Sense – Futurum Tech Podcast Interview Series* (Apr. 3, 2020).
[32] *DisrupTV: Episode 185, Carrie Palin, Jay Vijayan, Heather Clancy*, YOUTUBE (April 10, 2020), https://www.youtube.com/watch?v=IqF18s875OY.

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

43.     Defendants also emphasized the importance of Splunk's supposed continuous marketing investments in its filings with the SEC. In every quarterly filing with the SEC during the Class Period, Defendants told investors that "maintaining and enhancing the 'Splunk' brand identity is critical to our relationships with current customers and partners and to our ability to attract new customers and partners."[33] They added that the Company's marketing investments included "marketing and business development programs, including advertising programs to promote [the Splunk] brand and awareness, demand generating activities and customer events." They further emphasized that "[t]he successful promotion of our brand will depend largely upon our marketing efforts."

44.     Securities analysts accepted Defendants' representations, taking comfort in the Company's recognition in its SEC filings and elsewhere of the importance of its marketing investments to drive Splunk's growth. They agreed with Defendants that the Company needed to continuously invest in marketing because, as analysts and commentators noted, Splunk was a "company out of relatively obscurity" and "doesn't have ... brand-name recognition."[34] They further observed that "Splunk Inc. should be better known [to potential customers] than it is."[35] They highlighted how, "[t]o change its low profile and strengthen its brand," Splunk needed to continue "working with [its] new chief marketing officer and investing in a [marketing] campaign to showcase the great potential of data and how it can be tied to everything." Analysts added that "a major portion of operating leverage" would need "to come from [Splunk's] sales and marketing expense" and emphasized that Splunk would attain "margin improvement" as a result of its "sale and marketing expense through 2025."[36]

---

[33] *See, e.g.*, Splunk, Inc. Quarterly Report on Form 10-Q (Mar. 26, 2020).

[34] Dan Kawamoto, *How Splunk is using Obama's star power to illuminate its own*, SAN FRANCISCO BUSINESS TIMES (Sept. 18, 2019).

[35] Siliva Fregoni, *Splunk Strengthens its brand by showing the data potential of everything*, THECUBE (Oct. 28, 2019), https://siliconangle.com/2019/10/28/splunk-strengthens-brand-showing-data-potential-everything-splunkconf19/.

[36] Morningstar analyst report: *Light Fiscal 2021 Guidance Overshadows Strong Growth Story for Splunk; Raising FVE to $182* (Mar. 24, 2020).

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

1      45.    Defendants assured investors repeatedly during the Class Period that the Company

2  continuously made—and would continue to make—substantial investments in marketing. In their

3  SEC filings during the Class Period, Defendants repeated each quarter that "we continue to …

4  invest in marketing programs" and "we intend to continue to make directed and substantial

5  investments to expand our … marketing." They also assured investors that the Company's

6  marketing "campaign cadence remains high," which they acknowledged was critical to "make sure

7  that [Splunk] build[s] an adequate pipeline."

8      46.    Investors and analysts believed, consistent with what Defendants were telling them,

9  that Splunk had, indeed, continuously invested in marketing during the Class Period. For example,

10  Argus Research noted—in its reports recommending that investors buy Splunk's stock—its

11  expectation that Splunk would "continue to invest heavily in … expanded marketing efforts."[37]

### C.    Splunk Assures Investors that It Continues to Hire Sales Personnel

13      47.    In addition to repeatedly telling investors that Splunk was continuing its marketing

14  investments, Defendants also stressed that Splunk was continuing to hire additional sales

15  personnel. In their SEC filings during the Class Period, Defendants represented that Splunk was

16  "continu[ing] to aggressively expand [its] sales and marketing organizations" and that it was

17  "continu[ing] to hire additional personnel." During investor conference calls, they likewise

18  highlighted that Splunk continued to hire additional sales professionals to fuel revenue growth,

19  with Defendant Child telling investors that "we're definitely still hiring."

20      48.    Defendants additionally assured investors that the COVID-19 pandemic did not

21  meaningfully disrupt its continued hiring. To the contrary, they told investors that the COVID-19

22  pandemic was a positive for Splunk's business, with the pandemic a catalyst for generating

23  additional demand for its software. With regard to the pandemic, Defendant Child told investors

24  on May 21, 2020 that "at this time of remote work, we've seen increased demand for Splunk

25  Cloud" with the percentage of customers using cloud "the highest ever in our history and well

26  above our expectations going into the quarter."

---

[37] Argus Research Company analyst report: *Splunk Inc.* (Mar. 6, 2020).

49.     Analysts were comforted by these assurances. For example, William Blair analysts reported on May 22, 2020 that the Company "emphasized that business fundamentals remain strong—with the pandemic having no material impact to date on pipeline development—and expressed confidence in achieving its prior ARR and operating cash flow targets." William O'Neil analysts echoed Defendants' assurances that "Splunk is experiencing accelerated digital demand."[38] Futurum Research analyst, Daniel Newman, similarly reported that he "found a certain amount of confidence in the company's forecast and lack of concern about the global Covid-19 scare."[39]

50.     When analysts directly questioned Defendant Child during a May 21, 2020 investor conference call on the subject of hiring—asking him "<u>where is hiring?</u>"—Defendant Child responded that hiring continued, notwithstanding the pandemic. Specifically, he stated that, while "in early mid-March, we definitely did kind of put a freeze on hiring," Splunk quickly continued hiring again "to serve the growth needs that are going to continue" because it was "pretty clear that the underlying growth within our business is very healthy." Defendant Child reiterated during the Class Period that Splunk was "<u>definitely still hiring</u>" sales professionals and "<u>making the necessary hires to manage to [its] growth targets</u>."

51.     Splunk further assured investors that its temporary "freeze on hiring" in "early mid-March" had been quickly lifted. On March 26, 2020, the Company filed its Form 10-Q with the SEC. In it, the Company stated that, by that date, Splunk "<u>continue[d] to hire additional personnel</u>." Thus, according to the Company's statements to investors at the time, the temporary "hiring freeze" instituted in "early mid-March" had been lifted within a matter of two or three weeks, consistent with Defendants' representations that the pandemic had increased demand for the Company's cloud products.

52.     Defendants further represented that the Company had not, and did not intend to, conduct any layoffs or other cutbacks. For example, on June 8, 2020, when specifically asked by

---

[38] William O'Neil & Co analyst report: *Buy Recommendation* (May 26, 2020).
[39] Futurum analyst report: *Splunk's Transformation To Cloud Continues With Strong Q4* (Mar. 4, 2020).

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

the financial press whether Splunk was "thinking about potential layoffs or cutbacks," Defendant Merritt responded that "<u>things are going well</u>" and, before the Company made any such layoffs or cutbacks, "[t]here would have to be some really unexpected shifts in the macro environment beyond what we've already modeled."

53.     Defendants' representations about their continuous hiring were important to investors. Sales professionals are a critical component of a business's success, particularly at a high-growth company like Splunk. A corporation might succeed at developing products, but it needs qualified personnel to reach out to potential customers and complete sales. Industry experts have long recognized that the sales department "is the most important department possible when it comes to generating revenues" and that "no organization can survive long without a fully functional sales department for revenue generation purposes."[40] Industry leaders have further described how sales teams must work hand-in-hand with marketing, stating, "Think of it as leading a horse to the water (marketing) and actually getting it to drink (sales)."

54.     Defendants publicly recognized that continuously hiring sales personnel was critical for Splunk to achieve its promised growth and become cash-flow positive through revenue generation. For example, during a December 3, 2019 investor conference call, Defendant Child explained that Splunk's progress in attaining its cash flow and financial targets required its "continuing to spend OpEx to support the high growth of the company" and, specifically, "to continue to hire salespeople." Splunk's CFO likewise emphasized the importance of hiring additional sales personnel, explaining that "the investments we're making in [the] field continue to fuel our growth."[41]

55.     Defendants further highlighted to investors the importance of its hiring of sales personnel in their SEC filings, explaining that the Company "continue[d] to be substantially dependent on [its] sales force to effectively execute [its] sales strategies to obtain new customers

---

[40] April Salsbury, *The Sales Function: The Key to Survival in a Highly Competitive World*," SALSBURY & CO. https://www.salsburyandco.com/single-post/the-sales-function-the-key-to-survival-in-a-highly-competitive-world (last viewed on Mar. 17, 2021).
[41] Splunk, Inc. Q3 2019 Earnings Call transcript (Nov. 29, 2018).

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

and to drive additional use cases and adoption among [its] existing customers." Defendants added in their SEC filings that the Company's sales professionals, along with marketing, "drive market awareness, build a sales pipeline, and cultivate customer relationships to drive revenue growth." They also emphasized that the Company's "ability to achieve significant revenue growth will depend, in large part, on [its] success in recruiting, training and retaining sufficient numbers of sales personnel to support [its] growth."

56.     Analysts and the market credited Defendants' assurances. Argus Research analysts echoed Defendants' statements in their March 6, 2020 and August 31, 2020 analyst reports, stating that "[t]o fuel its go-to-market strategy, Splunk is expanding its field sales force" and that "Splunk has been expanding its sales force to drive down accounts per rep and to focus on demand-generation activities in order to reach its goals." William Blair analysts also maintained their "Outperform" rating for Splunk's stock on October 22, 2020, explaining that they were "optimistic" about the Company's growth targets, with "[d]rivers of this strong growth includ[ing] increased investment into sales efforts."[42] William Blair also included in their analyst reports a summary of Splunk's management's discussion on "Splunk's strengths," which included "adding sales capacity." Based on Defendants' assurances, William Blair concluded that "[m]anagement is adding significant capacity to its buying center sales rep force. We believe the new sales rep[resentatives] will help drive revenue acceleration in early calendar 2021." *Bloomberg* likewise concluded—based on the Company's repeated representations—that "the company will keep boosting hiring to propel international growth."[43]

> **D.     Splunk's Assurances Enable the Company to Complete Another $1.265 Billion Offering and Its Executives to Secure Shareholder Support for Millions of Dollars in Incentive Payments**

57.     Defendants succeeded in their efforts to convince investors that they were making the promised investments to achieve $1 billion in positive cash flow. At the start of the Class

---

[42] William Blair analyst report: *Day Two of .conf20: In Pole Position for Long-Term Success* (Oct. 22, 2020).

