**BERNSTEIN LITOWITZ BERGER**
    **& GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*Lead Counsel for Lead Plaintiff and*
*the Class*

[Additional Counsel Appear on Signature Page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| IN RE SPLUNK INC. SECURITIES LITIGATION | Case No. 4:20-cv-08600-JST <br><br> <u>CLASS ACTION</u> <br><br> **LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> Date: November 18, 2021 <br> Time: 2:00 p.m. <br> Judge: Hon. Jon S. Tigar <br> Courtroom: 6 |

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF ISSUES TO BE DECIDED ...................................................................1

II.   INTRODUCTION ............................................................................................................1

III.  STATEMENT OF FACTS ...............................................................................................3

    A.    Splunk Assured Investors of Its Continuous Investments in Its Critical
        Marketing Efforts and Continuous Hiring of Sales Personnel...................................3

    B.    Unfortunately for Investors, Splunk Was Not Continuing To Invest in
        Marketing, Was Not Continuing To Hire New Sales Personnel, and Had
        Made Significant Layoffs ..........................................................................................5

    C.    The Truth Emerged When Splunk Reported a Devastating Earnings Miss and
        Pulled Its Guidance and Then Admitted the Reasons..................................................6

IV.   ARGUMENT.....................................................................................................................7

    A.    The Complaint Alleges False and Misleading Statements .......................................7

        1.    Defendants Falsely Assured Investors That Splunk Was Continuing
            To Invest in Marketing..................................................................................8

        2.    Defendants Falsely Assured Investors That Splunk Was Continuing
            To Hire Sales Personnel...............................................................................13

        3.    Defendants Falsely Assured Investors That Splunk Was Not Laying
            Off Employees ............................................................................................18

    B.    The Amended Complaint Alleges a Strong Inference of Scienter...........................19

    C.    The Complaint Alleges Loss Causation..................................................................23

V.    CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ................................................................................ 12, 15

*In re Apple Inc. Sec. Litig.*,
  2020 WL 2857397 (N.D. Cal. June 2, 2020) ............................................................. 9

*In re Apple Inc. Sec. Litig.*,
  2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ........................................................ 8, 22

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ................................................................................ 19

*In re: Bofi Holding, Inc. Sec. Litig.*,
  2016 WL 5390533 (S.D. Cal. Sept. 27, 2016) ........................................... 11, 12, 15, 16

*In re BofI Holding, Inc. Sec. Litig.*,
  2017 WL 2257980 (S.D. Cal. May 23, 2017) ............................................................ 15

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
  302 F. Supp. 3d 1028 (N.D. Cal. 2018) ................................................................... 9

*Constr. Workers Pension Tr. Fun – Lake Cnty. v. Genoptix, Inc.*,
  2013 WL 12123841 (S.D. Cal. Mar. 22, 2013) ........................................................... 9

*Cutler v. Kirchner*,
  696 F. App'x 809 (9th Cir. 2017) ........................................................................... 10

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ......................................................................... 15, 16

*In re DDi Corp. Sec. Litig.*,
  2005 WL 3090882 (C.D. Cal. July 21, 2005) ........................................................... 16

*In re Extreme Networks, Inc. Sec. Litig.*,
  2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ........................................................... 20

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) ................................................................................. 8

*In re Finisar Corp. Sec. Litig.*,
  2017 WL 1549485 (N.D. Cal. May 1, 2017) ............................................................. 24

*In re Fusion-io, Inc. Sec. Litig.*,
  2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ............................................................. 10

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ............................................................................................... 7, 23

*Hatamian v. Advanced Micro Devices, Inc.*,
87 F. Supp. 3d 1149 (N.D. Cal. 2015) ......................................................................................... 8

*Hefler v. Wells Fargo & Co.*,
2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ................................................................... passim

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ................................................................................................... 22

*Huang v. Higgins*,
2019 WL 1245136 (N.D. Cal. Mar. 18, 2019) ..................................................................... 17, 25

*In re Impinj, Inc., Sec. Litig.*,
414 F. Supp. 3d 1327 (W.D. Wash. 2019) ................................................................................. 24

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ....................................................................................................... 13

*In re Intuitive Surgical Sec. Litig.*,
2014 WL 7146215 (N.D. Cal. Dec. 15, 2014) ........................................................................... 20

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ............................................................................................. passim

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) ..................................................................................... 17

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ................................................................................................... 20

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ............................................................................................... 24, 25

*Loritz v. Exide Techs.*,
2014 WL 4058752 (C.D. Cal. Aug. 7, 2014) ............................................................................. 19

*Mallen v. Alphatec Holdings, Inc.*,
861 F. Supp. 2d 1111 (S.D. Cal. 2012), *aff'd sub nom. Fresno Cty. Employees'
Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015) .................................... 9

*Medina v. Clovis Oncology, Inc.*,
215 F. Supp. 3d 1094 (D. Colo. 2017) ....................................................................................... 22

*In re Merit Med. Sys., Inc. Sec. Litig.*,
2021 WL 1258590 (C.D. Cal. Mar. 16, 2021), *report and recommendation
adopted*, 2021 WL 1753612 (C.D. Cal. May 3, 2021) ...................................................... 9, 15, 19

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) ................................................................................ 3, 23, 24, 25

*Mulligan v. Impax Labs., Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................................................ 12

*In re Nimble Storage, Inc.*,
  2016 WL 7209826 (N.D. Cal. Dec. 9, 2016) .................................................................... 13

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ..................................................................................... 7, 20

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
  780 F. App'x 480 (9th Cir. 2019) ..................................................................................... 20

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ......................................................................................... 10

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) ......................................................................................... 19

*Purple Mountain Tr. v. Wells Fargo & Co.*,
  432 F. Supp. 3d 1095 (N.D. Cal. 2020) ............................................................................. 8

*In re Qualcomm Inc. Sec. Litig.*,
  2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) ............................................................ 21, 22

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ................................................................................... passim

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) ......................................................................................... 15

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ........................................................................................... 22

*Roberts v. Zuora, Inc.*,
  2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) .................................................................. 20

*Sayce v. Forescout Techs., Inc.*,
  2021 WL 1146031 (N.D. Cal. Mar. 25, 2021)....................................................... 10, 15, 17

*Scheller v. Nutanix, Inc.*,
  2020 WL 5500422 (N.D. Cal. Sept. 11, 2020) ................................................................. 19

*Scheller v. Nutanix, Inc.*,
  450 F. Supp. 3d 1024 (N.D. Cal. 2020) ............................................................... 12, 15, 17

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ........................................................................................... 19

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
   485 F. Supp. 3d 1113 (N.D. Cal. 2020) ................................................................................... 11, 20

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) ............................................................................................ 12

*Smilovits v. First Solar, Inc.*,
   2012 WL 6574410 (D. Ariz. Dec. 17, 2012) ............................................................................... 21

*In re STEC Inc. Sec. Litig.*,
   2011 WL 2669217 (C.D. Cal. June 17, 2011) ......................................................................... 8, 21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ............................................................................................................................. 19

*In re Twitter, Inc. Sec. Litig.*,
   2020 WL 4187915 (N.D. Cal. Apr. 17, 2020) ...................................................................... 10, 25

*In re Twitter, Inc. Sec. Litig.*,
   2020 WL 7260479 (N.D. Cal. Dec. 10, 2020) ................................................................................ 10

*In re Twitter, Inc. Sec. Litig.*,
   2021 WL 4166725 (N.D. Cal. Sept. 14, 2021) ............................................................................. 10

*Washtenaw Cty. Emps. Ret. Sys. v. Celera Corp.*,
   2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) ............................................................................... 10

*Webb v. Solarcity Corp.*,
   884 F.3d 844 (9th Cir. 2018) ........................................................................................................... 22

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) .................................................................................................. 10, 16

*In re Zillow Grp., Inc. Sec. Litig.*,
   2019 WL 1755293 (W.D. Wash. Apr. 19, 2019) ................................................................... 13, 17

**FEDERAL STATUTES**

15 U.S.C. §78j(b) ....................................................................................................................................... 1

15 U.S.C. §78t(a) ....................................................................................................................................... 1

**FEDERAL RULES**

Fed. R. Civ. P. 15 ...................................................................................................................................... 25

**FEDERAL REGULATIONS**

17 C.F.R. §240.10b-5 ................................................................................................................................. 1

### MEMORANDUM OF POINTS AND AUTHORITIES

Lead Plaintiff hereby opposes Defendants' motion to dismiss (ECF No. 67, "Mot.").[1]

### I.   STATEMENT OF ISSUES TO BE DECIDED

Whether the Complaint alleges facts that, considered holistically, state claims under §10(b) of the Securities Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, and §20(a) of the Securities Exchange Act, 15 U.S.C. §78t(a).

