UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SPLUNK INC. SECURITIES LITIGATION | Case No. 20-cv-08600-JST<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>Re: ECF No. 67 |

Before the Court is Defendants' motion to dismiss the consolidated class action complaint. ECF No. 67. The Court will grant the motion in part and will deny it in part.

## I.  BACKGROUND

For the purpose of resolving the present motion, the Court accepts as true the allegations in the consolidated class action complaint (hereinafter, "operative complaint"), ECF No. 65.

Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Plaintiff") brings this action individually and on behalf of all persons who purchased the common stock of Splunk Inc. ("Splunk" or "the company") between March 26, 2020, and December 2, 2020, inclusive ("Class Period"). *Id.* ¶ 19.

Plaintiff alleges that Defendants Splunk and certain of its officers ("individual Defendants"), namely Douglas Merritt (Chief Executive Officer) and Jason Child (Chief Financial Officer) violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5, by making false or misleading statements that artificially inflated the price of Splunk stock during the Class Period. *Id.* ¶¶ 159-75.

Splunk sells data management software that can be used to search, monitor, and analyze large quantities of electronic data. *Id.* ¶ 24. Its software indexes real-time data and allows users to produce graphs, dashboards, and visualizations of the indexed data. *Id.* It additionally provides

United States District Court<br>Northern District of California

users the capability to diagnose network problems and protect against cybersecurity threats. *Id.*

Before the Class Period, Splunk had operated at a net loss every year since at least 2012. *Id.* ¶ 25. As a result of these deficits, and because Splunk's business is cash-intensive, the company had been forced to rely upon cash infusions from outside sources in the form of equity and debt offerings to operate. *Id.* ¶ 26.

As of 2019, analysts expressed concern about the company's negative operating cash flow because running deficits impacted the company's ability to generate profits. *Id.* ¶ 29. Analysts asked Defendants in 2019 to provide guidance as to when and how they expected the company to become cash-flow positive, meaning that the company would generate more incoming cash by selling its products than it spent on operational expenses to sell those products. *Id.* ¶¶ 30-31. Being cash-flow positive was important to investors because it meant that Splunk would no longer need to rely on debt and equity offerings to fund its operations. *Id.* ¶ 31.

In November 2019, before the start of the Class Period, Defendants assured investors that the company would achieve positive operational cash flow by January 31, 2022, and that it would approach one billion dollars in positive operational cash flow in fiscal year 2023. *See, e.g.*, *id.* ¶ 32. Also in 2019, Defendants made statements that indicated to investors that they intended to achieve positive cash flow, not by cutting operational expenses, but by tapping into a growing market for the type of software Splunk produced and by increasing revenues. *See, e.g.*, *id.* ¶¶ 36-37. Defendants stated that they would spend on operational expenses to support the company's growth and meet its revenue targets, and they indicated that achieving revenue growth was critical to meeting the company's positive operational cash-flow goals. *See, e.g.*, *id.* ¶ 37. Defendants further stated that they would need to make significant investments in marketing and to maintain an adequate headcount of sales personnel to achieve their positive operational cash-flow goals, as marketing was necessary to develop brand recognition and increase revenues and having an adequate number of sales personnel was necessary to facilitate the company's growth. *See, e.g.*, *id.* ¶¶ 42, 37; *see also id.* ¶ 54 (alleging that during a "December 3, 2019 investor conference call, Defendant Child explained that Splunk's progress in attaining its cash flow and financial targets required its 'continuing to spend OpEx to support the high growth of the company' and,

United States District Court
Northern District of California

2

United States District Court
Northern District of California

specifically, 'to continue to hire salespeople.'  Splunk's CFO likewise emphasized the importance of hiring additional sales personnel, explaining that 'the investments we're making in [the] field continue to fuel our growth'") (footnote omitted).

Analysists took note of these statements and interpreted them as indicating that Splunk would try to achieve positive cash flow by increasing sales and revenue, and that the company would increase its operating expenses as part of its strategy to increase sales and revenue. *See, e.g.*, *id.* ¶ 38.  Analysis noted that sales and marketing expenditures would be important to achieving increased sales and revenue, as such expenditures would help to improve the company's brand recognition. *See, e.g.*, *id.* ¶ 44.

During the Class Period, Defendants made statements that allegedly led investors to believe, incorrectly, that the company was making investments in marketing and sales personnel to the extent necessary to meet its sales and revenue goals. *See, e.g.*, *id.* ¶¶ 45, 47.  Analysis relied on these statements in recommending that investors purchase Splunk stock or in commenting positively about the company's prospects. *See, e.g., id.* ¶¶ 46, 49.  Analysis specifically commented during the Class Period that the pandemic was having no material impact on the company's fundamentals or its development of pipeline (i.e., potential customers for Splunk's product). *See, e.g.*, *id.* ¶ 49.  Analysts published statements indicating that they believed that Splunk was expanding and investing in its sales force and its sales efforts to reach its revenue and growth targets. *See, e.g.*, *id.* ¶ 56.

The price of Splunk stock increased from $129.14 per share at the start of the Class Period to a high of $223.59 per share during the Class Period—an increase of over 73%. *Id.* ¶ 58.  Plaintiff alleges that the increase in the stock price was artificial, because it reflected investors' incorrect belief, based on Defendants' false or misleading statements, that Defendants would invest in marketing and sales personnel to the extent necessary to build adequate pipeline and meet the company's growth and revenue targets. *See, e.g.*, *id.* ¶¶ 2-3.  Contrary to what Defendants' statements implied, Defendants were not investing in marketing or maintaining adequate sales personnel headcount during the Class Period to the extent necessary to build adequate pipeline and meet the company's growth and revenue targets; instead, Defendants suspended marketing

investments and instituted a hiring freeze of sales personnel, which lasted throughout the Class Period, and laid off employees whose job was to build pipeline. Defendants did not disclose the extent or potential impact of these actions to investors during the Class Period. *See, e.g.*, *id.* ¶ 8. These actions impaired the company's ability to build sufficient pipeline and caused the company to miss its earning targets for Q3 2020. *See, e.g.*, *id.* ¶¶ 7-9, 75.

Plaintiff alleges that Splunk's stock price remained artificially inflated throughout the Class Period as a result of Defendants' allegedly false or misleading statements. *See, e.g.*, *id.* ¶ 5. The artificially inflated price of Splunk's stock during the Class Period allowed Defendants to complete a debt offering on favorable terms in June 2020 that the company needed to service debt obligations and continue to fund operations. *See, e.g.*, *id.* ¶¶ 69-61. Analysists credited the successful debt offering to the elevated price of Splunk's stock. *Id.* ¶ 61. The artificially inflated price of Splunk stock also helped Defendants obtain shareholder approval for a compensation package that increased individual Defendants' compensation. *Id.* ¶ 62.

On December 2, 2020, Defendants disclosed a significant earnings miss for Q3 2020. *Id.* ¶ 94. Splunk reported an 11% year-over-year drop in total revenues, missing estimates by nearly $60 million. *Id.* A day later, on December 3, 2020, Child discussed the causes of Splunk's earnings miss for Q3 2020 during a call with analysts. *Id.* ¶ 96. Child stated that Splunk had, "when the pandemic hit," suspended investments in marketing and froze hiring for a "few months," and he admitted that these actions were a significant cause for the lower-than-expected revenues for Q3 2020, because they resulted in a tighter "pipeline" of potential customers of Splunk product. *Id.* ¶¶ 12, 63, 96. Child explained that it usually takes a few months to build pipeline. *Id.* ¶ 96. Multiple Splunk employees corroborated Child's admissions with respect to the cuts to investments in marketing and employment of sales personnel and their effects on the company's pipeline and ability to generate sales revenue. *Id.* ¶ 80. According to these employees, Defendant Merritt announced and admitted during an internal all-hands meeting that took place near the start of the Class Period a hiring freeze of sales personnel, which remained in place throughout the Class Period. *See, e.g.*, *id.* ¶¶ 76-77, 64, 67-68. Also according to these employees, Merritt announced layoffs in early May 2020 during an internal company-wide Zoom

4

meeting, *id.* ¶ 87, which eliminated, effective in June 2020, the company's "new logo" team, which was responsible for pipeline generation. *See, e.g.*, *id.* ¶¶ 88, 91-92. These actions negatively affected Splunk's pipeline generation and its efforts to generate demand for its products. *See, e.g.*, *id.* ¶¶ 72-76.

Analysts reacted negatively to the earnings miss for Q3 2020 and to Child's revelations on December 3, 2020, and downgraded Splunk stock. *Id.* ¶ 98.

On December 3, 2020, Splunk's stock price dropped 23%, falling from a closing price of $205.91 on December 2, 2020, to close at $158.03 per share on December 3, 2020, with high trading volume. *Id.* ¶ 97.

## II.    REQUEST FOR JUDICIAL NOTICE

Defendants request that the Court take judicial notice, or consider under the incorporation-by-reference doctrine, ten documents, namely: (1) Splunk's March 26, 2020, Form 10-K (excerpted), Exhibit 1; (2) the transcript of Splunk's May 21, 2020, earnings call for Q1 2021, Exhibit 2; (3) Splunk's June 1, 2020, Form 10-Q (excerpted), Exhibit 3; (4) a June 8, 2020, Silicon Valley Business Journal article, "Splunk CEO Doug Merritt on Growing in San Jose and Why He's Not Committing to No Layoffs This Year," regarding its interview with Merritt, Exhibit 4; (5) Splunk's September 3, 2020, Form 10-Q (excerpted), Exhibit 5; (6) the transcript of Splunk's presentation at the September 14, 2020, Jefferies Software Conference, Exhibit 6; (7) the transcript of Splunk's December 2, 2020, earnings call for Q3 2021, Exhibit 7; (8) the transcript of Splunk's presentation at the December 3, 2020, KeyBanc Capital Markets Cloud Leadership Conference, Exhibit 8; (9) Yahoo! Finance historical stock price data for Splunk for December 2, 2020, and December 3, 2020, Exhibit 9; and (10) Yahoo! Finance historical stock price data for the S&P 500 for December 2, 2020, and December 3, 2020, Exhibit 10. *See generally* ECF No. 68.

