**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com
Caitlin C. Bozman (Bar No. 343721)
caitlin.bozman@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*Lead Counsel for Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund and the Settlement Class*

[Additional Counsel Appear on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IN RE SPLUNK INC. SECURITIES LITIGATION | Case No. 4:20-cv-08600-JST<br><br>**LEAD PLAINTIFF'S SUPPLEMENTAL BRIEF FOR MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**<br><br>Judge:      Hon. Jon S. Tigar<br>Courtroom:  6 |

In accordance with the Court's June 20, 2023 Order Requiring Supplemental Briefing (ECF No. 130), Lead Plaintiff respectfully submits this supplemental brief explaining the method by which it estimated class-wide damages in this Action.

In calculating class-wide damages, Lead Plaintiff consulted with damages expert Steven P. Feinstein, Ph.D., CFA and his team at Crowninshield Financial Research. *See* ECF No. 98-2 at 69-77 (Resumé of Dr. Feinstein). Dr. Feinstein is a finance professor at Babson College and has extensive experience estimating damages in securities class actions. *Id*. Dr. Feinstein previously submitted an expert report in this Action at the class certification stage (ECF No. 98-2), and his expert opinions have been credited by numerous courts, including this one, in securities class actions. *See, e.g.*, *In re Twitter, Inc. Sec. Litig.*, 2020 WL 4187915, at *16 (N.D. Cal. Apr. 17, 2020); *Baker v. SeaWorld Ent., Inc.*, 423 F.Supp.3d 878, 895-899 (S.D. Cal. 2019); *Hsu v. Puma Biotechnology, Inc.*, 2018 WL 4956520, at *4 (C.D. Cal. Oct. 5, 2018); *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018); *Luna v. Marvell Tech. Grp., Ltd.*, 2017 WL 4865559, at *6 (N.D. Cal. Oct. 27, 2017); *Turocy v. El Pollo Loco Holdings, Inc.*, 2018 WL 3343493, at *17-18 (C.D. Cal. July 3, 2018).

Dr. Feinstein and his team applied the "out-of-pocket" damages method to calculate damages in this Action. The "out-of-pocket" damages method has been "regularly reaffirm[ed]" by courts in the Circuit as "the standard method for calculating damages in virtually every Section 10(b) class action." *RH, Inc.*, 2018 WL 4931543, at *3. The "out-of-pocket" damages method calculates the amount of "artificial inflation" present in a company's stock price on the date of class members' purchases, and subtracts the artificial inflation present at the time of class members' sales.

To quantify the amount of artificial inflation in Splunk's stock price prior to the alleged corrective disclosure in this case, Dr. Feinstein and his team conducted an "event study." Dr. Feinstein's event study utilized a standard regression analysis that compared the movements in the price of Splunk's common stock to the movements in the stock prices of the overall stock market and also an index composed of Splunk's industry peers—namely, the Nasdaq Computer

Index.[1]  An event study of this type is a common tool used by financial economists applying the out-of-pocket damages methodology in securities class actions and "is widely accepted" by courts "for calculating damages of a class of stockholders." *In re Lendingclub Sec. Litig.*, 282 F. Supp. 3d 1171, 1184 (N.D. Cal. 2017).  Based on this event study, Dr. Feinstein determined that Splunk's stock price experienced an abnormal decline by a statistically significant amount (relative to the market and industry peers) of $47.36 per share on December 3, 2020 following the alleged corrective disclosures.

Dr. Feinstein and his team then estimated the total number of damaged shares purchased by all class members.  In securities class actions like this one, experts regularly utilize a trading model to calculate the number of damaged shares purchased by the entire class of investors. Shares are considered "damaged" in this context if they are purchased during the class period when the share price is artificially inflated and held over the date of the corrective disclosure that dissipates the artificial inflation.  Dr. Feinstein and his team used a standard, two-trader proportional trading model to determine how many shares of Splunk stock were thusly "damaged"—*i.e.*, purchased by investors during the Class Period (May 21, 2020 to December 2, 2020, inclusive) and held over the alleged corrective disclosures.

