**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com
Caitlin C. Bozman (Bar No. 343721)
caitlin.bozman@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*Lead Counsel for Lead Plaintiff Louisiana
Sheriffs' Pension & Relief Fund and the Settlement
Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE SPLUNK INC. SECURITIES LITIGATION | Case No. 4:20-cv-08600-JST<br><br>**LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge: Hon. Jon S. Tigar<br>Courtroom: 6<br>Date: February 22, 2024<br>Time: 2:00 p.m. |

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ...................................................................................................... ii

STATEMENT OF ISSUES TO BE DECIDED .................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................................2

PRELIMINARY STATEMENT ....................................................................................................2

ARGUMENT ...............................................................................................................................4

I.   The Proposed Settlement Warrants Final Approval ............................................................4

    A.   Lead Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class..............................................................................................................5

    B.   The Settlement Was Reached After Substantial Discovery and Arm's-Length Negotiations Between Experienced Counsel, and with the Assistance of an Experienced Mediator..................................................................7

    C.   The Relief that the Settlement Provides for the Settlement Class Is Adequate, Taking into Account the Costs and Risks of Further Litigation and All Other Relevant Factors...........................................................................8

        1.   The Amount of the Proposed Settlement ......................................................8

        2.   The Strengths and Weaknesses of the Case and the Significant Risks of Continued Litigation ................................................................10

        3.   The Duration of Continued Litigation ......................................................15

        4.   All Other Factors in Rule 23(e)(2)(C) Support Approval of the Settlement ..............................................................................................16

    D.   The Settlement Treats Settlement Class Members Equitably.............................18

    E.   Additional Factors Considered by the Ninth Circuit Support Approval of the Settlement.........................................................................................................18

II.  The Plan of Allocation Is Fair and Reasonable ................................................................19

III. The Court Should Certify the Settlement Class.................................................................22

IV.  Notice to the Settlement Class Satisfied the Requirements of Rule 23 and Due Process ...............................................................................................................................23

CONCLUSION...........................................................................................................................24

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abadilla v. Precigen, Inc.*,
2023 WL 7305053 (N.D. Cal. Nov. 6, 2023) ...............................................................................7

*In re Am. Apparel, Inc. S'holder Litig.*,
2014 WL 10212865 (C.D. Cal. July 28, 2014) ............................................................................8

*In re Amgen Inc. Sec. Litig.*,
2016 WL 10571773 (C.D. Cal. Oct. 25, 2016) ...........................................................13, 15, 19

*In re Anthem, Inc. Data Breach Litig.*,
327 F.R.D. 299 (N.D. Cal. 2018) ................................................................................................7

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ...............................................................................15

*Azar v. Blount Int'l, Inc.*,
2019 WL 7372658 (D. Or. Dec. 31, 2019) ...............................................................................10

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ...................................................................................................7, 8

*Churchill Village L.L.C. v. Gen. Elec.*,
361 F.3d 566 (9th Cir. 2004) .........................................................................................5, 18, 23

*Class Plaintiffs v. City of Seattle*,
955 F.2d 1268 (9th Cir. 1992) ..............................................................................................5, 20

*Destefano v. Zynga, Inc.*,
2016 WL 537946 (N.D. Cal. Feb. 11, 2016) ...............................................................8, 15, 24

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ......................................................................................................5

*In re Extreme Networks, Inc. Sec. Litig.*,
2019 WL 3290770 (N.D. Cal. July 22, 2019) ...........................................................................10

*Fleming v. Impax Labs. Inc.*,
2022 WL 2789496 (N.D. Cal. July 15, 2022) ...........................................................................21

*Garner v. State Farm Mut. Auto. Ins. Co.*,
2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ............................................................................4

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) .........................................................................................5, 6, 7, 8

*Hartless v. Clorox Co.*,
273 F.R.D. 630 (S.D. Cal. 2011), *aff'd*, 473 Fed. App'x 716 (9th Cir. 2012)........................16

*Hayes v. MagnaChip Semiconductor Corp.*,
2016 WL 6902856 (N.D. Cal. Nov. 21, 2016) ......................................................................24

*Hefler v. Wells Fargo & Co.*,
2018 WL 4207245 (N.D. Cal. Sept. 4. 2018) ........................................................................18

*Hefler v. Wells Fargo & Co.*,
2018 WL 6619983 (N.D. Cal. Dec. 17, 2018), *aff'd,* 802 Fed. App'x 285 (9th
Cir. 2020) .............................................................................................................................22

*In re Heritage Bond Litig.*,
2005 WL 1594403 (C.D. Cal. June 10, 2005) ................................................................15, 20

*IBEW Local 697 v. Int'l Game Tech.*,
2012 WL 5199742 (D. Nev. Oct. 19, 2012) ..........................................................................10

*In re Immune Response Sec. Litig.*,
497 F. Supp. 2d 1166 (S.D. Cal. 2007)...........................................................................13, 14

*Kirkorian v. Borelli*,
695 F. Supp. 446 (N.D. Cal. 1988) .......................................................................................18

*Knapp v. Art.com, Inc.*,
283 F. Supp. 3d 823 (N.D. Cal. 2017). ...........................................................................10, 11

*Lane v. Facebook, Inc.*,
696 F.3d 811 (9th Cir. 2012) ..................................................................................................5

*Lembeck v. Arvest Cent. Mortg. Co.*,
2021 WL 5494940 (N.D. Cal. Aug. 26, 2021) ........................................................................7

*Lerwill v. Inflight Motion Pictures, Inc.*,
582 F.2d 507 (9th Cir. 1978) ..................................................................................................6

*In re LinkedIn User Privacy Litig.*,
309 F.R.D. 573 (N.D. Cal. 2015)...........................................................................................15

*Luna v. Marvell Tech. Grp.*,
2018 WL 1900150 (N.D. Cal. Apr. 20, 2018) ........................................................................23

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) ..................................................................................................9

*Nat'l Rural Telecommc'ns Coop. v. DIRECTV*,
221 F.R.D. 523 (C.D. Cal. 2004) ..........................................................................................18

*Officers for Justice v. Civil Serv. Comm'n*,
    688 F.2d 615 (9th Cir. 1982) ...........................................................................................5, 9

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ...........................................................................4, 20

*In re Oracle Sec. Litig.*,
    1994 WL 502054 (N.D. Cal. June 18, 1994) .......................................................................20

*In re Polaroid ERISA Litig.*,
    240 F.R.D. 65 (S.D.N.Y. 2006) ...........................................................................................6

*Spann v. J.C. Penney Corp.*,
    314 F.R.D. 312 (C.D. Cal. 2016) .......................................................................................23

*In re Syncor ERISA Litig.*,
    516 F.3d 1095 (9th Cir. 2008) ...........................................................................................4

*Torrisi v. Tucson Elec. Power Co.*,
    8 F.3d 1370 (9th Cir. 1993) .......................................................................................10, 15

*Vataj v. Johnson*,
    2021 WL 5161927 (N.D. Cal. Nov. 5, 2021) .......................................................................10

