**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com
Caitlin C. Bozman (Bar No. 343721)
caitlin.bozman@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*Lead Counsel for Lead Plaintiff Louisiana*
*Sheriffs' Pension & Relief Fund and the Settlement*
*Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE SPLUNK INC. SECURITIES LITIGATION | Case No. 4:20-cv-08600-JST |
| | **DECLARATION OF JONATHAN D. USLANER IN SUPPORT OF (I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION, AND (II) LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES** |
| | Judge: Hon. Jon S. Tigar<br>Courtroom: 6<br>Date: February 22, 2024<br>Time: 2:00 p.m. |

DECLARATION OF JONATHAN D.
USLANER IN SUPPORT OF SETTLEMENT
AND FEE MOTION

4:20-cv-08600-JST

## TABLE OF CONTENTS

**PAGE**

EXHIBIT LIST .................................................................................................................. iii

I.    HISTORY OF THE ACTION ........................................................................................3

    A.    The Appointment of Lead Plaintiff and Lead Counsel...............................................3

    B.    The Investigation and Filing of the Complaint...........................................................3

    C.    Defendants' Motion to Dismiss .................................................................................4

    D.    The Parties Conduct Extensive Fact Discovery.........................................................6

        1.    Document Discovery ........................................................................................7

        2.    Discovery Disputes ..........................................................................................8

    E.    Lead Plaintiff's Motion for Class Certification and Work with Experts ....................9

    F.    The Parties' Mediation Efforts and the Settlement of the Action.............................10

    G.    The Court Grants Preliminary Approval of the Settlement .......................................11

II.   RISKS OF CONTINUED LITIGATION.......................................................................12

    A.    Risks Concerning Liability .......................................................................................12

        1.    Falsity.............................................................................................................13

        2.    Materiality.......................................................................................................15

        3.    Scienter ..........................................................................................................15

    B.    Risks Related to Loss Causation and Damages ........................................................16

    C.    The Settlement Amount Compared to the Likely Maximum Damages that Could Be Proved at Trial ................................................................................19

III.  LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE........................................21

IV.   ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT...................................23

V.    THE FEE AND EXPENSE APPLICATION ................................................................26

    A.    The Fee Application..................................................................................................27

        1.    Lead Plaintiff Has Authorized and Supports the Fee Application..................................................................................................27

DECLARATION OF JONATHAN D. USLANER IN SUPPORT OF SETTLEMENT AND FEE MOTION

i

4:20-cv-08600-JST

2.       The Work Performed by Plaintiffs' Counsel ...............................................27

3.       The Experience and Standing of Lead Counsel............................................30

4.       Standing and Caliber of Defendants' Counsel.............................................32

5.       The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases ...............................................................................................................32

6.       The Reaction of the Settlement Class to the Fee Application ......................33

B.       The Expense Application...........................................................................................34

VI.      CONCLUSION..................................................................................................................35

DECLARATION OF JONATHAN D. USLANER IN SUPPORT OF SETTLEMENT AND FEE MOTION

ii

4:20-cv-08600-JST

**EXHIBIT LIST**

| Ex. No. | Description |
|---|---|
| 1 | Declaration of Jed D. Melnick in Support of Final Approval of Settlement ("Melnick Decl.") |
| 2 | Declaration of Osey "Skip" McGee, Executive Director of Louisiana Sheriffs' Pension and Relief Fund in Support of: (I) Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("McGee Decl.") |
| 3 | CORNERSTONE RESEARCH, SECURITIES CLASS ACTION SETTLEMENTS: 2022 REVIEW AND ANALYSIS (2023) |
| 4 | Declaration of Jack Ewashko Regarding (I) Mailing of Notice and Claim Form; (II) Publication of the Summary Notice; and (III) Report on Requests for Exclusion Received to Date ("Ewashko Decl.") |
| 5 | Summary of Plaintiffs' Counsel's Lodestar and Expenses |
| 5A | Declaration of Jonathan D. Uslaner in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses Filed on Behalf of Bernstein Litowitz Berger & Grossmann LLP |
| 5B | Declaration of Robert D. Klausner in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses Filed on Behalf of Klausner, Kaufman, Jensen & Levinson |
| 6 | Compendium of Unpublished Authorities Cited in Fee and Expense Motion |

DECLARATION OF JONATHAN D. USLANER IN SUPPORT OF SETTLEMENT AND FEE MOTION

iii

4:20-cv-08600-JST

JONATHAN D. USLANER declares as follows:

1.      I am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G").  BLB&G was appointed Lead Counsel for Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Lead Plaintiff" or "Louisiana Sheriffs") in the above-captioned action (the "Action").  I have personal knowledge of the matters set forth herein based on my active participation in all aspects of the prosecution and settlement of the Action.[1]

2.      The proposed Settlement before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $30,000,000.00, plus interest, for the benefit of the Settlement Class.  The Settlement Amount has been paid into an escrow account and is earning interest.  As detailed herein, the Settlement is a highly favorable outcome for the Settlement Class because it confers a substantial, certain, and near-term recovery for class members while avoiding the significant risks of continued litigation, including the risk that the Settlement Class could recover nothing or less than the Settlement Amount after years of additional litigation, appeals, and delay.

3.      The proposed Settlement is the result of extensive efforts by Lead Plaintiff and Lead Counsel, which included, among other things: (1) conducting an extensive investigation into the alleged fraud, including interviews with 240 former Spunk employees and a thorough review of public information such as filings with the U.S. Securities and Exchange Commission ("SEC"), analyst reports, conference call transcripts, and news articles; (2) drafting a detailed Consolidated Class Action Complaint (the "Complaint") based on Lead Counsel's extensive investigation; (3) successfully opposing Defendants' motion to dismiss; (4) conducting substantial fact discovery, including exchanging initial disclosures, propounding thorough document requests, and reviewing Defendants' extensive document productions; (5) preparing and serving document subpoenas to nine non-party witnesses; (6) preparing and filing Lead Plaintiff's motion for class certification;

---

[1] All capitalized terms that are not otherwise defined herein shall have the meanings provided in the Stipulation and Agreement of Settlement dated January 30, 2023 (ECF No. 117-1) (the "Stipulation"), which was entered into by and among (i) Lead Plaintiff, on behalf of itself and the Settlement Class, and (ii) defendant Splunk Inc. ("Splunk" or the "Company") and defendants Douglas Merritt and Jason Child (collectively, the "Individual Defendants" and, together with Splunk, "Defendants").

| DECLARATION OF JONATHAN D. USLANER IN SUPPORT OF SETTLEMENT AND FEE MOTION | 1 | 4:20-cv-08600-JST |

(7) consulting extensively with experts, including on issues of damages and market efficiency; and (8) engaging in extended arm's-length settlement negotiations overseen by an independent mediator. Due to these efforts, Lead Plaintiff and Lead Counsel were well informed of the strengths and weaknesses of the claims and defenses in the Action at the time they achieved the proposed Settlement.

4.    The $30 million Settlement was based on a mediator's recommendation made by an experienced mediator, Jed D. Melnick of JAMS, following extensive mediation briefing and a full-day, in-person mediation session.  Mr. Melnick has submitted a declaration in support of the Settlement, which states that "the negotiations between the Parties were vigorous and conducted at arm's-length and in good faith," and "the Settlement represents a recovery and outcome that is reasonable and fair for all parties involved."  Declaration of Jed D. Melnick ("Melnick Decl."), attached hereto as Exhibit 1, at ¶¶ 8, 9.

5.    Lead Plaintiff Louisiana Sheriffs is a sophisticated institutional investor that actively participated in the Action, closely supervised the work of Lead Counsel, and strongly endorses the approval of the Settlement.  *See* Declaration of Osey "Skip" McGee, Jr. ("McGee Decl."), attached hereto as Exhibit 2, at ¶¶ 5-6.

6.    As discussed in further detail below, the proposed Plan of Allocation, which was developed with the assistance of Lead Plaintiff's damages expert, provides for the equitable distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis fairly based on losses attributable to the alleged fraud.

7.    For its efforts in achieving the Settlement, Lead Counsel requests a fee, net of expenses, of 25% of the Settlement Fund, which is consistent with the benchmark for percentage fee awards in the Ninth Circuit and is well within the range of percentage fees that courts in this District and Circuit typically award in connection with comparable settlements.  Lead Counsel respectfully submits that the requested fee is fair and reasonable in light of the result achieved in the Action, the efforts of Lead Counsel, and the risks and complexity of the litigation.

DECLARATION OF JONATHAN D.
USLANER IN SUPPORT OF SETTLEMENT
AND FEE MOTION

2

4:20-cv-08600-JST

## I.      HISTORY OF THE ACTION

### A.      The Appointment of Lead Plaintiff and Lead Counsel

8.      On December 4, 2020, the initial complaint was filed in this action, asserting violations of federal securities laws against Splunk and the Individual Defendants.  (ECF No. 1.)

9.      On February 2, 2021, Louisiana Sheriffs filed a motion for appointment to serve as Lead Plaintiff and consolidate certain related actions brought against Splunk.  (ECF No. 28.)  As set forth in its motion, Louisiana Sheriffs had the largest financial interest of any movant and was an adequate representative of the Settlement Class.  Four other movants also filed competing motions for appointment as Lead Plaintiff.  (ECF Nos. 19, 23, 35, 41.)

10.      On March 16, 2021, the Court entered an Order appointing Louisiana Sheriffs as Lead Plaintiff for the Action, and approved Louisiana Sheriffs' selection of BLB&G as Lead Counsel. (ECF No. 59.)

