**BERNSTEIN LITOWITZ BERGER**
    **& GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com
Caitlin C. Bozman (Bar No. 343721)
caitlin.bozman@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3481

*Lead Counsel for Lead Plaintiff Louisiana
Sheriffs' Pension & Relief Fund and the Settlement
Class*

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE SPLUNK INC. SECURITIES LITIGATION | Case No. 4:20-cv-08600-JST |
| | **DECLARATION OF JACK EWASHKO IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR MOTION FOR APPROVAL OF DISTRIBUTION PLAN** |
| | Judge: Hon. Jon S. Tigar |
| | Courtroom: 6 |

DECLARATION OF JACK EWASHKO                                    4:20-cv-08600-JST

I, JACK EWASHKO, declare as follows:

1. I am a Director of Case Management of A.B. Data, Ltd.'s Class Action Administration Company ("A.B. Data"), which has its corporate office in Milwaukee, Wisconsin. I am over 21 years of age and am not a party to the above-captioned action ("Action"). [1] I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently thereto.

2. Pursuant to the Court's October 2, 2023 Corrected Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice (ECF No. 134) ("Preliminary Approval Order"), A.B. Data was retained by Lead Counsel to serve as the Claims Administrator in connection with the Settlement of the Action. As Claims Administrator, A.B. Data has, among other things: (i) mailed the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses ("Notice") and the Proof of Claim and Release Form ("Claim Form" and together with the Notice the "Notice Packet") to potential Settlement Class Members, brokers, and other nominees; (ii) created and continues to maintain a toll-free helpline for inquiries during the course of the administration; (iii) created and continues to maintain a website for the Settlement ("Settlement Website") and posted case-specific documents on it; (iv) caused the Summary Notice to be published; (v) provided, upon request, additional copies of the Notice Packet to potential Settlement Class Members, brokers, and other nominees; and (vi) received and processed each Claim Form received by the Claims Administrator (a "Claim").

3. On March 4, 2024, the Court entered the Order Granting Lead Plaintiff's Motion for Final Approval of Settlement (ECF No. 142). A.B. Data has completed processing all Claims received through July 10, 2024, in accordance with the terms of the Stipulation and the Court-approved Plan of Allocation set forth in the Notice, and hereby submits its administrative determinations accepting and rejecting the Claims in preparation for a distribution of the Net

---

[1] All terms with initial capitalization not otherwise defined herein shall have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated as of January 30, 2023 (ECF No. 117-1) ("Stipulation"). The Settlement is contained in the Stipulation.

DECLARATION OF JACK EWASHKO          1          4:20-CV-08600-JST

Settlement Fund to Authorized Claimants. A.B. Data also presents this declaration in support of Lead Plaintiff's [Unopposed] Motion for Approval of Distribution Plan.

## DISSEMINATION OF NOTICE

4.    As more fully described in the Declaration of Jack Ewashko Regarding: (I) Mailing of Notice and Claim Form; (II) Publication of the Summary Notice; and (III) Report on Requests for Exclusion Received to Date (ECF No. 138-4) ("Mailing Decl.") and the Supplemental Declaration of Jack Ewashko Regarding: (I) Mailing of the Notice and Claim Form and (II) Report on Requests for Exclusion Received (ECF No. 139 -1) ("Supp. Mailing Decl."), through February 8, 2024, A.B. Data had mailed 298,753 Notice Packets to potential Settlement Class Members, brokers, and other nominees. Supp. Mailing Decl. ¶ 2.  Following February 8, 2024, no additional Notice Packets were mailed.

5.    A.B. Data established and continues to maintain the Settlement Website (www.SplunkSecuritiesLitigation.com) and a toll-free telephone helpline (877-388-1755) to assist potential Settlement Class Members. The Settlement Website, which provides access to important documents relevant to the Settlement, and the telephone helpline enables Settlement Class Members to obtain information about the Settlement. In connection with establishing and maintaining the Settlement Website and toll-free telephone helpline, A.B. Data, among other things, formulated a system to ensure that proper responses were provided to all telephone and electronic inquiries. That work included training telephone agents to respond to inquiries specific to the Settlement; developing a series of common questions and the answers thereto known as Frequently Asked Questions or "FAQs"; loading key documents onto the Settlement Website; and programming the Settlement Website to permit the viewing and downloading of those documents.