[43] Mandeep Singh and Matthew Martino, *Investments, Hiring Likely to Remain High*, BLOOMBERG (Dec. 13, 2019).

Period, on March 26, 2020, Defendants reported positive operating cash flows for the first quarter of fiscal year 2021. By the second quarter, on August 26, 2020, Defendant Child reported that Splunk was ahead of its previously stated cash flow targets for the year. He told investors that "[c]urrent year operating cash flow is tracking ahead of plan, and we now expect it to be slightly better than last year." They emphasized that these results were achieved through the execution of their high-growth business plan—and <u>not</u> through a suspension of marketing or a freeze on hiring.

58.     As a result of Defendants' assurances, the Company's stock price soared by almost $94.45 a share, from $129.14 at the start of the Class Period to a high of $223.59 per share during the Class Period—an increase of over 73%.

59.     Defendants needed to attain this favorable investor sentiment to secure much-needed funds. As discussed above (*see* ¶¶25-28), by the start of the Class Period, Splunk was saddled with mounting losses, substantial debt, and cash outflows that outpaced cash inflows each year. The Company's deficit ballooned to $1.56 billion by the start of the Class Period, and the Company had over $2.1 billion in outstanding debt obligations. Defendants required additional financing to push out existing debt obligations and fund operations.

60.     Securing this additional financing was mission critical for Defendants. In fact, Defendant Merritt hired Defendant Child precisely because of his experience successfully securing financing for his past employer, Amazon. As market commentators observed, Splunk hired Defendant Child because he successfully orchestrated Amazon's "Hail Mary effort" to secure financing through a convertible debt offering in 1993.[44] Defendant Child himself confirmed why he was hired by Splunk, explaining that the Company's financials were "really messy" when he joined, and "I'm the clean-up guy."

61.     On June 1, 2020, Defendants Child and Splunk announced a $900 million debt offering. The next day, they upsized the offering to $1.1 billion—an increase of $200 million. Three days later, on June 5, 2020, they announced that they successfully completed the debt

---

[44] Tiernan Ray, *Splunk Has Been A Hot Mess, But That's Changing, Says CFO Jason Child*, THE TECHNOLOGY LETTER (Apr. 2, 2021).

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

offering at $1.265 billion. Splunk's investment advisor for the debt offering, J. Wood Capital Advisors, has acknowledged that "Splunk took advantage of the all-time high in its stock price to successfully execute its convertible [debt] issuance."[45]

62.     The Executive Defendants further took advantage of this favorable market sentiment during the Class Period. On April 28, 2020, Splunk published its annual shareholder proxy materials, including a "Say-on-Pay" proposal for its executives. The proposal included a compensation package for Defendant Merritt totaling $15.710 million—which represented a 16% increase in pay from the prior year. The proposal included an even bigger compensation package for Defendant Child, which totaled $17.485 million. The "Say-on-Pay" proposal also provided for salary raises in future years for both Defendants Merritt and Child. Defendants succeeded on their "Say-on-Pay" proposal. On June 11, 2020, shareholders—still believing that the Company was heading to positive cash flow through execution (not a suspension of critical investments)—voted to approve Defendants' multi-million-dollar compensation packages and raises.

### E.     Untold to Investors at the Time, Splunk Suspended Marketing Investments and Froze Hiring Throughout the Class Period

63.     Defendants' statements to investors that Splunk was continuing its marketing investments and continuing hiring during the Class Period were false and misleading. Defendants have admitted as much. At the end of the Class Period, on December 3, 2020, Defendant Child stunned investors when he revealed that, beginning in early March 2020, Splunk "suspended investments in marketing" and "froze hiring." He further admitted that the Company's hiring freeze was for a "few months"—not the couple weeks that Splunk previously told investors and not even the actual duration of the hiring freeze. Defendant Child further disclosed that, as a result of these corporate actions, "we did have a tighter pipeline going into Q3" (i.e., the quarter ending October 31, 2020), which resulted in lackluster revenues well below analysts' estimates.

---

[45] *JWCA Advises Splunk on Its $1,265 Million Convertible Bond and Capped Call Offering, and Simultaneous Repurchase*, J. WOOD CAPITAL ADVISORS (June 2020), https://www.jwoodcapital.com/splunk-case-study-june-2020-copy.

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

64.     Former Splunk employees have corroborated and expanded upon Defendant Child's admissions. They have confirmed that Defendant Merritt internally announced and admitted during an all-hands meeting at the start of the Class Period that the Company suspended its investments in marketing. Additionally, the Company froze hiring and conducted a series of layoffs, which eliminated the Company's entire "new logo" team. These undisclosed corporate actions—while they allowed Defendants to report better-than-otherwise cash flow numbers during the Class Period—derailed Splunk's stated plan to achieve $1 billion in positive cash flow through revenue generation by 2023. These undisclosed corporate actions led to a significant revenue miss in the third-quarter of Splunk's fiscal year 2021—as Defendant Child ultimately admitted—and also forced the Company to withdraw its guidance to investors that it would achieve $1 billion in positive cash flow by 2023.

### 1.     Splunk Suspended Its Investments in Marketing

65.     Former Splunk employees have explained how, at the same time that Defendants were publicly assuring investors that "we continue to … invest in marketing programs" and "[we] continue to make directed and substantial investments to expand our … marketing," they were privately telling their employees the exact opposite.

66.     Multiple former Splunk employees have recounted how Defendant Merritt internally announced at the start of the Class Period that Splunk had suspended its investments in marketing. The announcement was made at a Company-wide, all-hands meeting. All employees were invited to participate in this internal meeting, which was conducted via Zoom.

67.     Former Employee ("FE") 1 recalled that Defendant Merritt spoke about the suspension of investments in marketing during an all-hands meeting that occurred shortly after FE 1 joined the Company on March 16, 2020. FE 1 explained that the all-hands meeting occurred during either the last week of March or the first week of April 2020.[46]

---

[46] FE 1 was a Regional Sales Manager in California from March 2020 until June 10, 2020. FE 1 has extensive experience selling software. Prior to joining Splunk, FE 1 worked for an established software company in for 15 years. For ease of comprehension and readability, the Complaint uses the pronoun 'he' and possessive 'his' in connection with the Former Employees. However, this convention is not meant to identify the actual gender of any of the Former Employees.

68.     FE 1's account is corroborated by the account provided by FE 2. FE 2 similarly recalled how, during a Company all-hands meeting conducted via Zoom, Defendant Merritt walked through decisions the executives were making internally. Defendant Merritt stated that the Company suspended marketing to, among other things, prevent the Company from hemorrhaging cash flow and having to cut the research and development budget. FE 2 further explained that he was told of the suspension of marketing around March 2020.[47]

69.     Other witness accounts confirm that Splunk took the drastic step in early 2020 of suspending its investments in marketing. FE 3 reported that, in a meeting in or about February or March 2020, the Vice President of Product Marketing, the Chief Marketing Officer (Carrie Palin), and his own boss told him that the product marketing budget was going away, and that product marketing no longer had a budget.[48] FE 4 similarly recounted how he was told in February 2020 that the Company's marketing budget was cut going into the fiscal year.[49] And FE 5, when he joined the Company in April 2020, was also told by his boss, the director of product marketing, and his boss's boss that Splunk's marketing investments were frozen.[50]

70.     The Company's suspension of marketing was unprecedented. FE 3 stated that, during the years since product marketing had its own budget, he had not once seen another instance during which the product marketing budget was done away with. He added that that this was the first time that Splunk told the product marketing group that it did not have a budget during the entire time since the marketing group had its own budget.

71.     Splunk suspended investments in marketing throughout the entire Class Period. FE 3, who remained with Splunk until December 2020, explained that the freeze in the product

---

[47] FE 2 worked at Splunk as an Account Manager in Washington from September 2018 until December 2020.

[48] FE 3 worked at Splunk in San Francisco from February 2011 until December 2020, and most recently as a Sr. Product Marketing Manager at Splunk's headquarters.

[49] FE 4 was a Regional Sales Manager at Splunk in Texas, from April 2018 until he left in January 2021. He was most recently responsible for the North Central area (Ohio, Nebraska, Illinois). FE 4 sold Splunk's core products and reported to the regional sales director.

[50] FE 5 was a Senior Product Marketing Manager at Splunk from April 2020 through October 2020. He reported to Cody Bunce and was responsible for creating presentations and messengers for platform tools.

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

marketing budget continued in effect until he left the Company in December 2020. FE 5 corroborated this account, explaining that the marketing budget was frozen for his entire tenure at the Company—from April 2020 through mid-October 2020. FE 5 added that the marketing spend freeze applied across the board—it applied to all marketing teams, including the product marketing team, the customers marketing team, and the digital marketing team.

72.     Splunk's employees emphasized to Lead Counsel the importance of marketing investments to Splunk's bottom-line. FE 5 explained that the purpose of marketing at Splunk was to make people aware of the Company's offerings and why they should invest in, and use, its products.[51] FE 5 further noted that, as the sales process progresses, Splunk used marketing to show how the product would look in the customer's organization. FE 5 added that a marketing objective at Splunk is to keep a healthy pipeline through demand generation. FE 1 similarly explained that marketing at Splunk helps educate customers on use cases for Splunk technology, as well as introduce them to other Splunk offerings. FE 1 added that marketing also is important in generating new customer leads in the funnel.