### II.   INTRODUCTION

The Complaint alleges securities law violations backed by Defendants' own admissions that stand in direct conflict with their Class Period statements; 11 eyewitness accounts that support and amplify those admissions; and contemporaneous statements from securities analysts that report having been "blindsided" by the revelations that caused a 23% stock price decline and substantial damages to investors.

The Complaint details how, in the face of perpetual net losses, a ballooning deficit, and negative operating cash flows, Splunk's CEO, Defendant Merritt, told investors that the Company would reach positive operational cash flow by 2022 and achieve a billion dollars in positive operational cash flow by 2023. Defendants said they would reach these milestones because of their operational investments in marketing and sales personnel. Defendants assured investors throughout the Class Period that Splunk was "continu[ing] to … invest in marketing programs" and "continu[ing] to hire additional personnel." Defendants further represented that before any layoffs or cutbacks would occur, "there would have to be some really unexpected shifts in the macro environment beyond what we've already modeled." Defendants' statements caused Splunk's stock to soar by 73% in a matter of months.

In truth, and unknown to investors at the time, Defendants took a series of significant corporate actions to temporarily alleviate cash-flow concerns. Splunk suspended all marketing investments, froze hiring of sales personnel, and laid off the Company's entire new logo team responsible for pipeline generation. While Defendants admitted the truth internally, investors were kept in the dark

---

[1] Unless otherwise noted, citations to "¶_" are to the Complaint (ECF No. 65), emphasis is added, and internal citations, alterations, and quotations are omitted.

until after the market closed on December 2, 2020. That evening, Splunk announced a hard miss in its third-quarter results and withdrew its long-term cash-flow guidance. The next day, when asked, "what happened," Defendant Child (Splunk's CFO) was forced to admit that the third-quarter miss had been caused by Defendants' undisclosed corporate actions, revealing that Splunk "suspended investments in marketing" and "froze hiring," which led to "a tighter pipeline going into [the third quarter]." These corporate actions, while temporarily making Splunk appear closer to becoming cash-flow positive, harmed its ability to attract new customers, retain existing ones, and generate revenues critical to fuel Splunk's promised, future high growth. As Child was forced to confirm on December 3, 2020, as a direct result of these undisclosed corporation actions, Splunk "didn't get the pipeline build into [the third] quarter" and "didn't have the capacity in terms of sales execution to execute." Securities analysts were "blindsided," and Splunk's stock price cratered by 23% in a single day.

In their Motion, Defendants take a kitchen-sink approach, challenging falsity, scienter, and loss causation with all manner of arguments. Each fails.

Defendants first claim their statements are immunized by the PSLRA's safe harbor for forward-looking statements. But as the Ninth Circuit and district courts across the country have recognized, statements that conduct and circumstances "continue"—such as those at issue here—are representations of current and past facts and, thus, are not affected by the PSLRA's safe harbor. Defendants told investors that both their marketing investments and hiring of sales professionals "continued" when, in truth, they were suspended and frozen.

Defendants next attempt to rewrite their admissions and Class Period statements, injecting their own counter-factual narrative and pointing to disclosures they never made in an attempt to show that they told investors the truth. As the Ninth Circuit warned in reversing a dismissal of a securities class action, defendants are not permitted to "present their own version of the facts at the pleading stage" and district courts must not "accept those facts as uncontroverted and true." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018); *see also* Pl's Opp. to RJN, filed concurrently.

Defendants also half-heartedly contend that the Complaint fails to plead scienter, suggesting that they somehow did not know that their company took the drastic actions of suspending marketing and freezing hiring. But Merritt himself announced during his internal Company-wide Zoom calls the

very corporate actions Defendants kept hidden from the public, and Child admitted publicly his knowledge of them at the end of the Class Period. Moreover, by buoying Splunk's stock price and investor sentiment, Splunk was able to secure crucial external funding and the Executive Defendants were able to obtain a positive shareholder vote of their outsized compensation packages.

Finally, Defendants assert that the Complaint fails to establish loss causation because, according to them, the fraud must be fully revealed before any stock price decline to state a claim. But the Ninth Circuit squarely rejected Defendants' very contention in *Mineworkers' Pension Scheme v. First Solar Inc.*, holding that Plaintiff "need only show a 'causal connection' between the fraud and the loss" and may—as in this case—"prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." 881 F.3d 750, 753-54 (9th Cir. 2018). Loss causation is particularly straightforward in this case because Defendant Child himself publicly admitted that Splunk's suspension of marketing and hiring freeze were causes of the Company's earnings miss.

## III.    <u>STATEMENT OF FACTS</u>

### A.    Splunk Assured Investors of Its Continuous Investments in Its Critical Marketing Efforts and Continuous Hiring of Sales Personnel

Splunk has incurred GAAP net losses every year since becoming a public company in 2012, with a ballooning accumulated deficit of over $1.5 billion. ¶¶25, 28. To operate, it has relied upon cash infusions from outside sources. ¶26. Exacerbating its cash difficulties, the Company changed its business model, which resulted in negative operating cash flows in 2019 and elicited great concern among market analysts, who were losing patience with Splunk's "high growth" story and "implor[ed]" Defendants to explain when things would finally turn around. ¶¶26-31.

To address these concerns, Defendants told investors that Splunk would become cash-flow positive from operations by 2022 and approach $1 billion in positive operational cash flow by 2023. ¶¶32-35. Market commentators described this promise as a "carrot for investors to latch onto." ¶38. To make the "carrot" attractive, Defendants told investors that they would reach the momentous cash-flow positive state through revenue growth—i.e., successfully tapping into an $81 billion market—and not by "cutting back on OpEx [operational expenses] to try to show cash earlier." ¶¶35-37.

Splunk identified their continuous investments in marketing and continuous hiring of more sales personnel as the specific operational expenses needed to unlock this revenue growth and positive operational cash flow. ¶¶39-56. Merritt explained to the market that Splunk's investments in marketing would get potential customers past the stage of "what's Splunk?" ¶42. Likewise, Splunk's Chief Marketing Officer publicly assured investors that Splunk was using continued marketing investments to move away from "WTF [is] Splunk" and "'tak[ing] the brand to the next level,'" with marketing "so much more relevant to [Splunk's] revenue." ¶¶41-42. Child echoed that Splunk's progress in attaining its financial targets required "continuing to spend OpEx to support the high growth of the company" and, specifically, "to continue to hire salespeople." ¶54.

In this context, Defendants told investors in Splunk's SEC filings that they were "continu[ing] to … invest in marketing programs" and "continu[ing] to make directed and substantial investments to expand our … marketing." ¶45. They stressed that "maintaining and enhancing the 'Splunk' brand identity" were "critical" to retain and attract customers, emphasizing that "[t]he successful promotion of our brand will depend largely upon our marketing efforts." ¶43. They added that Splunk was "continu[ing] to aggressively expand [its] sales and marketing organizations" and that it was "continu[ing] to hire additional personnel." ¶47.

When the COVID-19 pandemic hit, Defendants further assured investors that they were making marketing investments and hiring sales professionals. In fact, they told investors that the requirement for "remote work" was a catalyst for driving demand for Splunk's cloud products to "the highest ever in [Splunk's] history." ¶48. Defendants represented to investors that—apart from a short, two-week hiatus "in early mid-March" 2020—the Company was "definitely still hiring" and "making the necessary hires to manage to [its] growth targets." ¶¶47-51. When asked in June 2020 about "potential layoffs or cutbacks," Merritt said that, before doing so, "[t]here would have to be some really unexpected shifts in the macro environment beyond what we've already modeled." ¶52.