Plaintiff partially opposes the request. Plaintiff concedes that "the Court may properly consider Defendants' SEC filings and other public documents to determine what Defendants told investors during the Class Period," ECF No. 71 at 4, but Plaintiff opposes the Court's consideration of the contents of the documents at issue for the truth of the matters asserted therein or to resolve factual disputes in a manner adverse to the allegations in the complaint, *id.* at 4-6.

United States District Court
Northern District of California

5

Federal Rule of Evidence 201 permits a court to notice an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)-(2). "Accordingly, '[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment[,]" but a "court cannot take judicial notice of disputed facts contained in such public records." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (citation omitted).

Because Plaintiff does not dispute their authenticity and accuracy, the Court grants Defendants' request for judicial notice of Exhibits 1 through 10, which are: Splunk's filings with the SEC; transcripts of calls with, or presentations to, analysts and investors; publications of Defendants' statements; and historical stock price data. Courts routinely take judicial notice of these types of documents for the purpose of determining what information was available to the market. *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (holding that the district court properly took judicial notice of publicly available financial documents and SEC filings); *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2009) (holding that courts "may take judicial notice of publications introduced to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true") (citation and internal quotation marks omitted); *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 799 (9th Cir. 2017) (taking judicial notice of "historical stock prices" on the ground that they are "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Wochos v. Tesla, Inc.*, No. 17-CV-05828-CRB, 2018 WL 4076437, at *2 (N.D. Cal. Aug. 27, 2018) (taking judicial notice of earnings call transcript "for the sole purpose of determining what representations [defendants] made to the market"). Because the truth of the matters asserted in these documents is subject to a reasonable dispute, however, the Court will take judicial notice of the statements in these documents, but not for the truth of the matters asserted therein or for the purpose of resolving factual disputes. *See Khoja*, 899 F.3d at 999-1001.

6

United States District Court
Northern District of California

**III.    JURISDICTION**

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

**IV.    LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While this standard is not a probability requirement, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks and citation omitted). In determining whether a plaintiff has met this plausibility standard, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

"If a claim alleges securities fraud, the Private Securities Litigation Reform Act ('PSLRA'), 15 U.S.C. § 78u-4, also applies." *Khoja*, 899 F.3d at 1008. "[A] district court ruling on a motion to dismiss [in an action for securities fraud] is not sitting as a trier of fact. It is true that the court need not accept as true conclusory allegations, nor make unwarranted deductions or unreasonable inferences. But so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) (internal citations omitted).

**V.    DISCUSSION**

**A.    Claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5**

The Securities and Exchange Act of 1934 "was designed to protect investors against manipulation of stock prices." *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988). The Supreme Court "repeatedly has described the fundamental purpose of the Act as implementing a philosophy of full disclosure." *Id.* (citations and internal quotation marks omitted).

7

Section 10(b) of the Securities Exchange Act of 1934 declares it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary." 15 U.S.C. § 78j(b). There is an "implied [ ] private cause of action" in Section 10(b). *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).

"SEC Rule 10b-5 implements [Section 10(b)] by making it unlawful to . . . 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading.'" *Id.* (quoting 17 C.F.R. § 240.10b–5).

"Thus, to prevail on a claim for violations of either Section 10(b) or Rule 10b-5, a plaintiff must prove six elements: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051-52 (9th Cir. 2014) (citation and internal quotation marks omitted). "Rule 9(b) applies to all elements of a securities fraud action, including loss causation." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

"Even where a plaintiff has properly pleaded all six elements of a Section 10(b) violation, the allegedly false or misleading statement may still be shielded from liability by the 'safe harbor' provision of the PSLRA." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017).

> The PSLRA exempts from liability any forward-looking statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or that the plaintiff fails to prove was made "with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1). That is, a defendant will not be liable for a false or misleading statement if it is forward-looking and either is accompanied by cautionary language or is made without actual knowledge that it is false or misleading.

*Id.* (citation omitted).

Here, Defendants move to dismiss the Section 10(b) and Rule 10b-5 claims in the operative complaint on the grounds that Plaintiff has not pleaded facts to plausibly support the

elements requiring a misrepresentation or omission, scienter, and loss causation.[1]  The Court analyzes each of these elements in turn.

### 1.        Misrepresentation or Omission

The first element of a claim under Section 10(b) and Rule 10b-5 requires a plaintiff to show that the defendant made a statement that was false or misleading as to a material fact.  *Basic*, 485 U.S. at 238.  This requires, in relevant part, "specify[ing] each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading[.]"  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321 (2007) (quoting 15 U.S.C. § 78u–4(b)(1)).  "In setting forth the reasons why they contend that each challenged statement is misleading, securities plaintiffs may rely on either an affirmative misrepresentation theory or an omission theory."  *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) (citing 17 C.F.R. § 240.10b-5(b)).  "Under Rule 10b-5, an affirmative misrepresentation is an 'untrue statement of a material fact,' and a fraudulent omission is a failure to 'state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'"  *Id.* (citation omitted).

"Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time."  *Khoja*, 899 F.3d at 1008 (citation omitted).  "Even if a statement is not false, it may be misleading if it omits material information."  *Id.* at 1008-09 (citation omitted).  Courts apply the objective standard of a "reasonable investor" to determine whether a statement is misleading.  *See In re VeriFone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir. 1993).  "Disclosure [of omitted information] is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'"  *Matrixx Initiatives*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5(b)).  As such, "companies can control what they have to disclose under these provisions by controlling what they say to the

---

[1] In their motion, Defendants do not move to dismiss the claims on the basis that Plaintiff has not plausibly pleaded materiality with respect to each of the challenged statements.  Materiality requires pleading that "a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed."  *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).  Because Defendants do not move to dismiss the claims on materiality grounds, the Court does not address that issue in this order.

United States District Court
Northern District of California

market." *Id.* at 45. "But once defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016) (quotation marks and citation omitted).

In the operative complaint, Plaintiff alleges that Defendants made statements during the Class Period that led investors to believe, incorrectly, that Splunk was making investments in marketing and in sales personnel to the extent necessary to build adequate pipeline and meet the company's revenue and growth targets. Plaintiff alleges that, unbeknownst to investors, Defendants had suspended investments in marketing, frozen hiring as to sales personnel, and laid off sales employees to an extent that could, and ultimately did, impact the company's ability to build adequate pipeline and meet its revenue and growth targets. ECF No. 65 ¶ 102. Plaintiff further avers that Defendants' failure to disclose to investors that they had taken these actions, as well as their extent and potential impact on the company's ability to meet its revenue and growth targets, rendered certain of Defendants' statements during the Class Period misleading. These undisclosed actions allegedly caused a significant earnings miss for Q3 2020 that was announced on December 2, 2020, which, in turn, caused Splunk's stock to drop sharply. *Id.* ¶ 106.

In the present motion, Defendants argue that none of the statements challenged in the operative complaint are actionable on the grounds that Plaintiff's allegations do not raise the inference that they were false or misleading, the statements are protected under the PSLRA safe harbor, or the statements amount to inactionable puffery.

Below, the Court considers the allegedly false or misleading statements that Plaintiff addressed in its opposition to the present motion.[2] The Court considers these challenged statements, which are shown in bold throughout this order, in chronological order.

        **a.**     **Statements made in the Form 10-K of March 26, 2020, and Forms 10-Q of June 1, 2020, and September 3, 2020**

Plaintiff alleges that Splunk's annual report on Form 10-K of March 26, 2020, and

---

[2] The operative complaint refers to other statements by Defendants that Plaintiff did not address in its opposition to the present motion. The Court interprets Plaintiff's failure to address such

Splunk's Forms 10-Q of June 1, 2020, and September 3, 2020, which were signed by Merritt and Child, contained various false or misleading statements that gave the false impression to investors that the company was investing in marketing and sales personnel to the extent necessary for the company to build adequate pipeline and meet its revenue and growth targets.

The first challenged statement in the Forms 10-K and 10-Q is the following, which is discussed in paragraphs 104 and 106 of the operative complaint:

> Sales and marketing expenses primarily consist of personnel and facility-related costs for our sales, marketing and busines development personnel, commissions earned by our sales personnel, and the cost of marketing and business development programs, including advertising programs to promote our brand and awareness, demand generating activities and customer events. We expect that sales and marketing expenses will continue to increase, in absolute dollars, as **we continue to hire additional personnel and invest in marketing programs**.

ECF No. 65 ¶¶ 104, 106; *see also* ECF No. 69-1 at 46; Ex. 69-3 at 18; Ex. 69-5 at 21.

The second challenged statement in the Forms 10-K and 10-Q is discussed in paragraph 106 of the operative complaint:

> We intend to continue investing for long-term growth.  We have invested and intend to continue to invest heavily in product development to deliver additional features and performance enhancements, deployment models and solutions that can address new end markets.  For example, during fiscal 2020, we released new versions of existing offerings such as Splunk ITSI and Splunk ES and introduced Splunk Data Fabric Search ("DFS") and Splunk Data Stream Processor ("DSP").  We also introduced Splunk Business Flow, a process mining solution that enables process improvement and business operations professionals to discover, investigate, and check conformance of any business process.  We expect to **continue to aggressively expand our sales and marketing organizations to market and sell our software** both in the United States and internationally.

ECF No. 65 ¶ 106; *see also* ECF No. 69-1 at 39; ECF No. 69-3 at 11; ECF No. 69-5 at 11.[3]

statements in its opposition as a concession that Plaintiff's theory of liability is not predicated on those statements.  The statements that Plaintiff did not address in its opposition include those discussed in paragraphs 106 and 109 of the complaint.  *See* ECF No. 65 ¶¶ 106, 109 (alleging that Defendants made the following statement and that it was false or misleading: "The key elements of our growth strategy are to . . . [c]ontinue to expand our direct and indirect sales organization").