In calculating damages, Lead Plaintiff and its expert also accounted for the two damage limitations set forth in the Private Securities Litigation Reform Act (the "PSLRA").  First, the PSLRA provides that recoverable damages "shall not exceed the difference between the purchase or sale price paid or received."  15 U.S.C. § 78u-4(e)(1).  Second, for shares sold during the 90 days following the Class Period (the "90-day look-back period") and for shares unsold at the end of the 90-day look-back period, the PSLRA applies a further limitation on damages. Specifically, for these purchases, damages were capped at the purchase price less either: (i) the rolling average price on the date of the class member's sale of their Splunk's stock, if the share was sold during the look-back period; or (ii) $166.17, which is the average price of Splunk's

---

[1] Splunk is a constituent of the Nasdaq Computer Index and compared itself to the index in its filings with the SEC, including on Forms 10-K filed at the end of the year.

stock during the 90-day look-back period, if the shares were unsold as of the end of the 90-day look-back period.

Applying the above methods and statutory limitations to the calculation of damages, Lead Plaintiff and its expert estimated that theoretical maximum damages, if investors were to prevail over all liability challenges, but before necessary considerations of issues of loss causation, amounted to approximately $886 million. For purposes of this damages estimate, Lead Plaintiff assumed that the Settlement Class would prevail <u>in full</u> on every element of its claim—including falsity, materiality, and scienter—and for every alleged misrepresentation during the entire Class Period. Importantly, as noted, this estimate does not account for necessary consideration of issues of "loss causation" present in this case, but instead credits the entire abnormal decline in Splunk's stock on December 3, 2020 as damages.

Lead Plaintiff's Unopposed Motion for Preliminary Approval (ECF No. 117) also included Lead Plaintiff's and its expert's estimates of the range of realistic maximum damages, accounting for considerations of loss causation. *See id*. at 11-12. These estimates were based on Dr. Feinstein's event study and model, discussed above. Like the previously discussed damages estimate, these estimates also assumed that Lead Plaintiff would prevail on numerous elements of its claim—including falsity, materiality, and scienter—and for the entire Class Period. These estimates, however, unlike the previously discussed estimate, realistically considered the necessary element of loss causation by examining whether factors unrelated to the alleged fraud caused a portion of investors' losses on the alleged corrective disclosure date.

Loss causation is "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Plaintiffs are only entitled to recover damages "proximate[ly] caused" by the allegedly misstated or omitted facts. *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). A plaintiff is not entitled to recover damages for the portion of a stock price decline that is due to disclosure of information unrelated to the alleged fraud. *Id*. It is the plaintiff's burden to prove loss causation as part of its case-in-chief.

To calculate the realistically recoverable maximum damages in this case as adjusted for

loss causation issues, Lead Plaintiff and its expert needed to determine what portion of investors' losses on December 3, 2020 were proximately caused by the alleged misstatements and omissions about Splunk's hiring freeze and suspension of marketing investments—as opposed to other factors, including the impact of the COVID-19 pandemic on Splunk's business during the Class Period.

To account for the element of "loss causation," Dr. Feinstein and his team reviewed the information disclosed by Splunk on and following the alleged corrective disclosure date. Dr. Feinstein and his team also reviewed reports issued by securities analysts following the alleged corrective disclosures. This analysis was especially important in this case because Splunk's alleged corrective disclosures occurred on the same date that Splunk made a series of other disclosures, which were unrelated to the alleged fraud, about its business operations in its quarterly financial report filed with the SEC on Form 8-K and during its quarter-end earnings calls. Thus, in order to account for loss causation, it was necessary to attempt to disaggregate the impact of such unrelated information from the impact of the information related to the alleged fraud.