*Velazquez v. Int'l Marine & Indus. Applicators, LLC*,
    2018 WL 828199 (S.D. Cal. Feb. 9, 2018) ..........................................................................16

*Vivendi Universal, S.A. Sec. Litig.*,
    Civ. No. 02-5571..............................................................................................................16

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    2018 WL 6198311 (N.D. Cal. Nov. 28, 2018) .....................................................................22

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    2019 WL 2077847 (N.D. Cal. May 10, 2019) .......................................................................5

**RULES**

Fed. R. Civ. P. 23............................................................................................................... *passim*

## NOTICE OF MOTION FOR FINAL APPROVAL
## OF SETTLEMENT AND PLAN OF ALLOCATION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that, pursuant to Rule 23(e)(2) of the Federal Rules of Civil Procedure and the Court's Corrected Order Preliminarily Approving Settlement and Providing for Notice (ECF No. 134) ("Preliminary Approval Order"), Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Lead Plaintiff" or "Louisiana Sheriffs") will and hereby does move the Court, before the Honorable Jon S. Tigar, on February 22, 2024, at 2:00 p.m. in Courtroom 6 of the Ronald V. Dellums Federal Building and United States Courthouse, 1301 Clay Street, Oakland, CA, 94612, or at such other location and time as set by the Court, for (1) entry of a judgment granting final approval of the proposed settlement of this Action (the "Settlement") and (2) entry of an order granting approval of the proposed plan of allocation of the net proceeds of the Settlement (the "Plan of Allocation").

This Motion is based on the following Memorandum of Points and Authorities, the accompanying Declaration of Jonathan D. Uslaner in Support of (I) Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Uslaner Declaration" or "Uslaner Decl.") and its exhibits, all other prior pleadings and papers in this Action, arguments of counsel, and any additional information or argument that may be required by the Court. The proposed Judgment and a proposed Order approving the Plan of Allocation will be submitted with Lead Plaintiff's reply submission, after the deadline for submission of any objections and requests for exclusion has passed.

## STATEMENT OF ISSUES TO BE DECIDED

1.    Whether the Court should approve the proposed Settlement of this securities class action as fair, reasonable, and adequate under Rule 23(e)(2); and

2.    Whether the Court should approve the Plan of Allocation as fair and reasonable.

LEAD PLAINTIFF'S MOTION FOR FINAL            1                    4:20-cv-08600-JST
APPROVAL OF SETLEMENT AND PLAN
OF ALLOCATION

### MEMORANDUM OF POINTS AND AUTHORITIES

Lead Plaintiff, on behalf of itself and the Settlement Class, respectfully submits this memorandum in support of its motion for final approval of the proposed Settlement and approval of the proposed Plan of Allocation.[1]

### PRELIMINARY STATEMENT

Lead Plaintiff is pleased to present for the Court's final approval its agreement to settle this securities class action in exchange for a cash payment of $30,000,000.00 for the benefit of the Settlement Class. The Court preliminarily approved the Settlement in its September 26, 2023 Order, authorizing delivery of notice to members of the Settlement Class.

Lead Plaintiff respectfully submits that the proposed Settlement is a very favorable result for the Settlement Class. As detailed in the accompanying Declaration of Jonathan D. Uslaner (the "Uslaner Declaration") and summarized herein, the proposed Settlement provides a substantial, certain, and immediate recovery for the Settlement Class while avoiding the significant risks of continued litigation, including the risk that the Settlement Class could recover less than the Settlement amount—or nothing at all—after years of additional litigation, appeals, and delay.

The proposed Settlement is the result of Lead Plaintiff's and Lead Counsel's substantial litigation efforts. As a result of these efforts, Lead Plaintiff and Lead Counsel possessed a very well-developed understanding of the strengths and weaknesses of the claims when the Settlement was reached. Those efforts started in late 2020 when Lead Counsel began a detailed investigation of the claims at issue, including an extensive review of public SEC filings, conference calls, analyst reports, and news articles; interviews of 240 former Splunk employees; and consultation with experts in loss causation and damages. ¶¶ 11-13. Based on this extensive investigation, Lead Plaintiff prepared and filed a detailed Consolidated Class Action Complaint (the "Complaint"). ¶ 14. Lead Plaintiff then successfully opposed Defendants' comprehensive motion to dismiss

---

[1] Unless otherwise defined in this memorandum, all capitalized terms have the meanings defined in the Stipulation and Agreement of Settlement, dated January 30, 2023 (ECF No. 117-1) (the "Stipulation") or in the Uslaner Declaration. Unless otherwise noted, citations to "¶ __" herein refer to paragraphs in the Uslaner Declaration and citations to "Ex. __" refer to exhibits to the Uslaner Declaration.

through extensive briefing and, following the Court's Order, conducted fact discovery, which included the exchange of initial disclosures and document requests as well as subpoenas to third parties, and resulted in Lead Counsel obtaining and analyzing Defendants' document productions. ¶¶ 15-38.

The proposed Settlement resulted from extensive arm's-length negotiations, including a full-day mediation session before JAMS Mediator Jed D. Melnick on December 15, 2022. ¶¶ 41-46. Prior to that mediation, the Parties exchanged detailed mediation statements, accompanied by numerous exhibits, which addressed issues of both liability and damages. ¶ 44. At the mediation session, the Parties engaged in vigorous settlement negotiations with the assistance of Mr. Melnick. *Id*. After a full day of vigorous and contentious negotiations between the Parties, Mr. Melnick issued a mediator's recommendation on a double-blind basis that the Parties settle the Action for $30 million, which the Parties accepted. ¶ 45. The Settlement has the support of Lead Plaintiff, a sophisticated institutional investor which took an active role in supervising the litigation. ¶ 5.

The proposed Settlement is a very favorable result for the Settlement Class given the significant risks that Lead Plaintiff faced in proving its securities fraud claims. As discussed below and in the Uslaner Declaration, Lead Plaintiff faced meaningful risks in establishing each element of its claims—including falsity, scienter, loss causation, and damages. ¶¶ 50-73. In particular, Lead Plaintiff faced a serious risk that the fact-finder would find that much, if not all, of the Company's earnings miss and resultant stock drop was caused by factors unrelated to the alleged fraud. ¶¶ 65-73. Lead Plaintiff would have faced serious challenges at summary judgment, trial, and on appeal in prevailing on this issue.

In light of these considerations and the other factors discussed below, Lead Plaintiff respectfully submits that the Settlement is fair, reasonable, and adequate and warrants final approval by the Court.

Additionally, Lead Plaintiff requests that the Court approve the Plan of Allocation, which was set forth in the Notice approved by the Court for mailing to potential Settlement Class Members. The Plan of Allocation, which was developed by Lead Counsel in consultation with

Lead Plaintiff's damages expert, provides a reasonable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid claims based on losses they suffered on purchases of Splunk common stock related to the alleged fraud.