### B.      The Investigation and Filing of the Complaint

11.      Lead Counsel undertook an extensive investigation into the alleged fraud and potential claims that could be asserted by Lead Plaintiff in the Action.  This investigation began prior to the Court's appointment of Lead Plaintiff and continued through preparation of the Consolidated Class Action Complaint.  The investigation included a careful review and analysis of: (1) Splunk's public filings with the SEC; (2) research reports by securities and financial analysts; (3) transcripts of investor conference calls; (4) publicly available presentations by Splunk; (5) press releases and media reports; and (6) securities pricing data.

12.      In addition, in connection with its investigation, Lead Counsel and its in-house investigators located former employees of Splunk and other industry participants who might have relevant information pertaining to the claims asserted in the Action.  This included contacting over 650 former Splunk employees who were believed to have potentially relevant information.  Lead Counsel and/or its in-house investigators spoke to 240 of these individuals.  Lead Counsel ultimately included detailed information received from 11 of these former Splunk employees in the Complaint.

13.      In connection with the preparation of the Complaint, Lead Counsel also consulted with Dr. Steven Feinstein of Crowninshield Financial Research, who has substantial experience in

| DECLARATION OF JONATHAN D. USLANER IN SUPPORT OF SETTLEMENT AND FEE MOTION | 3 | 4:20-cv-08600-JST |
| --- | --- | --- |

providing expert analysis and testimony regarding loss causation and damages in securities class actions. Lead Counsel consulted with Dr. Feinstein about, among other things, the impact of Defendants' alleged misstatements and omissions on the market price of Splunk's common stock and the damages suffered by Splunk shareholders.

14. On June 7, 2021, Lead Plaintiff filed and served the Consolidated Class Action Complaint for Violations of Federal Securities Laws (ECF No. 65) (the "Complaint"). The Complaint asserts claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and against Defendants Douglas Merritt and Jason Child under Section 20(a) of the Exchange Act. Lead Plaintiff alleged that, from March 26, 2020 through December 2, 2020, inclusive, Defendants made materially false and misleading statements and omissions about Splunk's spending on key drivers of the Company's growth. Specifically, the Complaint alleged that Defendants' statements claiming that Splunk continued to invest in marketing programs and continued to hire sales personnel were false and misleading because Splunk had already suspended all of its marketing investments, instituted a hiring freeze, and laid off critical employees, including those responsible for recruiting new clients. The Complaint further alleged that these investments in marketing and sales were material to investors because investors believed the investments were necessary for the Company to achieve the growth it promised to investors. Lead Plaintiff further alleged that the price of Splunk's common stock was artificially inflated as a result of Defendants' allegedly false and misleading misstatements and omissions and declined when the truth was allegedly revealed after the close of the market on December 2, 2020 and on December 3, 2020.

C. **Defendants' Motion to Dismiss**

15. On July 27, 2021, Defendants filed and served a motion to dismiss the Complaint. (ECF No. 67.) In their motion, Defendants argued that (1) many of Defendants' alleged misstatements were protected by the PSLRA's "safe harbor" provision because they were "forward-looking," accompanied by meaningful cautionary language or risk factors, and not made with the "actual knowledge" that they were false; (2) the alleged misstatements were not materially false or misleading because they constituted corporate puffery; (3) Lead Plaintiff's allegations of falsity did

not show that Splunk froze its hiring and marketing spending; (4) Lead Plaintiff did not adequately allege scienter because it did not allege that Defendants knew that their alleged misstatements were false; (5) Defendants had no motive to lie because the Individual Defendants did not improperly sell any stock during this period; and (6) Lead Plaintiff's loss causation theory was insufficient because the stock price declined in reaction to disappointing earnings results announced on December 2, 2020—before Defendant Child discussed on December 3, 2020 how Splunk froze its hiring and marketing spending.

16.    Defendants' motion to dismiss the Complaint included a request that the Court consider documents incorporated by reference in the Complaint and take judicial notice of additional documents submitted to the Court, including the Company's SEC filings and other public communications.  (ECF No. 68.)

17.    On September 15, 2021, Lead Plaintiff filed and served a memorandum of law in opposition to Defendants' motion to dismiss (ECF No. 70) and Defendants' request for judicial notice (ECF No. 71).  Lead Plaintiff explained that the Complaint adequately identified the false and misleading statements and omissions, detailed the reasons why each challenged statement was materially false or omitted material facts, raised a strong inference of scienter, and satisfied the pleading requirements for loss causation.

18.    Lead Plaintiff also objected to Defendants' request for judicial notice.  Specifically, Lead Plaintiff objected to Defendants' attempt to notice documents to improperly claim the truth of the matters asserted therein.  (ECF No. 71.)

19.    On October 20, 2021, Defendants filed and served reply papers in support of their motion.  (ECF No. 74.)

20.    On November 8, 2021, the Court entered an order vacating the scheduled hearing for the motion to dismiss argument.  (ECF No. 76.)

21.    On March 21, 2022, the Court entered an Order granting in part and denying in part Defendants' motion to dismiss.  (ECF No. 77.)  The Court dismissed claims that were based on the challenged statements made in Splunk's SEC filings (including the Form 10-K on March 26, 2020, and in the Forms 10-Q of June 1, 2020 and September 3, 2020) on the grounds that those statements

were "forward-looking" statements protected by the PSLRA "safe harbor" provisions.  The Court otherwise denied Defendants' motion to dismiss, sustaining the other claims in the Complaint, including the allegations that Defendants Merritt and Child made actionable misstatements during investor conferences on May 21, 2020 and September 14, 2020, and during a media interview for the *Silicon Valley Business Journal* published on June 8, 2020.

22.    As a result of the Court's dismissal of the alleged misstatements made on March 26, 2020, the operative Class Period in the Action was shortened to run from May 21, 2020 through December 2, 2020, inclusive.

23.    On May 13, 2022, Defendants filed their answer to the Complaint.  (ECF No. 86.) Defendants' answer denied Lead Plaintiff's allegations of wrongdoing and asserted various defenses to the claims pled against Defendants.

**D.    The Parties Conduct Extensive Fact Discovery**

24.    Discovery in the Action commenced in April 2022, following the Court's partial denial of Defendants' motion to dismiss.

25.    Lead Plaintiff served its First Set of Requests for the Production of Documents to Defendants on April 25, 2022.  Lead Plaintiff requested several categories of documents and communications, including those regarding: (1) the alleged false statements; (2) Defendants' layoffs, hiring plans, and certain key personnel departures; (3) Defendants' investments in marketing and sales, including new clients; (4) Defendants' headcount and budgetary requests; (5) the adequacy of Defendants' sales personnel; (6) the impact of COVID-19 on Defendants' business operations; (7) Defendants' financial performance, stock price, and historical net revenues; (8) Defendants' communications with analysts and investors, including presentations and SEC filings; and (9) Defendants' capital raises.

26.    Lead Counsel also prepared Lead Plaintiff's Initial Disclosures and for their conference with Defendants under Federal Rule of Civil Procedure 26(f).

27.    The Parties also drafted a Joint Case Management Statement submitted to the Court on April 26, 2022, which discussed the facts, issues, and history of the case and set forth the Parties'

---

DECLARATION OF JONATHAN D.
USLANER IN SUPPORT OF SETTLEMENT
AND FEE MOTION

6

4:20-cv-08600-JST

views on the scope of discovery to be conducted, e-discovery procedures, and proposed scheduling. (ECF No. 83.)

28. The Court held a case management conference on May 3, 2022 (ECF No. 84) and entered a Case Management Order on the same day. (ECF No. 85.)

29. The Parties exchanged their Initial Disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure on May 17, 2022.

30. The Parties also negotiated the terms of the protective order governing the treatment of documents and other information produced in discovery, which the Parties submitted to the Court on June 9, 2022. (ECF No. 94.) The Court entered the stipulated protective order on June 13, 2022. (ECF No. 96.)

### 1. Document Discovery

31. Defendants served their Responses and Objections to Lead Plaintiff's First Request for Production of Documents on June 10, 2022, and began the production of documents that month. Lead Counsel then engaged in numerous meet-and-confers with Defendants' Counsel and conducted extensive negotiations over the scope and adequacy of Defendants' discovery responses, including relating to the search terms to be used and custodians whose documents should be searched. After extensive, hard-fought negotiations, Defendants agreed to conduct searches of 15 custodians, including Splunk's central files, hardcopy files, emails, Slack data, and text messages.

32. Lead Plaintiff also prepared and issued extensive discovery requests to various non-parties who might possess relevant information. In total, Lead Plaintiff issued nine subpoenas to non-parties, including current and former Splunk employees. These included Carrie Palin, Splunk's Chief Marketing Officer; Jocelyn Yeh, Director of Finance; John Connors, Board Member; John Sabino, Vice President of Customer Success and Chief Revenue Officer; Sendur Sellakumar, Senior Vice President and General Manager of Cloud and Chief Product Officer; Susan St. Ledger, President of Worldwide Field Operations; Tim Tully, Chief Technology Officer; Grant Bassett, Vice President of Global Talent Acquisition; and Shreya Iyer, Director of Talent Acquisition.

33. In response to Lead Plaintiff's requests, Defendants made a series of significant document productions to Lead Plaintiff and substantially completed their production of documents from the files of the Individual Defendants.