6.    In accordance with paragraph 8(d) of the Preliminary Approval Order, on October 31, 2023, A.B. Data caused the Summary Notice to be published in *The Wall Street Journal* and released via *PR Newswire*. Mailing Decl. ¶ 12.

## PROCEDURES FOLLOWED IN PROCESSING CLAIMS

7.    Under the terms of the Preliminary Approval Order and as set forth in the Notice, each Settlement Class Member who wished to be eligible to receive a distribution from the Net

Settlement Fund was required to complete and submit to A.B. Data a properly executed Claim Form postmarked (if mailed) or online no later than February 15, 2024, together with adequate supporting documentation for the transactions and holdings reported in the Claim Form. Through July 10, 2024, A.B. Data has received and fully processed 154,449 Claims ("Presented Claims").

8.    In preparation for receiving and processing Claims, A.B. Data: (i) conferred with Lead Counsel to define the guidelines for processing Claims; (ii) created a unique database to store Claim details, images of Claims, and supporting documentation ("Settlement Database"); (iii) trained staff in the specifics of the Settlement so that Claims would be properly processed; (iv) formulated a system so that telephone and email inquiries would be properly responded to; (v) developed various computer programs and screens for entry of Settlement Class Members' identifying information and their transactional information; and (vi) developed a proprietary "calculation module" that would calculate Recognized Claims pursuant to the Court-approved Plan of Allocation for the Net Settlement Fund set forth in the Notice.

9.    Settlement Class Members seeking to share in the Net Settlement Fund were directed in the Notice to submit their Claims to a post office box address specifically designated for the Settlement or to submit their Claims online through the Settlement Website. Notice Packets returned by the United States Postal Service as undeliverable were reviewed for updated addresses and, where available, updated addresses were entered into the database and Notice Packets were mailed to the updated addresses. Any correspondence received at the post office box was reviewed and, when necessary, appropriate responses were provided to the senders.

<b><u>PROCESSING CLAIMS</u></b>

**A.    Paper Claims and Claim Forms Submitted Via the Settlement Website**

10.    Of the 154,449 Presented Claims, 3,933 are Claims that were submitted on paper (1,440) or via the online filing component of the Settlement Website provided for individual investors (2,493). Once received, paper Claims were opened and prepared for scanning. This process included unfolding documents, removing staples, copying nonconforming-sized documents, and sorting documents. This manual task of preparing the paper Claims is very laborious and time intensive. Once prepared, paper Claims were scanned into the Settlement

Database together with all submitted documentation. Subsequently, each Claim was assigned a unique Claim number. Once scanned, the information from each Claim Form, including the Claimant's name, address, and account number/information from the supporting documentation, and the Claimant's purchase/acquisition transactions, sale transactions, and holdings listed on the Claim Form, was entered into the Settlement Database. Once entered into the Settlement Database, each Claim was reviewed to verify that all required information had been provided. The documentation provided by the Claimant in support of the Claim was reviewed for authenticity and compared to the information provided in the Claim to verify the Claimant's identity and the purchase/acquisition transactions, sale transactions, and holdings listed on the Claim Form.

11.    To process the transactions detailed in the Claims, A.B. Data utilized internal codes ("flags") to identify and classify deficiency or ineligibility conditions existing within those Claims. Appropriate flags were assigned to the Claims as they were processed. For example, where a Claim was submitted by a Claimant who did not have any eligible transactions in Splunk common stock during the Class Period (*e.g.*, the Claimant purchased Splunk common stock only before or after the Class Period), that Claim would receive a flag that denoted ineligibility. Similar defect flags were used to denote other ineligible conditions, such as duplicate Claims. These flags would indicate to A.B. Data that the Claimant was not eligible to receive any payment from the Net Settlement Fund with respect to that Claim unless the deficiency was cured in its entirety. Examples of conditions of ineligibility are as follows:

| | |
|---|---|
| MIDOC | Inadequate or Missing Documentation for Entire Claim |
| DUPCL | Duplicate Claim |
| NOPUR | No Eligible Purchase during the Class Period |
| MISIG | No Signature |
| NOLOS | No Recognized Claim |