73.     FE 5 explained that the marketing budget, if not frozen, could have been used for things like sponsorships, working with outside vendors, conferences, paying analysts to produce reports, and vendor spend to create different marketing assets that the sales teams could use, such as white papers.

74.     As discussed above, Defendant Child ultimately admitted at the end of the Class Period that Splunk "suspended investments in marketing," which caused the Company to experience a significant revenue miss in the quarter ending October 31, 2020. Splunk employees have confirmed that the suspension in marketing investments, indeed, had a material effect on the Company's pipeline generation and sales efforts. For example, FE 2 explained that the decision to suspend marketing investments impacted his sales efforts for the remainder of his time at Splunk. FE 1 added that the suspension of marketing was adversely felt within the Company's new logo

---

[51] These responsibilities were explained to FE 5 by the leadership team in the marketing department and by different cross functional marketing people.

team, as they had no marketing efforts to support them. FE 4 further confirmed that the pipeline was being adversely impacted as a result of the lack of investment in marketing. FE 4 explained that "[t]owards the back half of [2020], it was tough; it was tough to find pipeline, people to buy." FE 6, who was involved in Splunk's forecasting for government accounts, likewise said the third-quarter pipeline "was ugly."[52] FE 6 recalled that, after he spoke to Splunk's sales leaders—including those over East Coast sales, Federal sales, mid-Atlantic sales, New York city sales—he knew people were "very concerned" about the numbers going into the third quarter. He explained that a lot of the concern was over making deals happen because everything was so "anemic" going into the third quarter.

### 2.    Splunk Froze Hiring Throughout the Class Period

75.    Splunk employees have recounted how, in addition to suspending investments in marketing, the Company's executives also instituted a freeze on hiring. Splunk employees have explained that the hiring freeze applied to all sales personnel, continued throughout the entire Class Period and had a significant impact on the Company's ability to sell product and generate revenues. As Defendant Child would ultimately admit at the close of the Class Period, the Company's hiring freeze, along with its suspension of marketing investments, "led to [the] tight pipeline in Q3 [i.e., the third quarter]" because of "the fact it usually takes a quarter or two to build your pipeline, especially for a company of [Splunk's] size."

76.    The Company instituted its hiring freeze in early 2020, and it continued throughout the Class Period. FE 3 explained that the hiring freeze started in February or March 2020 and continued until when he left the Company in December 2020. FE 3 further explained that Defendant Merritt referenced the hiring freeze at an all-hands Company meeting conducted via Zoom. He believes the all-hands meeting likely occurred in March 2020. FE 3 added that he was also informed of the hiring freeze by his bosses in a product all-hands meeting.

---

[52] FE 6 worked as a Sales Director in Washington DC Area from 2016 to June 2020 and reported to Frank Dimina (VP, Public Sector) who in turn reported to Christian Smith.

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

1    77.    FE 4, a former Regional Sales Manager at Splunk, also described how Splunk

2    instituted a hiring freeze by late February or early March 2020. FE 4 recounted that he knew that

3    the hiring freeze was ongoing in the months leading up to September 2020 because he had

4    submitted people for job openings. He was tracking the requisitions for job openings, which were

5    still frozen leading up to September 2020. FE 4 recounted that he also heard about the hiring freeze

6    from Senior Vice Presidents at the Company and added that everyone in the Sales group knew that

7    hiring was frozen. FE 4 further explained that the hiring freeze would also be discussed on monthly

8    calls because employees would ask about the status of the hiring freeze—a subject of employee

9    interest because they would get paid money if a job applicant they submitted for hiring got hired.

10    78.    FE 7, a former Account Executive at Splunk, similarly confirmed that Splunk

11    definitely implemented a hiring freeze. FE 7 explained he received an email about the hiring freeze

12    during the second week of March, which he thinks was sent by Susan St. Ledger, the President of

13    Worldwide Field Operations (i.e., the head of sales). FE 7 related that the hiring freeze was in

14    place until after he left the Company.[53]

15    79.    The impact of Splunk's hiring freeze was significant. FE 4 explained that Splunk

16    wanted to hire more people in the beginning of 2020. He explained that Splunk was short on sellers

17    at the beginning of 2020, as compared to the Company's growth plan. FE 4 explained that the

18    Company intended to start the hiring effort pretty immediately in early 2020. FE 4 added that, in

19    light of the hiring freeze, they had to freeze hiring candidates to whom they had already tendered

20    offers. FE 8 added that the Splunk sales team is usually very aggressive in hiring during January

21    and February because they want to get as many people in before the sales kickoff in March, but

22    that they did not do that in 2020.[54]

---

[53] FE 7 was an Account Executive at Splunk from February 2019 to May 2020. FE 7 was responsible for new and existing customers in the Mid-Atlantic, covering Washington, D.C. and Baltimore.

[54] FE 8 was a Finance Manager, Sales at Splunk from November 2018 to March 2020 and supported sales in a financial planning and analysis role. He reported to Jocelyn Yeh, the Director of Finance.

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

80.     The hiring freeze affected the sales team's ability to generate revenues. FE 4 explained that, when the Company is able to hire more salespeople, the territories get smaller. FE 4 further described that, as a result of the hiring freeze, Splunk expanded territories and gave existing salespeople more accounts because they were not able to hire. FE 4 said that, as a result of the hiring freeze, Splunk had accounts sitting there that were not being covered; therefore, he believes the lack of hiring would affect the Company's ability to sell.

81.     FE 4 explained that he knew the effects of the hiring freeze firsthand. FE 4 explained that he had to move territories in the middle of the fiscal year because Splunk had accounts that were not being covered because Splunk did not have enough salespeople. The territory had already been allotted, but Splunk did not have a sales representative to cover it because they had not been able to hire due to the hiring freeze. FE 4 described the impact on sales of shifting salespeople to different territories because of the hiring freeze. FE 4 explained that he had to take on new territories, and it takes three to four months to build a pipeline after starting in a new territory. FE 4 added that the hiring freeze affected sales because there were not as many sales representatives and their quotas were higher.

82.     FE 8 explained that he learned that sales leadership was worried about not getting the headcount to support the Company's top line and growth. The VP of Finance at the time told FE 8 he was having a hard time with sales leadership. In addition, FE 8 reported that, on the indirect sales side, the VP of Partnerships, Aziz Benmalek, had a request for a lot of headcount that was not approved because the Company did not have the budget. Benmalek's concern, FE 8 explained, was that he could not deliver on the growth targets without the headcount. FE 8 explained that he could see the headcount requests by Sales and that they were not approved. He saw this on a Google sheet shared with all of the Finance team. The document was a list of all the initiatives and projects by department and showed the kind of dollar impact each request would have. FE 8 explained that, in 2020, there were more conversations and arguments about the headcount asks because the top-line growth was so aggressive and Splunk would need extra investment to support that growth.

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

83.     Defendants implemented the hiring freeze to address short-term concerns about operating cash flows, notwithstanding the long-term impact of this corporate action on the Company's future growth. FE 8 explained that there was a concern at Splunk with the relationship between growth and revenue and growth in operating expenses. FE 8 recounted that cashflow at the time was negative and Splunk wanted to keep specific margins and bring back cash flow. FE 8 further explained that it looked like, with the plan for growth in operating expenses at the time, Splunk would not get to positive cash flow, so they were trying to fix it by slowing headcount because headcount was always a big bucket of expenses. FE 8 added that Susan St. Ledger, the President of Worldwide Field Operations, told Finance that they would need a higher headcount if they wanted the kind of growth they were asking for, but St. Ledger was not being given it. FE 8 believes this was discussed in one of the plan or budget meetings, which would have included all the executives, including the CEO, CFO, and Vice Presidents of all the departments.[55]

### 3.    Splunk Conducted Layoffs During the Class Period

84.     As noted above (*see* ¶52), Defendant Merritt was specifically asked by the financial press in June 2020 whether he was "thinking about potential layoffs or cutbacks." In response, he assured investors that "things are going well" and, before the Company made any such layoffs or cutbacks, "[t]here would have to be some really unexpected shifts in the macro environment beyond what we've already modeled." Unknown to investors at the time, this was simply not true. In reality, the Company had already conducted layoffs and had already made substantial cutbacks, including a suspension of marketing investments and a freeze on hiring.

---

[55] Susan St. Ledgers, who had overseen Splunk's go-to-market capabilities, resigned from Splunk during the Class Period. Though her departure was known, her internal disagreements over the budget and headcount required to meet the Company's goals were never disclosed. Instead, on September 24, 2020, Splunk announced that St. Ledgers was leaving Splunk to join another technology organization. Splunk did not fill her position, but instead promoted three executives underneath her, including Christian Smith (then-senior vice president, Global Sales, who was promoted to Chief Revenue Officer), John Sabino (then-senior vice president of Customer Success, who was promoted to Chief Customer Officer) and Carrie Palin (who remained senior vice president and Chief Marketing Officer). All three of these executives thereafter reported directly to Defendant Merritt.

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

85.     FE 9, a Sales Account Manager at Splunk, confirmed that he was laid off at the beginning of May 2020, and that the layoffs were called "D-day" at Splunk. He was told by his colleagues at the time that he was on the "front line of D-Day," and that some of the Company's top salespeople were also fired close to the time when he was.[56]

86.     FE 6 confirmed that over 100 people across the Company were let go in a layoff, which he believed occurred in April or May 2020. FE 6 was aware of the layoffs because they were documented to him from Vice Presidents, who are still with the Company, via emails and also verbally. FE 6 confirmed that the layoffs were across the board, including salespeople.

87.     FE 6 further stated that Splunk's CEO, Defendant Merritt, absolutely knew about the reduction in force because Merritt announced it at an all-hands meeting. FE 6 explained that there was an all-hands meeting—which he believes occurred in early May 2020 and before his departure on June 8, 2020—the purpose of which included discussing the layoffs. In that all-hands meeting, Defendant Merritt spoke about having to make the "hard decision" of the layoffs.