The financial press believed Defendants' assurances that Splunk was continuing to invest in marketing, continuing to hire sales personnel, and not conducting layoffs. In reports recommending that investors buy Splunk stock, analysts noted that Splunk would "continue to invest heavily in … expanded marketing efforts." ¶46. They likewise reported that Splunk was "expanding its field sales

force," "adding sales capacity," and would "keep boosting hiring." ¶56. Investors believed Defendants' statements that the Company's continuous operational investments—and not cutbacks—were driving Splunk to be "tracking ahead of plan" toward positive operating cash flows. ¶57.

As a result of Defendants' assurances, Splunk's stock price climbed over 44% by June 2020 and over 70% at its Class Period high. ¶¶5, 57-58. With a soaring stock price, Splunk secured imperative funding on favorable terms through a $1.265 billion debt offering on June 5, 2020. ¶¶57-61. With positive investor sentiment secured, the Executive Defendants then obtained a favorable shareholder vote on June 11, 2020 for Merritt's $15.71 million and Child's $17.485 million compensation packages. ¶¶62, 128.

**B.    Unfortunately for Investors, Splunk Was Not Continuing To Invest in Marketing, Was Not Continuing To Hire New Sales Personnel, and Had Made Significant Layoffs**

In truth, beginning in early March 2020 and throughout the Class Period, Splunk "suspended investments in marketing" and "froze hiring." ¶¶63-92. As a result of these corporate actions, Splunk "didn't get the pipeline build into [the third] quarter" and "didn't have the capacity in terms of sales execution to execute." ¶139. The Complaint details the accounts of 11 former employees who corroborate these facts, confirming that Splunk suspended all marketing investments, froze hiring of sales professionals for over a half year, and laid off the entire new logo team. ¶¶63-92.

*Splunk Suspended Marketing Investments*. Two former Splunk employees explained that Merritt himself announced Splunk's suspension of investments in marketing during an internal Company-wide Zoom call they each attended in late March 2020. ¶¶66-68. FE 3, a Senior Product Marketing Manager at Splunk's headquarters, recounted that, in a meeting in or about February or March 2020, the VP of Product Marketing, the Chief Marketing Officer, and his own boss informed him that product marketing no longer had a budget. ¶¶69-70. FE 5, also a Senior Product Marketing Manager, was likewise told in April 2020 by his boss and the director of product marketing that Splunk's marketing investments were frozen. *Id.* The suspension applied to all marketing teams, including the product marketing team, the customer marketing team, and the digital marketing team, reported FE 5. ¶71. The suspension continued throughout the entire Class Period.

The suspension in marketing investments adversely affected Splunk's pipeline generation. As FE 5 and FE 1 explained, the lack of marketing investments negatively impacted Splunk's efforts to generate demand and usher customers along the sales process to close and expand deals. ¶¶72-74. FE 4, a Regional Sales Manager, added that towards the back half of 2020 "it was tough to find pipeline, people to buy." ¶74. FE 6, a Sales Director involved in Splunk's forecasting, said Splunk's pipeline for deals going into the third quarter was "anemic" and sales leaders were "very concerned" about the numbers, including leaders over East Coast, Federal, Mid-Atlantic, and New York city. *Id.*

*Splunk Implemented a Hiring Freeze of Sales Personnel*. Merritt also announced the Company's hiring freeze of sales professionals during an internal Company-wide Zoom call in March 2020. ¶76. The hiring freeze was in place for the entire Class Period, including through when FE 3 left Splunk in December 2020. ¶¶76-77. The hiring freeze was well-known and widely discussed within Splunk. FE 3 not only heard about the freeze from Merritt's internal announcement in March 2020, but also from his bosses in a products all-hands meeting. ¶76. FE 7, an Account Executive, added that he received an email about the hiring freeze from Splunk's President of Worldwide Field Operations, Susan St. Ledger, in the second week of March. ¶78. FE 4, who discussed the hiring freeze with Splunk's Senior Vice Presidents, further explained that the entire sales team was aware of the hiring freeze, and that it was discussed on their monthly calls. ¶77.

*Splunk Made Significant Layoffs*. Merritt announced a reduction in workforce in early May 2020 during an internal Company-wide Zoom meeting, describing the layoffs as the "hard decision" that Merritt and the other executives had to make. ¶87. As part of the layoffs, Splunk fired, in May 2020, everyone in the "new logo" team, which was responsible for bringing in new business to the pipeline. ¶88. FE 10, along with his other colleagues from the new logo team, FE 11, FE 1, and all the management levels, including sales management, vice presidents, directors, and salespeople, were all terminated as part of this layoff. ¶¶88-92.

**C.      The Truth Emerged When Splunk Reported a Devastating Earnings Miss and Pulled Its Guidance and Then Admitted the Reasons**

The Company's undisclosed corporate actions caused a significant earnings miss in the third quarter of Splunk's fiscal year 2021. ¶¶63-101. On December 2, 2020, Splunk announced an 11%

year-over-year decline in revenues and a third-quarter net loss of over $201.5 million, which was four-times greater than the prior year. ¶94. Defendants were also forced to withdraw their guidance that Splunk would eclipse $1 billion in positive cash flow by 2023. ¶95.

The next day, on December 3, 2020, when asked "what happened," Child was forced to reveal that, beginning in early March 2020, Splunk "suspended investments in marketing" and "froze hiring." ¶96. Child also disclosed that these cutbacks caused "a tighter pipeline going into [the third quarter]" because of "the fact it usually takes a quarter or two to build your pipeline, especially for a company of [Splunk's] size." *Id.* He further confirmed that Splunk's undisclosed corporate actions negatively affected demand and supply, admitting that Splunk "didn't get the pipeline build into [the third quarter]" and "didn't have the capacity in terms of sales execution to execute." ¶139.

Following the revelations, Splunk's stock price declined 23% in a single trading day. ¶97. Analysts reported being "blindsided" and noted that "Splunk inflicted a garish wound to its credibility." ¶98. Splunk's stock price has not recovered. ¶101. Child himself has now admitted that Splunk "went through what transformation experts like to call the valley of death" during 2020, with "negative revenue, negative margin, negative cash flow." *Id.*

## IV. **UNDERLINE ARGUMENT**

Courts evaluating motions to dismiss must "take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) ("*QSI*"). "A complaint should not be dismissed unless it appears beyond doubt that the plaintiff cannot prove any set of facts that would entitle him or her to relief." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1229 (9th Cir. 2004). A district court ruling on a motion to dismiss is "not sitting as a trier of fact," and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

### A. The Complaint Alleges False and Misleading Statements

Section 10(b) and Rule 10b-5 make it "unlawful … to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *QSI*, 865 F.3d at 1140. A statement is

misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Hefler v. Wells Fargo & Co.*, 2018 WL 1070116, at *4 (N.D. Cal. Feb. 27, 2018). "Whether a public statement is misleading … is a mixed question to be decided by the trier of fact," *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *9 (C.D. Cal. June 17, 2011), and may not be resolved as a matter of law unless "the adequacy of the disclosure … is so obvious that reasonable minds could not differ," *Khoja*, 899 F.3d at 1014. As detailed below, the Complaint here pleads three categories of misstatements.

### 1. Defendants Falsely Assured Investors That Splunk Was Continuing To Invest in Marketing

Throughout the Class Period, Defendants repeatedly represented that "<u>we continue to</u> … invest in marketing programs" and led investors to believe Splunk was "<u>continu[ing]</u> to make directed and substantial investments to expand [its] … marketing." ¶¶104, 108. These representations were material to the market. Securities analysts recommended investors buy Splunk stock based on its assurances that it was "continu[ing] to invest heavily in … expanded marketing efforts." ¶¶44, 46.