[3] The word "aggressively" appears in the Form 10-K but was removed from the challenged statement as it appears in the Forms 10-Q.  The inclusion or exclusion of this word does not

United States District Court
Northern District of California

The third challenged statement in the Forms 10-K and 10-Q is discussed in paragraph 104 of the operative complaint:

> Although our business has experienced significant growth, we cannot provide any assurance that our business will continue to grow at the same rate or at all. We have experienced and expect to continue to experience rapid growth in our headcount and operations, which has placed and will continue to place significant demands on our management and our operational and financial systems and infrastructure. As of January 31, 2020, approximately 35% of our workforce had been employed by us for less than one year. As we continue to grow, we must effectively integrate, develop and motivate a large number of new employees, while maintaining the effectiveness of our business execution and the beneficial aspects of our corporate culture and values. In particular, we intend to **continue to make directed and substantial investments to expand our** research and development, **sales and marketing**, and general and administrative organizations, as well as our international operations.

ECF No. 65 ¶ 104; *see also* ECF No. 69-1 at 12-13; ECF No. 69-3 at 24; ECF No. 69-5 at 29.

Plaintiff alleges that the challenged statements above were misleading because they gave the incorrect impression to investors that the company was making investments in marketing and was employing sales personnel to the degree necessary to build adequate pipeline and meet Splunk's growth and revenue targets. ECF No. 65 ¶¶ 103-09. Plaintiff alleges that, contrary to what the challenged statements incorrectly implied, Defendants were not, in fact, investing in marketing and sales personnel to the extent necessary to build adequate pipeline and meet the company's growth and earnings targets; instead, Defendants, unbeknownst to investors, had suspended investments in marketing and implemented a hiring freeze as to sales personnel as of approximately early March, and these actions lasted throughout the Class Period. *See, e.g.*, *id.* ¶¶ 65-76, 103-09. These actions ultimately resulted in a significant earnings miss for Q3 2020 that was announced on December 2, 2020, which caused the price of Spunk stock to drop significantly on December 3, 2020. Id. ¶¶ 94-96.

Defendants argue that, even if Plaintiff had plausibly alleged that the challenged statements in question are false or misleading, the statements at issue are forward-looking and are, therefore,

impact the Court's analysis as to whether the challenged statement is actionable.

12

protected under the PSLRA safe harbor.  Defendants contend that the challenged statements relate to Splunk's plans and objectives for future investments and hiring, to future economic performance, or to the underlying assumptions related to those issues and, as such, they fall within the scope of the safe harbor.

The PSLRA safe harbor protects a defendant from liability "for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading."  *Wochos*, 985 F.3d at 1190 (emphasis in the original).  The PSLRA defines forward-looking statements, in relevant part, as: (A) statements "containing a projection of revenues. . . or other financial items," 15 U.S.C. § 78u-5(i)(1)(A); (B) statements "of the plans and objectives of management for future operations," 15 U.S.C. § 78u-5(i)(1)(B); (C) statements of "future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission," 15 U.S.C. § 78u-5(i)(1)(C); and "any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C)," 15 U.S.C. § 78u-5(i)(1)(D).

Here, Defendants argue, and Plaintiff does not dispute in its opposition,[4] that each of the three challenged statements in question were accompanied by the requisite cautionary language. The Forms 10-K and 10-Q included the following cautionary statements:

> This discussion contains forward-looking statements based upon current expectations that involve risks and uncertainties.  Our actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under 'Risk Factors' included in Part I, Item 1A or in other parts of this report.

---

[4] In the complaint, Plaintiff alleges, conclusorily, that the challenged statements "were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements."  ECF No. 65 ¶ 148.  These conclusory allegations are insufficient to raise the inference that the cautionary language that accompanied the challenged statements was not meaningful.  *See Wochos*, 985 F.3d at 1190 (holding that, where a challenged statement was accompanied by cautionary language and was forward-looking, a plaintiff seeking to "defeat" the invocation of the safe harbor must "plead additional facts . . . indicating that the 'cautionary statements' cited by the defendant were not 'meaningful'").

United States District Court
Northern District of California

*See* ECF No. 69-1 at 38; *see also* Ex. 69-3 at 9; Ex. 69-5 at 9 (similar).  Each of the SEC filings in question further contained a description of various risk factors that could cause actual results to differ materially from those anticipated in the forward-looking statements.  *See* ECF No. 69-1 at 10-36; ECF No. 69-3 at 22-48; ECF No. 69-5 at 27-54.  Because the challenged statements were accompanied by the requisite cautionary language, the challenged statements can be deemed to be protected by the safe harbor if they fall within the PSLRA's definition of a forward-looking statement.

Here, the first challenged statement, "[w]e expect that sales and marketing expenses will continue to increase, in absolute dollars, as we continue to hire additional personnel and invest in marketing programs," falls within the definition of a forward-looking statement under 15 U.S.C. § 78u-5(i)(1)(A) and (D) or 15 U.S.C. § 78u-5(i)(1)(C) and (D).  The first sentence, "[w]e expect that sales and marketing expenses will continue to increase," is a statement containing a projection of "other financial items," *see* 15 U.S.C. § 78u-5(i)(1)(A), or a statement of future economic performance, *see* 15 U.S.C. § 78u-5(i)(1)(C), and it, therefore, falls within the definition of a forward-looking statement.  Plaintiff does not dispute this.  The phrase that the parties dispute is the one that follows the first sentence, namely, "as we continue to hire additional personnel and invest in marketing programs."  That phrase is a statement of the assumptions underlying or relating to the statements in the preceding sentence; as such, it falls within the scope of 15 U.S.C. § 78u-5(i)(1)(D).  Plaintiff's interpretation of the challenged phrase "as we continue to. . ." ignores that this phrase functions as a premise of the preceding sentence, and that it describes the assumptions underlying or relating to the statements in the preceding sentence.

The second challenged statement, "[w]e expect to continue to aggressively expand our sales and marketing organizations to market and sell our software both in the United States and internationally," also is forward-looking, because it describes "the plans and objectives of management for future operations," *see* 15 U.S.C. § 78u-5(i)(1)(B).  Plaintiff's interpretation of the second challenged statement ignores the words "we expect to," but those words are precisely what indicate to the reader that the statements following such words are plans or objectives.

The third challenged statement, "we intend to continue to make directed and substantial

14

investments to expand our research and development, sales and marketing, and general and administrative organizations, as well as our international operations," also falls within the scope of 15 U.S.C. § 78u-5(i)(1)(B), because it describes Defendants' plans and objectives for future operations. Accordingly, the third challenged statement is forward-looking. Plaintiff's interpretation of the third challenged statement ignores the words "we intend to."

Plaintiff's arguments that the three challenged statements discussed above do not fall within the definition of a forward-looking statement are not persuasive. First, Plaintiff's arguments are predicated on alterations of the words used in the statements, which have the effect of changing the meaning of the statements. For example, Plaintiff argues that, "[i]n Splunk's SEC filings, they told investors that Splunk was 'continu[ing] to hire additional [sales] personnel' and 'continu[ing] to aggressively expand' its sales organization.'" ECF No. 70 at 20 (alterations in the original). In other portions of its opposition, Plaintiff argues that the challenged statements indicated that Defendants "continue[d] to hire" sales personnel. *See* ECF No. 70 at 17 n.3 (alterations in the original). The challenged statements, as they actually appear in the Forms 10-K and 10-Q, do not state that Defendants were "continuing" or "continued" to take certain actions; as discussed above, the statements employ the word "continue," not "continuing" or "continued," and they do so in conjunction with other phrases that Plaintiff ignores, such as "we expect" and "we intend," which indicate that the statements referred to expectations for the future or to company objectives.

Second, Plaintiff concedes that the challenged statements contain forward-looking aspects, but argues that the portions of the challenged statements that it challenges are not forward-looking and are, therefore, not covered by the safe harbor. This argument also fails. Plaintiff is correct that, where a statement is "mixed," "only the forward-looking aspects could be immunized from liability, because the safe harbor is not 'designed to protect [issuers] when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement.'" *Wochos*, 985 F.3d at 1190 (citation omitted, alterations in the original). However, for a challenged statement to be deemed "mixed," the non-forward-looking aspects of the challenged statement must be "separable" from the forward-looking aspects. *See id.*

15

(holding that "mixed" statements are statements that "combine non-actionable forward-looking statements with *separable*—and actionable—non-forward-looking statements") (emphasis added).

Here, Plaintiff has not shown that the portions of the challenged statements that they argue are non-forward-looking are "separable" from the forward-looking portions of the statements. As discussed above, in the first challenged statement, the phrase "as we continue to hire additional personnel and invest in marketing programs" is a statement of the assumptions underlying or relating to the statements in the preceding sentence, namely "[w]e expect that sales and marketing expenses will continue to increase." That phrase is, therefore, intertwined with the forward-looking portions of the statement and, as such, falls within the definition of a forward-looking statement. *See id.* at 1192 (holding that "statement[s] of the assumptions underlying or relating to a declared objective are also deemed to be forward-looking statements") (citation and internal quotations omitted). In the second and third challenged statements, the challenged phrases that begin with "to continue . . . " are inextricable from the phrases that precede them, which are forward-looking, namely "we expect" and "we intend." Accordingly, the challenged phrases cannot be said to "go beyond the assertion of a future goal," which is required to avoid the safe harbor under *Wochos*, 985 F.3d at 1192.

Plaintiff has not meaningfully distinguished *Wochos*, which is binding on this court. Plaintiff's reliance on *In re Quality Sys.*, 865 F.3d at 1143, for the proposition that the challenged statements are not forward-looking is misplaced; the statement at issue in that case, "[o]ur pipeline continues to build to record levels," was a standalone statement that was neither a predicate to forward-looking projections or objectives, nor intertwined with words such as "we expect" or "we intend." The rest of the authorities upon which Plaintiff relies for the proposition that the use of the word "continue" renders a statement not forward-looking pre-date *Wochos* or otherwise fail to address and incorporate *Wochos*' holdings, and the Court declines to follow them for that reason.