In conducting this analysis, Dr. Feinstein and his team found that securities analysts were most focused on macro challenges facing Splunk's business caused by the COVID-19 pandemic and did not quantify the reduction in Splunk's share price specifically attributable to the disclosure of Splunk's hiring freeze and temporary suspension of marketing, *i.e.*, the disclosures related to the alleged misstatements in the case. Dr. Feinstein and his team did find, however, that certain securities analysts attributed a portion of Splunk's share price decline following the alleged corrective disclosures, namely $25 per share, to "execution risk," *i.e.*, the risk that Splunk would no longer be able to execute effectively on its operational plans to achieve its future targets. If this case proceeded to summary judgment and trial, Lead Plaintiff would take the position that this "execution risk" was elevated, at least in part, by Splunk's temporary hiring freeze and suspension of marketing.

If one were to exclude the portion of the December 3, 2020 stock price decline that analysts did not attribute to allegation-related factors (including elevated "execution risk"), Dr.

Feinstein and his team concluded that the top of the range of potential realistic damages would be approximately $586 million, as described in Lead Plaintiff's motion. This upper bound assumes that Lead Plaintiff could prove at trial that all of the artificial inflation attributable to "execution risk" was caused by Splunk's alleged hiring freeze and marketing cutbacks, and comprised $25 of the per share stock price decline, with the remainder of the decline on December 3, 2020 attributable to non-allegation related factors noted by stock analysts, such as the COVID-19 pandemic and other adverse macro changes. The lower end of the range of approximately $146 million assumes that Lead Plaintiff would prove at trial that one-quarter of this $25 per-share artificial inflation identified and attributed by stock analysts to increased "execution risk" was the result of Splunk's alleged hiring freeze and marketing cutbacks.

In formulating this range, Lead Plaintiff and its damages expert recognized the challenges of proving loss causation in this case, which is informed by Lead Counsel's review of the evidence produced by Defendants during fact discovery. Lead Plaintiff recognizes the real risk that the trier-of-fact could conclude that all or some of the stock price decline (including the heightened "execution risk" confronting Splunk) was partially, if not entirely, caused by the impact of the COVID-19 pandemic and resulting changes in consumer patterns at the time—and not the Company's short-term suspension of hiring and marketing spend. To this end, Defendants would invariably contend that their internal documents and data show that Splunk's limited hiring freeze and suspension of marketing lasted only a few weeks, and that Splunk completed the deals that caused the revenue miss at issue in the very next quarter.

Lead Plaintiff appreciates the opportunity to provide the Court with this additional information about the method utilized to estimate damages. Lead Plaintiff is available to address any further questions that the Court may have about Lead Plaintiff's Unopposed Motion for Preliminary Approval of Settlement.

| | |
|---|---|
| Dated: June 29, 2023 | Respectfully Submitted, |
| | **BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP** |
| | /s/ *Jonathan D. Uslaner* |
| | Jonathan D. Uslaner (Bar No. 256898) |
| | jonathanu@blbglaw.com |
| | Lauren M. Cruz (Bar No. 299964) |
| | lauren.cruz@blbglaw.com |
| | Caitlin C. Bozman (Bar No. 343721) |
| | caitlin.bozman@blbglaw.com |
| | 2121 Avenue of the Stars, Suite 2575 |
| | Los Angeles, California 90067 |
| | Tel: (310) 819-3470 |
| | -and- |
| | John Rizio-Hamilton (admitted *pro hac vice*) |
| | johnr@blbglaw.com |
| | Brandon Slotkin (admitted *pro hac vice*) |
| | brandon.slotkin@blbglaw.com |
| | 1251 Avenue of the Americas |
| | New York, New York 10020 |
| | Tel: (212) 554-1400 |
| | Fax: (212) 554-1444 |
| | *Counsel for Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund and Lead Counsel for the Settlement Class* |
| | **KLAUSNER, KAUFMAN, JENSEN & LEVINSON** |
| | Robert D. Klausner (admitted *pro hac vice*) |
| | bob@robertdklausner.com |
| | 7080 NW 4th Street |
| | Plantation, Florida 33317 |
| | Tel: (954) 916-1202 |
| | Fax: (954) 916-1232 |
| | *Additional Counsel for Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund* |