## ARGUMENT

## I.    The Proposed Settlement Warrants Final Approval

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class-action claims. *See* Fed. R. Civ. P. 23(e).  A class-action settlement should be approved if the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

The Ninth Circuit recognizes "a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Syncor ERISA Litig*., 516 F.3d 1095, 1101 (9th Cir. 2008); *see also In re Omnivision Techs., Inc*., 559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2008) ("Ninth Circuit[] policy favor[s] settlement, particularly in class action law suits"). Class actions readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation.  The settlement of complex cases like this one also promotes efficient utilization of scarce judicial resources and the speedy resolution of claims. *See Garner v. State Farm Mut. Auto. Ins. Co*., 2010 WL 1687832, at *10 (N.D. Cal. Apr. 22, 2010) ("Settlement avoids the complexity, delay, risk and expense of continu[ed] … litigation" and allows "a prompt, certain, and substantial recovery" for the class).

In determining whether a proposed settlement is "fair, reasonable, and adequate," the Court should consider whether:

(A)    the class representatives and class counsel have adequately represented the class;
(B)    the proposal was negotiated at arm's length;
(C)    the relief provided for the class is adequate, taking into account, [among other things,] the costs, risks, and delay of trial and appeal […]; and
(D)    the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

In addition, the Ninth Circuit has held that district courts should consider the following factors in evaluating the fairness of a class action settlement:

LEAD PLAINTIFF'S MOTION FOR FINAL              4                     4:20-cv-08600-JST
APPROVAL OF SETLEMENT AND PLAN
OF ALLOCATION

(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Village L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *accord Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *see also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2019 WL 2077847, at *1 (N.D. Cal. May 10, 2019) (approving settlement after considering both the "Rule 23(e)(2) factors … and the factors identified in" Ninth Circuit case law).

The Ninth Circuit has explained that courts' review of class-action settlements should be "limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Hanlon*, 150 F.3d at 1027. Thus, a settlement hearing should "not to be turned into a trial or rehearsal for trial on the merits," *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982), and a court "need not 'reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.'" *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992).

### A.     Lead Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class

The first Rule 23(e)(2) consideration is whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). To determine adequacy, courts consider (1) if the named plaintiff and its counsel have any conflicts of interest with other class members, and (2) if the named plaintiff and its counsel have prosecuted or will prosecute the action vigorously on behalf of the class. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).

Here, Lead Plaintiff's claims are typical of and coextensive with those of the Settlement Class, and it does not have any interests that are antagonistic to the interest of other members of the Settlement Class. *See Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978); *Hanlon*, 150 F.3d at 1020. Lead Plaintiff—like all other Settlement Class Members—has an interest in obtaining the largest possible recovery from Defendants. *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members."). Indeed, in appointing Louisiana Sheriffs as Lead Plaintiff, the Court found that Lead Plaintiff was "most capable of adequately representing the interests of class members." *See* ECF No. 59, ¶ 2.

Further, Lead Plaintiff and Lead Counsel have adequately represented the Settlement Class in their vigorous prosecution of the Action over the past three years and in the negotiation and achievement of the proposed Settlement. The institutional investor Lead Plaintiff played an active role in supervising and participating in the litigation and retained counsel who are highly experienced in securities litigation and have successfully prosecuted many complex class actions throughout the United States. *See* Ex. 5A-11 (Lead Counsel's firm resume). Lead Plaintiff and Lead Counsel vigorously prosecuted the Settlement Class's claims, which included (by way of brief summary): (i) conducting an extensive investigation into the alleged fraud; (ii) drafting the Complaint based on the investigation; (iii) opposing Defendants' motion to dismiss through extensive briefing; (iv) conducting substantial fact discovery, including the review of Defendants' document production; (v) preparing and serving nine subpoenas to critical non-parties; (vi) successfully moving to compel Defendants and non-parties to produce additional documents over their objections; (vii) preparing and filing Lead Plaintiff's motion for class certification; (viii) consulting extensively with an expert on issues of damages and market efficiency; and (ix) participating in extended arm's length settlement negotiations, including a full-day mediation session with a professional mediator. ¶¶ 11-46.

**B.**     **The Settlement Was Reached After Substantial Discovery and Arm's-Length Negotiations Between Experienced Counsel, and with the Assistance of an Experienced Mediator**

The next Rule 23 consideration is whether the settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). This includes consideration of related circumstances bearing on the procedural fairness of the settlement, including (i) counsel's understanding of the strengths and weakness of the case, *Hanlon*, 150 F.3d at 1026; (ii) the presence or absence of any indicia of collusion, *see In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d 935, 947 (9th Cir. 2011); and (iii) the involvement of a mediator.

Here, the proposed Settlement was reached only after a full-day mediation session before Jed D. Melnick of JAMS, an experienced mediator of class actions and other complex litigation. ¶¶ 43-45. In advance of the mediation, the Parties prepared and exchanged detailed mediation statements that detailed their views of the merits and risks of the case. ¶ 44. After a full day of vigorous and contentious negotiations, Mr. Melnick made a mediator's recommendation that the Action be settled for $30 million, which the Parties accepted on a double-blind basis. ¶ 45.

In addition, as noted above, Lead Plaintiff and Lead Counsel possessed a thorough understanding of the strengths and weaknesses of the case before reaching the proposed Settlement. As detailed in the Uslaner Declaration, Lead Counsel conducted a thorough, substantive investigation, drafted a detailed complaint and briefed the motion to dismiss, filed a motion for class certification, and conducted substantial fact discovery.

The fact that the Parties reached a settlement through arm's-length negotiations between experienced counsel after conducting substantial discovery strongly supports a finding that the Settlement was negotiated at arm's length and is procedurally fair. *See Abadilla v. Precigen, Inc.*, 2023 WL 7305053, at *9 (N.D. Cal. Nov. 6, 2023) (finding that where settlement was reached by experienced counsel after substantial discovery and a session with an independent mediator, those facts were "highly probative of an arms-length negotiation free of collusion"). The involvement of an experienced mediator in the settlement process, like Mr. Melnick here, further "confirms that the settlement is non-collusive." *In re Anthem, Inc. Data Breach Litig*., 327 F.R.D. 299, 327 (N.D. Cal. 2018); *see also Lembeck v. Arvest Cent. Mortg. Co*., 2021 WL 5494940, at *4 (N.D. Cal. Aug.

26, 2021) (finding that a settlement "was negotiated at arms' length and under circumstances evidencing a lack of collusion" where it was reached following a mediation with Mr. Melnick); *In re Am. Apparel, Inc. S'holder Litig.*, 2014 WL 10212865, at \*8 (C.D. Cal. July 28, 2014) (finding that settlement was "reached in good faith after a well-informed, arms-length negotiation, and that it is therefore entitled to a presumption of fairness" where the parties had "reached an agreement in principle with the assistance of an experienced mediator [Mr. Melnick] following an in-person mediation at which the parties were initially unable to come to agreement.").