34. Lead Counsel carefully reviewed, analyzed, and coded the documents produced. In reviewing the documents, attorneys were tasked with making several analytical determinations as to the documents' importance and relevance. Specifically, they determined whether the documents were "hot," "relevant," or "not relevant." They also assessed which specific issues the documents concerned and determined the identities of the Splunk employees or other potential deponents to whom the documents related so that the documents could be retrieved when preparing for depositions. Lead Counsel's partners structured the document review to include regular team meetings to discuss the documents of highest interest and other issues that arose during the document review. Through these meetings, Lead Counsel ensured that all attorneys involved in the review understood the developing nature of the evidence and focused document review on the key issues in the Action. The documents discussed included those that were particularly relevant to Lead Plaintiff's claims and that offered insight into other important aspects of the case, including Defendants' likeliest defenses.

35. Defendants served their First Set of Requests for Production of Documents to Lead Plaintiff on June 3, 2022, which requested 34 categories of documents, including those concerning Lead Plaintiff's transactions in Splunk and any related communications, Lead Plaintiff's involvement in the Action, and its engagement of Lead Counsel. Lead Plaintiff searched for and gathered documents in its own files that were responsive to Defendants' requests for production of documents, which documents were then reviewed by Lead Counsel. Lead Plaintiff filed their Responses and Objections to Defendants' requests on July 5, 2022 and began producing documents to Defendants that month.

### 2. Discovery Disputes

36. Discovery in the Action was highly contested. Lead Counsel and Defendants' Counsel exchanged numerous letters and participated in numerous meet-and-confer sessions regarding, among other things, the scope of the documents produced and the adequacy of the search

---

DECLARATION OF JONATHAN D. USLANER IN SUPPORT OF SETTLEMENT AND FEE MOTION
8
4:20-cv-08600-JST

terms and custodians.  Defendants' Counsel also represented several of the non-parties on whom Lead Plaintiff served subpoenas, and Lead Counsel and Defendants' Counsel exchanged multiple letters and participated in multiple meet-and-confer sessions regarding the non-parties' responses to those subpoenas.  The great majority of these disputes were resolved through negotiation between the Parties and without need for intervention of the Court.

37.     The Parties were, however, unable to resolve certain discovery disputes. Accordingly, on September 16, 2022, Lead Plaintiff filed a motion seeking an order requiring (1) Defendants to produce documents and communications in response to six requests for production, including requests regarding Defendants' market access and business model, historical net revenues, Defendants' statements, key employee departures and personnel files; and (2) third parties Susan St. Ledger and Carrie Palin to produce text messages related to Splunk's sales and marketing efforts and financial performance.  (ECF No. 99.)

38.     On November 29, 2022, Judge Tse issued an order granting, in part, Lead Plaintiff's motion to compel the production of the requested documents.  (ECF No. 110.)  Specifically, Judge Tse compelled Defendants to produce documents related to Splunk's marketing investments, Defendants' statements, and key employee departures.  Additionally, Judge Tse ordered third parties St. Ledger and Palin to produce their text messages relating to Splunk's sales and marketing efforts and financial performance.  As Judge Tse explained, these requests were "tailored to relevant issues" and would not be "too burdensome" for Defendants to respond to.

**E.     Lead Plaintiff's Motion for Class Certification and Work with Experts**

39.     On July 22, 2022, Lead Plaintiff filed its motion for class certification.  (ECF No. 97.)  The motion was supported by a memorandum of law (*id*.) and an expert report from Lead Plaintiff's market efficiency expert, Dr. Steven P. Feinstein, Ph.D., CFA, Professor of Finance at Babson College.  As detailed in his expert report, Dr. Feinstein found that Splunk's common stock traded in an efficient market during the Class Period and that per-share damages could be measured for all class members using a common methodology that was consistent with Lead Plaintiff's theory of liability.  (ECF No. 98-2.)

40.     Lead Counsel further consulted with Dr. Feinstein and his team at Crowninshield in preparing the Complaint, in reviewing documents produced in discovery, and in preparation for settlement negotiations.  After the Settlement was reached, Lead Counsel worked with Dr. Feinstein and his team to develop the Plan of Allocation.

**F.     The Parties' Mediation Efforts and the Settlement of the Action**

41.     Pursuant to Local Rule 16-8 and ADR Local Rule 3-5, the Parties conferred prior to the initial case management conference and discussed potential dispute resolution options for the Action.  On April 12, 2022, Defendants filed their ADR Certifications pursuant to Local Rules 16-8(b) and 3-5(b), notifying the Court that they intended to stipulate to an ADR process.  (ECF Nos. 81, 82.)  The Parties discussed the prospect of settlement during this time and agreed that mediation would be appropriate at a later date, and so notified the Court in their Joint Case Management Statement.  (ECF No. 83.)

42.     On September 26, 2022, the Parties notified the Court that they agreed to conduct a mediation on December 15, 2022, and entered a stipulation and proposed order continuing the pending class certification briefing deadlines until after the mediation.  (ECF No. 102.)   On September 27, 2022, the Court so-ordered that stipulation.  (ECF No. 104.)

43.     The Parties conferred and selected JAMS Mediator Jed D. Melnick to serve as the mediator for this Action.  Mr. Melnick is an experienced mediator of securities class actions and other complex litigation.  *See* Melnick Decl. (Ex. 1), at ¶ 3.  Over his career, Mr. Melnick has twice been named as an "ADR Champion" by *The National Law Journal*, was recently included on Chambers USA's "National Mediators" list, and has delivered several presentations, keynote addresses, and panel sessions, including recognition as the Closing Panelist at the 2017 Delaware Judicial Retreat on the topic, "Mediation Strategies for Judges."

44.     On December 7, 2022, the Parties exchanged and submitted to the mediator detailed mediation statements addressing issues of liability and damages issues.  An in-person mediation session with Mr. Melnick was held on December 15, 2022.  At the mediation session, the Parties engaged in vigorous settlement negotiations with the assistance of Mr. Melnick.

45.     After a full day of extensive argument and deliberations, Mr. Melnick proposed a recommendation that the Parties settle the Action for $30 million, which both sides accepted on a double-blind basis.

46.     In the ensuing weeks, the Parties negotiated the full terms of the Settlement and drafted the settlement agreement and related papers, including the notices to be provided to the Settlement Class.  On January 30, 2023, the Parties executed the Stipulation and Agreement of Settlement (ECF No. 117-1), which set forth the complete terms of the Parties' agreement to settle all claims asserted in the Action for $30,000,000, subject to the approval of the Court.  On the same day, Lead Plaintiff and Splunk also executed a Supplemental Agreement which provides that Splunk has the option to terminate the Settlement if persons who request exclusion from the Settlement Class exceed a certain threshold.

**G.     The Court Grants Preliminary Approval of the Settlement**

47.     On February 7, 2023, Lead Plaintiff filed a motion for preliminary approval of the Settlement.  (ECF No. 117.)

48.     On June 20, 2023, the Court entered an Order Requiring Supplemental Briefing requesting further explanation of Lead Plaintiff's damages calculations by July 7, 2023.  (ECF No. 130.) On June 29, 2023, Lead Plaintiff filed a supplemental brief explaining Dr. Feinstein's damages analysis.  (ECF No. 131.)

49.     On September 26, 2023, the Court entered the Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice As Modified (ECF Nos. 133, 134) (the "Preliminary Approval Order") which, among other things: (1) preliminarily approved the Settlement; (2) approved the form of Notice, Summary Notice, and Claim Form, and authorized notice to be given to Settlement Class Members through mailing of the Notice and Claim Form, posting the Notice and Claim form on a Settlement website, and publication of the Summary Notice in *The Wall Street Journal* and over the *PR Newswire*; (3) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, and/or the fee and expense application; and (4) set a schedule for the filing of opening papers and reply papers in

DECLARATION OF JONATHAN D.                     11                     4:20-cv-08600-JST
USLANER IN SUPPORT OF SETTLEMENT
AND FEE MOTION

support of the proposed Settlement, Plan of Allocation, and the Fee and Expense Application.  The Preliminary Approval Order also scheduled the Settlement Hearing for February 22, 2024 at 2:00 p.m. to determine, among other things, whether the Settlement should be finally approved.

## II.    RISKS OF CONTINUED LITIGATION

50.    The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a $30,000,000 cash payment.  Lead Plaintiff and Lead Counsel believe that the proposed Settlement is a very favorable result for the Settlement Class.

51.    As explained below, Lead Plaintiff faced meaningful risks with respect to proving liability and recovering full damages in this case.  To prevail in this case, Lead Plaintiff had the burden to convince a unanimous jury by a preponderance of the evidence of each of the elements of its claims, including that (1) Defendants made misstatements; (2) the misstatements were material; (3) the misstatements were made with *scienter* (*i.e.*, knowingly or with deliberate recklessness); (4) investors relied upon the misstatements; and (5) Defendants' fraud caused investors' losses.

52.    Moreover, absent a settlement, Lead Plaintiff would still need to prevail at several additional stages of the litigation, including defeating Defendants' anticipated opposition to Lead Plaintiff's motion for class certification, Defendants' anticipated motion for summary judgment, at trial, and on appeal.  At each of these stages, Lead Plaintiff would have faced significant risks related to establishing liability and full damages, including, among other things, overcoming Defendants' falsity, scienter, and loss causation challenges.  Even after any trial, Lead Plaintiff would have faced post-trial motions, including a potential motion for judgment as a matter of law, as well as further appeals that might have prevented Lead Plaintiff from successfully obtaining a recovery for the Settlement Class.