12.    Because a Claim may be deficient only in part, but otherwise acceptable, A.B. Data utilized flags that were applied only to specific transactions within a Claim. For example, if a Claimant submitted a Claim with supporting documentation for all but one purchase transaction, that one transaction would receive a defect flag. The flag indicated that although the transaction

was deficient, the Claim was otherwise eligible for payment if other transactions in the Claim calculated to a Recognized Claim pursuant to the Court-approved Plan of Allocation. Thus, even if the deficiency were never cured, the Claim could still be partially accepted. Examples of transaction-specific flags are as follows:

TDOC  Missing or Inadequate Documentation for Specific Transaction

INEL  Ineligible Transaction

TRN  Transfer In/Free Receipt

## B. Electronic Claims

13. Of the 154,449 Presented Claims, 150,516 were submitted electronically ("Electronic Claims"). Electronic Claims are typically submitted by institutional investors who may have hundreds or thousands of transactions during the Class Period or by filers submitting Claims on behalf of multiple beneficial owners ("Electronic Claim Filers" or "E-Claim Filers"). Rather than provide reams of paper requiring data entry, the E-Claim Filers either mail a computer disc or electronically submit a file to A.B. Data so that A.B. Data can upload all transactions to the Settlement Database.

14. A.B. Data maintains an electronic filing operations team ("Electronic Claim Filing Team ("ECF Team")) to coordinate and supervise the receipt and handling of all Electronic Claims. In this case, the ECF Team reviewed and analyzed each electronic file to ensure that it was formatted in accordance with A.B. Data's required format and to identify any potential data issues or inconsistencies within the file. If any issues or inconsistencies arose, A.B. Data notified the filer. If the electronic file was deemed to be in an acceptable format, it was then loaded into the Settlement Database.

15. Once each electronic file was loaded, the Electronic Claims were flagged to denote any deficient or ineligible conditions that existed within them. These flags are similar to those applied to paper Claims. In lieu of manually applying flags, the ECF Team performed programmatic reviews on Electronic Claims to identify deficient and ineligible conditions (such as, but not limited to, price out-of-range issues, out-of-balance conditions, transactions outside the Class Period, etc.). The output was thoroughly verified and confirmed as accurate.

DECLARATION OF JACK EWASHKO    5    4:20-cv-08600-JST

16. The review process also included flagging any Electronic Claims that were not accompanied by a signed Claim Form, which serves as a "Master Proof of Claim Form" for all Claims referenced on the electronic file submitted. This process was reviewed by A.B. Data's ECF Team and, when appropriate, A.B. Data contacted the E-Claim Filers whose submissions were missing information. This ensured that only fully completed Claims, submitted by properly authorized representatives of the Claimants, were considered eligible to participate in the Settlement.

17. Finally, at the end of the process, A.B. Data performed various targeted reviews of Electronic Claims. Specifically, A.B. Data used criteria such as the calculated Recognized Claims and other identified criteria to flag and reach out to a selection of E-Claim Filers and request that various sample purchases, sales, and holdings selected by A.B. Data be documented by providing confirmation slips or other transaction-specific supporting documentation. These targeted reviews help to ensure that electronic data supplied by Claimants does not contain inaccurate information.

## EXCLUDED PERSONS

18. A.B. Data also reviewed all Claims to ensure that they were not submitted by or on behalf of "Excluded Persons" to the extent that the identities of such persons or entities were known to A.B. Data through the list of Defendants and other excluded persons and entities set forth in the Stipulation and the Notice and from the Claimants' certifications on the Claim Forms. A.B. Data also reviewed all Claims against the list of persons who were excluded from the Settlement Class pursuant to request.

## THE DEFICIENCY PROCESS

**A.    Paper Claims and Online Claims**

19. Approximately 64% of the paper and online Claims, *i.e.*, 2,523 of the 3,933 Claim Forms submitted either as paper Claims or via the Settlement Website, were incomplete or had one or more defects or conditions of ineligibility, such as the Claim not being signed, not being properly documented, or indicating no eligible transactions in Splunk common stock during the Class Period. The "Deficiency Process," which primarily involved mailing letters to Claimants and responding to communications from Claimants by email and/or telephone, was intended to

assist Claimants in properly completing their otherwise deficient submissions so that they could be eligible to participate in the Settlement.