88.     The Company's layoffs during the Class Period included the entire "new logo" team. The new logo team was responsible for bringing in "net new" business. Far from Defendants' representations that Splunk was "continuing to invest in sales capacity" during the Class Period and having the sales team "make sure [Splunk] buil[t] an adequate pipeline"—as Defendants told investors—Splunk did away with the entire new logo team and supporting positions in May 2020, effective June 2020.

89.     FE 10 was a member of the new logo team that was laid off. FE 10 reported that around the beginning of May or June 2020, he received an email on a Sunday night informing him of a mandatory meeting the following day. FE 10 explained that this was a very odd occurrence, so he knew it was going to be a major announcement. FE 10 recalled that Christian Smith (Splunk's then-senior vice president, Global Sales), led the Monday call and announced that the new logo

---

[56] FE 9 was a Sales Account Manager at Splunk from March 2020 to May 2020.

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

team had been terminated. FE 10 explained that the termination did not occur immediately after the meeting, but rather that the release of everyone on the team happened at the end of June 2020.[57]

90.     All members of the new logo team were terminated. FE 10 recounted that the management levels, including sales management, for the new logo group were let go with the rest of the sales team. FE 10 noted that, Scott McFadden, as well as FE 10's direct manager, Danitza Johnson, were also terminated.

91.     FE 11 was another new logo member who was terminated. FE 11 stated that he was terminated in June 2020, along with the rest of the new logo team. FE 11 explained that the new logo team was aimed at bringing in new business: they were given territories that they were in charge of managing along with an account list, and they would reach out to the accounts and try to bring new customers to Splunk. FE 11 specifically recalled that the new logo team was way above expectations and projections in 2020; thus, they were shocked when they were let go. FE 11 further recalled that the new logo team was over 100% for their objective for the first quarter of 2020, which was information he received from Splunk's regional Vice President.[58]

92.     FE 1 was also a member of the new logo team, and also laid off in June 2020. Like the rest of his colleagues, FE 1 corroborated that the entire new logo team was responsible for finding new business, and that team was terminated. The terminations included vice presidents, directors, and salespeople. FE 1 added that the new logo group had frequent communications from Defendant Merritt, including emails once or twice a month, and weekly update calls after the pandemic began.

## VI.     THE TRUTH EMERGES

93.     Although Defendant Merritt and his colleagues announced internally that Splunk had suspended its marketing investments, instituted a hiring freeze, and conducted significant layoffs, they told investors the opposite. As discussed above, Defendants told investors that (1) "we continue to … invest in marketing programs"; (2) we are "definitely still hiring"; and (3)

---

[57] FE 10 was a Regional Sales Manager based out of Orange County from June 2019 to July 2020.
[58] FE 11 was a Regional Sales Manager at Splunk in New York from April 2019 to June 2020.

we would only make layoffs or cutbacks if there were "some really unexpected shifts in the macro environment beyond what we've already modeled."

94.     Defendants could eventually no longer conceal the truth. After the market closed on December 2, 2020, Splunk issued a press release announcing a hard miss in its third-quarter financial results. Splunk reported an 11% year-over-year drop in total revenues, missing estimates by nearly $60 million. Splunk also announced that its third-quarter net loss ballooned to $201.5 million—a nearly four-times greater loss than the prior year.

95.     Later that day, Splunk held an earnings call to discuss the Company's quarterly results. During that call, Defendant Merritt conceded that the Company's results fell "certainly short of both our expectations and our communication of those expectations." Defendants withdrew their guidance that the Company would eclipse $1 billion in positive cash flow by 2023.

96.     On December 3, 2020, Defendant Child participated in a KeyBanc Capital Markets investor conference to field questions from investors and analysts. During the conference, Defendant Child discussed what drove Splunk's earnings miss. When the conference host, Michael Turits, asked "what happened?," Defendant Child finally revealed that Defendants took a series of undisclosed corporate actions in the beginning of 2020 that impacted the Company's revenues. Specifically, Defendant Child stated that, beginning "[w]hen the pandemic hit" (i.e. early March 2020), Splunk "suspended investments in marketing" and "froze hiring." He further admitted that the hiring freeze lasted "a few months" and that Splunk's corporate actions caused the Company to have "a tighter pipeline going into Q3" because of "the fact it usually takes a quarter or two to build your pipeline, especially for a company of [Splunk's] size."

97.     Splunk's stunning disclosures sent the Company's stock price tumbling. On December 3, 2020 Splunk's stock price plummeted 23% in a single trading day, falling from a closing price of $205.91 on December 2, 2020 to close at $158.03 per share on December 3, 2020, with high trading volume. As a result of this stock price decline, investors lost over $7.7 billion in shareholder value.

98.     Analysts were blindsided by Defendants' revelations and immediately downgraded the Company's stock. In issuing their downgrades, analysts at the investment firm Summit Insights

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

Group poignantly noted that "Splunk inflicted a garish wound to its credibility," including because the Company did not make their disclosures and withdraw their reiterated guidance earlier.[59] Cowen's analysts slashed their estimates and lowered their price target for Splunk's shares, reporting that "[t]his was a sizable miss" and noting that "with mgmt [management] rescinding its FY23 targets, the model transition bridge that investors have hung onto is now off the table."[60] J.P. Morgan also downgraded the stock, reduced its price target, and reported being "blindsided" by the revelations and noted that "[i]n a blow to investor confidence in its transition story, the company also suspended its FY23 OCF [i.e., Operating Cash Flow] guidance of $1B."[61] Analysts at Stifel Nicolaus also downgraded Splunk's stock, slashed its price target, and told investors that "[t]he magnitude of the miss and its long-term implications is especially surprising."[62] BTIG's analysts likewise wrote that Splunk was "too hard to defend" and downgraded the Company's stock, calling the news a "big disappointment."[63] Guggenheim likewise penned that the "[m]agnitude of the shortfall is pretty material; Implies ~25% of the business expected in the quarter did not materialize" and told investors that it "continue[s] to remain on the sidelines" while removing its price target for Splunk's stock altogether.[64] Truist Securities joined the negative sentiment, slashing its price target and reporting that "Splunk reported surprisingly disappointing 3Q21 numbers, despite just over a month ago at their analyst day (Oct. 21) being very sanguine about their near-term and long-term prospects."[65] Truist Securities noted that the most "disappointing" aspect of the Company's announcements was its "withdraw[al] [of] its long-term outlook of operating cash flow and ARR." William O'Neil withdrew its rating of Splunk

---

[59] Summit Insights Group analyst report: *Splunk (SPLK: HOLD) – Downgrading to HOLD and setting a new $160PT* (Dec. 2, 2020).

[60] Cowen Research analyst report: *Misses 3Q and Rescinds FY23 Targets; Lowering PT to $175* (Dec. 3, 2020).

[61] J. P. Morgan analyst report: *ARR Growth Still Strong at Scale, but Bookings Dip a Surprise; Downgrading to N* (Dec. 3, 2020).

[62] Stifel Nicolaus analyst report: *Downgrading to Hold and Lowering Target to $160* (Dec. 3, 2020).

[63] BTIG analyst report: *SPLK: Too Hard to Defend. Downgrade to Neutral* (Dec. 3, 2020).

[64] Guggenheim analyst report: *SPLK – Revenue and ARR Miss; FY23 ARR Guide Withdrawn* (Dec. 3, 2020).

[65] Truist Securities analyst report: *You Got Splunk(ed)!* (Dec. 3, 2020).

altogether, calling out the most important news that "management withdrew its long-term FY23 target."[66] *Investing.com* likewise reported that "Splunk spelunked after disappointing earnings," highlighting that the Company "withdrew [its] 2023 guidance, which had helped support the surge in shares this year, when they hit an all-time high."[67] Even Jim Cramer, the host of CNBC MadMoney, who had been a champion of Splunk for years, reported on December 3, 2020 that Splunk "won't ever be viewed the same way."[68]

99.     Analysts and market commentators also noted the disparity between Splunk's and other software companies' results. For example, *Bloomberg* reported on December 3, 2020 that Splunk's quarterly results were "shockingly weak" and "a stark exception to the advance" of its competitors, which "all jumped to records with double-digit advances" while Splunk "collapsed as much as 26%."[69] *Bloomberg* included the below chart in its report showing how Splunk's performance had consistently tracked its competitors—including Okta, Zscaler, and Crowdstrike Holdings—until the revelations at the end of the Class Period:



---

[66] William O'Neil analyst report: *Remove Buy Recommendation* (Dec. 3, 2020).
[67] Christiana Sciaudone, *Splunk Spelunked After Disappointing Earnings; Analysts Drop Price Targets,* INVESTING.COM (Dec. 3, 2020).
[68] *Jim Cramer: Software Companies to Buy That Aren't Splunk*, MSN: THESTREET (Dec. 3, 2020), https://www.msn.com/en-us/money/topstocks/jim-cramer-software-companies-to-buy-that-arent-splunk/vp-BB1bBBXA.
[69] Ryan Vlastelica, *Splunk Results Look Even Worse Against Blowouts From Peers*, BLOOMBERG (Dec. 3, 2020), https://www.bloomberg.com/news/articles/2020-12-03/splunk-results-look-even-worse-against-blowouts-from-peers.

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

100.     The fallout has continued. Numerous Splunk top executives have announced their sudden and unexpected resignations. These executives include Susan St. Ledger, President of Worldwide Field Operations, who abruptly resigned without replacement in September 2020; Tim Tully, the Chief Technology Officer, who abruptly resigned without a replacement in April 2021; and Carrie Palin, the Company's Chief Marketing Officer, who abruptly resigned without a replacement or an announcement in May 2021.