These statements, however, were false and misleading because, as Child ultimately admitted, Splunk had "<u>suspended investments in marketing</u>" by the time that these statements were made. ¶96; *see Purple Mountain Tr. v. Wells Fargo & Co.*, 432 F. Supp. 3d 1095, 1104-05 (N.D. Cal. 2020) (falsity established by defendant's later admissions); *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *6 (N.D. Cal. Nov. 4, 2020) (same); *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1160-61 (N.D. Cal. 2015) (same). In addition to Child's admission, former employees have confirmed that Merritt himself internally announced the suspension in March 2020, the suspension applied across the board, and it continued throughout the entire Class Period. ¶¶65-74; *see QSI*, 865 F.3d at 1143-44 (falsity established because "[CEO] personally explained on [internal] conference calls" information inconsistent with his public statement that "pipeline continues to build").

Courts in the Ninth Circuit routinely hold that statements that a company "continues to" engage in certain activities are actionable when, in fact, the company has ceased doing so, in whole or in part. *See id.* (statement that "pipeline continues to build" actionable because pipeline was not continuing to build); *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (statement that company

"anticipates a continuation of its accelerated expansion schedule" actionable because expansion had already failed); *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1039-41 (N.D. Cal. 2018) (finding statement that RH expected "inventory growth … given the inventory investments" actionable because it had not made meaningful inventory investments).

Faced with the Complaint's well-pled allegations, Defendants try to challenge the present-tense nature, falsity, and specificity of their representations, as well as the particularity of the former employee accounts. Each of Defendants' arguments fails.

***First***, Defendants assert that their misstatements that they "continue" to make marketing investments were purely "forward-looking" and, thus, immunized by the PSLRA's safe harbor. Mot. at 8-9. Not so. As courts in this Circuit have explained, even statements like "we anticipate that our revenues … will continue to grow"—although "ostensibly couched in terms of the future"—concern "historical and current fact" because "for the revenues to 'continue to grow,' it is necessary that they have <u>already been growing</u>." *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1126 (S.D. Cal. 2012) (emphasis in original). The Ninth Circuit and courts in this Circuit have repeatedly held that statements that conduct or circumstances "continue" are representations of current and historical fact and, thus, are not impacted by the PSLRA's safe harbor. *See QSI*, 865 F.3d at 1143 ("[o]ur pipeline <u>continues</u> to build" includes a representation the pipeline was currently building); *In re Merit Med. Sys., Inc. Sec. Litig.*, 2021 WL 1258590, at *8 (C.D. Cal. Mar. 16, 2021) ("sales <u>continue</u> to grow" and that integrations "<u>continue</u> to drive growth" are "statements ... about current or past facts"); *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *13 (N.D. Cal. June 2, 2020) ("we think that the performance will <u>continue</u> to improve" is representation that performance "is currently improving"); *Constr. Workers Pension Tr. Fun – Lake Cnty. v. Genoptix, Inc.*, 2013 WL 12123841, at *4 (S.D. Cal. Mar. 22, 2013) ("'<u>continued</u> strong demand for our high-quality service' ... reflect[s] past and current demand").

It is of no consequence that Defendants' statements at issue were combined with forward-looking statements. As the Ninth Circuit has explained, "a defendant may not transform non-forward-looking statements into forward-looking statements that are protected by the safe harbor provisions of the PSLRA by combining non-forward-looking statements about past or current facts with forward-

looking statements about projected revenues and earnings." *QSI*, 865 F.3d at 1141. Defendants are liable for their misrepresentations "about then-present circumstances," such as those here, even where they are "expressed in the same breath as forward-looking statements." *Cutler v. Kirchner*, 696 F. App'x 809, 815 (9th Cir. 2017); *see also In re Twitter, Inc. Sec. Litig.*, 2020 WL 4187915, at *11 (N.D. Cal. Apr. 17, 2020) (that misstatement "was followed by a forecast of future growth does not convert the challenged statement into a forward-looking statement").

Defendants' citation to *Wochos v. Tesla, Inc.* does not help them. *Tesla* "is not the sea change Defendants make it out to be." *In re Twitter, Inc. Sec. Litig.*, 2021 WL 4166725, at *2 (N.D. Cal. Sept. 14, 2021). The Court in *Tesla* was clear that "the PSLRA's safe harbor does <u>not</u> apply in an all-or-nothing fashion … [O]nly the forward-looking aspects [of mixed statements are] immunized from liability, because the safe harbor is not designed to protect [issuers] when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement." 985 F.3d 1180, 1190 (9th Cir. 2021). As courts in this District have explained in discussing *Tesla*, "concrete factual assertions about a specific present or past circumstance [that go beyond] the assertion of a future goal, and ... describ[e] concrete circumstances that have already occurred ... [are] not forward-looking." *Sayce v. Forescout Techs., Inc.*, 2021 WL 1146031, at *3 (N.D. Cal. Mar. 25, 2021).[2]

In any event, the PSLRA's safe harbor provides no license to lie. Defendants had actual knowledge of the true facts, admitting them internally (*see infra* at Section IV.B), and their "risk warnings" did not remotely alert investors to the fact that Splunk had <u>already</u> suspended its marketing investments at the time of Defendants' statements. ¶¶148-49. "The safe harbor cannot protect cautionary statements made with superior knowledge that some of the potential perils identified have in fact been realized." *Washtenaw Cty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at *4

---

[2] Defendants' other cases (Mot. at 9) are inapposite because each concerned a challenge to predictions—not, like here, representations of current fact. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) ("classic growth and revenue projections"); *In re Twitter, Inc. Sec. Litig.*, 2020 WL 7260479, at *882 (N.D. Cal. Dec. 10, 2020) ("projected revenue from and progress on" product); *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *12 (N.D. Cal. Feb. 12, 2015) (statements made "in the context of Fusion's guidance for its third-quarter revenues").

(N.D. Cal. Sept. 4, 2012).[3]

*Second*, contrary to Defendants' assertion (Mot. at 16), Child's admission at the end of the Class Period that Splunk "suspended investments in marketing" was plainly inconsistent with Defendants' Class Period representations that Splunk "continue[d] to … invest in marketing programs" and "continue[d] to make directed and substantial investments to expand … marketing." ¶¶104, 108. In an attempt to show otherwise, Defendants resort to trying to rewrite Child's admission, claiming that he only admitted to "a short-term suspension of certain marketing investments." Mot. at 16. But Child never said that the suspension of marketing investments was "short-term" or was confined to "certain" marketing investments. Rather, he said, without exception, that Splunk "suspended investments in marketing." ¶96. His actual words are consistent with the accounts of the Company's former employees, who recalled that Merritt announced the suspension internally in late March 2020, that it applied across the board, and that it continued through December 2020. ¶¶65-74. And, in any event, at this stage, the court "must adopt Plaintiff's interpretation" because the court "may not resolve any disputes about the actual meaning of the statement in this procedural posture." *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1132 (N.D. Cal. 2020).

*Third*, Defendants assert that their statements that Splunk continued its investments in marketing related only to "Splunk's expectations" and were therefore "vague" and "general." Mot. at 15-16. They are incorrect. Splunk's "expectations" are not challenged here; "taking a few of Plaintiffs' allegations out of context and labeling them as puffery is not sufficient to undermine Plaintiffs' detailed allegations." *In re: Bofi Holding, Inc. Sec. Litig.*, 2016 WL 5390533, at *9 (S.D. Cal. Sept. 27, 2016). Where, as here, "Defendants repeatedly represented, in a variety of forums, that it continued to" take corporate actions "when the defendants had, in fact" not taken those corporate actions, their statements are "neither aspirational nor general" and are therefore actionable. *Id.*

Likewise, Merritt's May 21, 2020 statement to investors (¶110) that Splunk's campaign cadence "remains high" is not puffery; it was an affirmative misrepresentation that Splunk's

---

[3] Identically, Defendants are incorrect (Mot. at 8-9) that their misstatements that they "continue[d] to hire" sales personnel are immunized by the PSLRA's safe harbor. None of Defendants' statements were mere "expectations for the future"—as they assert (Mot. at 13); plus, even optimistic statements are actionable if "anchored in misrepresentations of existing facts." *Hefler*, 2018 WL 1070116, at *7.