Third, Plaintiff argues that the safe harbor does not protect the challenged statements because "Defendants had actual knowledge of the true facts," namely that Splunk had already suspended its investments in marketing and sales personnel at the time the statements were made. Stated differently, Plaintiff argues that the safe harbor does not protect the challenged statements

16

because Defendants knew that the challenged statements were false or misleading when made, as Defendants were aware that their plans and objectives about continued investments in marketing and sales personnel would not be achieved. This argument is unavailing. Where, as here, "a defendant has made a sufficient showing that a challenged forward-looking statement was accompanied by meaningful cautionary statements, *see* 15 U.S.C. § 78u-5(e), a plaintiff cannot defeat that invocation of [the] safe harbor merely by alleging, for example, that the company knew that the announced forward-looking objective was unlikely to be achieved." *Wochos*, 985 F.3d at 1190. This is because, as noted above, the safe harbor protects from liability "a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *Id.* (emphasis in the original). For the reasons discussed above, Defendants have shown that the challenged statements are forward-looking and accompanied by the requisite cautionary language and, thus, the challenged statements fall within the scope of the safe harbor on that basis alone; the fact that the challenged statements do not *also* satisfy the alternative basis for protection under the safe harbor does not impact that conclusion.

In light of the foregoing, the Court concludes that, based on the allegations in the operative complaint, the first, second, and third challenged statements discussed above are protected by the safe harbor. The Court, therefore, GRANTS Defendants' motion to dismiss with respect to these statements. The Court will grant Plaintiff LEAVE TO AMEND as to these statements in the event that Plaintiff can allege additional facts that raise the inference that the cautionary language that accompanied the challenged statements was not meaningful.

### b. May 21, 2020, Q1 2020 earnings call

On May 21, 2020, Splunk held an earnings call to announce the results for Q1 2020. Defendants Merritt and Child spoke to investors and analysts on behalf of Splunk. During the question-and-answer portion of the call, an analyst asked individual Defendants, "I want to talk a little bit about where you are sort of seeing the momentum coming out of April into May, we're sort of few weeks into the quarter, how [sic] sort of pipeline and sort of bookings, any sort of changes in end of April, May versus end of March and April?"

17

In response, Merritt stated, in relevant part:

> We haven't seen any material difference in customer interest and activity. There is a lot of concerted effort that **the sales teams are driving along with helping the marketing teams to make sure that we build an adequate pipeline**. It's definitely – as you'd imagine, everyone's got to take different angles to build that pipe. Like many enterprise software companies, the field is responsible for a lot of that pipe gen, and that obviously comes from their activity day in and day out with customers that they're visiting. And now they're visiting virtually. So as you – I'm sure, you've seen with other software and cloud companies, we've got a ton of virtual events. **Our campaign cadence remains high**. We've shifted the rest of the events that we're participating in through the end of the year to the virtual format. We're seeing really high turnouts so far with people attending different information sessions and ultimately, marketing events. So, we're staying on top of serving customers and tight messaging around what's critical for cyber teams, infrastructure teams and App Dev teams to do their job effectively.

ECF No. 65 ¶ 110; *see also* ECF No. 69-2 at 12-13.

During the same call on May 21, 2020, an analyst asked, "where is hiring, I guess, based on your thought process coming into this year? I'd imagine you guys might have had to rethink that in March. And maybe what's the thought process on that now?" Child responded:

> Yeah. Regarding head count. So, yeah, when everything started slowing down in early mid-March, we definitely did kind of put a freeze on hiring and look at what – to try to get a better sense of what the environment was going to – how it's going to unfold. It's been pretty clear that the underlying growth within our business is very healthy. **So, we have been opening up hiring related to DQCs, of course, to serve the growth needs that are going to continue.** And then also, of course, there's some engineering head count related to a bunch of the migration work that we're continuing to do with really – in particular with cloud as well as within cloud, within SignalFx and some of the integration work there.
>
> **So, those areas we're definitely still hiring.** Most of the other areas, I think like most companies around are trying to make sure we're really focused on watching our cost structure closely and make sure that – especially with us going through a ratable transformation, we need to make sure that our cost structure doesn't outpace the growth revenue or it'll take a while for us to catch up. So that's something we're watching very carefully. But again, **we are mostly focused on making sure that we're making the necessary hires to manage to [sic] our growth targets**.

ECF No. 68 ¶ 113; *see also* ECF No. 69-2 at 24. The complaint alleges that "DQCs" are direct

18

quota-carrying sales representatives.  ECF No. 68 ¶ 113.

Plaintiff alleges that the challenged statements of May 21, 2020, shown in bold above, were misleading because Defendants failed to disclose adverse information known to them that cut against their positive representations regarding the company's efforts to build adequate pipeline, the high cadence of Splunk's marketing and sales campaign, and the company's efforts to maintain an adequate sales headcount to meet the company's growth and revenue targets.  *See* ECF No. 65 ¶¶ 112-14.  The adverse information in question was Defendants' suspension of investments in marketing and the hiring freeze of sales personnel, which Plaintiff alleges were implemented approximately at the beginning of the pandemic and lasted throughout the Class Period, as well as the fact that Splunk had fired the "new logo" team, which was responsible for generating pipeline, as of May 2020, to be effective in June 2020.  *See, e.g.*, *id.* ¶¶ 75-88.

When reading the operative complaint in the light most favorable to Plaintiff, as the Court must at this juncture, Plaintiff's allegations raise the reasonable inference that the challenged statements misled investors into believing, incorrectly, that Defendants' investments in marketing and their sales personnel headcount were sufficient for the company to build adequate pipeline to meet its growth and revenue targets.  Because Merritt and Child conveyed positive information regarding the company's efforts to build "adequate pipeline," the "cadence" of the company's sales and marketing campaigns notwithstanding the pandemic, the "very healthy" underlying growth within the company's business, and the fact that the company was hiring sales employees as part of the company's effort to "manage" its "growth targets," individual Defendants were obligated to disclose adverse information that cut against their positive representations in order to make such positive statements not misleading.  *See Schueneman*, 840 F.3d at 705-06 ("[O]nce defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.") (quotation marks and citation omitted).  Plaintiff's allegations raise the reasonable inference that, by the time Merritt and Child made the challenged statements at issue, Defendants had, unbeknownst to investors, fired the "new logo" team responsible for building pipeline, suspended investments in marketing, and had implemented a hiring freeze of sales

United States District Court
Northern District of California

personnel that lasted throughout the Class Period.[5]  They also raise the inference that the extent and duration of these actions was such that the company's ability to build pipeline and meet its growth and revenue targets was negatively and significantly impacted.  Plaintiff's averments also raise the inference that Defendants were aware of these adverse facts and of the likelihood that investors could be misled if they did not disclose them, not least because Defendants' own statements to analysts and investors had indicated that the company's investments in marketing and sales personnel were material to Splunk's ability to meet its growth and revenue targets.  *See, e.g.*, ECF No. 65 ¶¶ 36-42, 54.  Defendants nevertheless failed to disclose these adverse facts when they made the challenged statements in question, thus rendering the challenged statements misleading.

Defendants argue that Plaintiff has not alleged sufficient facts to raise the inference that the challenged statements were false.  *See* ECF No. 67 at 21-23.  This argument is unavailing.  To be actionable, a challenged statement must be false *or* misleading.  For the reasons discussed above, the Court finds that Plaintiff has plausibly alleged that the challenged statements were misleading on the basis that they omitted material information.  *See Khoja*, 899 F.3d at 1008-09 ("Even if a

United States District Court
Northern District of California

---

[5] Some of the allegations in the complaint with respect to the extent and duration of the hiring freeze and suspension in marketing investments are based on the accounts of several confidential witnesses.  *See, e.g.*, ECF No. 65 ¶¶ 66-83.  Defendants argue that the accounts of these confidential witnesses do not satisfy the PSLRA's heightened pleading standard because Plaintiff's allegations do not establish that each witness had the requisite reliability or personal knowledge.  Relying on *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005), Plaintiff responds that the confidential witness allegations in the operative complaint are sufficiently specific to satisfy the PSLRA because "the Complaint identifies each witness's title, dates of employment, job description, and the basis of their knowledge."  *See* ECF No. 70 at 22-23.  The Court agrees with Plaintiff.  In *In re Daou*, the Ninth Circuit held that allegations regarding information possessed by confidential witnesses satisfy the PSLRA's pleading standard "[s]o long as the sources are described 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged' and the complaint contains 'adequate corroborating details.'"  *Id.* (citation omitted).  The Ninth Circuit concluded that this standard was met based on the allegations before it because the allegations for each confidential witness "describe[d] his or her job description and responsibilities" and, therefore, supported the inference that each confidential witness would possess the information alleged.  Here, the complaint identifies the positions held by the confidential witnesses and the dates of their employment with Splunk, as well as the basis for each witness's knowledge of the information alleged.  *See* ECF No. 65 ¶¶ 66-83.  That is sufficient under *In re Daou* to find that the allegations regarding the information possessed by these confidential witnesses satisfies the PSLRA's pleading standard.  Defendants have not addressed, much less distinguished, *In re Daou*.

statement is not false, it may be misleading if it omits material information.") (citation omitted).

Defendants next contend that the challenged statements are not misleading as a matter of law because Child revealed during the May 21, 2020, call some of the adverse facts that Plaintiff alleges Defendants concealed, namely that the company had "kind of put a freeze on hiring" when "everything started slowing down in early mid-March," ECF No. 67 at 15.  This argument also is unpersuasive.  Defendants are correct that Child stated during the call that the company "did kind of put a freeze on hiring," but Defendants have not pointed to any portion of the call transcript where Child revealed the extent and duration of the hiring freeze or its potential impact on the company's ability to meet its growth and revenue targets.  Plaintiff's allegations raise the reasonable inference that Child's mention of a "kind of" hiring freeze concealed the extent and significance of it, because Child did not disclose the details of the hiring freeze and because Child mentioned it in conjunction with the positive and optimistic statements discussed above, which suggested that company was, notwithstanding the pandemic, building adequate pipeline to meet its revenue and growth targets.  Where, as here, reasonable minds could differ as to the adequacy of Child's disclosure with respect to the hiring freeze, the question of whether that disclosure was adequate to render the challenged statements not misleading cannot be resolved as a matter of law.  *See Khoja*, 899 F.3d at 1014 (holding that the district court erred in concluding that challenged statement was not actionable in light of what defendants argued was a prior disclosure where "it was far from obvious" that reasonable minds could not differ as to the adequacy of the prior disclosure).