Moreover, the proposed Settlement has none of the indicia of possible collusion identified by the Ninth Circuit (*see Bluetooth*, 654 F.3d at 947), such as a "clear-sailing" fee agreement or a provision that would allow settlement proceeds to revert to Defendants. *See* Stipulation ¶ 17 ("Lead Counsel's application for an award of attorneys' fees and/or Litigation Expenses is not the subject of any agreement between Defendants and Lead Plaintiff other than what is set forth in this Stipulation."); Stipulation ¶ 13 ("The Settlement is not a claims-made settlement. Upon the occurrence of the Effective Date, no Defendant, Defendants' Releasee, or any other person or entity who or which paid any portion of the Settlement Amount shall have any right to the return of the Settlement Fund or any portion thereof for any reason whatsoever . . . .").

## C.   The Relief that the Settlement Provides for the Settlement Class Is Adequate, Taking into Account the Costs and Risks of Further Litigation and All Other Relevant Factors

Next, Rule 23(e)(2) requires courts to consider whether a class-action settlement is "fair, reasonable, and adequate," including by "taking into account . . . the costs, risks, and delay of trial and appeal," as well as other relevant factors. Fed. R. Civ. P. 23(e)(2)(C). This analysis essentially encompasses four of the seven factors of the traditional *Hanlon* analysis: (1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class-action status throughout the trial; and (4) the amount offered in settlement. *See Hanlon*, 150 F.3d at 1026. Here, each of these factors supports approval.

### 1.   The Amount of the Proposed Settlement

The amount of a settlement "is generally considered the most important [factor], because the critical component of any settlement is the amount of relief obtained by the class." *Destefano*

*v. Zynga, Inc.*, 2016 WL 537946, at *11 (N.D. Cal. Feb. 11, 2016). However, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). In assessing the recovery, a fundamental question is how the value of the settlement compares to the amount the class potentially could recover at trial, discounted for risk, delay, and expense. "Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with litigation." *Officers for Justice*, 688 F. 2d at 624

Here, the proposed Settlement amount—$30 million in cash, plus interest—represents a very favorable outcome for the Settlement Class in light of the risks of the claims and the potential realistic maximum damages that could be recovered. As discussed in the Uslaner Declaration, the maximum damages that could be realistically established here, assuming that Lead Plaintiff prevailed on all elements of its claims—and depending on the extent to which Lead Plaintiff could prove that the damages suffered by the Settlement Class were attributable to Defendants' alleged fraud—ranged from $146 million to $586 million. ¶¶ 75-81. The upper end of that range assumed that Lead Plaintiff would be able to prove that the entire drop of $25 per share that certain securities analysts had ascribed to greater "execution risk" (the risk that Splunk would not be able to effectively execute on its operational plans to achieve future targets) was attributable to the suspension of marketing spending, hiring freeze, and layoffs that Lead Plaintiff alleged were not properly disclosed. ¶¶ 78-79. However, the analysts had not quantified the reduction in Splunk's share price attributable to Splunk's hiring freeze and suspension of marketing. ¶ 79. Lead Plaintiff would have faced significant challenges in proving that entire drop associated with "execution risk" was based on these factors and might only be able to prove that a fraction of the decline was due to those factors. Thus, more likely maximum damages figure that could be established at trial would be toward the bottom of that range, or $146 million. ¶ 80.

Therefore, the $30 million Settlement represents approximately 5% to 20.5% of the maximum damages that could realistically be obtained for the Settlement Class. Courts have routinely approved settlements with comparable or lower percentage recoveries than obtained here

LEAD PLAINTIFF'S MOTION FOR FINAL        9        4:20-cv-08600-JST
APPROVAL OF SETLEMENT AND PLAN
OF ALLOCATION

as fair and reasonable.  *See, e.g.*, *Vataj v. Johnson*, 2021 WL 5161927, at *6 (N.D. Cal. Nov. 5, 2021) (approving settlement recovering "slightly more than 2% of [] estimated damages" and noting that it was "consistent with the 2-3% average recovery that the parties identified in other securities class action settlements"); *In re Extreme Networks, Inc. Sec. Litig.*, 2019 WL 3290770, at *9 (N.D. Cal. July 22, 2019) (approving settlement representing between 5% and 9.5% of maximum potential damages); *Azar v. Blount Int'l, Inc.*, 2019 WL 7372658, at *7 (D. Or. Dec. 31, 2019) (approving settlement recovering 4.63% to 7.65% of the class's total estimated damages); *IBEW Local 697 v. Int'l Game Tech.,* 2012 WL 5199742, at *3 (D. Nev. Oct. 19, 2012) (approving settlement representing "about 3.5% of the maximum damages that Plaintiffs believe[d] could be recovered" and finding it "within the median recovery in securities class actions settled in the last few years").

Moreover, this analysis assumes that Lead Plaintiff prevailed at trial and appeal on ***all*** issues of falsity, materiality, and scienter.  ¶ 81.  Such success was not certain.  As discussed further below and detailed in the Uslaner Declaration, Defendants advanced substantial arguments regarding all elements of liability that, if accepted, would have substantially lowered the maximum damages or eliminated them entirely.

### 2.    The Strengths and Weaknesses of the Case and the Significant Risks of Continued Litigation

Courts evaluating proposed class action settlements consider the strength of the plaintiff's case and the risks of further litigation.  *See Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993).  To determine whether the proposed Settlement is fair, reasonable, and adequate, the Court "must balance the risks of continued litigation, including the strengths and weaknesses of plaintiff's case, against the benefits afforded to class members, including the immediacy and certainty of a recovery."  *Knapp v. Art.com, Inc.*, 283 F. Supp. 3d 823, 831 (N.D. Cal. 2017).

In considering whether to agree to the proposed Settlement, Lead Plaintiff, represented by Lead Counsel with considerable experience in securities litigation, weighed the risks inherent in establishing the elements of its claims, including risks at trial of proving to a jury the elements of

falsity, materiality, scienter, loss causation, and full damages. Each of these elements is addressed below.

*Falsity.* The Complaint alleged that Defendants misled investors through a series of false and misleading statements that failed to disclose that Splunk had (i) suspended its marketing investments; (ii) frozen hiring of its sales personnel; and (iii) terminated all of the members of its "new logo" team. ¶ 54. Defendants invariably would argue, pointing to documents produced during discovery and testimony, that none of their statements were false or misleading. ¶¶ 55-60.