### A.    Risks Concerning Liability

53.    Lead Plaintiff and Lead Counsel believe that the claims asserted against Defendants in the Action are meritorious.  They recognize, however, that this Action presented a number of meaningful risks to establishing Defendants' liability.  As discussed further below, Defendants have vigorously argued that their challenged statements about Splunk's marketing spending and hiring

practices were not false or misleading when made, and, in any invent, even if any of their statements were false or misleading, Defendants did not have any intent to mislead investors.

### 1.    Falsity

54.    Lead Plaintiff and Lead Counsel recognize that, while they largely prevailed at the motion to dismiss stage, they may have been unable to establish the falsity of Defendants' challenged statements at trial.  The Complaint alleges that Defendants misled investors through a series of false and misleading statements that failed to disclose that Splunk had (1) suspended its marketing investments; (2) frozen hiring of its sales personnel; and (3) terminated all of the members of its "new logo" team.

55.    Lead Plaintiff recognizes that there were substantial challenges in proving that Defendants' statements were materially false and misleading when made.  Lead Plaintiff anticipates that Defendants would argue that Splunk did not suspend its marketing investments, did not freeze hiring of sales personnel, and did not lay off any workers at the time their challenged statements were made.  Defendants would contend, pointing to documents and testimony in this litigation, that their alleged misstatements were not false or misleading for each category of misstatements remaining in the case.  Lead Counsel and Lead Plaintiff recognized that there were meaningful risks that the Court (on summary judgment) or a jury (at trial) might find that the challenged statements were not misleading.

56.    *First*, Lead Plaintiff anticipates that Defendants would argue that Splunk never suspended all of its investments in marketing.  Rather, they would contend that the Company had simply reduced its marketing spending from March 2020 to May 2020, in response to the COVID global pandemic.  Further, Lead Plaintiff anticipates that Defendants would maintain that their spending on marketing ultimately increased year-over-year, and as a result, Defendants exceeded their sales generation targets, contrary to Lead Plaintiff's allegations that the suspension of marketing investments had restricted Splunk's sales pipeline.  There was a meaningful risk that discovery would provide support for Defendants' arguments and that a factfinder might determine Defendants' statements regarding marketing spending were not false or misleading.

DECLARATION OF JONATHAN D. USLANER IN SUPPORT OF SETTLEMENT AND FEE MOTION                                13                    4:20-cv-08600-JST

57.     *Second*, Lead Plaintiff anticipates that Defendants would argue that they did not freeze the hiring of sales personnel, but instead continued to hire sales personnel throughout the Class Period.  Lead Plaintiff anticipates that Defendants would continue to assert that the "hiring freeze" that they had internally announced within the Company in March 2020 had effectively ended by May 2020, before Defendants' challenged statements were made.  If the discovery record supported Defendants' assertions, Lead Plaintiff faced serious risks in proving that Defendants' challenged statements regarding hiring were false or misleading.

58.     *Third*, Lead Plaintiff expects that Defendants would argue that Defendants' statements about layoffs were also not misleading or false when made.  The principal statement challenged here was Defendant Merritt's statement that Splunk had not laid off employees, which he made in an interview conducted on May 12, 2020, and published in the *Silicon Valley Business Journal* on June 8, 2020.  Defendants maintain that the layoffs at issue did not occur until June 16, 2020, so Defendant Merritt's statement was true both as of the time he was interviewed by the journalist and as of the time the article was published.  Further, Lead Plaintiff anticipates Defendants would argue that Splunk disclosed the layoffs the day they occurred, which was reported in a public news article.  Lead Plaintiff recognized that there were risks that the Court or a jury would find that Defendants' statements regarding layoffs were not false and misleading.

59.     Finally, as noted above, the Court dismissed from the case the alleged misstatements contained in Splunk's SEC filings.  As a result, the remaining misstatements at issue are all oral statements, including those made by Defendant Merritt concerning layoffs and reported in a news article published the *Silicon Valley Business Journal*.  Lead Plaintiff anticipates that Defendants would challenge the accuracy of the *SVBJ* article's account of Defendant Merritt's statements, claiming that he was misquoted or mischaracterized.  In this regard, Lead Plaintiff anticipates that Defendants would likely note that the *SVBJ* article does not purport to be a perfect transcription of Defendant Merritt's statements, and that the journalist mentions in the article that he "lightly edited" Defendant Merritt's statements contained in the interview "for length and clarity."

60.     Lead Plaintiff also expects that Defendants would likely argue that the investing public's response to the Company's admissions undermines the notion that Splunk misled investors.

DECLARATION OF JONATHAN D.
USLANER IN SUPPORT OF SETTLEMENT
AND FEE MOTION

14

4:20-cv-08600-JST

As discussed above, on December 3, 2020, Defendant Child publicly admitted that Splunk "froze hiring" and "suspended investments in marketing" during the Class Period, which contributed to the Company's disappointing financial results. Although securities analysts expressed disappointment that Splunk delivered poor quarterly results for the quarter, Defendants would continue to argue that they did not state in their contemporaneous analyst reports that Splunk had misled investors on these subjects. Moreover, Lead Plaintiff also expects that Defendants would continue to argue that neither the SEC nor any other regulatory body have criticized or taken any public enforcement action against the Company.

### 2. Materiality

61. Beyond Defendants' substantial arguments regarding falsity, Defendants would have also continued to contend that Lead Plaintiff would be unable to establish the materiality of their omissions regarding their marketing spending, hiring practices, and layoffs. For example, Lead Plaintiff anticipates that Defendants would argue that the undisclosed termination of the "new logo" team was not a material fact that required disclosure under the securities laws given the small size of that team compared to the overall number of sales employees at Splunk. Further, Lead Plaintiff anticipates that Defendants would argue that the market's existing knowledge of Splunk's marketing spending and hiring rendered any alleged undisclosed facts inconsequential or immaterial. In this regard, Defendants would likely continue to contend that they had disclosed, in both March and May 2020, that they had previously implemented a hiring freeze, such that the market already knew about the hiring freeze. Lead Plaintiff recognizes that there was a risk that the fact finder would accept Defendants' contentions that investors already knew the truth about Defendants' "hiring freeze," thus undermining Lead Plaintiff's allegations regarding materiality.

### 3. Scienter

62. Even if Lead Plaintiff were able to prove that Defendants' statements were materially false or misleading, it would still need to prove to a jury that Defendants made the alleged false statements with the intent to mislead investors or with deliberate recklessness. Defendants vigorously contended that they did not intentionally or recklessly misled investors regarding its

DECLARATION OF JONATHAN D. USLANER IN SUPPORT OF SETTLEMENT AND FEE MOTION                    15                    4:20-cv-08600-JST

hiring or marketing expenditures. Lead Plaintiff faced significant risks that a jury would not accept its theory of scienter, in part or in full.

63.     Lead Plaintiff alleged that Defendants Merritt and Child knew about and, in fact, instructed Splunk to freeze hiring and suspend investments in marketing, with only narrow exceptions. Lead Plaintiff was prepared to argue at summary judgment and at trial that Defendants' knowledge of these facts establishes their scienter. Lead Plaintiff anticipates that Defendants, in response, would argue that, even though Defendants Merritt and Child knew of the freezes on hiring and marketing investments, they did not know or believe at the time that these cost-saving efforts would negatively impact the Company's sales pipeline or revenue growth. Instead, the Individual Defendants would likely argue that they had an honest belief that any temporary cessation of hiring and marketing would not adversely impact the Company's sales pipeline. Lead Plaintiff anticipates that Defendants would also likely attempt to show that there was nothing unusual or untoward about their decision to temporarily pause hiring and investments in marketing, especially in the context of the COVID-19 pandemic.

64.     Lead Plaintiff anticipates that Defendants would also maintain that they had no motive to mislead the market. In this regard, Defendants would likely continue to point out that their relevant sales and marketing figures are publicly reported each quarter and they had told the market they were implementing cost-saving measures in the face of COVID. Additionally, Lead Plaintiff anticipates that Defendants would also likely point to the fact that Lead Plaintiff has not alleged in this action that Defendants engaged in insider trading. Accordingly, there was a real risk that Defendants would be able to forcefully argue to a jury that they were forthright about the marketing suspension, hiring freeze, and layoffs, and thus Lead Plaintiff faced a real risk in establishing Defendants' scienter.

**B.     Risks Related to Loss Causation and Damages**

65.     Even assuming that Lead Plaintiff and Lead Counsel overcame Defendants' arguments and established liability, Lead Plaintiff would have still confronted additional challenges in establishing loss causation and damages.

66.     Lead Plaintiff anticipated that Defendants would argue on summary judgment and at trial that the alleged misrepresentations could not have caused investors' losses because Splunk's stock price fell in response to Splunk's earnings miss on December 2, 2020—*i.e.*, the day before Defendant Child's December 3, 2020 statements concerning the Company's freeze on hiring and suspension of marketing investments.  Although the Court rejected this argument at the motion-to-dismiss stage, there remains a possibility that the Court or a jury could adopt Defendants' argument on a full record on summary judgment or at trial.

67.     As set forth in the Complaint, Lead Plaintiff alleged that the decline in Splunk's stock price was caused by Defendants' earnings miss announced on December 2, 2020, which in turn was caused by the marketing suspension, hiring freeze, and layoffs that Lead Plaintiff alleged were concealed from investors.  Thus, to demonstrate loss causation, Lead Plaintiff would need to show that the Company's earnings miss announced on December 2, 2020 was caused by Splunk's hiring freeze and suspension of marketing investments, and not by unrelated factors.  Defendants had vigorously argued and likely would continue to argue that none of the marketing suspension, hiring freeze, or layoffs caused the December 2020 earnings miss and the subsequent stock price decline.