20. If paper and online Claims were determined to be defective, a Notice of Rejection of Claim ("Deficiency Letter") was sent to the Claimants describing the defect(s) in the Claims and what steps, if any, were necessary to cure the defect(s) in these Claims. The Deficiency Letter advised Claimants that submission of appropriate information and/or documentary evidence to complete the Claim had to be sent within twenty (20) days from the date of the Deficiency Letter or the Claim would be recommended for rejection to the extent that the deficiency or condition of ineligibility was not cured. The Deficiency Letter also advised Claimants of their right to contest these administrative determinations, and that Claimants were required to submit written statements to A.B. Data requesting Court review of their Claims and setting forth the basis for such requests. A.B. Data sent a total of 3,106 Deficiency Letters to Claimants who submitted paper or online Claims that A.B. Data determined to be defective. It is possible for a Claimant to be sent more than one Deficiency Letter for a Claim and thus the number of Deficiency Letters sent would exceed the number of deficient Claims discussed above in paragraph 19. Attached hereto as Exhibit A is an example of a Deficiency Letter.

21. Claimants' responses to Deficiency Letters were scanned into the Settlement Database and associated with the corresponding Claims. The responses were then carefully reviewed and evaluated by A.B. Data's team of processors. If a Claimant's response corrected the defect(s) in a Claim, A.B. Data manually updated the Settlement Database to reflect the changes in the status of the Claim.

**B.     Electronic Claims**

22. For Electronic Claims, A.B. Data used the following process to contact the banks, brokers, nominees, and other E-Claim Filers to confirm receipt of their submissions and to notify the Electronic Claim Filers of any deficiencies or Electronic Claims that were ineligible. Each E-Claim Filer was sent an email to the email address included with the Claim Form(s) ("Status Email") with an attached Electronic Filer Status Spreadsheet, which contained detailed

information associated with the Claim(s) and indicated which Claim(s) within the filing were deficient and/or rejected ("Status Spreadsheet").

23.    The Status Email sent to the email address of record provided with the Claim Form:

(a)    Notified the filer that any Claims with deficiencies not corrected within twenty (20) days from the date of the Status Email may be rejected;

(b)    Advised the filer of the right to contest the rejection of the Claim(s) and request this Court's review of A.B. Data's administrative determination within twenty (20) days from the date of the Status Email; and

(c)    Provided the filer with instructions for how to submit corrections.

24.    The Status Spreadsheet attached to the Status Email contained the following information:

(a)    A listing of all Electronic Claims associated with the filing and their unique identification numbers;

(b)    Identification of individual Electronic Claims that were found to be deficient or ineligible;

(c)    Each Electronic Claim's current status in the Settlement Database; and

(d)    The current Recognized Claim calculation associated with each Electronic Claim.

25.    A.B. Data emailed a Status Email and Status Spreadsheet to 187 E-Claim Filers. Examples of a Status Email and Status Spreadsheet are attached hereto as Exhibits B and C, respectively.

26.    The E-Claim Filers' responses were reviewed by A.B. Data's ECF Team, scanned and/or loaded into the Settlement Database, and associated with the corresponding Electronic Claims. If a response corrected the defect(s) or affected an Electronic Claim's status, A.B. Data manually and/or programmatically updated the database to reflect such change in status of the Electronic Claim.

DECLARATION OF JACK EWASHKO            8            4:20-CV-08600-JST

**C.      Calling Campaign to Claimants Who Did Not Cure Deficiencies**

27.      After responses to the Deficiency Letters and Status Emails were received and evaluated, and the Claims updated, A.B. Data called Claimants with still-deficient Claims to provide them with a final opportunity to cure the deficiencies in their Claims.

28.      During this calling campaign, A.B. Data's agents explained to contacted Claimants that their Claims remained deficient, advised Claimants of the steps required to cure the deficiencies, and provided assistance to Claimants where possible, depending on the nature of the deficiency. For example, if a Claimant needed additional supporting documentation, A.B. Data explained the types of documentation that would render the Claim eligible and how the Claimant could obtain the necessary documentation. A.B. Data also provided some Claimants with direct phone numbers and email addresses so that Claimants could receive continued personalized attention and assistance.