101.     Splunk's investors continue to suffer as a consequence of Defendants having concealed their suspension of marketing investments, freezing of hiring, and laying off of critical employees. On March 3, 2021, Splunk again reported lackluster revenues—not the expected sky-rocketing revenues of a "high growth" company. And commentators have explained that "the extent of the [Company's] true economic losses is huge, with net losses reported at more than $900 million last year on essentially $2.2 billion in revenues."[70] To this day, Splunk's stock price has still not recovered and, in fact, continues to decline. Defendant Child himself has now admitted— contrary to his glowing assessments throughout the Class Period—that Splunk "went through what transformation experts like to call <u>the valley of death</u>" during 2020, with "<u>negative revenue, negative margin, negative cash flow</u>."[71]

## VII.     DEFENDANTS' FALSE AND MATERIALLY MISLEADING STATEMENTS AND OMISSIONS

102.     Defendants made a series of false and misleading statements during the Class Period. Specifically, Defendants represented to investors that: (i) Splunk was continuing to invest in marketing when, in truth, it suspended its investments in marketing; (ii) Splunk was continuing to hire when, in truth, it froze hiring; and (iii) Splunk was not laying off employees when, in truth, it had conducted layoffs, including the termination of its entire "new logo" unit.

---

[70] The Value Investor, *Splunk - Still In Transition*, SEEKING ALPHA (Apr. 18, 2021), https://seekingalpha.com/article/4419619-splunk-still-in-transition.
[71] Eric. J. Savitz, *Splunk Fell Behind in the Cloud Era. Now It's Catching Up and the Stock Could Soar*, BARRONS MAGAZINE (Mar. 22, 2021).

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

**A.     Defendants' Class Period Annual and Quarterly SEC Filings**

103.     On March 26, 2020, the first day of the Class Period, Splunk filed its annual report on Form 10-K (the "Form 10-K"). The Form 10-K was signed by Defendants Merritt and Child.

104.     Defendants' statements in the Form 10-K assured investors that Splunk was investing, and would continue to invest, in marketing. Specifically, Defendants told investors in the Form 10-K that "we continue to … invest in marketing programs" and "we intend to continue to make directed and substantial investments to expand our … marketing."

105.     Defendants' statements identified in ¶104 were false, misleading, and omitted material facts. As Defendant Child ultimately admitted, Splunk "suspended investments in marketing" by early to mid-March. ¶96. Former Splunk employees have confirmed that, by no later than March 2020, before the statements in ¶104 were made, Splunk's executives suspended the Company's investments in marketing. *See* Section V.E.1, *supra*. The Company's suspension of marketing investments restricted its sales pipeline and resulted in disappointing revenues during the third-quarter (i.e., the quarter ending October 31, 2020 (the "Third Quarter"))—facts also admitted by Defendant Child at the close of the Class Period. ¶96.

106.     In its Form 10-K, Defendants also led investors to believe that the Company was continuing to aggressively hire new employees, including sales personnel. Specifically, Defendants stated in the Form 10-K that (1) "we continue to hire additional personnel"; (2) "[w]e expect to continue to aggressively expand our sales and marketing organizations to market and sell our software both in the United States and internationally"; and (3) "[t]he key elements of our growth strategy are to," among other things, "[c]ontinue to expand our direct and indirect sales organization."

107.     Defendants' statements identified in ¶106 were false, misleading, and omitted material facts. Defendant Child has admitted that Splunk "froze hiring" by early to mid-March. ¶¶50, 96. Former Splunk employees have confirmed that, by no later than March 2020, before the statements in ¶106 were made, Splunk's executives instituted a Company-wide hiring freeze on sales personnel. *See* Section V.E.2, *supra*. They have further recounted that this freeze on hiring remained in effect throughout the Class Period. *Id.* Even Defendant Child later admitted to the

Company's hiring freeze, which he said began in "early mid-March," continued for a "few months"—meaning, that it was still in place by the date of Defendants' false statements identified in ¶106. The Company's hiring freeze restricted the Company's sales pipeline and caused disappointing revenues during the Third Quarter—facts also admitted by Defendant Child at the close of the Class Period. ¶96.

108.    On June 1, 2020 and September 3, 2020, Defendants issued additional quarterly reports on Form 10 Qs that falsely and misleadingly repeated that "we continue to … invest in marketing programs" and "we intend to continue to make directed and substantial investments to expand our … marketing." These statements were false and misleading for the same reasons set forth in ¶105, because, in truth, Defendants had suspended Splunk's investments in marketing. *See* Section V.E.1, *supra*.

109.    The Company's quarterly reports filed on June 1, 2020 and September 3, 2020 also falsely and misleadingly repeated that (1) "we continue to hire additional personnel"; (2) "[w]e expect to continue to expand our sales and marketing organizations to market and sell our software both in the United States and internationally"; and (3) "[t]he key elements of our growth strategy are to," among other things, "[c]ontinue to expand our direct and indirect sales organization." These statements were also false and misleading for the same reasons set forth in ¶107 because, in truth, Defendants had instituted a hiring freeze and, in fact, conducted significant layoffs, including of the entire "new logo" unit responsible for generating new customers. *See* Section V.E.2-3, *supra*.

**B.    Splunk's May 21, 2020 First Quarter Earnings Call**

110.    On May 21, 2020, Splunk held an earnings call to announce the results for its first quarter of the fiscal year. Defendants Merritt and Child spoke to investors and analysts on behalf of Splunk. During the question and answer portion of the call, an analyst asked Defendants, "about where you are sort of seeing the momentum coming out of April into May, … how sort of pipeline and sort of bookings, any sort of changes in end of April, May versus end of March and April?" In response, Defendant Merritt stated, in part:

> There is a lot of concerted effort that <u>the sales teams are driving along with helping the marketing teams to make sure that we build an adequate pipeline</u>. It's definitely – as you'd imagine, everyone's got to take different angles to build that pipe. Like many enterprise software companies, the field is responsible for a lot of that pipe gen, and that obviously comes from their activity day in and day out with customers that they're visiting. And now they're visiting virtually. So as you – I'm sure, you've seen with other software and cloud companies, we've got a ton of virtual events. <u>Our campaign cadence remains high</u>.

111.    Defendant Merritt's statements identified in ¶110 were false. The Company's marketing "campaign cadence" did not "remain[] high." To the contrary, as Defendant Child ultimately admitted, the Company "<u>suspended investments in marketing</u>" by early to mid-March. ¶96. Former Splunk employees have confirmed that, by no later than March 2020, before the statements in ¶110 were made, Splunk's executives instituted a Company-wide suspension of marketing investments. *See* Section V.E.1, *supra*. The Company's suspension of marketing investments, which remained in effect throughout the Class Period, restricted the Company's sales pipeline and resulted in disappointing revenues during the Third Quarter—facts admitted by Defendant Child at the end of the Class Period. ¶96.

112.    Defendant Merritt's statements identified in ¶110 were also highly misleading, omitting material facts. Having chosen to tout how Splunk's marketing team was "mak[ing] sure that [Splunk] build[s] an adequate pipeline" and that its "campaign cadence remains high," Defendant Merritt was obligated (but failed) to disclose adverse information about these matters that cut against the positive representations including, as Defendant Child ultimately admitted, that Splunk had "suspended investments in marketing," leading to "a tighter pipeline going into Q3." ¶96. As well-placed former Splunk employees corroborated, by no later than March 2020, Splunk had frozen its marketing investments. *See* Section V.E.1, *supra*. In addition, Splunk had already internally announced that it would fire the entire "new logo" team, which was responsible for generating pipeline. *See* Section V.E.3, *supra*.

113.    During the same investor conference, another analyst asked Defendant Child, "where is hiring, I guess, based on your thought process coming into this year? I'd imagine you guys might have had to rethink that in March. And maybe what's the thought process on that now?"

In response, Defendant Child stated, "Yeah. Regarding head count. So, yeah, when everything started slowing down in early mid-March, we definitely did kind of put a freeze on hiring and look at what – to try to get a better sense of what the environment was going to – how it's going to unfold. It's been pretty clear that the underlying growth within our business is very healthy. <u>So, we have been opening up hiring related to DQCs [direct quota-carrying sales representatives], of course, to serve the growth needs that are going to continue.</u>" He added, "<u>So, those areas we're definitely still hiring.</u>"

114.    Defendant Child's statements identified in ¶113 were false, misleading, and omitted material facts. Splunk employees have recounted that the Company's freeze on hiring sales personnel remained in effect throughout the Class Period. *See* Section V.E.2, *supra*. Even Defendant Child later admitted to the Company's hiring freeze, which he said began in "early mid-March," continued for a "few months"—meaning, that it was still in place by the date of his false statements identified in ¶113. The Company's hiring freeze restricted the Company's sales pipeline and caused disappointing revenues during the third quarter—facts also admitted by Defendant Child at the close of the Class Period. ¶96.

## C.    June 8, 2020 Silicon Valley Business Journal

115.    On June 8, 2020, the Silicon Valley Business Journal published an interview of Defendant Merritt. In the interview, Defendant Merritt led investors to believe that the Company had not conducted any layoffs and had not made cutbacks because, as he stated, "things are going well" for Splunk. He further led investors to believe that "[t]here would have to be some really unexpected shifts in the macro environment beyond what we've already modeled" before the Company conducted "layoffs or cutbacks." Specifically, he had the following exchange with the questioner from the Silicon Valley Business Journal:

> **Question:** <u>Have you made any commitments to not do any layoffs? Are you thinking about potential layoffs or cutbacks?</u>
>
> **Merritt:** I was pretty vocal internally that I am not going to make a commitment to no layoffs, only because it's such an uncertain time. <u>Right now things are going well for many tech companies, us included,</u> but I just didn't want to get in a position where I declared "Hey, no layoffs for the year," and <u>then the worst-case scenario happens and I've</u>

got to go back and say "Hey, I'm sorry for that commitment." The commitment I did make is our plans for the year are to grow headcount and spend... I still believe that we'll wind up with a bigger company in all ways at the end of calendar year 2020 versus what we entered calendar 2020. Through Q1, that looks like the right decision as people are moving all digital really quickly and really dependent on IT infrastructure to actually work and cybersecurity resiliency and try and make sense of the data. The customer reaction has continued to be really strong for Splunk. There would have to be some really unexpected shifts in the macro environment beyond what we've already modeled.