LEAD PLAINTIFF'S OPP. TO MOT. TO DISMISS                                        11
Master File No. 4:20-cv-08600-JST

campaign cadence remained at a certain level compared to prior quarters when, in fact, all marketing investments had been suspended.[4] A statement that metrics were "similar to what they were" before is verifiable, not puffery. *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1141 (N.D. Cal. 2017); *see also BofI*, 2016 WL 5390533, at *9 ("[w]e continue to" maintain underwriting practices not puffery).[5]

In any event, "determining whether a given statement is material entail[s] fact-intensive assessments that are more properly left to the jury." *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). Here, investors relied upon Defendants' statements, as evidenced by market analysts' reports recommending that investors buy Splunk stock precisely because Splunk "continue[d] to invest heavily in … expanded marketing efforts." ¶46. The suspension of marketing investments was also material to Splunk's bottom line. As Child admitted, the "suspended investments in marketing" "led to [the] tight pipeline in Q3 [i.e., the third quarter]" because Splunk "didn't get the pipeline build into [the third quarter]." ¶¶96, 139. With an "anemic" pipeline, the Company had no replacements for deals that failed to close. ¶¶72-74.

**Fourth**, Defendants quibble with their former employees' accounts about the marketing suspension. Mot. at 16. But the witness accounts are clear that the suspension involved marketing investments across the board—not "certain" or "limited" investments in marketing—and lasted throughout the Class Period. ¶¶39-46. Two of the former employees heard about the suspension directly from Merritt. ¶¶64-68. And the witness accounts are further corroborated by what Child himself admitted: the Company "suspended investments in marketing." These allegations are more than sufficient. *See QSI*, 865 F.3d at 1144 (witness allegations that "[Defendant CEO] personally explained on conference calls" information inconsistent with public statements sufficient to plead

---

[4] Defendants claim Merritt meant to say "Splunk was still holding events virtually." Mot. at 18. But Merritt said "[o]ur campaign cadence remains high." Whether virtual or nonvirtual does not change the misleading comparison. *See Hefler*, 2018 WL 1070116, at *4 (misleading to give "impression of a state of affairs that differs in a material way from the one that actually exists"); *Shenwick*, 282 F. Supp. 3d at 1138-39 (misleading to tout acceleration of certain metrics while omitting deceleration in other metrics because gave investors misimpression).

[5] Defendants' cited cases are in accord. *See, e.g.*, *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 701-05, 708 (9th Cir. 2021) ("[t]here have been no material changes to our risk factors" actionable); *Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1035 (N.D. Cal. 2020) ("continuing to build" and "intend to continue to grow our global sales and marketing team" could be actionable).

falsity); *In re Zillow Grp., Inc. Sec. Litig.*, 2019 WL 1755293, at *5 (W.D. Wash. Apr. 19, 2019) (witnesses' "consistent and interlocking testimony about how Zillow altered the co-marketing program," corroborated by company disclosures, sufficient to plead falsity).[6]

*Fifth*, Defendants claim that Splunk's disclosures of its aggregate amount of sales and marketing expenses belies the falsity of their statements that Splunk "continue[d] to … invest in marketing programs." *See* Mot. at 17. They do not. Defendants' reported numbers, if anything, added to the misleading picture. Splunk's SEC filings provide a general list of what Splunk's "[s]ales and marketing expenses primarily consist of." ECF. 69-1 (Def. Ex. 1 at 51). It nowhere provides a complete list, nor breaks down each of the listed items by dollar amount spent. These lumped together "sales and marketing expenses" could move in either direction for many reasons and hide the fact that the Company suspended investments in marketing. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 260 n.31 (3d Cir. 2009) (rejecting use of reported numbers in SEC filings that were not "conclusive," noting "many different factors in addition to [those at issue]" could affect them).[7]

What's more, Child's admission contradicts Defendants' proffered tealeaf reading of their expense item, as do the witness accounts, which cannot be ignored. When "reported financial results are in tension with the reports of the [witnesses]," courts "do not resolve factual disputes," but instead "assume the truth of the specific facts alleged." *Id.* Defendants cannot offer their expense line to "resolve factual disputes against the plaintiff's well-pled allegations." *Khoja*, 899 F.3d at 1014.[8]

### 2. Defendants Falsely Assured Investors That Splunk Was Continuing To Hire Sales Personnel

Throughout the Class Period, Defendants also falsely told investors that Splunk was

---

[6] It is irrelevant (Mot. at 17) that FE 5 was hired in marketing; Defendants' misstatements and omissions concern their having frozen the hiring of *sales* professionals—not marketing employees.

[7] Splunk's report (Mot. at 17) of one decrease "in marketing-related expenses" nowhere disclosed that Splunk had chosen to suspend marketing investments.

[8] Defendants' reliance on *In re Nimble Storage, Inc.* is misplaced because the challenged statements related to investments in sales and marketing as a single expenditure, which indisputably increased each quarter. 2016 WL 7209826, at *5-6 (N.D. Cal. Dec. 9, 2016). Here, Splunk told investors it continued marketing investments while, in truth, it had suspended marketing investments and thus, Splunk's *disputed* and *combined* "sales and marketing" expenditure does nothing to contradict the Complaint.

continuing to hire sales personnel to fuel increased demand and drive revenue growth. ¶¶47-56. In Splunk's SEC filings, they told investors that Splunk was "continu[ing] to hire additional [sales] personnel" and "continu[ing] to aggressively expand" its sales organization. ¶¶106, 109. When asked in May 2020, "where is hiring," Child said they had been "opening up hiring related to DQCs [direct quota-carrying sales representatives], of course, to serve the growth needs" and that "we're definitely still hiring" sales professionals. ¶113. Again, in September 2020, an analyst asked about Splunk's "plans in hiring and adding direct quota-carrying reps" and "what changes you've made around hiring and go-to-market resources." ¶117. In response, Child said, "we're continuing to hire DQCs. We're having to – we're growing," and because of that growth, "we have to be continuing to invest in sales capacity." *Id.* He added, "we also have to continue to staff up for capacity" and "we're definitely going to continue to be hiring." *Id*.

These assurances were important to investors, particularly during the COVID-19 pandemic that started in March 2020 and continued throughout the Class Period. ¶48. Splunk reassured investors that it was continuously hiring sales professionals notwithstanding the pandemic, which was purportedly a catalyst for generating demand to "the highest ever in [Splunk's] history." *Id.* Securities analysts took comfort in Defendants' representations, noting that "Splunk has been expanding its sales force" and that this added "sales capacity" would "help drive revenue acceleration." ¶56.

Defendants' statements were false and misleading. Splunk was not continuing to hire, expand, or staff up its sales personnel. To the contrary, as Child later admitted, Splunk had "frozen hiring" in "early mid-March," i.e., before Defendants' first misstatement on March 26, 2020. ¶96. Child's admission that Splunk had not continued to hire, but instead, froze hiring, is sufficient to plead falsity. *See supra* at Section IV.A.1 (collecting cases).

Former employees have further corroborated that Splunk instituted a Company-wide hiring freeze of sales personnel throughout the entire Class Period. ¶¶75-83. Defendants remained quiet about these facts when asked "what changes you've made around hiring," instead leading investors to believe the Company was "continu[ing] to staff up" and "continu[ing] to be hiring" sales personnel. ¶¶117-18. "Such discrepancy between what [company] executives reported and the allegedly true state of affairs of [the Company's] employ is adequately misleading to state a claim under 10(b)." *In*

*re Daou Sys., Inc.*, 411 F.3d 1006, 1020 (9th Cir. 2005); *Merit Med.*, 2021 WL 1258590, at *8 (statements that "sales continue to grow according to our expectations" and "[w]e've maintained the sales force" actionable because of attrition of 20% of salesforce); *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *10-11 (S.D. Cal. May 23, 2017) (statements that company made "significant investments" by hiring "new personnel" actionable because witness allegations gave "an impression of a different state of affairs," including that company "did not hire new personnel").

Defendants' arguments in response to the well-pled allegations once again fail.

*First*, Defendants again attempt to recast their statements as vague and general puffery—i.e., corporate fluff. *See* Mot. at 11-12. But Defendants' statements that Splunk was "continuing to hire" sales personnel (¶¶106, 109, 117) were "concrete description[s] of the past and present state of" hiring—not puffery. *QSI*, 865 F.3d at 1144; *see also supra* at 11-12. As courts have explained, representations that defendants "continued to" take certain actions "when the defendants had, in fact" not taken those actions are "neither aspirational nor general." *BofI*, 2016 WL 5390533, at *9.