Defendants also contend that the challenged statements were not misleading as a matter of law because Splunk disclosed in its SEC filings some information as to its sales and marketing expenditures.  *See, e.g.*, ECF No. 67 at 20-21, 23.  This argument fails for the same reasons as the preceding one.  The company's SEC filings disclose the company's aggregate expenditures on "sales and marketing," collectively, and they provide some high-level descriptions as to general trends in such expenditures.  *See, e.g.*, ECF No. 69-1 at 62.  Defendants have not shown, however, that Splunk's SEC filings itemize each marketing- and sales-related expenditure with a degree of specificity that would have allowed investors to discover, to a degree that reasonable minds could

United States District Court
Northern District of California

not differ, the adverse facts that Defendants allegedly concealed from investors, namely that the company had suspended marketing investments, froze hiring of sales personnel, and fired certain staff to an extent that could, and ultimately allegedly did, impact the company's ability to build adequate pipeline and meet its growth and revenue targets. Thus, the Court cannot conclude, at this stage of the litigation, that the high-level sales and marketing expenditure information disclosed in Splunk's SEC filings rendered the challenged statements not misleading as a matter of law. *See Durning v. First Bos. Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987) ("Only if the disclosure is so obvious that reasonable minds cannot differ is the issue [of whether a statement was misleading] appropriately resolved as a matter of law. Like materiality, adequacy of disclosure is normally a jury question.") (internal citation omitted).

Defendants next argue that the challenged statements are corporate puffery and, therefore, are not actionable. ECF No. 67 at 18. "Statements of mere corporate puffery, 'vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers,' are not actionable because 'professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives.'" *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (citation omitted). "[T]he context in which the statements were made is key" to determining whether they are inactionable puffery. *Id.* "But even general statements of optimism, when taken in context, may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys.*, 865 F.3d at 1143 (citation and internal quotation marks omitted). In other words, optimistic statements are *not* inactionable puffery and may form a basis for a securities fraud claim where the plaintiff pleads allegations raising the inference that the defendants were aware of facts that rendered the optimistic statements false or misleading. *See, e.g.*, *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (holding that defendants' optimistic assurances that FDA approval was "imminent" were actionable because plaintiff pleaded facts raising the inference that defendants were aware that their product "would never be approved by the FDA"); *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (holding that optimistic statements about the defendant company's financial future based on expansion of retail

22

operations were actionable because the plaintiff alleged facts raising the inference that the defendants were aware of adverse facts indicating that the expansion had failed).  On the other hand, optimistic statements are inactionable puffery where "the market already knew" of adverse facts that cut against the optimistic statements and, therefore, the court can infer that "any reasonable investor would have understood [the] statements as mere corporate optimism." *Police Ret. Syst.*, 759 F.3d at 1060 (citation and internal quotation marks omitted).

Here, for the reasons discussed above, Plaintiff's allegations raise the inference that Defendants were aware of material adverse facts that cut against the positive representations that Defendants made in the challenged statements, and that Defendants' omission of these adverse facts from the challenged statements gave investors the inaccurate impression that Defendants' investments in marketing and their sales personnel headcount were sufficient for the company to build adequate pipeline to meet its growth and revenue targets.  Because Plaintiff plausibly alleges that investors were not aware of the material adverse facts that cut against Defendants' optimistic statements, the Court cannot conclude as a matter of law, at this stage of the litigation, that a reasonable investor would have understood the challenged statements as mere corporate optimism. *Cf. Police Ret. Syst.*, 759 F.3d at 1060.

In light of the foregoing, the Court concludes that Defendants have not shown that the May 21, 2020, challenged statements are not actionable.

### c.       June 8, 2020, Silicon Valley Business Journal

On June 8, 2020, Merritt was asked by the Silicon Valley Business Journal about "potential layoffs or cutbacks":

> Question: Have you made any commitments to not do any layoffs? **Are you thinking about potential layoffs or cutbacks?**
>
> Merritt: I was pretty vocal internally that I am not going to make a commitment to no layoffs, only because it's such an uncertain time. **Right now things are going well for many tech companies, us included**, but I just didn't want to get in a position where I declared "Hey, no layoffs for the year," and then **the worst-case scenario happens and I've got to go back and say "Hey, I'm sorry for that commitment."**  The commitment I did make is our plans for the year are to grow headcount and spend . . . I still believe that we'll wind up with a bigger company in all ways at the end of calendar year 2020 versus what we entered calendar

23

> 2020.  Through Q1, that looks like the right decision as people are moving all digital really quickly and really dependent on IT infrastructure to actually work and cybersecurity resiliency and try and make sense of the data.  The customer reaction has continued to be really strong for Splunk.  **There would have to be some really unexpected shifts in the macro environment beyond what we've already modeled.**

ECF No. 65 ¶ 115.

Plaintiff alleges that the challenged statements, shown in bold above, were misleading because they led investors to believe, incorrectly, that Splunk had not made "layoffs or cutbacks," even though Defendants had laid off the new logo team in May 2020, effective June 2020, had suspended investments in marketing, and had implemented a hiring freeze of sales personnel.  *See, e.g.*, *id.* ¶¶ 115, 87-88.  Plaintiff avers that, because Merritt was asked about layoffs and cutbacks, Merritt's positive representations that "things are going well" for Splunk, in combination with his failure to mention the layoffs, hiring freeze, and suspensions in marketing investments that had already happened, Merritt's statements implied that layoffs and cutbacks had not yet occurred and would occur only in a "worst-case scenario" that had not yet materialized.  *Id.* ¶¶ 115-16, 84-92.

When reading the operative complaint in the light most favorable to Plaintiff, as the Court must at this juncture, Plaintiff's allegations raise the reasonable inference that the challenged statements misled investors into believing, incorrectly, that Defendants had not laid off employees or made cutbacks as of when the statements were made.  Plaintiff's allegations raise the reasonable inference that, by the time Merritt made the statements at issue, Defendants had already fired the "new logo" team responsible for building pipeline, had suspended investments in marketing, and had implemented a hiring freeze of sales personnel, and that this played a role in the company's ultimate failure to build adequate pipeline and meet its growth and revenue targets for Q3 2020.  Because, when he was asked directly about layoffs and cutbacks, Merritt mentioned that "things are going well" and that Defendants' intent was to "grow headcount and spend," Merritt was obligated to disclose adverse information that cut against these positive representations in order to make his statements not misleading.  *See Schueneman*, 840 F.3d at 705-06 ("[O]nce defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive

United States District Court
Northern District of California

24

information.") (quotation marks and citation omitted).  Plaintiff's allegations support the reasonable inference that Merritt's alleged failure to disclose the alleged layoffs and cutbacks that Defendants allegedly had already made gave investors an impression of a state of affairs that differed materially from the one that actually existed.  *See Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (holding that a statement is misleading if it would give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists").

Defendants argue that the June 8, 2020, challenged statements are forward-looking and protected by the PSLRA safe harbor.  ECF No. 67 at 15.  As noted above, the PSLRA safe harbor protects a defendant from liability "for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading."  *Wochos*, 985 F.3d at 1190 (emphasis in the original).  Here, Defendants have not identified any cautionary language that accompanied the June 8, 2020, challenged statements.[6] Accordingly, the only way in which these statements could be protected by the safe harbor is if the statements fall within the definition of a forward-looking statement *and* Plaintiff has not plausibly alleged that Defendants made the statements with actual knowledge that they were false or misleading.

Here, the Court need not decide whether the challenged statements of June 8, 2020, fall within the PSLRA's definition of a forward-looking statement because, even assuming that the statements fell within the scope of that definition, the Court cannot conclude, at this stage of the litigation, that Defendants made the statements without actual knowledge that they were false or misleading.  This is because Plaintiff's allegations raise the strong inference that Defendants made the challenged statements with actual knowledge that they were misleading.  *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (holding that "statements fall outside the safe harbor if the plaintiff can allege facts that would create a strong inference that the defendants made the

---

[6] The only cautionary language that Defendants have identified is that which accompanied the challenged statements in the Form 10-K and Forms 10-Q.  *See* ECF No. 67 at 16.

25

[statements] at issue with 'actual knowledge . . . that the statement was false or misleading'") (quoting 15 U.S.C. § 78u–5(c)(1)(B)(i)).  Plaintiff's allegations raise the strong inference that individual Defendants were aware of the adverse facts that Merritt allegedly failed to disclose on June 8, 2020, (i.e., the "new logo" team layoffs, the suspension in marketing investments, and the hiring freeze as to sales personnel) by virtue of their executive roles and because of the importance of the adverse facts to the company's ability to build adequate pipeline and meet its growth and revenue targets.  Plaintiff's allegations also raise the inference that Defendants knew that the adverse facts at issue would be material to investors, as analysts and Defendants themselves had commented on the importance of Splunk's continued investments in marketing and sales personnel to the company's ability to build adequate pipeline and meet the company's growth and revenue targets.  Given Defendants' alleged awareness of these matters, the operative complaint raises the strong inference that Defendants had actual knowledge that their failure to disclose the adverse facts in question could create an impression in the minds of investors of a state of affairs that differed materially from the one that actually existed with respect to layoffs, headcount, and the company's ability to build adequate pipeline and meet its growth and revenue targets.  In light of Plaintiff's allegations, the question of whether the challenged statements are protected by the safe harbor is a question of fact that cannot be resolved at this stage of the litigation.

Defendants also argue that the challenged statements are inactionable corporate puffery.  ECF No. 67 at 18, 25.  As noted above, optimistic statements are *not* inactionable puffery and may form a basis for a securities fraud claim where the plaintiff pleads allegations raising the inference that the defendants were aware of facts that rendered the optimistic statements false or misleading.  *See, e.g.*, *Warshaw*, 74 F.3d at 959; *Fecht*, 70 F.3d at 1081.  For the reasons discussed above, Plaintiff's allegations satisfy that standard.  Accordingly, the question of whether the challenged statements are inactionable puffery cannot be resolved as a matter of law at this stage of the litigation.

In light of the foregoing, the Court concludes that Defendants have not shown that the June 8, 2020, challenged statements are not actionable.