*First*, Defendants would continue to assert that Splunk never terminated its investments in marketing. Rather, they would contend that Splunk—like many companies—simply adjusted and reduced its marketing spend from March 2020 to May 2020 in response to the COVID global pandemic. ¶ 56. Further, Defendants would continue to maintain that their marketing spend increased year-over-year and, as a result, Splunk exceeded its sales generation targets—contrary to Lead Plaintiff's allegations that Splunk's marketing adjustments restricted Splunk's sales pipeline. *Id.* Although Lead Plaintiff believes it had responses to these arguments, there was a meaningful risk that a factfinder might determine that Defendants' statements regarding marketing spending were not false or misleading. *Id.*

*Second*, Defendants would continue to argue that they did not freeze the hiring of sales personnel, but rather responsibly reduced the pace of hiring during the onset of the COVID pandemic. In this regard, Defendants would continue to claim that the "hiring freeze" that they had internally announced within the Company in March 2020 had effectively ended by May 2020, before Defendants' challenged statements were made. ¶ 57. If the discovery record supported Defendants' assertions, Lead Plaintiff faced significant risks in proving that Defendants' challenged statements regarding hiring were false or misleading. *Id.*

*Third*, Defendants would continue to argue that the challenged statements about Splunk's layoffs were not false when made. The Complaint challenged Defendant Merritt's statement that Splunk had not laid off employees, which he made in an interview conducted on May 12, 2020, and published in the *Silicon Valley Business Journal* ("*SVBJ*") on June 8, 2020. Defendants would continue to maintain that Splunk's layoffs at issue did not occur until shortly afterwards; thus,

LEAD PLAINTIFF'S MOTION FOR FINAL          11                    4:20-cv-08600-JST
APPROVAL OF SETLEMENT AND PLAN
OF ALLOCATION

according to Defendants, Merritt's statement were true as of the time he was interviewed by the journalist and when the article was published. ¶ 58. Further, Defendants would continue to assert that Splunk publicly disclosed the layoffs the day they occurred, which was reported in a news article. *Id*. In light of these arguments, Lead Plaintiff recognized that there were risks that the Court or a jury would find that Defendants' statements regarding layoffs were not false and misleading. *Id*.

Additionally, Defendants would invariably challenge the accuracy of the *SVBJ* article's account of Defendant Merritt's statements, claiming that the interviewer mischaracterized Merritt's statements. In this regard, Lead Plaintiff anticipates that Defendants would point the jury to the fact that the *SVBJ* article did not purport to include a perfect transcription of Defendant Merritt's statements during the interview, but rather stated that Merritt's statements were "lightly edited for length and clarity." ¶ 59.

*Finally*, Defendants would also continue to argue that the investing public's response to the alleged "corrective disclosures" undermined the notion that Splunk misled investors. In this regard, Defendants invariably would point to the fact that, although securities analysts expressed disappointment that Splunk delivered poor quarterly results, they did not state in their contemporaneous analyst reports that Splunk had misled investors regarding its reduced marketing spending, hiring freeze, or layoffs. ¶ 60. Moreover, neither the SEC nor any other regulatory body has taken any public enforcement action against the Company. *Id*.

*Materiality*. Defendants further contended that Lead Plaintiff would be unable to establish materiality. In particular, Defendants would continue to argue that Splunk's termination of the "new logo" team was not a material fact that required disclosure under the securities laws because the team was small and focused on new customers that would have negligible impact on current revenue. ¶ 61. Additionally, Defendants would continue to contend that they had already disclosed, in both March and May 2020, that they had previously implemented a hiring freeze, so the market already knew about the alleged "hiring freezes." *Id*. Lead Plaintiff recognized that there was a risk that a jury would accept Defendants' contentions on "materiality" at trial. *Id*.

*Scienter*.  Assuming Lead Plaintiff were able to prove to a jury that Defendants' statements were materially false or misleading, it would still need to prove that Defendants made the alleged false statements with the intent to mislead investors or with deliberate recklessness.  As courts have recognized, a defendant's state of mind in a securities case "is the most difficult element of proof and one that is rarely supported by direct evidence."  *See, e.g., In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773, at *3 (C.D. Cal. Oct. 25, 2016); *see also In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1172 (S.D. Cal. 2007) (scienter is a "complex and difficult [element] to establish at trial").

Defendants would invariably argue that, even though Defendants Merritt and Child knew of temporary reductions in hiring and marketing investments, they did not know or believe at the time that these cost-saving efforts would negatively impact the Company's sales pipeline or revenue growth, especially since they were implemented in response to the COVID-19 pandemic. ¶ 63.  Instead, the Individual Defendants would continue to argue that they had an honest belief that the temporary freeze on hiring and marketing would not adversely impact the Company's sales pipeline.  *Id*.  Defendants would also continue to contend that there was nothing unusual or untoward about their decision to temporarily pause hiring and investments in marketing in the context of the COVID-19 pandemic.  *Id*.

Defendants would also continue to maintain that they had no motive to mislead the market. In this regard, Defendants would point out that Lead Plaintiff has not alleged that Defendants engaged in any improper personal trading of their Splunk shares.  ¶ 64.  On these facts, there was a risk that Defendants would have contended that they were forthright with investors and did not act with any improper motive.  *Id*.

*Loss Causation and Damages*.  Even if Lead Plaintiff overcame Defendants' falsity, materiality, and scienter arguments, it would have still confronted additional challenges in establishing loss causation and damages.  Defendants would continue to argue that the alleged misrepresentations could not have caused investors' losses because Splunk's stock price fell in response to Splunk's earning miss on December 2, 2020—and not in response to Defendant Child's statements the next day concerning Splunk's freeze on hiring and suspension of marketing

LEAD PLAINTIFF'S MOTION FOR FINAL       13       4:20-cv-08600-JST
APPROVAL OF SETLEMENT AND PLAN
OF ALLOCATION

investments. ¶ 66. Although the Court rejected this argument at the motion-to-dismiss stage, there remained a possibility that the Court or a jury could adopt Defendants' argument on a full record on summary judgment or at trial.

As set forth in the Complaint, Lead Plaintiff alleged that the decline in Splunk's stock price was caused by Defendants' earnings miss announced on December 2, 2020, which in turn was caused by the marketing suspension, hiring freeze, and layoffs that Lead Plaintiff alleged were concealed from investors. Thus, to demonstrate loss causation, Lead Plaintiff would need to show that the Company's earnings miss announced on December 2, 2020 was caused by Splunk's hiring freeze and suspension of marketing investments, and not by unrelated factors. Defendants had vigorously argued and likely would continue to argue that none of the marketing suspension, hiring freeze, or layoffs caused the earnings miss and the subsequent stock price decline. ¶ 67.

Defendants would posit as a plausible alternative Splunk's explanation at the time for its December 2020 earnings miss—namely, that Splunk failed to close seven of its ten largest deals before the close of the quarter, for reasons unrelated to the hiring freeze. ¶ 68. Defendants would continue to assert that if Splunk had closed those seven deals before the quarter's end, the Company would have met its anticipated sales numbers, and, therefore, the missed sales, and not the alleged fraud, were the direct and most substantial cause of Splunk's earning miss. *Id*. Further, Defendants would point out that the Company in fact closed several of those deals the following quarter, which they would use to attempt to show that their December 2020 earnings miss was not related to the alleged fraud. *Id*.