68.     Lead Plaintiff anticipates that Defendants would attempt to provide plausible alternative explanations for why Splunk missed its target financial numbers in December 2020. Splunk explained to investors at the time that the Company failed to close seven of its ten largest deals before the close of the quarter.  Defendant would likely continue to argue that that if Splunk had closed those seven deals before the quarter's end, the Company would have met its anticipated sales numbers, and thus this factor—rather than alleged undisclosed marketing and hiring freezes— was the direct and most substantial cause of its earning miss.  Further, Defendants would point out that the Company in fact closed several of those deals the following quarter, which they would use to attempt to show that their December 2020 earnings miss was not related to the alleged fraud.

69.     Defendants also would likely continue to claim that they disclosed the hiring freeze in May 2020, so it could not have caused a stock price decline in December 2020.  Further, while Defendant Child discussed the freeze on hiring and suspension of marketing investments in his December 3, 2020 discussion of the earnings miss, Defendants would likely continue to argue that

DECLARATION OF JONATHAN D. USLANER IN SUPPORT OF SETTLEMENT AND FEE MOTION                    17                    4:20-cv-08600-JST

Defendant Child also identified several other factors that caused the earning miss—such as market demand, the macroeconomic environment, and lower customer conversion rates. Thus, Defendants would continue to contend that Lead Plaintiff could not isolate the loss attributable to the temporary marketing and hiring freezes, as opposed to these other confounding variables.

70.    Lead Plaintiff further anticipates that Defendants would continue to argue that Lead Plaintiff could not establish a connection between the Company's layoffs and the earnings miss. Defendants would likely argue that Splunk announced the layoffs at issue in June 2020, so the existence of the layoffs could not have caused a stock price decline in December 2020. Additionally, Defendants would likely contend that the layoffs could not have caused the December 2020 earnings miss because the layoffs affected only a small group of salespeople who had only a minimal effect on the Company's earnings.

71.    Lead Plaintiff further anticipates that Defendants would argue that Lead Plaintiff could not prove the existence, or amount, of damages. As noted above, Defendants would likely assert with the support of their experts that Lead Plaintiff's purported damages were attributable to causes other than the marketing suspension, hiring freeze, or layoffs. Defendants would also likely point to other factors such as market demand, the macroeconomic environment, and lower customer conversion rates as the purported causes of the stock price decrease, and would argue that Lead Plaintiff could not credibly disaggregate those confounding variables from the damages (if any) that were caused by the alleged misstatements on marketing spend, hiring, and layoffs.

72.    Additionally, Defendants would likely assert that investors could only recover for damages stemming from previously undisclosed information—because an efficient market incorporates all public information and only reacts to new information about a company's performance. As noted above, Lead Plaintiff anticipates that Defendants and their experts would attempt to show that the truth of the matters addressed in Defendants' challenged statements had been revealed months before the December 2020 stock price decline and thus could not have been the cause of the price decline.

73.    In sum, Lead Plaintiff recognized that Defendants' arguments regarding loss causation and damages posed meaningful risks for investors' eventual recovery.

DECLARATION OF JONATHAN D. USLANER IN SUPPORT OF SETTLEMENT AND FEE MOTION
18
4:20-cv-08600-JST

**C.    The Settlement Amount Compared to the Likely Maximum Damages that Could Be Proved at Trial**

74.    The Settlement Amount—$30 million in cash, plus interest—represents a significant recovery for the Settlement Class.  The Settlement is nearly four times the size of the median securities class-action settlement in the Ninth Circuit from 2013 to 2023 ($7.6 million).  *See* CORNERSTONE RESEARCH, SECURITIES CLASS ACTION SETTLEMENTS: 2022 REVIEW AND ANALYSIS (2023), attached hereto as Exhibit 3, at 19.

75.    The $30 million Settlement is also a favorable result when it is considered in relation to the maximum amount of damages that could be realistically established at trial, in the event that Lead Plaintiff prevailed on class certification and liability issues, including falsity and scienter, at summary judgment.  Assuming Lead Plaintiff prevailed on all class certification and liability issues (which was far from certain), Lead Counsel believes that the range of maximum damages that Lead Plaintiff could realistically establish at trial, after accounting for loss causation and damages issues, is between $146 million to $586 million.

76.    As discussed in detail in Lead Plaintiff's Supplemental Brief for Motion for Preliminary Approval of Settlement (ECF No. 131), Lead Plaintiff calculated the range of possible class damages in consultation with its damages expert, Steven P. Feinstein, Ph.D.  The damages estimates were prepared based on (1) Dr. Feinstein's "event study," which was used to calculate the statistically abnormal decline of Splunk common stock (relative to the market and industry peers) on December 3, 2020 following the alleged corrective disclosures and the resulting amount of "artificial inflation" in Splunk common stock during the Class Period; (2) a trading model that was used to calculate the number of damaged shares purchased by the class;[2] and (3) application of the PLSRA's limit on recovery based on the stock's average closing price in the 90-days after the Class Period.

---

[2] Shares are considered "damaged" in this context if they are purchased during the Class Period when the share price was artificially inflated and held over the date of the corrective disclosure that dissipates the artificial inflation.

DECLARATION OF JONATHAN D. USLANER IN SUPPORT OF SETTLEMENT AND FEE MOTION                    19                    4:20-cv-08600-JST

77. Applying the above methods to the calculation of damages, Lead Plaintiff and its expert first estimated the theoretical maximum damages <u>before</u> necessary considerations of the element of loss causation, which amounted to approximately $886 million. This first step in the estimation of damages does not account for necessary consideration of issues of loss causation present in this case—*i.e.*, determining what portion of Splunk's stock price decline was attributable to the alleged hiring freeze and marketing cutbacks, as opposed to other factors—but instead credits the entire abnormal decline in Splunk's stock on December 3, 2020 as damages attributed to the fraud. In other words, this amount of damages would correspond to the entire abnormal price decline of $47.36 per share on December 3, 2020, following the earnings miss the prior day.

78. Lead Plaintiff's range of realistic class damages accounts for the necessary element of loss causation by examining the extent to which factors unrelated to the alleged fraud caused a portion of investors' losses on the alleged corrective disclosure date. This analysis was especially important in this case because the alleged corrective disclosures occurred on the same date that Splunk made a series of other disclosures, which were unrelated to the alleged fraud, about its business operations in its quarterly financial report filed with the SEC on Form 8-K and during its quarter-end earnings calls. To calculate the realistically recoverable maximum damages, as adjusted for loss causation issues, Lead Plaintiff and its expert needed to determine what portion of investors' losses on December 3, 2020 were proximately caused by the alleged misstatements and omissions about Splunk's hiring freeze and suspension of marketing investments—as opposed to other factors, including the impact of the COVID-19 pandemic on Splunk's business during the Class Period.

79. To account for the element of loss causation, Dr. Feinstein and his team reviewed the information disclosed by Splunk on and following the alleged corrective disclosure date. Dr. Feinstein and his team also reviewed reports issued by securities analysts following the alleged corrective disclosures. In conducting this analysis, Dr. Feinstein and his team found that securities analysts were most focused on macro challenges facing Splunk's business caused by the COVID-19 pandemic and did not quantify the reduction in Splunk's share price specifically attributable to the disclosure of Splunk's hiring freeze and temporary suspension of marketing, *i.e.*, the disclosures related to the alleged misstatements in the case. Dr. Feinstein and his team did find, however, that

certain securities analysts attributed a portion of Splunk's share price decline following the alleged corrective disclosures, namely $25 per share, to "execution risk," *i.e.*, the risk that Splunk would no longer be able to execute effectively on its operational plans to achieve its future targets.  If this case proceeded to summary judgment and trial, Lead Plaintiff would take the position that this "execution risk" was elevated, at least in part, by Splunk's temporary hiring freeze and suspension of marketing. If the entire $25 decline attributed to "execution risk" were determined to be linked to Splunk's hiring freeze and marketing suspension, then the potential class damages would be $586 million, which Lead Plaintiff considers the upper end of the realistic range of damages that could be proved.

80.    The lower end of the estimated maximum damages range, $146 million, assumes that Lead Plaintiff would be able to prove at trial that one-quarter of the $25 per-share artificial inflation identified and attributed by stock analysts to increased "execution risk" was the result of Splunk's alleged hiring freeze and marketing cutbacks—as opposed to other factors.  Defendants, of course, dispute that Lead Plaintiff or investors were damaged at all, or that the alleged misstatements caused any portion of the price decline, and believe Lead Plaintiff and the class are not entitled to recover anything through this Action.

81.    Accordingly, the Settlement Amount represents between approximately 5% and 20.5% of the realistic maximum damages for the Settlement Class, assuming that Lead Plaintiff prevailed on class certification and on all liability issues at trial and appeal.

82.    Given the meaningful litigation risks, and the immediacy and amount of the $30,000,000 recovery for the Settlement Class, Lead Plaintiff and Lead Counsel believe that the Settlement is fair, reasonable, and adequate, and is in the best interest of the Settlement Class.

III.    **LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE**

83.    The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to potential members of the Settlement Class.  The Preliminary Approval Order also set January 25, 2024 as the deadline for Settlement Class Members to submit objections to the

DECLARATION OF JONATHAN D.
USLANER IN SUPPORT OF SETTLEMENT
AND FEE MOTION

21

4:20-cv-08600-JST

Settlement, the Plan of Allocation, or the Fee and Expense Application or to request exclusion from the Settlement Class.