29.      If A.B. Data could not reach a Claimant to speak one-on-one, A.B. Data left a voice message, when possible, requesting a return call. A.B. Data explained in the voice message that it was calling to assist the Claimant in remedying outstanding deficiencies in the Claim. A.B. Data also reached out to Claimants via email if a valid email address was provided in their Claim submission.

30.      If, in response to a telephone call or email, a Claimant cured the deficiency in a Claim by providing the appropriate information and/or supporting documentation, A.B. Data updated the Settlement Database to reflect the change in the status of the Claim.

## NO DISPUTED CLAIMS

31.      As noted above, Claimants were advised that they had the right to contest A.B. Data's administrative determination of deficiencies or ineligibility within twenty (20) days from the date of notification and that they could request that the dispute be submitted to the Court for review. More specifically, Claimants were advised in the Deficiency Letter or Status Email that, if they disputed A.B. Data's determination, they had to provide a statement of reasons indicating the grounds for contesting the determination, along with supporting documentation, and if the

dispute concerning the Claim could not otherwise be resolved, Lead Counsel would thereafter present the request for review to the Court for a final determination.

32.     A.B. Data received eleven (11) requests for Court review. To resolve these disputes without necessitating the Court's intervention, A.B. Data reached out to each Claimant requesting Court review and attempted to answer all questions, fully explain A.B. Data's administrative determination of the Claim's status, and facilitate the submission of missing information or documentation where applicable. As a result of these efforts, all eleven (11) Claimants resolved their deficiencies, and their Claims are now recommended for approval. There are, therefore, no disputed Claims requiring Court review.

## LATE BUT OTHERWISE ELIGIBLE CLAIMS

33.     Of the 154,449 Presented Claims, 42,320 Claims were received or postmarked after February 15, 2024, the Claim submission deadline established by the Court. A.B. Data processed all late Claims received through July 10, 2024, and 28,467 late Claims have been found to be otherwise eligible in whole or in part ("Late But Otherwise Eligible Claims"). A.B. Data has not rejected any Claim received through July 10, 2024, solely based on its late submission, and A.B. Data believes no delay has resulted from the provisional acceptance of these Late But Otherwise Eligible Claims. To the extent they are eligible but for the fact that they were late, they are recommended for payment.

34.     However, there must be a final cut-off date after which no more Claims will be accepted so that there may be a proportional allocation of the Net Settlement Fund and the distribution may be accomplished. Acceptance of additional Claims or responses received during the finalization of the administration and the preparation of this declaration would necessarily require a delay in the distribution. Accordingly, A.B. Data also respectfully requests that this Court order that no Claim received after July 10, 2024, or Claim cured or adjusted after July 10, 2024, 2024, be eligible for payment for any reason whatsoever subject only to the provision of paragraph 43(f) of the proposed distribution plan discussed below. If the Court adopts the proposed distribution plan, then, after Lead Counsel has determined that further distributions are not cost-effective and before any contribution of the residual funds to charity, if sufficient funds remain to

warrant the processing of Claims received after July 10, 2024, these Claims will be processed and, if any would have been eligible if timely received, these Claimants may be paid their distribution amounts, to the extent permitted by the amount of remaining funds, on a *pro rata* basis that would bring them into parity with other Authorized Claimants who have cashed all their prior distribution checks. *See* ¶ 43(f) below. With respect to previously submitted Claims that are cured or adjusted after July 10, 2024, such Claims will be reevaluated upon receipt of the adjustment and, to the extent that they are found eligible for a distribution or additional distribution, they will be treated in the same manner as Claims received after July 10, 2024. However, should an adjustment result in a lower Recognized Claim amount, the Recognized Claim amount will be reduced accordingly prior to a distribution to that Claimant.