116.    Defendant Merritt's statements identified in ¶115 were false, misleading, and omitted material facts. It was false or, at minimum, highly misleading for Defendant Merritt—in answering the question of whether he is "thinking about potential layoffs or cutbacks"—to state that "[t]here would have to be some really unexpected shifts in the macro environment beyond what we've already modeled." Indeed, by the time of Defendant Merritt's statements, the Company had already made substantial cutbacks and layoffs, including (1) a suspension of all investments in marketing; (2) a freeze on hiring; and (3) layoffs of salespeople and other employees, including a planned layoff of the entire new logo team. *See* Section V.E.1-3, *supra*. These actions had significant ramifications, with Defendant Child admitting at the end of the Third Quarter that they "led to [the] tight pipeline in Q3" because of "the fact it usually takes a quarter or two to build your pipeline, especially for a company of [Splunk's] size." ¶96.

**D.    September 14, 2020 Jefferies Virtual Software Conference**

117.    On September 14, 2020, Splunk spoke at the Software Virtual Conference hosted by the analyst firm Jefferies. Defendant Child attended on behalf of Splunk. During the investor conference, Jefferies asked Defendant Child "when you think about how your plans in hiring and adding direct quota-carrying reps and going – kind of trying to get back to normal, how do you think about this year and what changes you've made around hiring and go-to-market resources? How has that shifted through the year for you?" In response, Defendant Child stated that "from our perspective, we're continuing to hire DQCs [i.e., direct quota-carrying sales representatives]. We're having to – we're growing" and that because of that growth, "we have to be continuing to invest in sales capacity. Because again, we're not a self-service model. We're – the sales team

drives all of the growth." He added, "we also have to continue to staff up for capacity" and "we're definitely going to <u>continue to be hiring</u>."

118.    Defendants' statements identified in ¶117 were false, misleading, and omitted material facts. Defendant Child has admitted that Splunk "<u>froze hiring</u>" by early to mid-March 2020. ¶¶50, 96. Former Splunk employees have further recounted that the Company's freeze on hiring of sales personnel remained in effect throughout the Class Period, up until December 2020. *See* Section V.E.2, *supra*. Additionally, the Company laid off its entire new logo team responsible for bringing in new customers. *See* Section V.E.3, *supra*. As Defendant Child admitted at the end of the Class Period, the Company's hiring freeze restricted the Company's pipeline entering the Third Quarter and resulted in disappointing revenues during the Third Quarter. ¶96.

## VIII.    <u>ADDITIONAL SCIENTER ALLEGATIONS</u>

119.    A host of facts, in addition to those discussed above, raise a strong inference that Defendants knew or were deliberately reckless in not knowing that their Class Period misrepresentations were false or misleading when made.

120.    ***Defendants admitted that Splunk suspended its marketing investments and implemented a hiring freeze.*** Defendant Child admitted at the end of the of the Class Period that they "suspended investments in marketing" and "froze hiring," which together caused Splunk to have "a tighter pipeline going into Q3." ¶96. These admissions directly contradict Defendants' repeated statements during the Class Period, including their statements in Splunk's SEC filings that "we continue to hire additional personnel and invest in marketing programs."

121.    ***Defendant Merritt personally announced the Company's hiring freeze and suspension of marketing investments during all-hands meetings attended by the Company's employees.*** Multiple Splunk employees have recounted how Defendant Merritt personally announced the decision to suspend marketing investments, freeze hiring, and lay off employees during all-hands meetings in early 2020. *See* Section V.E.1-3, *supra*. Having personally announced these corporate actions, Defendant Merritt cannot plausibly claim he lacked knowledge of them.

122.    ***In response to pointed investor questions, Defendants Merritt and Child directly denied that Splunk was suspending investments, freezing hiring, and laying off employees.***

Analysts repeatedly questioned Defendants during the Class Period about whether they were making cutbacks. In response, Defendants repeatedly denied they were doing so. For example, when Defendant Child was asked about hiring on May 21, 2020, he assured investors that Splunk was "definitely still hiring." ¶50. When he was asked a few months later about hiring, he said again, that Splunk was "definitely going to continue to be hiring." ¶117. Defendant Merritt was also specifically asked on June 8, 2020 about whether Splunk was "thinking about potential layoffs or cutbacks," to which he replied, "There would have to be some really unexpected shifts in the macro environment beyond what we've already modeled." ¶52. Defendants' specific denials—in the face of specific questions—further bolsters the scienter inference.

123. ***Marketing investments were critical to Splunk's success.*** As Defendant Merritt admitted to the Company's Chief Marketing Officer, "'the world doesn't know about [Splunk].'" ¶41. Marketing investments were imperative to change this. ¶¶39-42. Indeed, Defendants reported to investors in Splunk's SEC filings that "maintaining and enhancing the 'Splunk' brand identity is critical to our relationships with current customers and partners and to our ability to attract new customers and partners." ¶43. Defendants further acknowledged in the Company's SEC filings that "the successful promotion of our brand will depend largely upon our marketing efforts." *Id.* Defendants knew, or were deliberately reckless in not knowing, that the Company suspended these all-important marketing investments so critical to the Company's high-growth business plan.

124. ***Sales personnel were critical to Splunk's success.*** Without sales professionals to actually sell Splunk's software products, Splunk could not generate the high growth they promised to investors. ¶53. Defendants publicly recognized that hiring and maintaining sales personnel was necessary for Splunk to achieve its promised growth. ¶54. The Company also emphasized the importance of its sales personnel in its SEC filings, explaining that the Company was "substantially dependent on [its] sales force to effectively execute [its] sales strategies to obtain new customers and to drive additional use cases and adoption among [its] existing customers" ¶55. It further acknowledged that Splunk's "ability to achieve significant revenue growth will depend, in large part, on [its] success in recruiting, training and retaining sufficient numbers of sales personnel to support [its] growth." *Id.* Given their critical importance, Defendants knew, or were deliberately

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

reckless in not knowing, that the Company froze hiring and, in fact, laid off the Company's entire new logo unit responsible for attracting new customers.

125.     ***The Executive Defendants were responsible for corporate decisions, including when and whether to suspend investments in marketing, freeze hiring, and conduct layoffs.*** The Executive Defendants knew about, and were consulted on, decisions to alter the Company's core operational investment strategies. As the Company has explained in its SEC filings, Defendant Merritt was the Company's "chief operating decision maker," including "for purposes of making operating decisions, assessing financial performance and allocating resources." ¶21. And Defendant Child has recounted in his own words that he was hired by Splunk in May 2019 to "clean-up" the Company's "really messy" financials. ¶60. Given their roles and responsibilities, the Executive Defendants knew, or were deliberately reckless in not knowing, that the Company suspended marketing investments, froze hiring, and conducted layoffs.

126.     ***Defendants' misstatements enabled the Company to complete a needed debt offering.*** With a mounting deficit from years of net losses, swelling to over $1.8 billion by April 2020, a cash intensive business, and a changed busines model that left cash inflows depleted for several years to come, Splunk needed to secure additional financing to push out and refinance outstanding debt obligations, fund their compensation packages, and pay for operations. ¶¶59-60. To do so, Splunk planned and completed on June 5, 2020, a $1.265 billion bond offering. ¶61.

127.     It was critical for Splunk to allay investor concern during the Class Period in order to successfully complete its bond offering. Had Splunk disclosed that it had suspended its all-important marketing investments, frozen hiring, and fired the "new logo" unit, the price of the offered debt would have cratered and the Company may have been unable to complete the offering altogether. Indeed, when the truth was revealed at the close of the Class Period, the price of the debt that the Company issued months earlier during the Class Period fell 11% in a single day, from $113.26 on December 2, 2020 to $100.82 on December 3, 2020. By delaying disclosure of its suspension of marketing investments and hiring freeze, Defendants were able to complete their debt offering, and to do so on favorable terms—facts that further strengthen the scienter inference.

128. ***Defendants' misstatements enabled the Executive Defendants to secure shareholder approval of their outsized compensation packages.*** The Company's executives personally took advantage of the favorable investor sentiment they had created through their misstatements to secure shareholder approval of their outsized compensation packages. ¶62. The Company's Compensation Committee asked shareholders to support the Executive Defendants' lavish compensation packages through a "Say-on-Pay" vote on June 11, 2020—just three days after Defendant Merritt falsely told the financial press that "things are going well" at Splunk and that, before the Company made any layoffs or cutbacks, "[t]here would have to be some really unexpected shifts in the macro environment beyond what we've already modeled." ¶¶52, 62. As a result of Defendants' positive statements, Splunk's shareholders voted to approve Defendant Merritt's $15.71 million in pay—representing a 16% increase from the prior year—and Defendant Child's even bigger pay package totaling $17.485 million. The shareholders also approved of each Defendant securing a base salary raise for the following year. Delaying disclosure of the Company's suspension of marketing and hiring allowed the Executive Defendants to buoy investor sentiment and receive approval of their outsized compensation packages. *See* Section V.D, *supra*.

129. ***Defendant Merritt received substantial performance-based compensation for suspending marketing investments, freezing hiring, and committing layoffs.*** Splunk's unique compensation structure incentivized the Executive Defendants to lower operating expenses to prop up operating cash flow in the short-term during the Class Period. Defendant Merritt's compensation for the year ending January 21, 2021 was 75% "performance based," with his compensation multiplied in the event that the Company surpassed its target performance metrics, one of which was operating cash flow. By suspending marketing investments, freezing hiring, and laying off the new logo team, Splunk's executives were able to report operating cash flow that beat its targets by $89 million. Because Splunk surpassed its targets, Defendant Merritt received approximately $3.6 million in additional incentive compensation, notwithstanding that his corporate actions harmed the Company's performance in future quarters.