Defendants' cases confirm that misstatements, like those at issue here, are not puffery, as they provided a "concrete description of the past and present" that created an impression of a "state of affairs that differed in a material way from the one that actually existed." *Alphabet*, 1 F.4th at 700; *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (same); *see also Nutanix*, 450 F. Supp. 3d at 1035-36 (noting that statement "we intend to continue to grow our global sales and marketing team" could be actionable); *Forescout*, 2021 WL 1146031, at *4 (noting that statement we are "hiring like crazy" could be actionable).

Defendants' statements were also material. As Child ultimately admitted, Splunk's hiring freeze "led to [the] tight pipeline in [the third quarter]" because "it usually takes a quarter or two to build your pipeline, especially for a company of [Splunk's] size" and without adequate sales personnel, Splunk "didn't have the capacity" to execute the deals that were in its limited pipeline. ¶¶96, 139. Investors relied on Defendants' statements, with analysts noting that "Splunk's strengths"

included "adding sales capacity." ¶56; *BofI*, 2016 WL 5390533, at *9.[9]

***Second***, Defendants assert that the Ninth Circuit's decision *Tesla* immunizes their misstatements from liability. *See* Mot. at 13. But in *Tesla*, the court held that a "pure statement of opinion" that Tesla was making "great progress" would be actionable if Tesla was "making no progress at all." 985 F.3d at 1196. Here, in contrast to *Tesla*, Defendants' statements were not "opinions" and, even under Defendants' contortion of *Tesla*, Defendants' representations are actionable because Splunk froze hiring of sales personnel (¶¶75-83) and, thus, was "making no progress at all" in hiring sales personnel.[10]

***Third***, despite Defendants' assertion (Mot. at 13), there is nothing vague about a "hiring freeze." Even accepting Defendants' proffered "Investopedia" definition that a "hiring freeze" "may not mean that all hiring is stopped," this is consistent with Plaintiff's allegations that Splunk implemented a hiring freeze of sales personnel—not <u>all</u> personnel. In any event, "[t]hese types of [definitional] arguments are more appropriate for summary judgment or trial than a Rule 12(b)(6) motion to dismiss." *In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *12 n.14 (C.D. Cal. July 21, 2005) (rejecting "quibble over the definition").

***Fourth***, Defendants cast aspersions on the reliability, personal knowledge, and specificity of the consistent and corroborating accounts of FE 3, FE 4, FE 7, and FE 8. *See* Mot. at 13-14. It is well-established, however, that witness allegations are sufficient where, as here, the Complaint identifies each witness's title, dates of employment, job description, and the basis of their knowledge. *Daou*, 411 F.3d at 1015-16. Each witness had personal knowledge. For example, FE 3 was told about the hiring freeze by Merritt and also his boss, while FE 7 received an email from the President of Worldwide Field Operations. ¶¶76, 78; *see QSI*, 865 F.3d at 1144 (witness account that "[defendant]

---

[9] Defendants also pluck from context to call puffery (Mot. at 12) Merritt's May 2020 statement touting the marketing team. ¶¶110, 115. These statements are misleading in context. *See supra* at Section IV.A.1; *infra* at Section IV.A.3; *see also Hefler*, 2018 WL 1070116, at *7 (materiality requires "analysis of the context in which the statements were made").

[10] Defendants' absurd argument (Mot. at 13 n.8) that their statements in Splunk's March 26, 2020 10-K were really made on January 31, 2020 is refuted by the Form 10-K itself, which Merritt signed on March 26, 2020 (two months after January 31, 2020) and which references events in March 2020 (i.e., events that post-date January 31, 2020). *See* ECF No. 69.01 (Def. Ex. 1) at 13, 60-61, 63.

---

explained [information] in internal QSI conference calls" supported falsity). FE 4 explained that the hiring freeze was widely known because it affected current employees' commissions for referrals. ¶77; *see QSI*, 865 F.3d at 1139 (knowledge of witness established because compensation affected). Each witness also described their personal experiences, including FE 4, who had to take on new territories because of the hiring freeze and FE 8, who saw a spreadsheet of the unapproved requests for new hires. ¶¶81-82. These "consistent and interlocking" accounts are sufficient. *Zillow*, 2019 WL 1755293, at *5.

Defendants' cases do not support their criticisms. *Huang v. Higgins* concerned off-label marketing of pharmaceuticals, but no witness ever marketed the products off-label, was ever explicitly told to do so, or cited actual instances of it. 2019 WL 1245136, at *7-8 (N.D. Cal. Mar. 18, 2019). *Nutanix* and *Forescout* each concerned non-continuous hiring freezes and no detail about their start, stops, or scope, or why the witnesses knew about them. 450 F. Supp. 3d at 1036; 2021 WL 1146031, at *5. In stark contrast, here, there was one, continuous hiring freeze, instituted in March 2020 that ran until at least December 2020, and affected all sales personnel. Each witness is "one whose context and access to critical information makes him or her reasonably reliable, such that his or her conclusions about the inner workings of the company are not speculative but reasonably informed." *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1243 (N.D. Cal. 2008).[11]

*Fifth*, Defendants claim that Child revealed the truth about the hiring freeze early in the Class Period, on May 21, 2020. *See* Mot. at 12, 15. He did not. In fact, Child's May 21 "disclosure" was itself false and misleading. On that date, Child stated that the Company "kind of put a freeze on hiring" back in "early mid-March" and, in the same breath, falsely assured the market it had ended. He stated that Splunk had "been opening up hiring related to DQCs" and was "definitely still hiring." But the Company did not "kind of" put a freeze on hiring—it froze hiring of sales personnel. And the Company had not "open[ed] up hiring" and was not "definitely still hiring"—the hiring freeze remained in place throughout the Class Period. ¶¶75-83. Thus, it is "far from obvious" that Child's

---

[11] With zero basis, Defendants attempt to distinguish DQCs from sales personnel (Mot. at 15), but FE 4 explained that the sales personnel were quota carrying. ¶81.

May 21, 2020 statement "amounted to a prior, accurate disclosure." *Khoja*, 899 F.3d at 1014.[12]

In the same vein, Defendants claim their statements are inactionable because (purportedly) the market was not concerned about Child's May 21, 2020 "disclosure." Mot. at 12. This again ignores what Child actually said and what the market had already been told. On May 21, Child falsely said that Splunk had earlier implemented "some kind" of hiring freeze, that it quickly ended, and hiring had continued. ¶113. Buttressing this misrepresentation, Splunk had elsewhere falsely reported that, as of March 26, it was "continu[ing] to hire. ¶51. Thus, Child's statements did not reveal the truth; to the contrary, they perpetuated the falsehood that Splunk was continuously hiring sales professionals.

***Finally***, Defendants rehash their argument that investors could somehow divine that they froze hiring from their "sales and marketing expenses" line item. *See* Mot. at 14-15. But, as discussed above (*see supra* at 13), that line item did not remotely disclose the Company's hiring freeze.[13]

### 3.   Defendants Falsely Assured Investors That Splunk Was Not Laying Off Employees

Defendants also misled investors into believing that Splunk had not engaged in any "layoffs or cutbacks" following the pandemic. When asked on June 8, 2020 about "potential layoffs or cutbacks," Merritt said, "the worst-case scenario" would have to happen first and "[t]here would have to be some really unexpected shifts in the macro environment beyond what we've already modeled." ¶115. He assured investors that layoffs and cutbacks had not yet occurred at Splunk, explaining that "things are going well for many tech companies, us included" and "[t]he customer reaction has continued to be really strong for Splunk." *Id.*

In truth, however, Defendants had already made substantial layoffs. ¶¶84-92. Indeed, Merritt himself announced internally, one month earlier, that he and his executive colleagues had made the "hard decision" to lay off the entire new logo team. ¶87. Thus, Merritt's public statements "g[a]ve a reasonable investor the impression of a state of affairs that differ[ed] in a material way from the one

---

[12] Defendants' cases (Mot. at 15)—where the truth was actually disclosed—are inapposite.