**d.      September 14, 2020, Jefferies Virtual Software Conference**

During a virtual software conference call held on September 14, 2020, an analyst asked Child, "when you think about how your plans in hiring and adding direct quota-carrying reps and going – kind of trying to get back to normal, how do you think about this year and what changes you've made around hiring and go-to-market resources?  How has that shifted through the year for you?"  ECF No. 65 ¶ 117.  Child responded, in relevant part:

> . . . And while – I know a lot of folks and some of the companies have started – been very positive about macro, I think most of the companies I've seen that have been positive have also removed all the guidance, took it down and then now taken apart back up to some extent, but not quite to where they started.  We're kind of one of the few that actually has maintained our ARR [annual recurring revenue] guidance throughout the year.  And so, from our perspective, **we're continuing to hire DQCs**, **we're having to – we're growing** 50% ARR last quarter.  I think it's six or seven quarters in a row over 50%.  And so, it's just that kind of growth, **we have to be continuing to invest in sales capacity** because, again, we're not a self-service model where – the sales team drives all of the growth.  And then also now with cloud growth accelerating, last quarter from 82% to 89%, now we're, well, between $400 million to $1 billion.  I think we're the fastest growing cloud company on ARR basis out there.  And so, that means we also have to continue to step up for capacity.  And obviously, we gave out a three year CAGR that says we expect to maintain a 40% compounded annual growth from last year through FY 2023 and we haven't changed that guidance.  So, we're definitely going to **continue to be hiring.**

*Id.*; *see also* ECF No. 69-6 at 9-10.  As noted above, the complaint defines "DQCs" as "direct quota-carrying sales representatives."  ECF No. 65 ¶ 117.

Plaintiff alleges that the challenged statements were misleading because Child failed to disclose adverse information known to him that cut against the positive representations he made with respect to hiring and the company's growth and ability to meet revenue targets.  *See* ECF No. 65 ¶¶ 117-18.  The adverse information in question was Defendants' hiring freeze of sales personnel, which Plaintiff alleges was implemented at the beginning of the pandemic and lasted throughout the Class Period, as well as the fact that Splunk had fired the "new logo" team, which was responsible for generating pipeline, as of May 2020, to be effective in June 2020.  *Id.*

When reading the operative complaint in the light most favorable to Plaintiff, as the Court must at this stage, Plaintiff's allegations raise the reasonable inference that the challenged

27

statements misled investors into believing, incorrectly, that the company had not laid off any sales employees and had not implemented a hiring freeze of sales personnel that lasted throughout the Class Period.  When asked about the changes the company had made regarding hiring and go-to-market resources "through the year," Child made positive statements regarding Splunk's revenue growth relative to other companies and touted the company's need to "continue to be hiring" in order to achieve "that kind of growth."  Because Child made these positive representations, which suggested that the company had been growing in revenue and headcount, he was obligated to disclose adverse information that cut against the positive representations in order to make his statements not misleading.  *See Schueneman*, 840 F.3d at 705-06 ("[O]nce defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.") (quotation marks and citation omitted).  That adverse information, which Child did not disclose, was that Defendants had implemented a hiring freeze of sales personnel in approximately March 2020 that remained in place at the time that Child made the challenged statements at issue, and that the company had fired the "new logo" team responsible for building pipeline as of May 2020, to be effective June 2020.  The complaint raises the reasonable inference that Child had actual knowledge of these adverse facts by virtue of his executive role within the company, of their potential negative impact on the company's ability to build pipeline and meet its growth and revenue targets, and of the likelihood that omitting such facts from the challenged statements could mislead investors.  Plaintiff's allegations are sufficient, therefore, to raise the inference that the challenged statements were misleading.

Defendants argue that Plaintiff has not alleged sufficient facts to raise the inference that the challenged statements were false.  *See* ECF No. 67 at 21-23.  This argument is unavailing because, to be actionable, a challenged statement must be false *or* misleading.  For the reasons discussed above, the Court finds that Plaintiff has plausibly alleged that the challenged statements were misleading.

Defendants next contend that the challenged statements were not misleading as a matter of law in light of Child's mention of a "kind of" hiring freeze during the earnings call held on May

21, 2020, and in light of Splunk's disclosure in its SEC filings of some high-level information as to its sales and marketing expenditures. For the reasons discussed at length above, the question of whether the disclosures Defendants point to were sufficient to reveal to investors the extent and impact of the hiring freeze of sales personnel and suspension in marketing investments that form the basis of Plaintiff's claims is one that cannot be resolved at this stage of the litigation. The adequacy of the disclosures Defendants point to is subject to a reasonable dispute, and the Court may not resolve factual disputes at the pleading stage. *See Khoja*, 899 F.3d at 1003 (reaffirming "the prohibition against resolving factual disputes at the pleading stage").

Defendants next argue that the September 14, 2020, challenged statements are forward-looking and protected by the safe harbor. ECF No. 67 at 15. As noted above, the PSLRA safe harbor protects a defendant from liability "for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *Wochos*, 985 F.3d at 1190 (emphasis in the original). Here, Defendants have not identified any cautionary language that accompanied the challenged statements of September 14, 2020. Accordingly, the challenged statements could be protected by the safe harbor only if they are forward-looking *and* Plaintiff has not plausibly alleged that Defendants made the statements with actual knowledge that they were false or misleading.

Here, the Court need not decide whether the challenged statements of September 14, 2020, fall within the PSLRA's definition of a forward-looking statement because, even assuming that the statements fell within the scope of that definition, the Court cannot conclude, at this stage of the litigation, that Child made the challenged statements without actual knowledge that they were false or misleading, as Plaintiff's allegations raise the strong inference that Child made the challenged statements with actual knowledge that they were misleading. *See In re Cutera*, 610 F.3d at 1112 (holding that "statements fall outside the safe harbor if the plaintiff can allege facts that would create a strong inference that the defendants made the [statements] at issue with 'actual knowledge . . . that the statement was false or misleading'") (citation omitted). As discussed above, Plaintiff's allegations raise the strong inference that Child was aware of the adverse facts that he allegedly failed to disclose on September 14, 2020, by virtue of his executive role and

because of the importance of the adverse facts to the company's ability to build adequate pipeline and meet its growth and revenue targets. Plaintiff's allegations also raise the inference that Child knew that the adverse facts at issue would be material to investors. In light of Child's alleged awareness of these matters, the operative complaint raises the strong inference that Child had actual knowledge that his failure to disclose the adverse facts in question could create an impression in the minds of investors of a state of affairs that differed materially from the one that actually existed. The question of whether the challenged statements are protected by the safe harbor, therefore, is a question of fact that cannot be resolved at this stage of the litigation.

Defendants also argue that the challenged statements are inactionable corporate puffery. ECF No. 67 at 18. As noted above, optimistic statements are *not* inactionable puffery and may form a basis for a securities fraud claim where the plaintiff pleads allegations raising the inference that the defendants were aware of facts that rendered the optimistic statements false or misleading. *See, e.g.*, *Warshaw*, 74 F.3d at 959; *Fecht*, 70 F.3d at 1081. For the reasons discussed above, Plaintiff's allegations satisfy this standard. Accordingly, the question of whether the challenged statements are inactionable puffery cannot be resolved as a matter of law at this stage of the litigation.

In light of the foregoing, the Court concludes that Defendants have not shown that the September 14, 2020, challenged statements are not actionable.

### 2. Scienter

"To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter[.]" *Matrixx Initiatives*, 563 U.S. at 48 (citation and internal quotation marks omitted). Scienter is "a mental state that not only covers 'intent to deceive, manipulate, or defraud,' but also 'deliberate recklessness[.]'" *Schueneman*, 840 F.3d at 705 (internal citations omitted). "[D]eliberate recklessness is an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (citation and internal quotation marks omitted). In evaluating scienter, courts must "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs,*

30

*Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. A complaint not meeting these requirements "shall" be dismissed. 15 U.S.C. § 78u-4(b)(3)(A).

The allegations in the operative complaint, when considered holistically, raise a strong inference of scienter as to individual Defendants, because they strongly suggest that individual Defendants[7] had actual knowledge that the challenged statements of May 21, 2020, June 8, 2020, and September 14, 2020, would be misleading to investors. Specifically, Plaintiff alleges that that individual Defendants knew that the challenged statements would be misleading because: (1) individual Defendants knew that the company had suspended marketing investments, froze hiring of sales personnel, and laid off employees to an extent that could, and ultimately allegedly did, impact the company's ability to generate sufficient pipeline and meet its growth and revenue targets, because Merritt announced such actions during an all-hands meeting at the start of the Class Period, *see, e.g.*, ECF No. 65 ¶ 121, and because individual Defendants were aware of core operational actions and strategies of the company by virtue of their executive roles, *id.* ¶ 125; (2) individual Defendants failed to reveal the suspension in marketing investments, hiring freeze of sales personnel, and layoffs when making the challenged statements even though analysts asked pointed questions that actively solicited information about the state of the company's marketing investments, hiring, and layoffs, *see, e.g.*, *id.* ¶ 123; (3) individual Defendants were aware of the importance of making sufficient investments in marketing and in employing enough sales personnel to the company's ability to build adequate pipeline and meet its growth and revenue targets; *see, e.g.*, *id.* ¶¶ 123-24; and (4) individual Defendants had an incentive to make investors believe that the state of the company's marketing investments and sales personnel headcount was better than it actually was, because that would facilitate their efforts to secure additional financing for the company on favorable terms and to secure approval for their compensation packages,

_____

[7] The parties do not distinguish each of the individual Defendants from each other for the purpose of analyzing the question of whether Plaintiff has adequately pleaded scienter. The Court does the same in this order.

United States District Court
Northern District of California

which increased their pay, *id.* ¶¶ 126-27, 62.

Because the scienter element is met as to individual Defendants, it also is met as to Splunk because Defendants do not argue that the individual Defendants were acting outside the scope of their apparent authority. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) ("The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority.").

Defendants argue that Plaintiff has not pleaded sufficient facts to support a strong inference of scienter because the allegations in the operative complaint merely show that Defendants had knowledge of the suspension of "certain" investments in marketing and of a "short-term" hiring freeze, but "[k]nowing that Splunk had implemented a short-term hiring freeze (of an unspecified scope) and suspended certain investments in marketing does not equate to knowing the challenged statements were false." ECF No. 67 at 26. This argument is unpersuasive. Plaintiff need not allege that individual Defendants knew that the challenged statements were false to raise the inference of scienter; Plaintiff need only allege facts that raise the strong inference that individual Defendants were aware of the adverse facts that cut against positive information conveyed in the challenged statements and knew that the challenged statements would be misleading to investors if they failed to disclose such adverse facts. The Court concludes that Plaintiff has done so, for the reasons discussed above.