Beyond providing alternatives, Defendants would also continue to attempt to sever the connection between the earnings miss and the alleged fraud. Defendants would invariably argue that Splunk had actually increased its investments in marketing over this period, exceeding their target sales leads generated from their marketing activities, which would not contribute to the earnings miss. ¶¶ 56, 69. Similarly, Defendants would continue to claim that they disclosed the hiring freeze in May 2020, so Child's later comments regarding the hiring freeze and layoffs could not have caused a stock price decline in December 2020. ¶ 69. Similarly, Defendants would maintain that the layoffs, announced in June 2020 and affecting a small team with minimal

LEAD PLAINTIFF'S MOTION FOR FINAL           14           4:20-cv-08600-JST
APPROVAL OF SETLEMENT AND PLAN
OF ALLOCATION

immediate impact on revenue, could not have contributed to the December 2020 earnings miss. ¶ 70.

Defendants would also continue to argue that Lead Plaintiff could not credibly disaggregate confounding variables from the damages (if any) that were caused by revelation of Splunk's alleged misstatements on marketing spend, hiring, and layoffs. ¶ 71. Especially in light of these above litigation risks, the proposed Settlement is fair, reasonable, and adequate.

### 3. The Duration of Continued Litigation

Courts consistently recognize that the likely duration of continued litigation is a key factor in evaluating the reasonableness of a settlement. *See, e.g.*, *Torrisi*, 8 F.3d at 1376 (finding that "the cost, complexity and time of fully litigating the case" rendered the settlement fair). "Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015). Due to the "notorious complexity" of securities class actions in particular, settlement is often appropriate because it "circumvents the difficulty and uncertainty inherent in long, costly trials." *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 2006 WL 903236, at *8 (S.D.N.Y. Apr. 6, 2006); *see also In re Heritage Bond Litig.*, 2005 WL 1594403, at *6 (C.D. Cal. June 10, 2005) (finding that securities class actions have well-deserved reputation for complexity).

Here, without the proposed Settlement, continued litigation would have required, among other things: (i) an expert discovery process that was expected to include, at a minimum, experts on loss causation and damages from both Lead Plaintiff and Defendants; (ii) motions for summary judgment; (iii) extensive pre-trial motion practice, such as motions *in limine* and *Daubert* motions; (iv) a trial requiring a substantial amount of detailed factual and expert testimony; (v) post-verdict challenges to individual class members' damages; and (vi) appeals. The continued litigation and appeals would have substantially delayed any recovery for Settlement Class Members, possibly for years. *See Zynga*, 2016 WL 537946, at *10; *Amgen*, 2016 WL 10571773, at *3 ("A trial of a complex, fact-intensive case . . . [as here] . . . could have taken weeks, and the likely appeals of rulings on summary judgment and at trial could have added years to the litigation.").

LEAD PLAINTIFF'S MOTION FOR FINAL         15                    4:20-cv-08600-JST
APPROVAL OF SETLEMENT AND PLAN
OF ALLOCATION

And, even if a favorable trial verdict was affirmed on appeal, the Settlement Class would have faced a potentially complex, lengthy, and contested claims-administration process.  In other securities-fraud class actions that have gone to trial, the time from a verdict to a final judgment has been as long as seven years.  *See Jaffe Pension Plan v. Household Int'l, Inc.*, No. 1:02-cv-05893, Verdict Form, ECF No. 1611 (N.D. Ill. May 7, 2009) & Final Judgment and Order of Dismissal with Prejudice, ECF No. 2267 (N.D. Ill. Nov. 10, 2016); *see also Vivendi Universal, S.A. Sec. Litig.*, Civ. No. 02-5571 (RJH/HBP), Verdict Form, ECF No. 998 (S.D.N.Y. Feb. 2, 2010) (jury verdict issued on Jan. 29, 2010) & Final Judgment Approving Class Action Settlement of All Remaining Claims, ECF No. 1317 (S.D.N.Y. May 9, 2017).

Absent the proposed Settlement, there is no question that the resolution of this case would take considerable time and require additional expenses for the Settlement Class, with the end result not remotely certain.  *See Hartless v. Clorox Co.*, 273 F.R.D. 630, 640 (S.D. Cal. 2011) ("Considering these risks, expenses and delays, an immediate and certain recovery for class members . . . favors settlement of this action."), *aff'd*, 473 Fed. App'x 716 (9th Cir. 2012).

In sum, the risk, complexity, and likely duration of further litigation support approval of the proposed Settlement.  The present value of a certain and substantial recovery now, as opposed to the mere chance of a possibly greater one years later, supports approval of a settlement that eliminates the expense and delay of continued litigation and the risk that the Settlement Class could receive no recovery.  *See Velazquez v. Int'l Marine & Indus. Applicators, LLC*, 2018 WL 828199, at *4 (S.D. Cal. Feb. 9, 2018) (holding that courts "shall consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation").

### 4. All Other Factors in Rule 23(e)(2)(C) Support Approval of the Settlement

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims," "the terms of any proposed award of attorney's fees, including timing of payment," and "any agreement required to be identified under

Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv).  Each of these factors also supports approval of the proposed Settlement or is neutral and does not suggest any basis for a finding that the Settlement is inadequate.

*First*, the procedures for processing Settlement Class Members' claims and distributing the proceeds of the Settlement to eligible claimants are well-established, effective methods that have been widely used in securities class action litigation.  The proceeds of the Settlement will be distributed to Settlement Class Members who submit eligible Claim Forms with required documentation to the Court-approved Claims Administrator, A.B. Data, Ltd. ("A.B. Data").  A.B. Data, an independent company with extensive experience administering securities class actions, will review and process the claims under Lead Counsel's supervision, provide claimants with an opportunity to cure any deficiencies in their claims or request review of the denial of their claims by the Court, and then mail or wire claimants their *pro rata* share of the Net Settlement Fund (as calculated under the Plan of Allocation) upon approval of the Court.  This type of claims processing is standard in securities class actions and has long been used and found to be effective.  This claim procedure is necessary because neither Lead Plaintiff nor Defendants possess data regarding investors' transactions in Splunk common stock that would allow the Parties to create a claims-free process to distribute Settlement funds.

*Second*, the relief provided for the Settlement Class is also adequate when the terms and timing of the proposed award of attorney's fees are taken into account.  As discussed in the Fee Memorandum, the 25% fee requested, to be paid upon the Court's approval, is the same as the benchmark for percentage fee awards in the Ninth Circuit and is well within in the range of percentage fees that courts within this Circuit award for similarly sized settlements.  The fee percentage is also reasonable in light of Lead Counsel's efforts, the recovery obtained, and the risks in the litigation.  Moreover, neither Lead Plaintiff nor Lead Counsel may terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees. *See* Stipulation ¶ 18.

*Lastly*, Rule 23(e)(2)(C) asks the Court to consider the proposed Settlement's fairness in light of any agreements required to be identified under Rule 23(e)(3).  *See* Fed. R. Civ. P.