84. In accordance with the Preliminary Approval Order, Lead Counsel instructed A.B. Data, Ltd. ("A.B. Data"), the Court-approved Claims Administrator, to begin disseminating copies of the Notice and the Claim Form by mail and to publish the Summary Notice. The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, or exclude themselves from the Settlement Class. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, and for Litigation Expenses in an amount not to exceed $325,000.

85. To disseminate the Notice and Claim Form (together, the "Notice Packet"), A.B. Data obtained information from Splunk and from banks, brokers, and other nominees regarding the names and addresses of potential Settlement Class Members. The accompanying Declaration of Jack Ewashko ("Ewashko Decl."), attached hereto as Exhibit 4, provides additional information about the Claims Administrator's distribution of the Notice Packet. *See* Ewashko Decl. ¶¶ 2-11. Attorneys at BLB&G have had regular conference calls and communications with A.B. Data to oversee the process of disseminating notice to Settlement Class Members and the initial processing of claims received.

86. A.B. Data began mailing copies of the Notice Packet to potential Class Members and nominee owners on October 18, 2023. *Id*. ¶¶ 2-5. As of December 7, 2023, A.B. Data disseminated a total of 291,713 Notice Packets to Settlement Class Members and nominees. *Id.* ¶ 9.

87. On October 31, 2023, in accordance with the Preliminary Approval Order, A.B. Data caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over the *PR Newswire*. *Id*. ¶ 11.

88. Lead Counsel also caused A.B. Data to establish a dedicated settlement website, www.SplunkSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to copies of the Notice and Claim Form, as well

DECLARATION OF JONATHAN D. USLANER IN SUPPORT OF SETTLEMENT AND FEE MOTION

22

4:20-cv-08600-JST

as copies of the Complaint, Stipulation, Preliminary Approval Order, and other relevant documents. *See* Ewashko Decl. ¶ 15. That website became operational on October 18, 2023. *Id*. Lead Counsel also made copies of the Notice and Claim Form and other documents available on its own website, www.blbglaw.com. Lead Counsel and A.B. Data have regularly monitored the settlement website to ensure that it is operating correctly. Lead Counsel and A.B. Data will continue to monitor and to update the settlement website as the settlement process continues. For example, Lead Plaintiff's papers in support of its motion for final approval of the Settlement and Lead Counsel's papers in support of its motion for attorneys' fees and litigation expenses will be made available on the website after they are filed, and any orders entered by the Court in connection with the motions will also be posted.

89. As noted above, the deadline for Settlement Class Members to file objections to the Settlement, Plan of Allocation, or Fee and Expense Application, or to request exclusion from the Class is January 25, 2024. To date, no requests for exclusion have been received, *see* Ewashko Decl. ¶ 16, and no objections to the Settlement, Plan of Allocation, or Lead Counsel's Fee and Expense Application have been received. Lead Counsel will file reply papers on or before February 8, 2024, that will address all requests for exclusion and any objections that may be received.

## IV.    ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

90. Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to be eligible to participate in the distribution of the Net Settlement Fund must submit a valid Claim Form with all required information postmarked (if mailed) or submitted online no later than February 15, 2024. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members who submit eligible claims according to the plan of allocation approved by the Court.

91. Lead Counsel consulted with Lead Plaintiff's damages expert in developing the proposed plan of allocation for the Net Settlement Fund (the "Plan of Allocation"). Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Action.

92.     The Plan of Allocation is set forth at pages 14 to 18 of the Notice.  *See* Ewashko Decl., Ex. A at pp. 14-18.  As described in the Notice, calculations under the Plan of Allocation are intended as a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.  *See* Notice ¶ 73.

93.     In developing the Plan of Allocation, Lead Plaintiff's damages expert calculated the estimated amount of artificial inflation in the per-share closing price of Splunk common stock which allegedly was proximately caused by Defendants' alleged materially false and misleading statements and omissions during the Class Period.  *See* Notice ¶ 74.  In calculating the estimated artificial inflation allegedly caused by those misrepresentations and omissions, Lead Plaintiff's damages expert considered price changes in Splunk common stock in reaction to the public disclosure that allegedly corrected the alleged misrepresentations and omissions, adjusting the price change for factors that were attributable to market or industry forces, and for non-fraud related information.  *Id*.  The estimated amount of alleged artificial inflation calculated by Lead Plaintiff's damages expert for purposes of the Plan of Allocation was $25.00 per share.  *Id.*

94.     In order to have recoverable damages in connection with purchases or acquisitions of Splunk common stock during the Class Period, disclosure of the alleged misrepresentations or omissions must be the cause of the decline in the price of the Splunk common stock.  In this case, Lead Plaintiff alleges that Defendants made false statements and omitted material facts during the Class Period (May 21, 2020 through December 2, 2020), which had the effect of artificially inflating the prices of Splunk common stock and that the artificial inflation was removed from the price of Splunk common stock as the result of the alleged corrective disclosure that occurred after the close of trading on December 2, 2020.  In order to be eligible under the Plan of Allocation, shares of Splunk common stock must have been purchased or otherwise acquired during the Class Period and held through the end of the Class Period (when the corrective disclosure occurred).

95.     Recognized Loss Amounts are calculated under the Plan of Allocation for each purchase or acquisition of Splunk common stock during the Class Period that is listed on a Claimant's Claim Form and for which adequate documentation is provided.  For shares purchased during the Class Period and sold during the Class Period, the Recognized Loss Amount is zero,

DECLARATION OF JONATHAN D. USLANER IN SUPPORT OF SETTLEMENT AND FEE MOTION

24

4:20-cv-08600-JST

because, as discussed above, those shares were not damaged by the alleged fraud. For shares purchased during the Class Period and sold during the 90-day period after the Class Period, Recognized Loss Amounts are calculated as *the least of*: (a) the amount of alleged artificial inflation in Splunk common stock ($25 per share), (b) the difference between the purchase price and the sale price; or (c) the difference between the purchase price and the average closing price of Splunk from December 3, 2020 and the date of sale. *See* Notice ¶ 77.B. For shares purchased during the Class Period and held until the end of 90-day period after the Class Period (March 2, 2021) or longer, the Recognized Loss Amount is *the lesser of*: (a) the amount of alleged artificial inflation in Splunk common stock ($25 per share), or (b) the difference between the purchase price and the average closing price of Splunk during the 90-day period ($166.17 per share). *See* Notice ¶ 77.C.

96.     The sum of a Claimant's Recognized Loss Amounts for all of his, her, or its purchases of Splunk common stock during the Class Period is the Claimant's "Recognized Claim." Notice ¶ 78. The Plan of Allocation also limits Claimants' Recognized Claim based on whether they had an overall market loss in their transactions in Splunk common stock during the Class Period. A Claimant's Recognized Claim will be limited to the amount of his, her, or its market loss in Splunk common stock transactions during the Class Period, and Claimants who have an overall market gain are not eligible for a recovery. *Id*. ¶¶ 85-86.

97.     The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. Notice ¶¶ 87-88. If an Authorized Claimant's *pro rata* distribution amount calculates to less than ten dollars, no payment will be made to that Authorized Claimant. *Id*. ¶ 89. Those funds will be included in the distribution to the Authorized Claimants whose payments exceed the ten-dollar minimum.

98.     One-hundred percent of the Net Settlement Fund will be distributed to Authorized Claimants. If any funds remain after the initial *pro rata* distribution, as a result of uncashed or returned checks or other reasons, subsequent cost-effective distributions to Authorized Claimants will be conducted. Notice ¶ 90. Only when the residual amount left for re-distribution to Settlement Class Members is so small that a further re-distribution would not be cost effective (for example,

DECLARATION OF JONATHAN D.
USLANER IN SUPPORT OF SETTLEMENT
AND FEE MOTION

25

4:20-cv-08600-JST

where the administrative costs of conducting the additional distribution would largely subsume the funds available), will those funds be donated to the *cy pres* recipient. *Id*.

99. The Plan of Allocation identifies the Investor Protection Trust as the proposed *cy pres* recipient if there are any residual funds remaining after all cost-effective distributions to Settlement Class Members have been completed. Notice ¶ 90. The Investor Protection Trust ("IPT") is a 501(c)(3) nonprofit organization devoted to investor education and support of investor protection efforts. Information about the IPT's activities, including investor education and protection programs and research on the subject of investor education, is found on the IPT's website, www.investorprotection.org.

100. The Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on damages they suffered on purchases of Splunk common stock that were attributable to the misconduct alleged in the Action. To date, no objections to the proposed Plan of Allocation have been received.

## V. THE FEE AND EXPENSE APPLICATION

101. Lead Counsel is applying to the Court on behalf of Plaintiffs' Counsel for an award of attorneys' fees of 25% of the Settlement Fund, including any interest earned, net of expenses awarded (the "Fee Application"). Lead Counsel also requests payment for expenses that Plaintiffs' Counsel incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $239,754.85.

102. The legal authorities supporting the requested fee and expenses are discussed in Lead Counsel's Fee Memorandum. As discussed in the Fee Memorandum, the 25% fee award requested is consistent with the benchmark for percentage fee awards in the Ninth Circuit, is well within the range of percentage fees typically awarded in comparable securities class actions in this Circuit and elsewhere, and is fair and reasonable in light of all the circumstances in this case.