## QUALITY ASSURANCE

35.    An integral part of the claims administration process is the Quality Assurance review. Throughout the administration process, A.B. Data's Quality Assurance Department worked to verify that Claims were processed properly by ensuring that information was entered correctly into the database, deficiency and/or rejection flags were assigned accurately, and deficiency and/or rejection notifications were sent appropriately. After all Claims were processed, deficiency and/or rejection notifications were sent, and Claimants' responses to the deficiency and/or rejection notifications were reviewed and processed, the supervisors and managers in A.B. Data's Quality Assurance Department performed additional Quality Assurance reviews. These final Quality Assurance reviews further ensured the correctness and completeness of all Claims processed prior to preparing this declaration and all A.B. Data's final documents in support of distribution of the Net Settlement Fund. As part of the Quality Assurance reviews, A.B. Data:

(a)    Verified that all Claim Forms had signatures of authorized individuals;

(b)    Verified that true duplicate Claims were identified, verified, and rejected;

(c)    Verified that Tax Identification Numbers were provided, when applicable;

(d)    Verified that persons and entities excluded from the Settlement Class did not file Claims or their Claims were rejected upon review;

(e)    Performed a final Quality Assurance audit of Claims and all supporting documentation to ensure completeness of Claims;

(f)    Determined that Claimants requiring deficiency and/or rejection notifications were sent such notification;

(g)    Performed an audit of deficient Claims;

(h)    Performed additional review of Claims with high Recognized Claim amounts;

(i)    Audited Claims that were designated invalid;

(j)    Audited Claims with a Recognized Claim amount equal to zero;

(k)    Performed other auditing based on Claims completion requirements and the approved calculation specifications based on the Court-approved Plan of Allocation; and

(l)    Re-tested the accuracy of the Recognized Claim amount calculation program.

36.    As part of its due diligence in processing the Claims, A.B. Data conducted a Questionable Claim Filer search of all Claims submitted in connection with the Settlement. A.B. Data maintains a Questionable Claim Filer Database of known questionable filers, which contains names, addresses, and aliases of individuals or entities that have been investigated by government agencies for questionable claim filing, as well as names and contact information compiled from previous settlements administered by A.B. Data in which fraudulent claims were received. A.B. Data updates this Questionable Claim Filer Database on a regular basis. The Settlement Database was searched for all individuals identified in the Questionable Claim Filer Database. A.B. Data performs searches based on names, aliases, addresses, and city/zip codes. In addition, A.B. Data's claim processors are trained to identify any potentially inauthentic documentation when processing claims, including claims submitted by Claimants not previously captured in the Questionable Claim Filer Database. Processors are instructed to flag any questionable Claims and escalate them to management for review. A.B. Data's procedures did not identify any potentially fraudulent Claims necessitating further review and verification.

## RECOMMENDATIONS FOR APPROVAL AND REJECTION

37. As noted above, the number of Presented Claims in this motion is 154,449.

### A. Timely Submitted and Valid Claims

38. A total of 112,129 Claims were received or postmarked on or before February 15, 2024, the Court-approved Claim submission deadline, of which 17,444 Claims were determined by A.B. Data to be eligible to participate in the Settlement and are recommended for approval ("Timely Eligible Claims"). The total Recognized Claim amount for these Timely Eligible Claims is $503,654,761.33.

### B. Late But Otherwise Eligible Claims

39. A total of 42,320 Claims were received or postmarked after February 15, 2024, the Court-approved Claim submission deadline, but received on or before July 10, 2024. Of those 42,320 late Claims, 28,467 were determined by A.B. Data to be otherwise eligible and are recommended for approval ("Late But Otherwise Eligible Claims"). The total Recognized Claim amount for these Late But Otherwise Eligible Claims is $83,877,132.40.

### C. Rejected Claims

40. After the responses to Deficiency Letters and Status Emails were processed, a total of 108,538 Claims remain recommended for rejection by the Court ("Rejected Claims") for the following reasons:

    (a) 59,358 Claims Had No Purchase(s) of Splunk Common Stock During the Class Period;

    (b) 12,379 Claims Did Not Result in a Recognized Claim;

    (c) 36,790 Duplicate or Replaced Claims; and

    (d) 11 Claims Withdrawn.

### D. Lists of All Presented Claims

41. Attached hereto as Exhibits D through G are listings of all the Presented Claims:

    (a) Exhibit D lists the Timely Eligible Claims and shows each Claimant's Recognized Claim;

(b)   Exhibit E lists the Late But Otherwise Eligible Claims and shows each Claimant's Recognized Claim; and

(c)   Exhibit F lists the Rejected Claims and the reasons for rejection.