130. The foregoing facts, particularly when considered collectively (as they must be), support a strong inference of Defendants' scienter.

## IX.   **LOSS CAUSATION**

131.    The market price of Splunk's publicly traded common stock was artificially inflated and/or maintained by the material misstatements and omissions alleged herein.

132.    Splunk's stock price was artificially inflated and/or maintained by Defendants' omissions and statements that (i) Splunk was continuing to invest in marketing when, in truth, it suspended its investments in marketing; (ii) Splunk was continuing to hire when, in truth, it froze hiring; and (iii) Splunk was not laying off employees when, in truth, it had conducted significant layoffs, including the termination of its entire "new logo" unit. The artificial inflation in Splunk's stock price was removed when the conditions and risks misstated and omitted by Defendants were revealed to the market and/or materialized. The information was disseminated through disclosures after hours on December 2, 2020 and during trading hours on December 3, 2020. These disclosures reduced the amount of inflation in the price of Splunk's publicly traded stock, causing economic injury to Lead Plaintiff and other members of the Class.

133.    Specifically, after the market closed on December 2, 2020, Splunk issued a press release announcing a hard miss in its third-quarter financial results. Splunk reported an 11% year-over-year drop in total revenues, a miss of EPS analyst estimates, and a net loss that widened to $201.5 million.

134.    Shortly thereafter, again after the market closed on December 2, 2020, Splunk held an earnings call to discuss the Company's quarterly results. Defendant Merritt admitted that the Company's results fell "certainly short of both our expectations and our communication of those expectations." Defendant Merritt noted a "much lower-than-normal close rate among our largest deals." The Company also completely withdrew its estimates reiterated just ten days before the close of the quarter for its operating cash flow for fiscal year 2023.

135.    Then, on December 3, 2020, during trading hours, in a follow-up conference call with investors, Defendant Child revealed that beginning "[w]hen the pandemic hit," Splunk "froze hiring" and "suspended investments in marketing." He further admitted that these cutbacks lasted "a few months" and caused Splunk to have "a tighter pipeline going into Q3" because of "the fact

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

it usually takes a quarter or two to build your pipeline, especially for a company of [Splunk's] size."

136.    Splunk's stunning disclosures sent the Company's stock price tumbling 23% in a single trading day, falling from a closing price of $205.91 on December 2, 2020 to close at $158.03 per share on December 3, 2020, with high trading volume.

137.    Analysts were blindsided by the Company's revelations and immediately downgraded the stock. Summit Insights Group analysts downgraded the stock on December 2, 2020, stating "Splunk inflicted a garish wound to its credibility."[72] Likewise, on the same day, Cowen analysts slashed their estimates and lowered their price target for Splunk's shares, reporting that "[t]his was a sizable miss" and "with mgmt [management] rescinding its FY23 targets, the model transition bridge that investors have hung onto is now off the table."[73] J.P. Morgan also downgraded the stock, reduced its price target, and reported being "blindsided" by the disclosures and noted that "[i]n a blow to investor confidence in its transition story, the company also suspended its FY23 OCF [i.e., Operating Cash Flow] guidance of $1B."[74] Stifel Nicolaus downgraded the stock, slashed its price target, and told investors that "[t]he magnitude of the miss and its long-term implications is especially surprising."[75] BTIG's analysts likewise wrote that Splunk was "too hard to defend" and downgraded the stock, calling the news a "big disappointment."[76] Guggenheim likewise penned that the "[m]agnitude of the shortfall is pretty material; Implies ~25% of the business expected in the quarter did not materialize" and told investors that it "continue[s] to remain on the sidelines" while removing its price target for

---

[72] Summit Insights Group analyst report: *Splunk (SPLK: HOLD) – Downgrading to HOLD and setting a new $160PT* (Dec. 2, 2020).

[73] Cowen analyst report: *Misses 3Q And Rescinds FY23 Targets; Lowing PT to $175* (Dec. 3, 2020).

[74] J. P. Morgan analyst report: *ARR Growth Still Strong at Scale, but Bookings Dip a Surprise; Downgrading to N* (Dec. 3, 2020).

[75] Stifel Nicolaus analyst report: *Downgrading to Hold and Lowering Target to $160* (Dec. 3, 2020).

[76] BTIG analyst report: *SPLK: Too Hard to Defend. Downgrade to Neutral* (Dec. 3, 2020).

Splunk's stock altogether.[77] Truist Securities joined the negative sentiment, slashing its price target and reporting that "Splunk reported surprisingly disappointing 3Q21 numbers, despite just over a month ago at their analyst day (Oct. 21) being very sanguine about their near-term and long-term prospects."[78] Truist Securities noted that the most "disappointing" aspect of the Company's announcements was its "withdrawal [of] its long-term outlook of operating cash flow and ARR." William O'Neil withdrew its rating of Splunk altogether, calling out the most important news that "management withdrew its long-term FY23 target."[79] *Investing.com* reported that "Splunk Spelunked After Disappointing Earnings," noting that the Company "withdrew [its] 2023 guidance, which had helped support the surge in shares this year, when they hit an all-time high."[80] Jim Cramer, host of CNBC MadMoney, who had been a long-time defender of the stock, reported on December 3, 2020 that Splunk "won't ever be viewed the same way."[81]

138.    The market was also—correctly—skeptical of any attempt to attribute Splunk's lackluster results to a few deals that did not close during the quarter. For example, analysts questioned why the Company was retracting its long-term targets if the miss was simply over a few pushed-out deals, with one analyst noting, "it's a bit surprising to hear you take off the board FY [20]23 targets altogether – or withdraw[al] altogether rather than giving kind of a time-based stamp." In its analysts' report, Morgan Stanley questioned "Deal slippage, or Something More?," explaining that the withdrawal of the Company's guidance "shows a lack of conviction in the demand environment by management and spurs questions on whether there are additional impacts to be considered."[82] SMBC Group analysts warned investors that the Company's "whiff raises

---

[77] Guggenheim analyst report: *SPLK – Revenue and ARR Miss; FY23 ARR Guide Withdrawn* (Dec. 3, 2020).

[78] Truist Securities analyst report: *You Got Splunk(ed)!* (Dec. 3, 2020).

[79] William O'Neil analyst report: *Remove Buy Recommendation* (Dec. 3, 2020).

[80] Christiana Sciaudone, *Splunk Spelunked After Disappointing Earnings; Analysts Drop Price Targets*, INVESTING.COM (Dec. 3, 2020).

[81] *Jim Cramer: Software Companies to Buy That Aren't Splunk*, MSN: THESTREET (Dec. 3, 2020), https://www.msn.com/en-us/money/smallbusiness/jim-cramer-software-companies-to-buy-that-arent-splunk/vi-BB1bBBXA.

[82] Morgan Stanley analyst report: *3Q21 Results – Growth Engine Stalls, But Not Blown* (Dec. 3, 2020).

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

questions" and that "we can't entirely dismiss the possibility that execution was partly to blame."[83] Guggenheim also noted for investors that Splunk's "deciding to suspend its FY24 guide adds to the uncertainty about what is actually happening with the business."[84] BTIG analysts agreed: "[W]e think the explanation on large deal delays on increased C-level scrutiny is fairly confusing given that most peers in the software space (and particularly in security software) saw relatively strong trends in [the] Q[uarter]."[85]

139.    On December 3, 2020, an analyst confirmed with Defendant Child that the Company's results were driven, in large part (if not entirely), by Splunk's suspension of marketing investments and freeze on hiring. The analyst questioned Defendant Child as follows: "[Y]ou pulled back on hiring and on investment such that you didn't get the pipeline build into this quarter. So in that sense [the quarter's results were] more of a supply issue than a demand issue. So is it both or more on that side of supply, and you just didn't have the capacity in terms of sales execution to execute at this point?" In response, Defendant Child admitted that "[i]t's both."

140.    Indeed, but for Defendants' undisclosed corporate actions of suspending marketing investments and freezing hiring, Splunk would not have had a "tight pipeline" going into the third quarter, as Defendant Child admitted. Also, but for Defendants' undisclosed corporate actions, the Company would have had a larger pipeline of transactions that could have replaced the small number of deals that purportedly failed to close within the quarter. The ramifications of Splunk's failure to close deals during the quarter was a direct result of, and a materialization of the risk that, the Defendants caused by suspending investments in marketing and freezing hiring.

141.    Lead Plaintiff and the other Class members suffered economic loss as a result of their purchases of Splunk stock during the Class Period. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and other Class members.

---

[83] SMBC Group analyst report: *A Rare Whiff Raises Questions* (Dec. 3, 2020).
[84] Guggenheim analyst report: *SPLK – Revenue and ARR Miss; FY23 ARR Guide Withdrawn* (Dec. 3, 2020).
[85] BTIG analyst report: *SPLK: Too Hard to Defend. Downgrade to Neutral* (Dec. 3, 2020).

142.     Had Defendants disclosed complete, accurate, and truthful information concerning these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired Splunk's securities or would not have purchased or otherwise acquired these securities at the artificially inflated prices that they paid.

143.     It was foreseeable to Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Splunk's securities and that the ultimate disclosure of this information, or the materialization of the risks concealed by Defendants' material misstatements and omissions, would cause the price of Splunk's securities to decline.