[13] That Splunk purportedly "increased headcount to expand [its] field sales organization" changes nothing. Splunk's SEC filings do not define "field sales organization." Merritt, however, said "the field" organization was the "sales teams" *and* "marketing teams." ¶110. The Complaint makes no allegations that the Company froze hiring of marketing personnel.

that actually exist[ed]." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008); *Scheller v. Nutanix, Inc.*, 2020 WL 5500422, at \*8 (N.D. Cal. Sept. 11, 2020) (statement company "had strong success in our hiring" was "misleading to a reasonable investor in light of Plaintiffs' allegations that Nutanix's sales force was experiencing high levels of attrition"); *Merit Med.*, 2021 WL 1258590, at \*8 (statement "[w]e've maintained the sales force" was "false and misleading" given salesforce attrition).

There is nothing inactionably "vague" (Mot. at 18-19) about Merritt's representations, and the "context" (Mot. at 19) is clear: Merritt led investors to believe that Splunk was making no layoffs or cutbacks just three days before he secured a positive shareholder vote approving his and Child's outsized compensation plans. The new logo team was imperative to Splunk's salesforce and revenue as it was responsible for generating pipeline. ¶88. As Child admitted, the lack of an adequate pipeline going into the third quarter, because of the cuts that Splunk had made during the Class Period, was a cause of the earnings miss. ¶¶96, 139; *see Merit Med.*, 2021 WL 1258590, at \*8 (finding loss of 3 important salespeople sufficient for falsity). And, in any event, "[w]hether a reasonable investor would be misle[]d by [Merritt's] statement is a question for the trier of fact." *Loritz v. Exide Techs.*, 2014 WL 4058752, at \*8 (C.D. Cal. Aug. 7, 2014) (rejecting argument that statement taken "out of context"). At best, Defendants' arguments to the contrary (Mot. at 18-19) "raise factual issues that cannot be resolved as a matter of law at this stage in the litigation." *Id.* at \*7.

**B.      The Amended Complaint Alleges a Strong Inference of Scienter**

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). Plaintiff need only raise a "strong inference" of scienter that "need not be irrefutable … or even the most plausible." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-24 (2007). No "smoking-gun" is required. *Id.* The inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23. "Scienter can be established by direct or circumstantial evidence." *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996). The Complaint adequately alleges scienter.

*First*, Merritt and Splunk undoubtedly knew of the suspension of marketing, hiring freeze, and layoffs because Merritt personally announced them during internal, Company-wide Zoom meetings in March and May 2020. Four separate former employees personally attended these meetings and provide corroborating accounts of them. ¶¶66-68, 76, 87. "[T]hat the defendants published statements when they knew facts suggesting the statements were inaccurate ... is classic evidence of scienter." *Align Tech.*, 485 F. Supp. 3d at 1133-34; *see also Oracle*, 380 F.3d at 1230 (reversing dismissal and holding that the "most direct way" to allege scienter is to allege knowledge of "contemporaneous" information); *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *17 (N.D. Cal. Mar. 21, 2018) (that defendant made "state[ments] at the annual global sales conference" that conflicted with public statements supported scienter).

To escape the clear-cut inference of scienter, Defendants try to invent a new requirement that Plaintiff must allege that Defendants concealed the true facts both from their colleagues and investors. *See* Mot. at 20. Specifically, Defendants claim (citing no legal support) that Merritt's announcements during internal meetings "undermines" scienter because he "widely" disclosed the true facts within the Company. But courts find that a wider dissemination of the undisclosed facts within the corporation strengthens the scienter inference. *Extreme Networks*, 2018 WL 1411129, at *17, *19 (statements in "company-wide" emails and during "global sales conference" established scienter); *In re Intuitive Surgical Sec. Litig.*, 2014 WL 7146215, at *4 (N.D. Cal. Dec. 15, 2014) (statements in "national sales meetings that individual Defendants attended" established scienter).

Defendants next contend that "the FE accounts do not raise an inference of scienter" because supposedly "[n]one of the FEs report communicating directly with Defendants." Mot. at 21. This assertion is flatly wrong: as noted, four of the former employees describe the meetings where Merritt himself announced these corporate actions. ¶¶66-68, 76, 87. In any event, nothing requires plaintiffs to plead direct communication with defendants; even "hearsay" is sufficient to the "scienter calculus." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016); *see also Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484-85 n.5 (9th Cir. 2019) (refusing to discount witness allegations when witness lacked direct contact with defendant); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10-11 (N.D. Cal. Apr. 28, 2020) (same); *Extreme Networks*, 2018 WL 1411129, at *28

(crediting witnesses who had no communications with defendant other than meetings).

***Second***, Child also admitted to his knowledge and involvement in the Company's hiring freeze and suspension of investments in marketing. Specifically, at the close of the Class Period, he admitted that "we"—i.e., he and his executive colleagues—"froze hiring [and] suspended investments in marketing," which led to a "a tighter pipeline going into Q3." ¶96; *see also STEC*, 2011 WL 2669217, at *11 (defendants' statement at the end of the class period that "*we did sign the [EMC Agreement], ... this was* a one-off type of deal" supported the "inference that Defendants knew at the time they signed the EMC Agreement that it was not an ordinary course contract") (emphasis in original). Nowhere did Child or Merritt state that they were never informed about the significant corporate actions that Splunk took—nor could they claim otherwise, as Splunk's CEO (and touted "chief operating decision maker") and Splunk's CFO (and self-described "clean-up guy"). ¶125.

In response, Defendants try to rewrite the scienter standard, requiring Plaintiff to show Defendants "kn[ew] the challenged statements were false." Mot. at 20. But all that is required is that Defendants were "consciously reckless as to their truth or falsity," *Hefler*, 2018 WL 1070116, at *4—which Plaintiff has shown. Moreover, in support of their heightened standard, Defendants interject their own counter-factual narrative that Splunk had merely implemented a "short-term" hiring freeze and suspended "certain" investments in marketing. But Defendants cannot simply rewrite the Complaint to avoid liability. "[F]actual disputes about specific, plausible allegations are not sufficient to dismiss a claim. Factual allegations and their reasonable inferences are accepted as true at the motion to dismiss stage." *Smilovits v. First Solar, Inc.*, 2012 WL 6574410, at *7 (D. Ariz. Dec. 17, 2012).

***Third***, Defendants' false denials—in the face of specific analyst questions—further strengthen the scienter inference. For example, when Child was asked about hiring on May 21, 2020, he assured investors that Splunk was "definitely still hiring." ¶50. Merritt was also specifically asked on June 8, 2020 about whether Splunk was "thinking about potential layoffs or cutbacks," to which he falsely replied that "[t]here would have to be some really unexpected shifts in the macro environment beyond what we've already modeled." ¶52; *see In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019) (strong scienter inference when defendants "issued specific [statements] …

in response to questions from analysts and investors").[14]

***Finally***, while neither "allegations of motive" nor "a specific theory of defendants' motives" are required, *Apple*, 2020 WL 6482014, at *12-13, the Complaint pleads a plausible motive.[15] As detailed in the Complaint, in the face of a daunting and ever-expanding $1.2 billion deficit and negative operating cash flows, Defendants needed to provide investors the "carrot" that Splunk would soon reach positive operating cash flows and do so in a sustainable way. ¶32. By suspending marketing investments, instituting a hiring freeze, and conducting layoffs, Defendants were able to temporarily report that Splunk was on track toward positive operating cash flow; and, by keeping these specific corporate actions well hidden, investors believed these reported results were the product of sustainable operational investments driving sustainable growth. ¶¶35-57. With the market convinced, Defendants secured a necessary cash infusion through a $1.265 billion debt offering on favorable terms and a favorable shareholder vote for the Executive Defendants' $15 million and $17 million compensation packages, plus substantial raises. ¶¶58-62. Defendants' need to maintain Splunk's stock price to "raise financing" to fund their "business plan" and meet "projections" provides motive. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064, n.8 (9th Cir. 2000); *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1128 (D. Colo. 2017) (need for financing provides motive). Indeed, when the truth was revealed, the price of the debt plummeted 11% in a single trading day. ¶127.