Defendants also argue that any inference of scienter is negated by Defendants' disclosure of certain matters, namely Merritt's mention of a "kind of" hiring freeze during the earnings call held on May 21, 2020, and Splunk's disclosure of high-level information about sales and marketing operational expenditures in its SEC filings. ECF No. 67 at 27-28. Defendants argue that, because Defendants disclosed these matters before the company secured additional financing and individual Defendants' compensation package was approved by shareholders, the Court may infer that Defendants did not intend to deceive investors about the company's marketing investments or hiring freeze. ECF No. 74 at 17-19. For the reasons discussed above, the Court finds that reasonable minds could differ as to whether investors would have been able to discern

32

from the disclosures to which Defendants point the adverse facts that Plaintiff alleges Defendants concealed from investors.  Accordingly, the Court finds that the allegations in the operative complaint raise an inference of scienter that is "cogent and at least as compelling as any opposing inference" that can be drawn, even when taking into account the disclosures Defendants point to.[8] *See Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1106 (9th Cir. 2021).  Where that is the case, a securities fraud claim cannot be dismissed for failure to plausibly plead scienter.  *Id.*

Finally, Defendants argue that Plaintiff's failure to allege any "improper stock sales by Defendants" undermines any inference of scienter.  ECF No. 67 at 30.  This argument is misplaced.  Improper stock sales may be relevant to the scienter analysis where the plaintiff's scienter theory is predicated on allegations that the defendants had an incentive to deceive investors because they stood to benefit from the fraud if "the value of their stock options" increased.  *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012).  When scienter is predicated on such a theory, the absence of allegations that the defendants sold their stock options when the price of the same was artificially inflated as a result of the fraud undermines an inference of scienter.  *See id.* ("[B]ecause none of the defendants sold stock during the period between the allegedly fraudulent statements and the subsequent public disclosure of the detailed data, which is the period during which they would have benefitted from any allegedly fraudulent statements, the value of the stock and stock options does not support an inference of scienter.").  Here, however, Plaintiff's scienter theory is not predicated on the theory that individual Defendants had an incentive to mislead investors because they stood to gain from the

---

[8] This distinguishes the allegations here from those in the cases that Defendants rely upon; in Defendants' cases, the inference of scienter was less compelling than an opposing inference.  *See, e.g.*, *Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018) (where securities fraud claims were based on accounting error, holding that allegations "do not give rise to an inference of scienter that is at least as compelling as the inference of an honest mistake"); *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1107 (9th Cir. 2021) (holding that allegations raised the inference that the defendants' alleged conduct was nothing more than an "embarrassing or inexplicable" error, and that inference was more compelling than an inference of scienter); *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020) (holding that scienter theory based on conclusorily allegations that defendants sought to artificially inflate the price of a company's stock for a period of time, without any allegations that defendants would profit from the alleged scheme or otherwise had a motive to deceive investors, "does not make a whole lot of sense" and that scienter inference was not as compelling as opposing inference).

fraud if they sold their Splunk stock during the Class Period.[9]  Accordingly, Plaintiff's failure to allege that individual Defendants sold Splunk stock during the Class Period does not impact the Court's finding that the operative complaint raises a strong inference of scienter.

In light of the foregoing, the Court concludes that Defendants have not shown that Plaintiff's claims are subject to dismissal for failure to plausibly plead scienter.

### 3.     Loss causation

The Securities Exchange Act of 1934 defines "loss causation" "as the plaintiff's 'burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.'" *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2741 (2019) (quoting 15 U.S.C. § 78u-4(b)(4)) ("*First Solar*").

> This inquiry requires no more than the familiar test for proximate cause.  To prove loss causation, plaintiffs need only show a causal connection between the fraud and the loss, by tracing the loss back to the very facts about which the defendant lied[.]  Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss.

*Id.* (internal citations and quotation marks omitted).

"[L]oss causation is a 'context-dependent' inquiry as there are an 'infinite variety' of ways for a tort to cause a loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). "Because loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Id.* (citation omitted).  A complaint sufficiently alleges loss causation when it contains "enough fact to raise a reasonable expectation that discovery will reveal evidence of loss causation." *In re Gilead*, 536 F.3d at 1057 (citation and internal quotation marks omitted).  "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is

United States District Court
Northern District of California

---

[9] Instead, Plaintiff alleges that individual Defendants had an incentive to deceive investors because doing so would help them secure financing for the company on favorable terms and would help them secure shareholder approval for their compensation packages.  Defendants have not shown that these allegations are insufficient to raise the inference that individual Defendants had a motive to mislead investors.

best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *Id.* at 1057.

Here, Plaintiff argues that the complaint adequately alleges loss causation under *First Solar*, in which the Ninth Circuit reaffirmed the principle that a plaintiff plausibly alleges loss causation by averring facts raising the inference that the "defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *See* 881 F.3d at 754.  The Ninth Circuit further held in *First Solar* that this showing can be made in myriad ways, one of which is by alleging a loss causation theory whereby "the stock price fell upon the revelation of an earnings miss" that was proximately caused by the defendants' allegedly false or misleading statement.  *Id.* (citation omitted).  A plaintiff that proceeds under this theory need not allege that the matters that were concealed by the defendants' allegedly false or misleading statements were revealed to investors before the drop in the stock price.  *Id.*

Here, Plaintiff's allegations raise the reasonable inference that a decline in the price of Splunk's stock was caused by an earnings miss for Q3 2020, which, in turn, was caused by the undisclosed actions regarding which Defendants allegedly misled investors, namely the suspension in marketing investments, the hiring freeze of sales personnel, and the layoff of the "new logo" team that was responsible for building pipeline.  Specifically, Plaintiff alleges that Splunk's stock price declined significantly after an earnings miss for Q3 2020 was revealed on December 2, 2020.  ECF No. 65 ¶ 94.  Plaintiff further alleges that, the next day, on December 3, 2020, Child admitted that the Q3 2020 earnings miss was caused by the matters regarding which Defendants misled investors.  Specifically, on December 3, 2020, Child was asked for an explanation of the causes for the "less satisfying quarter" (Q3 2020), and Child responded, in relevant part:

> When the pandemic hit, we like, I think, most every other company, froze hiring, suspended investments in marketing, a lot of the more offensive-oriented spend to try to figure out what's going to happen in the pandemic.  After a few months when things, especially in the software world, I think, we saw that demand was still pretty strong, we then started rehiring and really getting much more aggressive about building pipeline.  What that led to was a bit of a tight pipeline in Q3.

United States District Court
Northern District of California

*See* ECF No. 69-8 at 9.  Child also mentioned that another reason for the Q3 2020 earnings miss was that Splunk had failed to "close" multiple large deals.  *Id.*

Child was then asked follow-up questions to attempt to clarify the cause of the Q3 earnings miss:

> Question: [Y]ou pulled back on hiring and on investment such that you didn't get the pipeline build into this quarter.  So in that sense [the Q3 2020 results were] more of a supply issue than a demand issue.  So is it both or more of that side of supply and you just didn't have the capacity in terms of sales execution to execute at this point?  Or was it demand?  Or was it both?"

*Id.* at 9-10.  Child responded: "It's both."  *Id.* at 10.  Child admitted that "it usually takes a quarter or two to build your pipeline, especially for a company of [Splunk's] size."  *Id.*

Plaintiff avers that the foregoing statements by Child constitute admissions that substantial causes for the Q3 2020 earnings miss were that the company had lacked the capacity in terms of sales execution and had failed to build sufficient pipeline in the quarters preceding Q3 2020, which are the quarters that fall within the Class Period.  ECF No. 65 ¶ 140.  Plaintiff further alleges that these circumstances were, in turn, caused by the actions regarding which Defendants allegedly misled investors:

> but for Defendants' undisclosed corporate actions of suspending marketing investments and freezing hiring, Splunk would not have had a 'tight pipeline' going into the third quarter, as Defendant Child admitted.  Also, but for Defendants' undisclosed corporate actions, the Company would have had a larger pipeline of transactions that could have replaced the small number of deals that purportedly failed to close within the quarter.  The ramifications of Splunk's failure to close deals during the quarter was a direct result of, and a materialization of the risk that, the Defendants caused by suspending investments in marketing and freezing hiring.

*Id.*

The foregoing allegations raise the reasonable inference that the matters about which Defendants misled investors during the Class Period were a significant cause of the earnings miss for Q3 2020 that was announced on December 2, 2020, which, in turn, caused the price of Splunk stock to decline significantly on December 3, 2020.  The matters that Defendants allegedly concealed to investors were their suspension of investments in marketing and their hiring freeze of

36

sales personnel, which lasted throughout the Class Period. The operative complaint raises the inference that Defendants' concealed suspension of marketing investments and hiring freeze as to sales personnel resulted in the company lacking adequate capacity in terms of sales execution and in failing to build sufficient pipeline for Q3 2020, which, in turn, resulted in lower-than-expected earnings in Q3 2020. These allegations are sufficient under *First Solar* to establish the requisite causal connection between the Q3 2020 earnings miss that led to a sharp decline in Splunk's stock price, and the matters about which Defendants allegedly misled investors during the Class Period.

Defendants contend that Plaintiff has not sufficiently pleaded loss causation because it failed to plead facts consistent with a "revelation of the fraud" theory, which, according to Defendants, requires allegations that the decline in Splunk's stock price have taken place *after* the matters that Defendants allegedly concealed from investors were revealed by Child on December 3, 2020. Defendants argue that Plaintiff cannot allege facts consistent with this theory because most of the decline in the price of Splunk stock took place *before* Child allegedly revealed on December 3, 2020, the matters that Defendants allegedly had concealed from investors; Defendants contend that most of the stock price decline occurred between the earnings miss disclosure on December 2, 2020, and Child's statements regarding of the causes of the earnings miss on December 3, 2020. This argument fails. Plaintiff need not allege facts consistent with a revelation-of-the-fraud theory to plausibly allege loss causation, where, as here, it has plausibly alleged loss causation under a cognizable alternative theory.[10] The Ninth Circuit held in *First Solar* that "[r]evelation of fraud in the marketplace is simply one of the 'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause[,]" and that a plaintiff may also prove loss causation under other theories, including the one discussed above, which requires pleading a decline in the company's stock price following the revelation of an earnings miss that was caused by the alleged fraud. For the reasons discussed above, Plaintiff's allegations are

---

[10] Plaintiff did not respond to Defendants' argument that its claims are subject to dismissal to the extent that they are predicated on a revelation-of-the-fraud theory. The Court interprets Plaintiff's failure to address Defendants' arguments regarding a revelation-of-the-fraud theory as an implicit concession that its claims are not predicated on such a theory.

sufficient to plead loss causation under the earnings miss disclosure theory discussed in *First Solar*.