23(e)(2)(C)(iv).  As previously disclosed (and filed with the Court under seal), the only agreement the Parties entered into in addition to the Stipulation itself was a confidential Supplemental Agreement regarding requests for exclusion.  *See* Stipulation ¶ 38.  The Supplemental Agreement gives Splunk the right to terminate the Settlement if the valid requests for exclusion received from persons and entities entitled to be members of the Settlement Class exceeds an amount agreed to by Lead Plaintiff and Splunk.  *Id*.  This type of agreement is standard in securities class actions and has no negative impact on the fairness of the Settlement.  *See, e.g.*, *Hefler v. Wells Fargo & Co.*, 2018 WL 4207245, at *11 (N.D. Cal. Sept. 4. 2018) ("The existence of a termination option triggered by the number of class members who opt out of the Settlement does not by itself render the Settlement unfair.").

### D.    The Settlement Treats Settlement Class Members Equitably

In determining whether a class action settlement is "fair, reasonable, and adequate," the Court must also consider whether the Settlement treats class members equitably relative to each other.  *See* Fed. R. Civ. P. 23(e)(2)(D).  Here, the proposed Settlement does so.  As discussed below in Part II, eligible claimants approved for payment by the Court will receive their *pro rata* share of the recovery based on damages they suffered that were attributable to the alleged fraud. No subset of the Settlement Class is receiving any special treatment and Lead Plaintiff will receive the same level of *pro rata* recovery under the Plan of Allocation (based on its Recognized Claims as calculated under the Plan) as all other Settlement Class Members.

### E.    Additional Factors Considered by the Ninth Circuit
### Support Approval of the Settlement

Two additional factors considered by the Ninth Circuit in assessing a proposed settlement are "the experience and views of counsel" and "the reaction of the class members to the proposed settlement."  *Churchill*, 361 F.3d at 575.  Each of these factors also supports the Settlement.

As courts in this Circuit have explained, "[t]he recommendation of experienced counsel carries significant weight in the court's determination of the reasonableness of the settlement." *Kirkorian v. Borelli*, 695 F. Supp. 446, 451 (N.D. Cal. 1988); *see Nat'l Rural Telecommc'ns Coop. v. DIRECTV*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("'Great weight' is accorded to the

recommendation of counsel . . . because 'parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation'"). Here, Lead Counsel—based on a thorough understanding of the strengths and weaknesses of the Action—concluded that the proposed Settlement represents an excellent outcome for Settlement Class Members given the risks of continued litigation and the range and probability of potential outcomes. Accordingly, this additional factor support approval of the Settlement.

Likewise, the reaction of the class to the proposed Settlement to date is another factor that supports approval of the Settlement. *See Amgen*, 2016 WL 10571773, at *4. Pursuant to the Preliminary Approval Order, the Court-appointed Claims Administrator, A.B. Data, has mailed a total of 291,713 copies of the Court-approved Notice and Claim Form (collectively, the "Notice Packet") to potential Settlement Class Members and nominees as of December 7, 2023. *See* Ewashko Decl. (Ex. 4) at ¶ 9. In addition, the Court-approved Summary Notice was published in *The Wall Street Journal* and over the *PR Newswire* on October 31, 2023. *See id.* ¶ 12. The Notice set out the essential terms of the Settlement and informed potential Settlement Class Members of, among other things, their right to request exclusion from the Settlement Class or object to any aspect of the proposed Settlement. While the January 25, 2024 deadline for Settlement Class Members to exclude themselves or object has not yet passed, to date, no objections to the Settlement or the Plan of Allocation have been received, *see* Uslaner Decl. ¶ 89, and no requests for exclusion from the Settlement Class have been received. Ewashko Decl. ¶ 16. Lead Plaintiff will discuss any requests for exclusion or objections that may be received in its reply papers, to be filed by February 8, 2024.

In sum, all of the factors to be considered under Rule 23(e)(2) support a finding that the proposed Settlement is fair, reasonable, and adequate.

## II.    The Plan of Allocation Is Fair and Reasonable

In addition to seeking final approval of the Settlement, Lead Plaintiff seeks approval of the proposed Plan of Allocation for the Settlement proceeds. The Plan of Allocation is set forth at pages 14 to 18 of the Notice mailed to Settlement Class Members. It is the same Plan of Allocation

that was contained in the Notice approved by the Court in its Preliminary Approval Order.  ECF No. 134 at 31-36.

The standard for approval of a plan of allocation in a class action under Rule 23 is the same as the standard applicable to the settlement as a whole: the plan must be "fair, reasonable, and adequate."  *Class Plaintiffs*, 955 F.2d at 1284-85; *see also Omnivision*, 559 F. Supp. 2d at 1045. An allocation formula need only have a reasonable basis, particularly if recommended by experienced class counsel, as here.  *See Heritage Bond*, 2005 WL 1594403, at *11.  Courts hold that "[a] plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable."  *In re Oracle Sec. Litig.*, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994).

Lead Counsel developed the Plan of Allocation with the assistance of Lead Plaintiff's damages expert.  ¶ 91.  The Plan provides for the distribution of the Net Settlement Fund to Settlement Class Members on a *pro rata* basis based on the extent of their injuries related to the alleged fraud.  *Id.*  In developing the Plan of Allocation, Lead Plaintiff's expert calculated the estimated amount of artificial inflation in the per-share closing prices of Splunk common stock that was allegedly proximately caused by Defendants' alleged false and misleading statements and omissions.  ¶ 93.  To calculate the estimated artificial inflation, Lead Plaintiff's damages expert considered the price change in Splunk common stock in reaction to the public disclosure that allegedly corrected the alleged misrepresentations and omissions, adjusting the price change for factors that were attributable to market or industry forces, and for non-fraud related information. *Id.*  The estimated amount of alleged artificial inflation calculated by Lead Plaintiff's damages expert for purposes of the Plan of Allocation was $25.00 per share.  *Id.*

The Plan of Allocation calculates a "Recognized Loss Amount" for each purchase of Splunk common stock during the Class Period that is listed in the Claim Form and for which adequate supporting documentation is provided.  The calculation of Recognized Loss Amounts depends upon several factors, including when the claimant's stock was purchased and sold and the purchase or sale price.  Claimants who purchased shares during the Class Period but did not hold those shares through the close of trading on December 2, 2020 (when the corrective disclosure occurred) will have no Recognized Loss Amount as to those transactions because any loss they

LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETLEMENT AND PLAN OF ALLOCATION                    20                    4:20-cv-08600-JST

suffered would not have been caused by revelation of the alleged fraud. *See* Notice ¶¶ 75, 77.A. For shares sold during the 90-day period after the Class Period, Recognized Loss Amounts will be the least of*:* (i) the amount of alleged artificial inflation in Splunk common stock ($25 per share), (ii) the difference between the purchase price and the sale price; or (iii) the difference between the purchase price and the average closing price of Splunk from December 3, 2020 and the date of sale. *See* Notice ¶ 77.B. For shares held until the end of 90-day period after the Class Period (or later), the Recognized Loss Amount is the lesser of: (i) the amount of alleged artificial inflation in Splunk common stock ($25 per share), or (ii) the difference between the purchase price and the average closing price of Splunk during the 90-day period ($166.17 per share). *Id*. ¶ 77.C.