**A.      The Fee Application**

103.      For the efforts of Plaintiffs' Counsel on behalf of the Settlement Class, Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis.[3] As discussed in the accompanying Fee Memorandum, the percentage method is the standard and appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interests of the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances. Use of the percentage method has been recognized as appropriate by the Supreme Court and Ninth Circuit for cases of this nature where an all-cash common fund has been recovered for a class.

**1.      Lead Plaintiff Has Authorized and Supports the Fee Application**

104.      Lead Plaintiff Louisiana Sheriffs is a sophisticated institutional investor that closely supervised and monitored the prosecution and settlement of this Action. *See* Declaration of Osey "Skip" McGee, Jr. on behalf of Louisiana Sheriffs ("McGee Decl."), attached hereto as Exhibit 2, at ¶ 5. Lead Plaintiff has evaluated the Fee Application and fully supports the fee requested. *See* McGee Decl. ¶ 7. Lead Plaintiff believes that proposed fee of 25% net of expenses is fair and reasonable in light of the result obtained for the Settlement Class, the amount and quality of the work performed by Plaintiffs' Counsel, and the significant litigation risk counsel faced. *Id.*

**2.      The Work Performed by Plaintiffs' Counsel**

105.      Plaintiffs' Counsel devoted substantial time to the prosecution of the Action. The work that Plaintiffs' Counsel performed in this Action included, among other things: (1) conducting an extensive investigation into the claims asserted, which included a detailed review of public documents, interviews with 240 former Splunk employees, and consultation with experts; (2) drafting the detailed Complaint; (3) researching and briefing Lead Plaintiff's opposition to Defendants' motion to dismiss; (4) researching and briefing Lead Plaintiff's motion for class certification; (5) conducting extensive fact discovery, including propounding detailed document requests to Defendants and subpoenas to third parties and obtaining and reviewing substantial

---

[3] Plaintiffs' Counsel are Lead Counsel BLB&G and Klausner, Kaufman, Jensen & Levinson ("Klausner Kaufman"), additional counsel for Lead Plaintiff Louisiana Sheriffs.

document productions; (6) successfully moving to compel Defendants to produce additional documents; and (7) engaging in extensive arm's-length settlement negotiations to achieve the Settlement, including a formal mediation session.

106.    Attached hereto as Exhibits 5A and 5B are Declarations from myself on behalf of BLB&G and from Robert D. Klausner on behalf of Klausner Kaufman in support of the motion for attorneys' fees and litigation expenses.  The first page of Exhibit 5 contains a summary chart of the hours expended and lodestar amounts for each Plaintiffs' Counsel firm, as well as a summary of each firm's litigation expenses.  Included within each supporting Declaration are schedules summarizing the hours and lodestar of each firm from the inception of the case through November 30, 2023, and a summary of Litigation Expenses, by category, and a firm resume, among other documents. Consistent with Northern District of California's Procedural Guidance for Class Action Settlements and the Court's requests of plaintiffs' counsel in *Rodman v. Safeway, Inc.*, these Declarations include detailed exhibits showing the hours worked by each of the professionals who worked on the matter, broken down by month and by 13 different substantive categories of work, and various summaries of that information, as well as biographical information for each timekeeper.  No time expended in preparing the application for fees and expenses has been included.  Lead Counsel also notes that there will not be any additional fees charged for any work by counsel following this application, notwithstanding that counsel already has and will continue to invest substantial time and effort in this case after the November 30, 2023 cut-off imposed for its lodestar submissions on this application.

107.    As set forth in Exhibit 5, Plaintiffs' Counsel collectively expended a total of 6,360.8 hours in the investigation and prosecution of the Action from its inception through November 30, 2023, for a lodestar of $3,506,218.75 at current rates, and $3,328,200.00 based on the hourly rates in effect at the time the work was performed ("historical rates").  If the Court awards Lead Counsel's litigation expenses as requested, the requested fee of 25% of the Settlement Fund, net of expenses, represents $7,440,061 (plus interest accrued at the same rate as the Settlement Fund), and therefore represents a multiplier of approximately 2.1 of Plaintiffs' Counsel's lodestar at current rates, and 2.2 at historic rates.  As discussed in further detail in the Fee Memorandum, the requested multiplier

| DECLARATION OF JONATHAN D. USLANER IN SUPPORT OF SETTLEMENT AND FEE MOTION | 28 | 4:20-cv-08600-JST |

cross-check is well within the range of multipliers typically seen in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

108.   As noted above, Exhibits 5A and 5B include charts summarizing worked performed by professionals at each Plaintiffs' Counsel firm who worked on the matter, broken down by month and by 13 different substantive categories of work.  The categories for work used (and total hours for all Plaintiffs' Counsel on each category) are set forth here:

(1)   **Investigation and Pre-Filing Case Analysis (1,351 hours):** includes time spent on the thorough investigation into the claims asserted in the Action, including reviewing the voluminous public record and identifying, contacting, and interviewing potential witnesses; initial case development; and analysis of clients' and class losses;

(2)   **Lead-Plaintiff Motion (62.7 hours):** includes time spent researching and drafting motion papers for appointment of Louisiana Sheriffs as Lead Plaintiff and BLB&G as Lead Counsel;

(3)   **Complaint (543.5 hours):** includes time incurred by Lead Counsel in researching and preparing the Complaint, including associated legal and factual research;

(4)   **Motion to Dismiss (349 hours):** includes time incurred in researching and drafting Lead Plaintiff's opposition to Defendants' motion to dismiss the Complaint, as well as related briefing on Defendants' request for judicial notice, and preparing for potential oral argument in opposition to the motion;

(5)   **Class Certification (144 hours):** includes the time spent on Lead Plaintiff's motion for class certification, including related legal research and briefing.

(6)   **Discovery Communications, Disputes & General (629.75 hours):** includes time spent on discovery correspondence, numerous meet and confers with Defendants' Counsel, preparing Lead Plaintiff's Initial Disclosure Statement under Rule 26(a), drafting and negotiating the proposed protective order, discovery disputes (including communications re same and research and briefing), and strategy and planning related to discovery efforts;

(7)   **Written/Document Discovery (2,148.2 hours):** includes the time incurred in drafting requests for production of documents and subpoenas; preparing responses and objections to requests for production of documents served on Lead Plaintiff; reviewing Lead Plaintiff's documents for production; reviewing and analyzing documents produced by Defendants and third parties; and work related to the electronic document database

(8)   **Expert Work (50.25 hours):** includes time spent communicating with experts and consultants and working on preparing expert reports;

(9) **Mediation & Settlement (688.35 hours):** includes time incurred in extended settlement negotiations with Defendants; preparing for and attending the mediation session; drafting the mediation statement; drafting and negotiating the Term Sheet and Stipulation of Settlement and related documents; and drafting Lead Plaintiff's motions for preliminary and final approval of the Settlement (but does not include any work related to Lead Counsel's motion for fees and expenses);

(10) **Case Management (157 hours):** includes time incurred in preparing status reports to the Court, *pro hac vice* motions, participating in case management conferences and status hearings, negotiating and preparing stipulations and proposed scheduling orders, and other procedural and administrative tasks not connected to one of the other substantive tasks;

(11) **Case Strategy & Analysis (89.5 hours):** includes time devoted to overall case strategy and analysis, including litigation strategy and damages issues;

(12) **Docket/News Monitoring (79.25 hours)**: includes time incurred in reviewing docket updates on the case or related cases and monitoring of news and SEC filings of Splunk or other industry news; and

(13) **Client Communications (68.3 hours):** includes time incurred in communications with Lead Plaintiff Louisiana Sheriffs, including preparing status reports and memoranda at various stages of the case.

### 3. The Experience and Standing of Lead Counsel

109. A copy of Lead Counsel BLB&G's firm resume, which includes information about the standing of the firm, is attached as Exhibit 5A-11, and brief biographical summaries for each attorney or other professional listed in Exhibit 5A, including information about their position, education, and relevant experience, is attached as Exhibit 5A-3. As demonstrated by the firm resume, BLB&G is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases. BLB&G is consistently ranked among the top plaintiffs' firms in the country. For example, in February 2019, BLB&G was named the national "Plaintiff Firm of the Year" by *Benchmark Litigation* for the fifth time since the award's inception, demonstrating its leadership in the field. In addition, ISS/Securities Class Action Services' 2022 report on the "Top 100 U.S. Class Action Settlements of All Time" shows that BLB&G has been lead or co-lead counsel in more top recoveries than any other firm in history. Further, BLB&G has taken complex cases such as this to trial, and it is among the few firms

with experience doing so on behalf of plaintiffs in securities class actions.  I believe this willingness and ability added valuable leverage in the settlement negotiations.

110.    As reflected in the Firm Resume, BLB&G is among the most experienced securities class action law firms in the country.  BLB&G served as Lead Counsel in *In re WorldCom, Inc. Securities Litigation*, No. 02-cv-3288 (S.D.N.Y.), in which settlements were obtained for the class totaling in excess of $6 billion.  BLB&G also secured a resolution of $2.43 billion for the class in *In re Bank of America Corp. Securities, Derivative & "ERISA" Litigation*, No. 09-md-2058 (S.D.N.Y.); a $1.06 billion recovery for the class in *In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation*, No. 05-cv-1151 (D.N.J.); a $1 billion recovery for the class in *In re Wells Fargo & Co. Securities Litigation*, No. 1:20-cv-04494-GHW-SN (S.D.N.Y.); and a $730 million settlement on behalf of the class in *In re Citigroup Inc. Bond Action Litigation*, No. 08-cv-9522 (S.D.N.Y.).

111.    Courts in this District and Circuit have recognized BLB&G as qualified class counsel in securities class actions.  Such examples include *In re McKesson HBOC, Inc. Securities Litigation*, No. 99-cv-20743 (N.D. Cal.), in which BLB&G recovered $1.05 billion for investors, the largest recovery in a securities class action in the Ninth Circuit; *Hefler v. Wells Fargo & Company*, No. 16-cv-5479 (N.D. Cal.), in which BLB&G recovered $480 million for investors; *In re Allergan, Inc. Proxy Violation Securities Litigation*, No. 14-cv-2004 (C.D. Cal.), in which BLB&G recovered $250 million for investors; and *In re New Century Securities Litigation*, No. 07-cv-931 (C.D. Cal.), in which BLB&G secured an approximately $125 million recovery for investors.

112.    BLB&G previously submitted to the Court (ECF Nos. 98-4, 117-4), a copy of an order issued in April 2021 in an unrelated action in this District where BLB&G served as lead counsel for a different lead plaintiff and as class counsel for a certified class.  *See SEB Inv. Mgmt. AB v. Symantec Corp.*, 2021 WL 1540996 (N.D. Cal. Apr. 20, 2021).  As reflected in that order, counsel for an unsuccessful lead plaintiff movant raised questions about BLB&G's hiring of a former employee of the lead plaintiff in that case.  Following discovery and extensive briefing, the court found that the evidence did not establish a *quid pro quo*, and allowed BLB&G to continue as class counsel.  *See id.* at *1-2.  The court required BLB&G to bring the order to the attention of courts in which BLB&G seeks appointment as class counsel, and to the decisionmaker for the proposed lead

| DECLARATION OF JONATHAN D. USLANER IN SUPPORT OF SETTLEMENT AND FEE MOTION | 31 | 4:20-cv-08600-JST |
| --- | --- | --- |

plaintiff who is selecting class counsel. *See id.* at *2. After entering that order and later in that proceeding, the court in *Symantec* granted final approval of the $70 million settlement in that action, commenting on the record that BLB&G "did a good job, so thank you for that." *SEB Inv. Mgmt. AB v. Symantec Corp.*, No. 3:18-cv-2902-WHA, slip op. at 18 (N.D. Cal. Feb. 10, 2022), EFC No. 425. Courts have repeatedly approved BLB&G as lead counsel and class counsel in securities class actions after being apprised of the *Symantec* order, including *In re Oracle Corp. Securities Litigation*, 2022 WL 1459567, at *5 (N.D. Cal. May 9, 2022), *In re Mattel, Inc. Securities Litigation*, 2021 WL 4704578, at *7 (C.D. Cal. Oct. 6, 2021), and *In re Myriad Genetics, Inc. Securities Litigation*, 2021 WL 5882259, at *13 (D. Utah Dec. 13, 2021).

**4.      Standing and Caliber of Defendants' Counsel**

113.    The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Defendants were represented in the Action by a team of extremely able counsel from Sidley Austin LLP, who vigorously litigated the Action. In the face of this skillful and well-financed opposition, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade Defendants and their counsel to settle the case on terms that are highly favorable to the Settlement Class.

**5.      The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases**

114.    The prosecution of these claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Lead Counsel in bringing this Action to a successful conclusion are described above. The risks assumed by Lead Counsel here, and the time and expenses incurred by Lead Counsel without any payment, were extensive.

115.    From the outset, Lead Counsel understood that it was embarking on a complex, expensive, lengthy, and hard-fought litigation with no guarantee of ever being compensated for the substantial investment of time and the outlay of money that the prosecution of the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources (in terms of attorney and support staff time) were dedicated to the litigation, and that Lead Counsel would further advance all of the costs necessary to pursue the case vigorously on a fully contingent

basis, including funds to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case such as this typically demands.  Because complex shareholder litigation often proceeds for several years before reaching a conclusion, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Lead Counsel has received no compensation during the course of this Action and no reimbursement of any out-of-pocket expenses.

116.    Lead Counsel also bore the risk that no recovery would be achieved in the Action.  As discussed above, this case presented a number of significant trial risks and uncertainties from the outset, including challenges in proving the materiality and falsity of Defendants' statements, establishing scienter, and establishing loss causation and damages.  These risks were elevated in this case.  Defendants vigorously denied making any false statements and denied that the price decline at issue was caused by revelation of the truth related to the challenged statements.  Moreover, Splunk never restated any of its financial statements and there was no parallel SEC enforcement action or any criminal prosecution here concerning the claims asserted.

117.    The Settlement was reached only after Lead Counsel had overcome Defendants' motion to dismiss, engaged in substantial discovery, and filed Lead Plaintiff's motion for class certification.  Lead Counsel's persistent efforts in the face of significant risks and uncertainties have resulted in a significant and certain recovery for the Settlement Class.

### 6.    The Reaction of the Settlement Class to the Fee Application

118.    As noted above, as of December 7, 2023, over 291,000 Notice Packets had been sent to potential Settlement Class Members advising them that Lead Counsel would apply for attorneys' fees in an amount not to exceed 25% of the Settlement Fund.  *See* Ewashko Decl. ¶ 9 and Ex. A (Notice ¶¶ 5, 54).  In addition, the Court-approved Summary Notice was published in *The Wall Street Journal* and transmitted over the *PR Newswire* on October 31, 2023.  *See* Ewashko Decl. ¶ 12.  To date, no objections to the request for attorneys' fees have been received.

**B.    The Expense Application**

119.    Lead Counsel also seeks payment from the Settlement Fund of $239,754.85 in litigation expenses that it reasonably incurred in connection with commencing, litigating and settling the claims asserted in the Action.

120.    From the outset of the Action, Lead Counsel has been aware that they might not recover any of the expenses they incurred, and, further, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years.  Lead Counsel also understood that, even assuming that the case was ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action, and that any attorneys' fee percentage awarded to Lead Counsel would be net of any awarded expenses.  Consequently, Lead Counsel was motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

121.    As set forth in Exhibit 5A-7 hereto, Lead Counsel has paid or incurred a total of $239,754.85 in litigation expenses in connection with the prosecution of the Action.  These expense items are billed separately by Lead Counsel, and such charges are not duplicated in Lead Counsel's hourly rates.

122.    Of the total amount of expenses, $170,367.00, or approximately 71%, was expended for the retention of experts and consultants.  As discussed above, Lead Counsel consulted with a well-qualified expert in market efficiency, loss causation, and damages during its investigation and the preparation of the Complaint; in connection with Lead Plaintiff's motion for class certification (which was supported by an expert declaration); during the settlement negotiations with Defendants, and in connection with the development of the proposed Plan of Allocation.

123.    Another large component of the litigation expenses was for online legal and factual research, which was necessary to prepare the Complaint, research the law pertaining to the claims asserted in the Action, oppose Defendants' motion to dismiss, and prepare Lead Plaintiff's class certification motion and mediation submissions.  The charges for on-line research amounted to $47,249.82 or 20% of the total amount of expenses.

| DECLARATION OF JONATHAN D. USLANER IN SUPPORT OF SETTLEMENT AND FEE MOTION | 34 | 4:20-cv-08600-JST |
| --- | --- | --- |

124.     The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, document management costs, court fees, long distance telephone charges, and postage and delivery expenses.

125.     All of the litigation expenses incurred by Plaintiffs' Counsel were reasonable and necessary to the successful litigation of the Action, and have been approved by Lead Plaintiff.  *See* McGee Decl. ¶ 8.

126.     The amount requested for Plaintiff's Counsel's expenses, $239,754.85, is below the $325,000 that Settlement Class Members were advised could be sought in the Notice.  To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.

127.     Attached in Exhibit 6 hereto are true and correct copies of the following documents cited in the Fee Memorandum:

Ex. 6A     NERA ECONOMIC CONSULTING, RECENT TRENDS IN SECURITIES CLASS ACTION LITIGATION: 2022 FULL-YEAR REVIEW (2023)

Ex. 6B     *In re Diamond Sports Grp., LLC*, Case No. 23-90116 (CML), Sixth Monthly Fee Statement of Paul, Weiss, Rifkind, Wharton & Garrison LLP (Bankr. S.D. Tex. Oct. 24, 2023), ECF No. 1310 (excerpt)

Ex. 6C     *In re RML, LLC*, Case No. 22-10784 (SDJ), Third Interim & Final Fee Application of Paul, Weiss, Rifkind, Wharton & Garrison LLP (Bankr. S.D.N.Y. June 15, 2023), ECF No. 163 (excerpt)

Ex. 6D     *In re AppHarvest Prods. LLC*, Case No. 23-90745 (CM), First & Final Fee Application of Sidley Austin LLP (Bankr. S.D. Tex. Oct. 27, 2023), ECF No. 611 (excerpt)

Ex. 6E     *In re Tricida, Inc.*, Case No. 23-10024 (JTD), Fifth Monthly & Final Fee Application of Sidley Austin LLP (Bankr. D. Del. June 21, 2023), ECF No. 560 (excerpt)

## VI.     CONCLUSION

128.     For all the reasons set forth above, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  Lead Counsel further submits that the requested fee in the amount of 25% of the Settlement Fund net of expenses should be approved as fair and reasonable, and the request for total Litigation Expenses in the amount of $239,754.85, should also be approved.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed on December 7, 2023.

/s/ Jonathan D. Uslaner
Jonathan D. Uslaner

#3376225