**FEES AND DISBURSEMENTS**

42.   A.B. Data agreed to be the Claims Administrator in exchange for payment of its fees and out-of-pocket expenses. Lead Counsel received reports on and invoices for the work A.B. Data performed with respect to the provision of notice and administration of the Settlement. Attached hereto as Exhibit G are copies of A.B. Data's invoices for its work performed on behalf of the Settlement Class as well as an estimate for the work that will be performed and the costs that will be incurred in connection with the initial distribution of the Net Settlement Fund. Should the estimate of fees and expenses to conduct the initial distribution of the Net Settlement Fund exceed the actual cost, the excess will be returned to the Net Settlement Fund and will be available for subsequent distribution to Authorized Claimants. As set forth in these invoices, A.B. Data's total fees and expenses for this matter through July 11, 2024, are $805,309.49. A.B. Data anticipates that its fees and expenses for the work performed in conjunction with the initial distribution of the Net Settlement Fund will be $29,759.32.  To date A.B. Data has been reimbursed in the amount of $350,000. Accordingly, there is an outstanding balance of $485,068.81 payable to A.B. Data from the Settlement Fund, which includes the estimate for completing the initial distribution.

**DISTRIBUTION PLAN FOR THE NET SETTLEMENT FUND**

43.   Should the Court concur with A.B. Data's determinations concerning the provisionally accepted and rejected Claims, including the Late But Otherwise Eligible Claims, A.B. Data recommends the following distribution plan ("Distribution Plan"):

(a)   A.B. Data will distribute 100% of the Net Settlement Fund, after deducting all payments approved by the Court, and after payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees (the "Distribution"), as follows:

(1)    In accordance with the Court-approved Plan of Allocation, A.B. Data will calculate each Authorized Claimant's *pro rata* share of the Net Settlement Fund based on the amount of the Authorized Claimant's Recognized Claim in comparison to the total Recognized Claims of all Authorized Claimants. *See* Notice ¶ 87.

(2)    A.B. Data will, pursuant to the terms of the Plan of Allocation, eliminate from the Distribution any Authorized Claimant whose *pro rata* share calculates to less than $10.00. *See id*. ¶ 90. These Claimants will not receive any payment from the Net Settlement Fund and will be so notified by A.B. Data.

(3)    After eliminating Claimants who would have received less than $10.00, A.B. Data will recalculate the *pro rata* share of the Net Settlement Fund for Authorized Claimants who would have received $10.00 or more. A "Distribution Amount" will be calculated for each of these Authorized Claimants, which shall be the Authorized Claimant's Recognized Claim divided by the total Recognized Claims of all Authorized Claimants who would have received $10.00 or more, multiplied by the total amount in the Net Settlement Fund. *See id*. ¶ 87.

(b)    To encourage Authorized Claimants to deposit their payments promptly, all distribution checks will bear a notation: "CASH PROMPTLY. VOID AND SUBJECT TO REDISTRIBUTION IF NOT CASHED BY [DATE 90 DAYS AFTER ISSUE DATE]." For Authorized Claimants whose checks are returned as undeliverable, A.B. Data will endeavor to locate new addresses through reasonable methods. Where a new address is located, A.B. Data will update the Settlement Database accordingly and reissue a distribution check to the Authorized Claimant at the new address. In the event a distribution check is lost or damaged or otherwise requires

reissuance, A.B. Data will issue replacements. Distribution reissues will be undertaken only upon written instructions from the Authorized Claimant, provided that the Authorized Claimant returns the previous check where appropriate. For all checks, A.B. Data will void the initial payment prior to reissuing a payment. In order not to delay further distributions to Authorized Claimants who have timely cashed their checks, A.B. Data's outreach program shall end thirty (30) days after the initial void date. Authorized Claimants will be informed that, if they do not cash their Distribution checks within ninety (90) days of the mail date, or they do not cash check reissues within thirty (30) days of the mailing of such reissued check, their check will lapse, their entitlement to recovery will be irrevocably forfeited, and the funds will be reallocated to other Authorized Claimants. Reissue requests for lost or damaged checks will be granted after the void date on the checks as long as the request for the reissue is received no later than forty-five (45) days prior to the next planned distribution. Requests for reissued checks in connection with any subsequent distributions (should such distributions occur) will be handled in the same manner.

(c) Authorized Claimants who do not cash their Distribution checks within the time allotted or on the conditions set forth above will irrevocably forfeit all recovery from the Settlement. The funds allocated to all such stale-dated checks will be available for distribution to other Authorized Claimants if Lead Counsel, in consultation with A.B. Data, determines that it is cost-effective to conduct a second distribution. Similarly, Authorized Claimants who do not cash their second or subsequent distribution checks, should such distributions occur, within the time allotted or on the conditions set forth above will irrevocably forfeit any further recovery from the Net Settlement Fund.

(d)     Consistent with the Court-approved Plan of Allocation, after A.B. Data has made reasonable and diligent efforts to have Authorized Claimants cash their Distribution checks, which efforts shall consist of the follow-up efforts described above, but not earlier than seven (7) months after the Distribution, A.B. Data will, if Lead Counsel, in consultation with A.B. Data, determines that it is cost-effective to do so, conduct a second distribution of the Net Settlement Fund ("Second Distribution"). *See id*. ¶ 90. Any amounts remaining in the Net Settlement Fund after the Distribution, including from the funds allocated for all void stale-dated checks, after deducting A.B. Data's unpaid fees and expenses incurred in connection with administering the Settlement, including A.B. Data's estimated costs of the Second Distribution, and after deducting the payment of any estimated taxes, the costs of preparing appropriate tax returns, any escrow fees, and appropriate reserves, will be distributed to all Authorized Claimants in the Distribution who cashed their Distribution checks and who would receive at least $10.00 in the Second Distribution based on their *pro rata* share of the remaining funds. *See id*. Additional distributions, after deduction of costs and expenses as described above and subject to the same conditions, may occur thereafter at six-month intervals until Lead Counsel, in consultation with A.B. Data, determines that further distribution is not cost-effective. *See id*.

(e)     At such time as Lead Counsel, in consultation with A.B. Data, determines that further distribution of the funds remaining in the Net Settlement Fund is not cost-effective, if sufficient funds remain to warrant the processing of Claims received after July 10, 2024, those Claims will be processed, and any otherwise valid Claims received after July 10, 2024, as well as any earlier-received Claims for which an adjustment was received after July 10, 2024, that resulted in an increased Recognized Claim, will be paid in accordance with subparagraph (f) below. If any funds remain in the Net

Settlement Fund after payment of these late or late-adjusted Claims, the remaining balance of the Net Settlement Fund, after payment of any unpaid fees or expenses incurred in connection with administering the Net Settlement Fund and after the payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, will be contributed to the Investor Protection Trust, a non-sectarian, not-for-profit 501(c)(3) organization. *See id.*

(f)    No new Claims may be accepted after July 10, 2024, and no further adjustments to Claims received on or before July 10, 2024, that would result in an increased Recognized Claim may be made for any reason after July 10, 2024, subject to the following exception. If Claims are received or modified after July 10, 2024, that would have been eligible for payment or additional payment under the Plan of Allocation if timely received, then at the time that Lead Counsel, in consultation with A.B. Data, determines that an additional distribution is not cost-effective as provided in subparagraph (e) above, and after payment of any unpaid fees or expenses incurred in connection with administering the Net Settlement Fund and after deducting the payment of any estimated taxes, the costs of preparing appropriate tax returns, and any escrow fees, such Claimants, at the discretion of Lead Counsel and to the extent possible, may be paid the distribution amounts or additional distribution amounts on a *pro rata* basis that would bring them into parity with other Authorized Claimants who have cashed all their prior distribution checks.

(g)    Unless otherwise ordered by the Court, A.B. Data may destroy the paper copies of the Claims and all supporting documentation one (1) year after the Distribution, and one (1) year after all funds have been distributed may destroy the electronic copies of the same.

DECLARATION OF JACK EWASHKO        18        4:20-cv-08600-JST

**CONCLUSION**

44.    A.B. Data respectfully requests that the Court enter the Class Distribution Order approving its administrative determinations accepting and rejecting the Claims submitted herein and approving the proposed Distribution Plan. A.B. Data further respectfully submits that its unpaid fees and expenses and its fees and expenses expected to be incurred in connection with the Distribution, as reflected on the invoices attached hereto as Exhibit G, should be approved for payment from the Settlement Fund.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on July 22, 2024

_____
JACK EWASHKO

DECLARATION OF JACK EWASHKO              19              4:20-cv-08600-JST