144.     Defendants' materially false and misleading statements and omissions artificially inflated the price of Splunk common stock before and during the Class Period, and maintained inflation in the stock price. That artificial inflation was removed on December 2 and 3, 2020 in direct response to information revealed in Splunk's disclosures, and/or the materialization of the risks concealed by Defendants' material misrepresentations and omissions. As detailed herein, these disclosures and/and or materializations divulged or revealed, among other things, that Splunk suspended its investments in marketing and instituted a hiring freeze, both of which led to a tight pipeline going into the third quarter of 2020, which corrected Defendants' prior misrepresentations and omissions of material fact, and/or disclosed facts Defendants misrepresented or omitted that were a substantial factor in causing investors' economic loss.

145.     In response to the disclosures, Splunk's stock price suffered an immediate and highly material drop. The stock price dropped by 23% in a single day, on abnormally high trading volume of more than 30 million shares.

146.     The timing and magnitude of the decline in the Company's share price negates any inference that the losses suffered by Lead Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' violations of the federal securities laws.

## X.     THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

147.     The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading

statements pleaded in this Complaint. The misstatements complained of herein were historical statements or statements of purportedly current facts and conditions existing at the time or prior to when the statements were made.

148.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth in detail above (*see* Section V.E, *supra*), then-existing facts contradicted Defendants' statements. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosure made by Defendants was insufficient to insulate Defendants from liability from their materially untrue and misleading statements.

149.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and the statement was authorized or approved by an executive officer of Splunk who knew that the statement was false or misleading when made.

## XI.    THE PRESUMPTION OF RELIANCE

150.    The Class is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Splunk's common stock was efficient for the following reasons, among others:

> a.    Splunk's stock met the requirements for listing, and was listed and actively traded on the NASDAQ Stock Market, a highly efficient and automated market;

> b.    Splunk's common stock traded at high weekly volumes;

> c.    As a regulated issuer, Splunk filed periodic reports with the SEC;

> d.    Splunk was eligible to file registration statements with the SEC on Form S-3;

- 49 -

e.  Splunk regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

f.  Splunk was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace;

g.  The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Splunk securities; and

h.  Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased or acquired Splunk common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

151.  As a result of the foregoing, the market for Splunk's common stock reasonably promptly digested current information regarding Splunk from all publicly available sources and reflected such information in the price of Splunk's common stock. All purchasers of Splunk common stock during the Class Period suffered similar injury through their purchase of Splunk common stock at artificially inflated prices, and a presumption of reliance applies.

152.  A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## XII.   CLASS ACTION ALLEGATIONS

153.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased Splunk common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company at all relevant times, members of their immediate families, and Defendants' legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

154.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Splunk shares were actively traded on the NASDAQ Stock Market. As of March 19, 2020, there were approximately 158.6 million shares of Splunk common stock outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds-of-thousands of members of the Class. Class members who purchased Splunk common stock may be identified from records maintained by Splunk or its transfer agent(s) and may be notified of this class action using a form of notice similar to that customarily used in securities class actions. Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

155.    Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

156.    Lead Plaintiff will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation. Plaintiff has no interest that conflicts with the interests of the Class.

157.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

> a.     whether Defendants' misrepresentations and omissions as alleged herein violated the federal securities laws;

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    b.     whether the Executive Defendants are personally liable for the alleged misrepresentations and omissions described herein;

    c.     whether Defendants' misrepresentations and omissions as alleged herein caused the Class members to suffer a compensable loss; and

    d.     whether the members of the Class have sustained damages, and the proper measure of damages.

158.    A class action is superior to all other available methods for the fair and efficient adjudication of this action. Joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it practically impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**(Against All Defendants)**

159.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

160.    This Count is asserted on behalf of all members of the Class against Splunk and the Executive Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

161.    During the Class Period, Defendants disseminated or approved the false and misleading statements specified above, which they knew were, or they deliberately disregarded as, false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

162.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of

the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Splunk common stock during the Class Period.

163.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with deliberate recklessness; and employed devices and artifices to defraud in connection with the purchase and sale of Splunk common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, Splunk's freeze on marketing investments and hiring; (b) artificially inflate and maintain the market price of Splunk common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase Splunk common stock at artificially inflated prices and suffer losses when the true facts became known.

164.    Splunk and the Executive Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

165.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Splunk stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

166.    Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Splunk common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiff and the Class would not have purchased Splunk common stock at the prices they paid, or at all, if they had

been aware that the market price had been artificially and falsely inflated by these Defendants' materially misleading statements.

167.   As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Splunk common stock during the Class Period.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act**
**(Against Defendants Merritt and Child)**

168.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

169.   This count is asserted on behalf of all members of the Class against the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

170.   The Executive Defendants acted as controlling persons of Splunk within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

171.   By reasons of their high-level positions of control and authority as the Company's most senior officers, the Executive Defendants had the authority to influence and control, and did influence and control, the decision-making and the activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. The Executive Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Splunk during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein. The Executive Defendants were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

172.    Each of the Executive Defendants spoke to investors on behalf of the Company during the Class Period. Therefore, each of the Executive Defendants was able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Splunk during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

173.    As set forth above, Splunk violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

174.    By virtue of their positions as controlling persons of Splunk and as a result of their own aforementioned conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Splunk securities. As detailed above, during the respective times, these Executive Defendants served as officers and/or directors of Splunk.

175.    As a direct and proximate result of the Executive Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Splunk common stock.

## XIV.   PRAYER FOR RELIEF

176.    WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.    Awarding compensatory damages in favor of Lead Plaintiff and other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

1          d.      Awarding such equitable, injunctive or other further relief as the Court may

2                  deem just and proper.

3   **XV.    JURY DEMAND**

4          177.    Lead Plaintiff hereby demands a trial by jury.

5

6   DATED:  June 7, 2021                     **BERNSTEIN LITOWITZ BERGER**
                                              **& GROSSMANN LLP**
7

8                                            */s/ Jonathan D. Uslaner*
                                             Jonathan D. Uslaner (Bar No. 256898)
9                                            jonathanu@blbglaw.com
                                             Lauren M. Cruz (Bar No. 299964)
10                                           lauren.cruz@blbglaw.com
                                             2121 Avenue of the Stars
11                                           Los Angeles, California  90067
                                             Tel: (310) 819-3470
12

13                                           *-and-*

14                                           John J. Rizio-Hamilton (admitted *pro hac vice*)
                                             johnr@blbglaw.com
15                                           1251 Avenue of the Americas
                                             New York, New York  10020
16                                           Tel: (212) 554-1400
                                             Fax: (212) 554-1444
17

18                                           *Attorneys for Lead Plaintiff Louisiana Sheriffs'*
                                             *Pension & Relief Fund and Lead Counsel for the*
19                                           *Class*

20                                           ***KLAUSNER, KAUFMAN, JENSEN &***
                                             ***LEVINSON***
21                                           Robert D. Klausner (*pro hac vice* forthcoming)
22                                           bob@robertdklausner.com
                                             7080 NW 4th Street
23                                           Plantation, Florida 33317
                                             (954) 916-1202
24                                           (954) 916-1232 (fax)

25
                                             *Additional Counsel for Louisiana Sheriffs'*
26                                           *Pension & Relief Fund*

27

28

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 4:20-cv-08600-JST

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Osey McGee, on behalf of the court appointed Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Executive Director of Louisiana Sheriffs. I have reviewed the Consolidated Class Actions Complaint in this matter with the Fund's legal counsel. Based on the legal counsel's knowledge and advice, Louisiana Sheriffs has authorized the filing of this complaint.

2. Louisiana Sheriffs did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Louisiana Sheriffs fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. Louisiana Sheriffs' transactions in the Splunk Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Louisiana Sheriffs has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*In re Evoqua Water Technologies Corp. Sec. Litigation.*, No. 18-cv-10320 (S.D.N.Y.)
*In re Luckin Coffee Inc. Securities Litigation,* No. 20-cv-1293 (S.D.N.Y.)
*In re Wells Fargo & Company Securities Litigation,* No. 20-cv-4494 (S.D.N.Y.)
*In re Splunk Inc. Securities Litigation*, No. 20-cv-8600 (N.D. Cal.)

6. Louisiana Sheriffs has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff:

*Louisiana Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*,
No. 19-cv-3347 (S.D. Ohio)

7.  Louisiana Sheriffs will not accept any payment for serving as a representative party on behalf of the Class beyond Louisiana Sheriffs' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

Louisiana Sheriffs has relied on the research and analysis of the complaint provided by legal counsel Bernstein Litowitz Berger & Grossmann LLP.   The undersigned declares that the statements made and information provided are, to the best of his knowledge, true and correct.

Executed this **3⁺**day of June, 2021.


_____

Osey McGee
Executive Director
*Louisiana Sheriffs' Pension & Relief Fund*

**Louisiana Sheriffs' Pension & Relief Fund
Transactions in Splunk Inc.**

| <u>Transaction</u> | <u>Date</u> | <u>Shares</u> | <u>Price</u> |
|---|---|---|---|
| Purchase | 6/24/2020 | 201 | 191.4385 |
| Purchase | 7/7/2020 | 148 | 198.0342 |
| Purchase | 9/3/2020 | 130 | 206.7623 |
| Purchase | 9/29/2020 | 217 | 187.4650 |
| Purchase | 9/30/2020 | 124 | 188.1779 |
| Purchase | 10/1/2020 | 59 | 191.4358 |
| Purchase | 10/2/2020 | 1,600 | 193.9043 |
| Purchase | 10/5/2020 | 800 | 193.9910 |
| Purchase | 10/6/2020 | 750 | 198.6720 |
| Purchase | 10/7/2020 | 800 | 204.5003 |
| Purchase | 10/8/2020 | 2,250 | 208.8263 |
| Purchase | 10/9/2020 | 750 | 212.2029 |
| Purchase | 10/14/2020 | 2,400 | 206.4663 |
| Purchase | 11/9/2020 | 200 | 201.8445 |
| | | | |
| Sale | 5/21/2020 | (1,200) | 164.2829 |
| Sale | 6/19/2020 | (789) | 187.1600 |
| Sale | 8/14/2020 | (717) | 192.3400 |