Defendants gain nothing by noting that "[i]t was commonplace and expected for companies to pause hiring and cut expenses as a result of COVID." Mot. at 21-22. This assertion ignores that Splunk—unlike other companies—told investors that COVID was a boon for its business and made positive statements against the "expectation" investors may have had. ¶48. The ongoing pandemic

---

[14] Defendants' assertions (Mot. at 20, 21, 22) that Splunk disclosed the hiring freeze during the Class Period and their reported "sales and marketing expenses" disclosed the truth is not only misguided (*see supra* at 13, 17-18) but introduces factual disputes unfit for resolution now. *Khoja*, 899 F.3d at 1014.

[15] Defendants' cases are inapposite. *Webb v. Solarcity Corp.* concerned stock purchases "evidencing an expectation that stock prices would *not* rise," 884 F.3d 844, 856 (9th Cir. 2018), while *In re Rigel Pharms., Inc. Sec. Litig.* concerned an alleged motive that defendants knew "the value of their stock options would increase," making an absence of stock sales relevant. 697 F.3d 869, 884 (9th Cir. 2012).

only heightened investor and analyst attention to Defendants' statements (¶¶49-52), and did not permit Defendants to lie.

### C.    The Complaint Alleges Loss Causation

As the Ninth Circuit emphasized in *First Solar*, loss causation involves "no more than the familiar test for proximate cause," which can be shown in "an 'infinite variety' of ways." 881 F.3d at 753. Plaintiff "need only show a 'causal connection' between the fraud and the loss" and may "prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *Id.* at 753-54. "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation," dismissal is improper. *Gilead*, 536 F.3d at 1057. The Complaint readily satisfies the loss causation pleading standards.

The Complaint details how, after trading hours on December 2, Splunk announced a significant earnings miss, an 11% year-over-year drop in total revenues, a miss of earnings-per-share analyst estimates, and a net loss that widened to $201.5 million. ¶133. Later that night, Splunk withdrew its coveted operating cash flow guidance for fiscal year 2023, which it had reiterated just ten days earlier. ¶134. The earnings miss was driven, in significant part, by the Company's suspension of marketing investments, hiring freeze, and layoffs. Indeed, Child admitted on December 3 that the Company's having "suspend[ed] investments in marketing" and "froze[n] hiring" led to the "tighter pipeline." ¶135. He likewise explained why these specific corporate actions were a cause of this specific earnings miss; as Child explained, "it usually takes a quarter or two to build your pipeline." *Id.* Child's admissions are supported by the Complaint's additional, well-pled witness allegations and logic. The Complaint further explains that on December 2 and 3, securities analysts and the financial press justifiably lambasted the Company for its about-face revelations, reporting that Splunk had "inflicted a garish wound to its credibility," and that the Company "won't ever be viewed the same way." ¶137. Finally, the Complaint describes how Splunk's stock price declined by 23% as a result. Allegations, like these, that "the stock price fell upon the revelation of an earnings miss," more than suffice to satisfy the applicable pleading standards. *First Solar*, 881 F.3d at 753-54.

Each of Defendants' loss causation challenges fail.

***First***, Defendants assert erroneously that the Complaint includes no allegations that "connect

the disappointing results announced on December 2, 2020" to the misrepresented and omitted facts. Mot. at 23. That assertion is demonstrably untrue. The Complaint explains how Child made this very "connection" when he admitted that the Company's "suspend[ed] investments in marketing" and "froze[n] hiring" led to the "tight pipeline in Q3." ¶135. As Child also confirmed, because of these corporate actions, Splunk "didn't get the pipeline build into [the third quarter]" (i.e., because there were no marketing investments or adequate sales personnel to drive it) and "didn't have the capacity in terms of sales execution to execute" (i.e., because Splunk lacked sufficient sales personnel). ¶139. The Complaint additionally features former employee accounts corroborating that the misrepresented and omitted facts were proximate causes of investors' losses. ¶¶63-92.

Defendants' next argument (Mot. at 22-23), that the bulk of Splunk's stock price decline followed its after-hours earnings miss announcement on December 2 and before trading opened on December 3, is wholly irrelevant. Plaintiff does not allege otherwise—nor must it. ¶132. Splunk's stock price declined following the revelation of the earning miss after trading closed on December 2, with the decline persisting and increasing during trading hours on December 3. That Splunk did not disclose the causes of the earnings miss on December 2—but rather disclosed them the following day—does not defeat loss causation or excuse Defendants from liability. As the Ninth Circuit has explained, "Disclosure of the fraud is not a *sine qua non* of loss causation," and plaintiff may establish "loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *First Solar*, 881 F.3d at 753-54; *see also In re Impinj, Inc., Sec. Litig.*, 414 F. Supp. 3d 1327, 1338 (W.D. Wash. 2019) (loss causation satisfied where "[t]here is nothing implausible about that chain of events" alleged to have caused the revenue miss). Defendants' argument separately fails because "a corrective disclosure need not be a 'mirror-image' disclosure—a direct admission that a previous statement is untrue; it must simply relate to the same subject matter as the alleged misrepresentation"—a standard readily met here. *In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at *8 (N.D. Cal. May 1, 2017).

Defendants' cited authorities do not support them. Ignoring *First Solar*, Defendants instead try to rely upon the Ninth Circuit's earlier decision in *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014). But *Loos* is not relevant, as that case concerned an "announcement of an investigation,

without more" (*id.* at 890); meanwhile, *First Solar* involved the precise situation here: an announcement of an earnings miss (881 F.3d at 754). Equally inapposite is this Court's decision in *Higgins*, in which there were no allegations "connect[ing] the risks of the alleged off-label marketing to a subsequent stagnation or decrease in off-label prescriptions underlying the negative financial news released." 2019 WL 1245136, at *17. Here, in stark contrast, Defendant Child, himself, admitted and connected the misrepresented and omitted facts to the negative financial news.

*Second*, Defendants make the irrelevant assertion that the Company's withdrawal of its long-term guidance contributed to the stock price decline. *See* Mot. at 25. In making this point, Defendants ignore that Splunk withdrew its guidance precisely <u>because</u> the Company's undisclosed corporate actions derailed its stated long-term plan. ¶64. In any event, as this Court has observed, Plaintiff need not show that the misrepresented facts were the "sole reason" or even the primary cause of Splunk's poor results and the stock price decline. *Twitter*, 2020 WL 4187915, at *15. "[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement." *Id.*

*Finally*, Defendants rehash their contention that they supposedly told the market that they suspended their marketing investments and disclosed that they froze hiring during the Class Period. *See* Mot. at 25. In reality, the opposite is true: as detailed in the Complaint, Defendants issued a series of statements perpetuating the false market understanding that they were continuously investing in marketing and, with the exception of a couple week hiatus, continuously hiring sales professionals to fuel their needed growth. ¶¶39-56.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied. If, however, the Court grants any part of the Motion, Plaintiff requests leave to amend under Fed. R. Civ. P. 15.[16]

---

[16] Because the Complaint states a primary violation of Section 10(b), the Court should deny the motion to dismiss the Section 20(a) claim.

DATED:  September 15, 2021

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP

*/s/ Jonathan D. Uslaner*

Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, California  90067
Tel: (310) 819-3470

*-and-*

John Rizio-Hamilton (admitted *pro hac vice*)
johnr@blbglaw.com
1251 Avenue of the Americas
New York, New York  10020
Tel: (212) 554-1400
Fax: (212) 554-1444

*Attorneys for Lead Plaintiff Louisiana Sheriffs'
Pension & Relief Fund and Lead Counsel for the
Class*

KLAUSNER, KAUFMAN, JENSEN &
LEVINSON
Robert D. Klausner (*pro hac vice* forthcoming)
bob@robertdklausner.com
7080 NW 4th Street
Plantation, Florida 33317
(954) 916-1202
(954) 916-1232 (fax)

*Additional Counsel for Louisiana Sheriffs'
Pension & Relief Fund*