Defendants next argue that Plaintiff cannot otherwise allege loss causation based on the revelation of the Q3 2020 earnings miss because Plaintiff has not alleged facts to show a sufficient causal connection between the Q3 2020 earnings miss and the matters about which Defendants allegedly misled investors, namely marketing, hiring, and layoffs. ECF No. 67 at 29-30. The Court is not persuaded. For the reasons discussed above, the Court finds that Plaintiff has alleged sufficient facts to establish the requisite causal connection. Moreover, the authorities that Defendants rely upon to support the proposition that Plaintiff has not adequately pleaded the requisite causal connection are inapposite.[11]

Defendants also argue that Plaintiff has not adequately alleged loss causation because Child identified on December 3, 2020, multiple causes for the Q3 2020 earnings miss, some of which have nothing to do with the matters that Defendants allegedly concealed from investors during the Class Period. Defendants contend that, because multiple factors caused the earnings miss, it is not the case that the matters that Defendants allegedly concealed from investors were the "primary" cause for the Q3 2020 earnings miss. ECF No. 67 at 30-31. The Court disagrees. Plaintiff is not required to show that the matters about which Defendants allegedly misled investors during the Class Period were the *only* cause of the earnings miss and resultant drop in

---

[11] In *Loos v. Immersion Corp.*, the plaintiff proceeded under a revelation-of-the-fraud theory of loss causation, which is not at issue here. *See* 762 F.3d 880, 887 (9th Cir. 2014), *as amended* (Sept. 11, 2014) (noting that the plaintiff alleged loss causation based on the theory that "fraudulent accounting was *revealed to the market* through a series of 'partial disclosures'" and holding that the plaintiff, accordingly, was required to "plausibly allege that the defendant's fraud *was 'revealed to the market* and caused the resulting losses'") (citation omitted) (emphasis added). *In Inchen Huang v. Higgins*, No. 17-CV-04830-JST, 2019 WL 1245136, at *16 (N.D. Cal. Mar. 18, 2019), this Court held that the plaintiffs had not sufficiently alleged loss causation because they had not "alleged 'a causal connection'" between the matters that the defendants had allegedly concealed from investors, and the negative financial results that defendants announced, which preceded a drop in the price of the company's stock. *See id.* (finding that loss causation was not adequately pleaded because "Plaintiffs have not sufficiently alleged 'a causal connection' between the risks of the alleged off-label marketing and the negative financial news announced on the identified disclosure dates."). Here, by contrast, and as discussed above, Plaintiff has alleged sufficient facts to causally tie the matters about which Defendants allegedly misled investors to the earnings miss for Q3 2020, which led to the drop in Splunk's stock price.

38

Splunk's stock price, so long as Plaintiff plausibly alleges that these matters were a *substantial* cause. *See In re Daou*, 411 F.3d at 1025 ("A plaintiff is not required to show 'that a misrepresentation was the sole reason for the investment's decline in value' in order to establish loss causation. . . . '[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement' but will play a role 'in determining recoverable damages.'") (citation omitted).  As discussed above, according to Child's own statements on December 3, 2020, Defendants' suspension of marketing investments and hiring freeze (which are matters that Defendants allegedly concealed) substantially contributed to the lower-than-expected Q3 2020 earnings.  In light of Child's statements, and the other allegations discussed above, the Court cannot conclude, at this stage of the litigation, that the matters that Defendants allegedly concealed from investors were not substantial causes of the Q3 2020 earnings miss.

Finally, Defendants argue that Plaintiff's loss causation theory, which is predicated on the decline in Splunk's stock price between December 2 and December 3, 2020, fails, because information that Plaintiff alleges was concealed during the Class Period was, in fact, already known to investors and incorporated into the price of Splunk's stock during the Class Period. Defendants contend that, because Child disclosed a "kind of" hiring freeze on May 21, 2020, and Splunk disclosed some high-level information about its sales and marketing expenditures in its SEC filings throughout the Class Period, investors already knew about the suspension in marketing investments and hiring freeze that Child allegedly revealed on December 3, 2020. Thus, according to Defendants, Child's revelations on December 3, 2020, could not have caused or contributed to the stock price decline upon which Plaintiff's loss causation theory depends. ECF No. 67 at 31.  This argument also fails.  As discussed above, Plaintiff is proceeding under a loss causation theory that depends on the revelation of the earnings miss for Q3 2020 on December 2, 2020.  A theory of loss causation predicated on the revelation of an earnings miss is not defeated if some information about the matters that caused the earnings miss was made public prior to the earnings miss *and* the plaintiff alleges facts that raise the inference that the market did not understand the significance of that information at the time it was made public.  *See In re BofI*

*Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020), *cert. denied sub nom. BofI Holding, Inc. v. Houston Mun. Emps. Pension Sys.*, 142 S. Ct. 71 (2021) (noting that "some information, although nominally available to the public, can still be 'new' if the market has not previously understood its significance"); *see also In re Gilead*, 536 F.3d at 1058.[12]

Here, Plaintiff's loss causation theory is not defeated, at this stage of the litigation, by either Child's disclosure of a "kind of" hiring freeze in May 2020, or Defendants' disclosure of some high-level information about sales and marketing expenditures in SEC filings during the Class Period. For the reasons discussed above, reasonable minds could differ as to whether the disclosures Defendants point to sufficiently revealed the matters that Defendants allegedly concealed from investors; for that reason, the Court cannot conclude at this juncture that investors understood from such disclosures that Defendants had frozen hiring and suspended investments in marketing to an extent that could have, and allegedly did, impact the company's ability to build adequate pipeline and meet its growth and revenue goals. For the reasons discussed above, Plaintiff's allegations raise the reasonable inference that investors failed to appreciate these matters until Child's statements of December 3, 2020.

In sum, the Court GRANTS Defendants' motion to dismiss Plaintiff's claims under Section 10(b) to the extent that they are predicated on the challenged statements made in the Form 10-K of March 26, 2020, and the Forms 10-Q of June 1, 2020, and September 3, 2020, with LEAVE TO AMEND. The Court otherwise DENIES Defendants' motion to dismiss Plaintiff's claims under Section 10(b).

---

[12] In *In re Gilead*, 536 F.3d at 1058, the Ninth Circuit held that the plaintiff plausibly pleaded loss causation by alleging that the company's stock price declined after lower-than-expected revenues were disclosed to the market and that such lower-than-expected revenues were caused by the defendants' fraud. The fraud had allegedly prevented investors from learning that off-label marketing of a drug was the cornerstone of demand for the drug. The FDA issued a warning letter to defendants regarding the off-label marketing that defendants had concealed to investors, which the FDA made public three months before the lower-than-expected revenues were disclosed to investors. The Ninth Circuit held that the fact that the FDA warning letter revealed some facts about the off-label marketing that was the subject of defendants' fraud three months prior to the disclosure of the lower-than-expected revenues did not defeat the plaintiff's loss causation theory, because the plaintiff had alleged facts indicating that investors "failed to appreciate its significance." *See id.* at 1058, 1053.

United States District Court
Northern District of California

### B.      Claim under Section 20(a)

"Section 20(a) of the Securities Exchange Act of 1934 provides for liability of a 'controlling person.'" *In re NVIDIA*, 768 F.3d at 1052 (quoting 15 U.S.C. § 78t(a)). "To establish a cause of action under this provision, a plaintiff must first prove a primary violation of underlying federal securities laws, such as Section 10(b) or Rule 10b-5, and then show that the defendant exercised actual power over the primary violator." *Id.* (citation omitted). A claim under Section 20(a) can survive only if the underlying predicate Exchange Act violation also survives. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017). "'Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b).'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009).

Plaintiff asserts a claim under Section 20(a) against individual Defendants Merritt and Child based on allegations that they exercised power and authority over Splunk's operations and management and that their false and misleading statements caused artificial inflation of Splunk's stock price during the Class Period. ECF No. 65 ¶¶ 168-75.

Defendants move to dismiss this claim, arguing that "[b]ecause Plaintiff fails to state a Section 10(b) claim, its Section 20(a) claim also fails." ECF No. 67 at 31.

Because the only basis that Defendants have advanced for dismissing Plaintiff's Section 20(a) claim is that Plaintiff failed to state a predicate claim under Section 10(b), the Court DENIES Defendants' motion to dismiss the Section 20(a) claim to the extent that it is predicated on the challenged statements made on May 21, 2020, June 8, 2020, and September 14, 2020, as Plaintiff's Section 10(b) claim is not subject to dismissal to the extent that it is predicated on those statements.

### CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss Plaintiff's claims under Section 10(b) and Rule 10b-5 to the extent that they are predicated on the challenged statements made in the Form 10-K of March 26, 2020, and the Forms 10-Q of June 1, 2020, and September 3, 2020, with LEAVE TO AMEND. The Court DENIES Defendants' motion to

41

dismiss Plaintiff's claims under Section 10(b) and Section 20(a) to the extent that they are predicated on the challenged statements of May 21, 2020, June 8, 2020, and September 14, 2020.

Plaintiff may file an amended complaint within 30 days of the date this order is filed to cure the deficiencies discussed herein, to the extent that Plaintiff can do so without contradicting the allegations in its prior pleadings. A failure to file an amended complaint will result in dismissal with prejudice of all claims predicated on challenged statements other than those made on May 21, 2020, June 8, 2020, and September 14, 2020.

**IT IS SO ORDERED.**

Dated: March 21, 2022



JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

42