The sum of a Claimant's Recognized Loss Amounts for all his or her Class Period purchases is the Claimant's "Recognized Claim." Notice ¶ 78. The Plan of Allocation also limits Claimants' Recognized Claim based on whether they had an overall market loss in their transactions in Splunk common stock during the Class Period. A Claimant's Recognized Claim will be limited to the amount of his, her, or its market loss in Splunk common stock transactions during the Class Period, and Claimants who have an overall market gain are not eligible for a recovery. *Id*. ¶¶ 85-86. The Net Settlement Fund will then be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. *Id*. ¶¶ 87-88.

One hundred percent of the Net Settlement Fund will be distributed to Settlement Class Members who submit eligible claims. If any funds remain after an initial distribution to Authorized Claimants, as a result of uncashed or returned checks or other reasons, subsequent cost-effective distributions will also be conducted. Notice ¶ 90. In the event any residual funds remain after all cost-effective distributions of the Net Settlement Fund to eligible claimants have been completed, the Plan of Allocation identifies the Investor Protection Trust ("IPT") as the proposed *cy pres* recipient. *Id*. The IPT is a 501(c)(3) nonprofit organization devoted to investor education (Uslaner Decl. ¶ 99) and is an appropriate *cy pres* recipient because its mission relates to the nature of the securities fraud claims asserted in the Action. For these reasons, courts in this District have approved IPT as a *cy pres* recipient in other securities fraud class actions in recent years. *See, e.g.*, *Fleming v. Impax Labs. Inc.*, 2022 WL 2789496, at *2 (N.D. Cal. July 15, 2022) (approving IPT

LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETLEMENT AND PLAN OF ALLOCATION          21          4:20-cv-08600-JST

as *cy pres* recipient based on a finding of a "sufficient nexus between the Class and the [IPT], which shares the Class Members' interests in protecting investors and preventing fraud"); *Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *11 (N.D. Cal. Dec. 17, 2018) ("the Court concludes that the Investor Protection Trust's mission of educating investors makes it an appropriate *cy pres* beneficiary"), *aff'd,* 802 Fed. App'x 285 (9th Cir. 2020); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2018 WL 6198311, at *5 (N.D. Cal. Nov. 28, 2018) ("the Investor Protection Trust is a nonprofit organization focused on investor education. A savvy educated investor is hopefully more likely to identify signs of securities fraud, which furthers the Exchange Act's purpose of maintaining 'fair and honest markets.'"). Neither Lead Plaintiff nor Lead Counsel has a relationship with the Investor Protection Trust. As noted, payment will only be made to this charity when the residual amount left for re-distribution to eligible claimants is so small that a further re-distribution would not be cost effective—for example, in the event the administrative costs of conducting an additional distribution would largely subsume the funds available.

As of December 7, 2023, more than 291,000 copies of the Notice, which contains the Plan of Allocation and advises Settlement Class Members of their right to object to the Plan, have been mailed to potential Settlement Class Members. *See* Ewashko Decl. ¶ 9. To date, no objections to the Plan of Allocation have been received. *See* Uslaner Decl. ¶ 100.

In sum, Lead Plaintiff respectfully submits that the proposed Plan of Allocation is fair and reasonable and should be approved.

**III.    The Court Should Certify the Settlement Class**

As set forth in Lead Plaintiff's motion for preliminary approval of the Settlement, the Settlement Class satisfies all of the requirements of Rules 23(a) and (b)(3). ECF No. 117 at 13-17; Preliminary Approval Order ¶¶ 1-3 (finding the Court will likely be able to certify the Settlement Class in connection with final approval). None of the facts supporting certification of the Settlement Class have changed since Lead Plaintiff submitted its preliminary approval motion. Accordingly, Lead Plaintiff respectfully requests that the Court certify the Settlement Class under Rules 23(a) and (b)(3) for purposes of effectuating the Settlement.

**IV.    Notice to the Settlement Class Satisfied the Requirements of Rule 23 and Due Process**

In accordance with the Court's Preliminary Approval Order, A.B. Data, the Court-approved Claims Administrator, began mailing copies of the Notice Packet to potential Settlement Class Members and nominees on October 18, 2023. *See* Ewashko Decl. ¶¶ 2-5. As of December 7, 2023, A.B. Data had mailed a total of 291,713 copies of the Notice Packet by first-class mail to potential Settlement Class Members and nominees. *See id.* ¶ 9. In addition, A.B. Data arranged for the Summary Notice to be published in *The Wall Street Journal* and transmitted over the *PR Newswire* on October 31, 2023. *See id.* ¶ 12. A.B. Data also established a dedicated settlement website, www.SplunkSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to downloadable copies of the Notice, Claim Form, and Stipulation, among other documents. *See id.* Copies of the Notice and Claim Form were also made available on Lead Counsel's website, www.blbglaw.com. *See* Uslaner Decl. ¶ 88.

The Notice disseminated to the Settlement Class in accordance with the Court's Preliminary Approval Order satisfied all the requirements of due process, Rule 23, and the PSLRA. For a class certified under Rule 23(b)(3), due process and Rule 23 require that class members be given notice of the class action and their right to request exclusion that is "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). In addition, notice of a class action settlement must be directed "in a reasonable manner to all class members who would be bound" by the Settlement. Rule 23(e)(1)(B). The notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill*, 361 F.3d at 575; *see also Luna v. Marvell Tech. Grp.*, 2018 WL 1900150, at *2 (N.D. Cal. Apr. 20, 2018) (same); *Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 330 (C.D. Cal. 2016) ("Settlement notices must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.").

LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETLEMENT AND PLAN OF ALLOCATION          23          4:20-cv-08600-JST

The notice program's combination of individual first-class mail to all Settlement Class Members who could be identified with reasonable effort, supplemented by notice in widely circulated publications, transmission over a business newswire, and publication on internet websites, satisfied all requirements of Rule 23 and due process. *See, e.g.*, *Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 6902856, at *4-5 (N.D. Cal. Nov. 21, 2016) (approving similar notice program); *Zynga*, 2016 WL 537946, at *7 (finding individual notice mailed to class members combined with summary publication constituted "the best form of notice available under the circumstances").

## CONCLUSION

For these reasons, Lead Plaintiff respectfully requests that the Court grant final approval of the proposed Settlement and approve the Plan of Allocation.

Dated:  December 7, 2023

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

/s/ *Jonathan D. Uslaner*
JONATHAN D.  USLANER (Bar No. 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com
Caitlin C. Bozman (Bar No. 343721)
caitlin.bozman@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*-and-*

John Rizio-Hamilton (admitted *pro hac vice*)
johnr@blbglaw.com
Brandon Slotkin (admitted *pro hac vice*)
brandon.slotkin@blbglaw.com
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444

*Counsel for Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund and the Settlement Class*

**KLAUSNER, KAUFMAN, JENSEN & LEVINSON**
Robert D. Klausner (admitted *pro hac vice*)
bob@robertdklausner.com
7080 NW 4th Street
Plantation, FL 33317
Tel: (954) 916-1202
Fax: (954) 916-1232

*Additional Counsel for Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund*